—2:22-cr-00030-RFB-DJA—

1             UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,         )
                                      )   Case No. 2:22-cr-00030-RFB-DJA
5             Plaintiff,              )
                                      )   Las Vegas, Nevada
6         vs.                         )   Tuesday, May 28, 2024
                                      )   1:54 p.m. - 4:45 p.m.
7   KRISTOPHER LEE DALLMANN,(1)       )
    DOUGLAS M. COURSON,(3)            )   JURY TRIAL - DAY 1
8   FELIPE GARCIA,(4)                 )   P.M. SESSION
    JARED EDWARD JAUREQUI,(5)         )   VOLUME I
9   PETER H. HUBER,(6),               )
                                      )   *C E R T I F I E D   C O P Y*
10            Defendants.             )
    _____  )

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15         THE HONORABLE RICHARD F. BOULWARE, II,
                UNITED STATES DISTRICT JUDGE

16

17

18

19   APPEARANCES:       See Next Page

20

21

22   COURT REPORTER:      Samantha N. McNett, RMR, CRR
                          United States District Court
23                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada  89101
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

—— 2:22-cr-00030-RFB-DJA ——

1   **APPEARANCES:**

2   For the Government:

3         **JESSICA OLIVA, AUSA**
          **EDWARD VERONDA, AUSA**
4         **RICHARD ANTHONY LOPEZ, AUSA**
          U.S. ATTORNEY'S OFFICE
5         501 Las Vegas Boulevard South, Suite 1100
          Las Vegas, Nevada 89101
6         (702) 388-6268

7         and

8         **MICHAEL CHRISTIN, ESQ.**
          **CHRISTOPHER S. MERRIAM, ESQ.**
9         U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
          1301 New York Avenue, NW, Suite 600
10        Washington, DC 20530
          (202) 514-1026

11
     For Defendant Kristopher Lee Dallmann:
12
          **LARONDA R. MARTIN, ESQ.**
13        **KEVIN ANDRE TATE, ESQ.**
          **RICK MULA, ESQ.**
14        OFFICE OF THE FEDERAL PUBLIC DEFENDER
          411 E. Bonneville Avenue, Suite 250
15        Las Vegas, Nevada 89101
          (702) 388-6577
16
     For Defendant Douglas M. Courson:
17
          **PAOLA M. ARMENI, ESQ.**
18        **AUSTIN T. BARNUM, ESQ.**
          CLARK HILL
19        1700 South Pavilion Center Drive, Suite 500
          Las Vegas, Nevada 89135
20        (702) 862-8300

21   For Defendant Felipe Garcia:

22        **WILLIAM H. BROWN, ESQ.**
          **CHRISTOPHER MISHLER, ESQ.**
23        BROWN MISHLER, PLLC
          911 N. Buffalo Drive, Suite 202
24        Las Vegas, Nevada 89128
          (702) 816-2200

25

────── 2:22-cr-00030-RFB-DJA ──────

1   **APPEARANCES CONTINUED:**

2   For Defendant Jared Edward Jaurequi:

3         **RUSSELL MARSH, ESQ.**
          **SUNETHRA MURALIDHARA ESQ.**
4         WRIGHT MARSH & LEVY
          300 S. 4th Street, Suite 701
5         Las Vegas, NV 89101
          (702) 382-4004
6
    For Defendant Peter H. Huber:
7
          **KATHLEEN BLISS, ESQ.**
8         KATHLEEN BLISS LAW
          170 South Green Valley Parkway, Suite 300
9         Henderson, Nevada 89012
          (702) 318-7375
10
          and
11
          **MILAN CHATTERJEE, ESQ.**
12        MILAN'S LEGAL
          3172 N. Rainbow Boulevard, Suite 1406
13        Las Vegas, Nevada 89109
          (702) 538-3749
14
                              * * *
15

16

17

18

19

20

21

22

23

24

25

1        LAS VEGAS, NEVADA; TUESDAY, MAY 28, 2024; 1:54 P.M.

2                              --oOo--

3                       P R O C E E D I N G S

4        THE COURT:  Okay.  We're back on the record now.

5        Is there anything that we need to address before we

6   start bringing prospective jurors in?

7        (No response.)

8        THE COURT:  All right.  Let's bring back Juror Number

9   28.

10       Please come up to the podium here, please.

11       So I wanted to let you know I've heard some of the

12  things that you've said.  And I'm going to excuse you from the

13  jury, but I did want to say, I was a little concerned about

14  some of the things you said.  It sounded like you were saying

15  that clearly to get off the jury.

16       PROSPECTIVE JUROR:  That what?

17       THE COURT:  You were saying some things as if -- you

18  said them purely to get off of the jury.  It sounded, to me,

19  like you said a few things, from what I heard, that may not

20  have been completely genuine simply because you wanted to get

21  to your home in Colorado, which I appreciate.

22       I want to let you know that that's not something that

23  I look favorably upon because it affects the entire jury here.

24       PROSPECTIVE JUROR:  No, I agree.  And I was not lying

25  in anything that I said.  So I was not misrepresenting.

1          THE COURT:  Okay.  Well, I'm going to excuse you.

2   You're going to be off of the pool, but I'm going to excuse

3   you.  Just letting you know.

4          PROSPECTIVE JUROR:  Thank you.  Appreciate it.

5          THE COURT:  All right.  You're excused.

6          PROSPECTIVE JUROR:  Thank you.  Have a good day.

7          THE COURT:  So what we need to do is bring in Juror --

8   we're at Number 77.  Who's going to take that spot?

9          So we're moving you into a slot because one of the

10  jurors was excused, but I need to go ahead and ask you some of

11  the questions that were asked before.

12          Is there anything about this schedule that would make

13  it difficult for you to appear for this trial?

14          PROSPECTIVE JUROR:  So I'm a sole provider for my wife

15  and two kids.  My wife doesn't work.  And then --

16          THE COURT:  What type of work do you do and where do

17  you work?

18          PROSPECTIVE JUROR:  I'm a plant operator.  I work for

19  Desert Ready Mix.  They're a new company.  They just came into

20  town.  We actually started two weeks ago, so I'm the only

21  person in my position.  My boss is actually -- he came up from

22  Arizona to cover me today so I could be here.  So there's --

23  there's nobody else to --

24          THE COURT:  Okay.

25          PROSPECTIVE JUROR:  There's no one here to do my job.

1          THE COURT:  I'm sorry?

2          PROSPECTIVE JUROR:  There's nobody else here to do my

3  job.

4          THE COURT:  So there's no one else here to do your

5  job, you're saying, and your company just started here?

6          PROSPECTIVE JUROR:  Yeah.  Yeah.  Orientation was the

7  13th.  So two weeks ago.  We literally started two weeks ago.

8          THE COURT:  Okay.  Well, all right.  Let's see here.

9          Any objection to excusing this juror?

10          (No response.)

11          THE COURT:  All right.  Thank you, sir.  You'll be

12  excused.

13          PROSPECTIVE JUROR:  Thank you.

14          THE COURT:  78, Brandon, please.

15          Ma'am, if you could come on up, please.

16          So we excused some jurors and I wanted to ask you some

17  of the same questions, but let me start with the scheduling

18  issue.  Is there a reason, because of the scheduling, you can't

19  sit for this trial?

20          PROSPECTIVE JUROR:  Probably only because I still -- I

21  have two small children and they have daycare during the

22  summer.  But my husband and I share a car.  They go to school

23  in Henderson.  And we both work on the Strip.  So it would be

24  kind of difficult, but I could probably make it work.

25          THE COURT:  We would appreciate that.  Again, you may

1   not be selected.  So part of it is you might not be selected.

2   But, again, if there's issues that come up or people have to

3   come in a little later or leave a little earlier, we can

4   accommodate that over the course of the trial.

5           PROSPECTIVE JUROR:  Got it.

6           THE COURT:  So if we were able to do that, would that

7   work for you then?

8           PROSPECTIVE JUROR:  Ideally, yeah.  Especially because

9   I have a five-year-old and a one-year-old and, you know,

10  they're always running into stuff and just getting hurt the way

11  children are.  Especially my five-year-old.

12          So if that would be something that we could work --

13          THE COURT:  We could work with that.

14          Is there any other reason why you couldn't sit as a

15  juror in this case?

16          PROSPECTIVE JUROR:  So one of the witnesses that was

17  named, I think his name is Ryan Chase.  I actually went to

18  school with a Ryan Chase.  So I'm not sure if maybe that's the

19  same Ryan Chase, but I figured I'd let you --

20          THE COURT:  When you say you went to school, what

21  grade?

22          PROSPECTIVE JUROR:  High school.

23          THE COURT:  In high school?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  And have you spoken with this Mr. Chase

1   since then?

2           PROSPECTIVE JUROR:  I mean, through social media a

3   little bit, but not like -- we weren't very close friends.  So

4   I just figured I'd let you know.

5           THE COURT:  Have you had any interactions about this

6   case in particular?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  All right.  Because I mean, that's not a

9   common name, but that -- I don't know if it's the same person.

10          What school was it that you went to?

11          PROSPECTIVE JUROR:  This was -- I went to school -- I

12  graduated high school in 2010.  This was back in New York.  We

13  went to Renaissance High School in the Bronx.  So I --

14          THE COURT:  So you knew a Ryan Chase who lived in the

15  Bronx?

16          PROSPECTIVE JUROR:  You'd be surprised how many people

17  come to Vegas.

18          THE COURT:  Yeah.  I'm glad you said something.

19          PROSPECTIVE JUROR:  I want to make sure I'm being

20  honest.

21          THE COURT:  No.  No.  No.  I appreciate that.  Because

22  I don't know that that's necessarily the same -- would be the

23  same person.

24          PROSPECTIVE JUROR:  Yeah.

25          THE COURT:  And even if -- even if that was the case,

1   right, is there anything about that that would prevent you from

2   being fair and impartial in this case?

3           He's not a defendant in the case, you understand?

4           PROSPECTIVE JUROR:  Absolutely not, no.

5           THE COURT:  All right.  So I want you to go ahead, if

6   you could, answer the questions.  They're actually right there

7   in front of you --

8           PROSPECTIVE JUROR:  Okay.

9           THE COURT:  -- for us.

10          PROSPECTIVE JUROR:  Okay.  So one, I have -- I'm Juror

11  Number 78.

12          I've lived in Las Vegas for the last three years.

13          I currently rent my residence.

14          I currently work in VIP services for Caesars

15  Entertainment.

16          I am married.  My husband also works at the Paris.  He

17  is a chef for the Martha Stewart restaurant there.

18          We have, as I mentioned, two small children, a

19  five-year-old and a one-year-old.

20          I am currently in school to be an esthetician, but I

21  have my high school diploma.

22          I don't have any prior jury service or for any other

23  court.

24          Let's see.  No, none of this -- I guess my favorite

25  movie would probably be *The Fifth Element*.

1          My favorite books are the Harry Potter series.

2          My daily news would probably be between my husband,

3     social media, a bit of the internet --

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  -- those things.

6          I don't have any family members that are in the law

7     office or court systems.  I've had a couple of family members

8     in New York that are retired police officers, but I don't know

9     if that would play with that here.

10         I don't know anyone close that has applied for a

11    patent or copyright or a trademark.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  I have heard of Roku.  The other

14    names, I have not.

15         I do use the internet to view content for

16    entertainment.

17         I do not have a website or a blog.

18         I do not know how to write computer code.

19         I do have all the streaming services.

20         And the social media I would use is Instagram,

21    Facebook, Tik Tok a little bit.  That's about it.

22         THE COURT:  Okay.  Perfect.

23         And you remember I asked a couple questions earlier

24    on.  You wouldn't have answered "yes" to any of those questions

25    other than the knowing the witness?

1          PROSPECTIVE JUROR:  I don't think so.

2          The only thing that I don't believe you mentioned was

3  I currently just recently found out that I -- my license may be

4  suspended because of a bench warrant that I was unaware of.

5  And I tried to find out before I came in, but I wasn't able to

6  call the office because they were only open certain days of the

7  week.  So that might be another thing that may potentially not

8  allow me to sit on the jury.

9          THE COURT:  Okay.  Well, again, right now, you're not

10  aware of that being an issue, correct?

11          PROSPECTIVE JUROR:  I'm not sure, honestly.  I'd have

12  to call the department because I've been trying to reach them

13  and they've been closed.  So...

14          THE COURT:  You don't know for sure?

15          PROSPECTIVE JUROR:  I'm not sure.  Yeah, I'm not sure.

16          THE COURT:  All right.  Well, again, we may call you

17  back in to ask you some more questions, but we wanted to ask

18  those basic questions right now.  So thank you.

19          PROSPECTIVE JUROR:  No worries.

20          THE COURT:  I appreciate it.  You may step back out.

21          Juror Number 1, please.

22          If you could come up to the -- right up here to this

23  podium.  Yeah, there you go.  Come a little closer.

24          So you said you had some difficulty understanding

25  what's being said today; is that right?

––––––2:22-cr-00030-RFB-DJA––––––

1          PROSPECTIVE JUROR:  Hm?  Yes.

2          THE COURT:  You had difficulty understanding?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Is that because English is not your first

5    language or for some other reason?

6          PROSPECTIVE JUROR:  Yeah.  English my second language.

7    So I only know a little bit for my work.  And that's it.

8          THE COURT:  And that's it?

9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  So you don't understand everything that's

11    being said when we're talking in English?

12          PROSPECTIVE JUROR:  Barely.  Yeah.  Not a lot.

13          THE COURT:  All right.  Thank you.

14          Any objection to excusing Juror Number 1?

15          MR. TATE:  No objection.

16          THE COURT:  All right.  Thank you.

17          You'll be excused for today.  So you can leave.

18          PROSPECTIVE JUROR:  Thank you very much.

19          THE COURT:  All right.  Thank you.

20          79 is who I need, please.  79 will go into the Number

21    1 spot, hopefully.

22          Sir, if you could come up to the podium here.  We

23    excused one of the jurors so we're going to move you into one

24    of the slots where you may be questioned.

25          Do you remember the questions that I asked at the

2:22-cr-00030-RFB-DJA

1  beginning part of the process?

2         PROSPECTIVE JUROR:  Yeah.

3         THE COURT:  Is there anything about the -- the

4  schedule that would make it difficult for you to sit?

5         PROSPECTIVE JUROR:  I mean, just one thing.  I do

6  have, like, a little health issue going on right now and I do

7  have a procedure June 12th.  But that's it, really.

8         THE COURT:  When you say a health issue -- I'm not

9  going to ask you to elaborate in front of everyone, but is that

10 something that means on June 12th, you would be out that day?

11        PROSPECTIVE JUROR:  Yeah.

12        THE COURT:  And would you be out subsequent days after

13 that?

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  Okay.  And how many days would you be out,

16 do you know?

17        PROSPECTIVE JUROR:  Recovery may be two, three weeks.

18        THE COURT:  Okay.  Wow.

19        PROSPECTIVE JUROR:  Yeah.

20        THE COURT:  That will probably prevent you from

21 sitting on the jury.

22        So any objection to excusing Juror Number 79?

23        MR. TATE:  No, your Honor.

24        THE COURT:  All right.  And you're excused.  I

25 appreciate you letting us know that.

```
1              PROSPECTIVE JUROR:  Thank you.

2              THE COURT:  Number 80.

3         Ma'am, can you come up to the podium, please?

4              So, first, let me ask this question:  Is there

5    anything about the schedule in the case that would prevent you

6    from sitting as a juror?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Okay.  Second, you remember I asked some

9    of the questions of the other -- of the other prospective

10   jurors about -- I asked them if they'd answer "yes" to some of

11   those questions.  Do you remember that?

12             PROSPECTIVE JUROR:  Yes, I do, sir.

13             THE COURT:  Would you answer "yes" to any of the

14   questions that I asked?

15             PROSPECTIVE JUROR:  Repeat that.  I didn't understand.

16             THE COURT:  Would you have answered "yes" to any of

17   the questions that I asked?

18             So for example, is there any reason why you couldn't

19   be fair and impartial in this case?

20             PROSPECTIVE JUROR:  Yes.  Could I be?

21             THE COURT:  Could you be fair and impartial in this

22   case?

23             PROSPECTIVE JUROR:  Oh, of course.  I mean, it's no

24   reason not to.

25             THE COURT:  Okay.  Why don't we do this then.  Do you
```

1    see that list of questions right there?  Because you haven't

2    had a chance to answer those questions.  So if you could go

3    through that list starting with your juror number and give us

4    your answers, please, I would appreciate that.

5            PROSPECTIVE JUROR:  29 years.

6            THE COURT:  So 29 years.  I need you to speak directly

7    in the microphone because I know you're soft --

8            PROSPECTIVE JUROR:  29.

9            THE COURT:  29 years, you lived in the community?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  Okay.  And you own or rent your home?

12           PROSPECTIVE JUROR:  I rent.

13           THE COURT:  You rent?

14           And are you currently employed?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Where are --

17           PROSPECTIVE JUROR:  MGM property.  An MGM property,

18   Aria.

19           THE COURT:  MGM Aria?

20           And what type of work do you do?

21           PROSPECTIVE JUROR:  A linen attendant.

22           THE COURT:  And are you married?

23           PROSPECTIVE JUROR:  Single.

24           THE COURT:  Okay.  Do you have any children living

25   with you?

1          PROSPECTIVE JUROR:  No children.

2          THE COURT:  Okay.  Your highest education?

3          PROSPECTIVE JUROR:  High school graduate.

4          THE COURT:  You can keep going then.

5          PROSPECTIVE JUROR:  No, I have never been prior jury

6  service.  No.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.

10          PROSPECTIVE JUROR:  *Pelican Brief*.

11          THE COURT:  *Pelican Brief* is your favorite movie?

12          PROSPECTIVE JUROR:  One of them.

13          THE COURT:  Okay.  Your favorite book or is it the

14  same?

15          PROSPECTIVE JUROR:  John Grisham, *Firm*.

16          THE COURT:  John Grisham books, okay.

17          And where do you get your news from?

18          PROSPECTIVE JUROR:  The three major networks.

19          THE COURT:  The major networks?  The three major

20  networks?

21          PROSPECTIVE JUROR:  The major ones, yeah.

22          THE COURT:  Okay.  And do you or any family member

23  have any special training?  Do you see number 11?  Any training

24  in those areas?

25          PROSPECTIVE JUROR:  No.

1            THE COURT:  Okay.  Have you ever applied for a patent

2     or know anyone who did?

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  Or copyright?

5            PROSPECTIVE JUROR:  No.

6            THE COURT:  Okay.

7            PROSPECTIVE JUROR:  14, no.

8            THE COURT:  Okay.  13, you said no?

9            (Court reporter interruption.)

10            THE COURT:  So let's go back.  Your answer to question

11     13 would be no?

12            PROSPECTIVE JUROR:  Correct.

13            THE COURT:  Okay.  And your answer to question 14?

14            PROSPECTIVE JUROR:  It would be no.  Except for my

15     job.  That's the only time I -- I don't know how...

16            THE COURT:  Okay.  And number 15?

17            PROSPECTIVE JUROR:  No.

18            THE COURT:  Okay.  And then the answer to number 16?

19            PROSPECTIVE JUROR:  No.

20            THE COURT:  All right.  And to 17?

21            PROSPECTIVE JUROR:  No.

22            THE COURT:  No?  Okay.

23            PROSPECTIVE JUROR:  I don't know how to use the

24     internet.

25            THE COURT:  And I take it since you don't use the

———— 2:22-cr-00030-RFB-DJA ————

1   internet, you don't use any social media; is that correct?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Okay.  All right.

4           MS. MARTIN:  Your Honor, we didn't hear the

5   employment.

6           THE COURT:  Could you repeat what type of employment

7   you have again?

8           You're at Aria, you said?

9           PROSPECTIVE JUROR:  Aria, yeah, Hotel Casino.

10          THE COURT:  And you work as a linen --

11          PROSPECTIVE JUROR:  A linen attendant.

12          THE COURT:  A linen attendant?

13          PROSPECTIVE JUROR:  Uh-huh.

14          THE COURT:  Okay.  Thank you.  I'll ask you to step

15   out for a few moments.

16          PROSPECTIVE JUROR:  Thank you.

17          THE COURT:  Thank you.  Okay.

18          Juror Number 60.

19          So ma'am, I just wanted to ask you some follow-up

20   questions.

21          Okay.  So one of the questions I have -- I know that

22   you had said that you were from or grew up in Mexico; is that

23   right?

24          PROSPECTIVE JUROR:  I live in Mexico.

25          THE COURT:  You live in Mexico.  Where do you live?

—— 2:22-cr-00030-RFB-DJA ——

1          PROSPECTIVE JUROR:  Oh.  Here.

2          THE COURT:  You live here?

3          PROSPECTIVE JUROR:  Sorry.

4          THE COURT:  I'm sorry.  So is -- is English your

5    second language?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Okay.  So do you have difficulty

8    understanding what's being said out loud?

9          PROSPECTIVE JUROR:  Just sometimes.  But I understand

10   most.

11         THE COURT:  So you understand most of what's said?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  So about how much do you understand of

14   what I've said?

15         PROSPECTIVE JUROR:  Maybe 90 percent.

16         THE COURT:  90 percent?  Okay.

17         And are you able to read in English?

18         PROSPECTIVE JUROR:  Yeah.

19         THE COURT:  I'm sorry?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Yes?  Okay.  All right.  Thank you.  If

22   you could step back out for a moment, please.

23         PROSPECTIVE JUROR:  Thank you.

24         THE COURT:  So I don't know if there's an exact

25   percentage of what needs to be understood as it relates to

—2:22-cr-00030-RFB-DJA—

1   English.  Although, I don't know if even English speakers
2   understand 100 percent of what's being said because people
3   don't always listen.
4          But I'm inclined to excuse this juror for cause, as
5   well.  90 percent seem, to me, to be significantly insufficient
6   in terms of the 10 percent that might actually be of
7   significance.  I'm not sure I've said that well, but you all
8   understood what I meant.
9          I'll ask the Government:  Any reason why we shouldn't
10  excuse that juror?
11         MR. MERRIAM:  I -- just, I thought she was very
12  straightforward.  She asked follow-up questions.  She was
13  getting the points she needed to understand and I thought that
14  was a really nice analytical answer.  I wish I sometimes
15  understood 90 percent of what was going on in court, your
16  Honor.
17         So I -- I don't think she'd qualified for strike for
18  cause, but that's the Court's call.
19         THE COURT:  Okay.  I'll hear from any of the
20  defendants.
21         MR. TATE:  No objection.
22         MR. BROWN:  Yeah.  Obviously, no objection.  We --
23         THE COURT:  Well, they're saying I shouldn't actually
24  strike for cause.  So if you want to make an argument as to why
25  she should be struck for cause, now would be a time to do that.

1          MR. BROWN:  Well, a juror who admits going -- before
2     she hears any evidence that she is going to be able to
3     understand less than all of the evidence, to me, is patently
4     insufficient to deliberate and render a fair verdict.  I don't
5     know how anything else follows from that concession.

6          THE COURT:  All right.  Thank you.

7          So I'm going to excuse Number -- Juror Number 60.

8          Can you let her know that she's excused?  And we can
9     bring in Juror Number 81, please.

10         All right.  You are Juror Number 81?

11         PROSPECTIVE JUROR:  That's right.

12         THE COURT:  Okay.  So first let me ask you:  Is there
13    anything about this schedule in this trial that would make it
14    difficult for you to sit?

15         PROSPECTIVE JUROR:  Nothing that kind of jumps out at
16    me.

17         THE COURT:  Okay.  So when you heard me ask some of
18    these other individuals if they'd say "yes" to any of these
19    questions -- do you remember those questions?

20         PROSPECTIVE JUROR:  Some of the basic ones like, "Do
21    you know any of the witnesses?"

22         THE COURT:  Right.

23         PROSPECTIVE JUROR:  "Do you know anyone that's going
24    to be called in?"

25         And I can say no to all of those right in there.

---------- 2:22-cr-00030-RFB-DJA ----------

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  One that I recall was views toward

3  copyright and things of that nature if I remember correctly.

4          THE COURT:  Well, yeah, we asked -- so there's going

5  to be some specific questions.

6          PROSPECTIVE JUROR:  Sure.

7          THE COURT:  Or I guess initial questions.  Was

8  anything that you heard about this case would make it difficult

9  for you to be fair and impartial?

10          PROSPECTIVE JUROR:  There is one thing that did stand

11  out to me a little bit.

12          I do have a tendency to lean towards digital piracy in

13  the modern era.  And so I'm a little skewed in that regard.

14          THE COURT:  So can you tell me a little bit more what

15  you mean by that?  You're saying that -- when you lean towards

16  it, are you saying that you -- you think, to a certain extent,

17  certain content should be more readily available?

18          PROSPECTIVE JUROR:  Absolutely.

19          THE COURT:  And so you're saying that you don't have a

20  positive view of the -- of the copyright laws?  Is that what

21  you're saying?

22          PROSPECTIVE JUROR:  That is correct.

23          THE COURT:  If I were to direct you to put aside your

24  personal beliefs and to follow the law and do so fairly and

25  impartially, could you do that?

—————— 2:22-cr-00030-RFB-DJA ——————

1          PROSPECTIVE JUROR:  I cannot answer that with a

2   hundred percent certainty.

3          THE COURT:  Okay.  I appreciate that.

4          Any reason why we can't excuse Juror Number 81?

5          PROSPECTIVE JUROR:  I'm sorry?

6          THE COURT:  We're going to excuse you because I mean,

7   again, you have to be able to say --

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  -- it's going to be fair and impartial.

10  Otherwise, it's not fair to either side.  That's why I'm saying

11  that right now because, you know, I appreciate your honestly

12  because otherwise we won't know.  And people have strongly held

13  beliefs and that's okay.

14         So I'm going to excuse you for today.  Thank you.

15         PROSPECTIVE JUROR:  Thank you, sir.

16         THE COURT:  82.

17         You can come forward.

18         Now, I understand you're Juror Number 82, that English

19  is not your first language?

20         PROSPECTIVE JUROR:  Sorry.  I -- no -- no --

21         THE COURT:  You don't understand?

22         PROSPECTIVE JUROR:  Yeah.  Not much.  And then work a

23  lot.  I don't want to sit in.

24         THE COURT:  That's fine.

25         PROSPECTIVE JUROR:  Yeah.

———— 2:22-cr-00030-RFB-DJA ————

1              THE COURT:  Any objection to me excusing Juror Number

2     82?

3              (No response.)

4              THE COURT:  Thank you.  You can leave for the day.

5     You're excused.  You can go home now.

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  Okay?

8              PROSPECTIVE JUROR:  Maybe.

9              THE COURT:  That's fine.  Thank you.

10             PROSPECTIVE JUROR:  Thank you.

11             THE COURT:  Okay.  Juror Number 83.

12             Come on up to the podium, please.

13             Okay.  So let's start with:  Is there anything about

14    this schedule in this case that would make it difficult for you

15    to sit?

16             PROSPECTIVE JUROR:  I am a sole proprietor.  I do have

17    my own business that's very -- but I could make time.

18             THE COURT:  Okay.  I appreciate that.

19             Is there anything about this case that you've heard

20    that would make it difficult for you to be fair and impartial?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  What is that?

23             PROSPECTIVE JUROR:  My father-in-law is an

24    entertainment attorney.  He was a very prominent one.  He

25    represented Ray Charles, Gladys Knight, all the major ones, Joe

1    Fishel.

2          Also, my uncle is Irving Azoff, the CEO of

3    Ticketmaster and Giant Records and --

4          THE COURT:  But if I were to -- to direct you to be

5    fair and impartial in this case and put aside your personal

6    beliefs --

7          PROSPECTIVE JUROR:  I have a lot of -- about

8    copyright.  I've read *This Business of Music* cover to cover.

9    So it's maybe not necessarily the same, but I grew up in that

10   industry.

11         THE COURT:  So I guess what I'm trying to understand

12   is, you say you have some familiarity with copyright law.

13         PROSPECTIVE JUROR:  Lots of it.

14         THE COURT:  Okay.  And what I'm asking you is:  If I

15   were to tell you to put aside your experience and just to

16   decide this case on the facts and the law, could you do that?

17         PROSPECTIVE JUROR:  I would have difficulty doing it.

18         THE COURT:  You'd have difficulty because?

19         PROSPECTIVE JUROR:  Just because I grew up in the '70s

20   when it was very much about the copyrights and the ASCAP and

21   BMI and all of the copyright --

22         THE COURT:  Right.  But we're talking about a -- a

23   modern case.

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  And so I appreciate that if --

—— 2:22-cr-00030-RFB-DJA ——

1           PROSPECTIVE JUROR:  I'm saying --

2           (Indiscernible simultaneous crosstalk.)

3           PROSPECTIVE JUROR:  Well, I'm so steeped in it that I

4  -- it's part of my culture.

5           THE COURT:  When you're saying it's part of your

6  culture, you're saying that --

7           PROSPECTIVE JUROR:  I'm just --

8           THE COURT:  -- it would be difficult for you to put

9  that aside?

10          PROSPECTIVE JUROR:  Yes.  I believe that copyright

11  infringement is theft.

12          THE COURT:  Okay.  All right.  Just a moment, please.

13          Any reason we can't excuse this juror?

14          (No response.)

15          THE COURT:  Thank you for your time.  You'll be

16  excused.

17          Number 84.

18          Okay.  Now, is there any reason why you couldn't sit

19  as a juror in this case?

20          PROSPECTIVE JUROR:  I'm sorry?

21          THE COURT:  Is there any reason why, because of the

22  schedule, you couldn't sit as a juror in this case?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  Is there anything that you've heard

25  about this case that would make it difficult for you to be fair

2:22-cr-00030-RFB-DJA

1    and impartial?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  I'm going to ask you to answer

4    the -- there's a little -- there's a sheet there with the

5    questions.  Starting with number 1, could you answer those?

6              PROSPECTIVE JUROR:  Juror Number 84.

7              I moved to Las Vegas in 2017.

8              We own our home.

9              I'm retired.

10             THE COURT:  What was your occupation before you

11   retired?

12             PROSPECTIVE JUROR:  I used to work with the County of

13   Orange, social service --

14             THE COURT:  Okay.

15             PROSPECTIVE JUROR:  -- for five years.

16             Married.  My husband is also retired.  He's a retired

17   federal employee.

18             No minor children at home.

19             College graduate.  Bachelor of science, psychology and

20   English.

21             I've had -- I've served as a juror about 24 years ago

22   in California.  I believe it was a criminal case.  I don't

23   remember what the decision was.

24             THE COURT:  Okay.

25             PROSPECTIVE JUROR:  My favorite movie is the latest

1    movie that I watched, *The Judge*.

2          And my favorite book is the current book that I'm

3    reading, *Crying in H Mart*.

4          I get news through the internet, mostly from YouTube.

5    Don't read newspapers.

6          No family has had any special training on law, law

7    firms, patents, computers, software, streaming media,

8    development, televisions, or PayPal.

9          Number 12, no, no one.

10         I'm only familiar with Roku.

11         I do use the internet to view content for

12   entertainment.

13         No website or blog.

14         Don't know how to write -- don't know how to do

15   coding.

16         I have all -- all of these streaming services.

17         And I use Instagram and Facebook.

18         THE COURT:  Okay.  Thank you.  We'll bring you back

19   for some more questions, but thank you.

20         So those were all the jurors that I intended to call

21   back at this point in time for cause.  If you want to query the

22   others on specific questions, you can.  And so we'll bring them

23   back in order.

24         Now, the way this works is simple.  You get to ask --

25   I'll let you ask each of the jurors a couple of questions.  If

1  I think the question is improper, I'm just going to say to you,

2  "Counsel, next question."  I'm not going to explain to you why.

3  We're not going back and forth.  If I say "Next question,"

4  there's not going to be a sidebar.  We're not going to have

5  further discussion.  Just move on.

6          So you get a couple questions, two or three questions.

7  You can ask a question that's related to your theory of the

8  case or defense and I'll make a judgment call on the nature of

9  the question when it's asked.

10          Any questions about this procedure or process?

11          MR. MERRIAM:  I apologize, your Honor, but before we

12  start that, did the Court make a ruling about our decision

13  about Juror 69 about the travel conflict in June?

14          THE COURT:  Well, we need to confirm that particular

15  conflict, right?  And we can ask about that.

16          MR. MERRIAM:  Okay.  We can do that as part of the

17  process, your Honor?

18          THE COURT:  Yes.

19          MR. MERRIAM:  Okay.

20          THE COURT:  Okay.

21          MR. CHRISTIN:  Your, Honor, if I may just inquire with

22  the order of questioning just because there's a lot of

23  attorneys in the room.  I didn't know if there was a certain --

24          THE COURT:  We're going to do the same order that

25  we've done.  The only thing that will alternate is whether or

1  not the Government or defense goes first, but it will go

2  Government and then we'll start here with Mr. Brown and go

3  around as we've done each time.

4          MR. CHRISTIN:  Thank you, your Honor.

5          THE COURT:  Okay.  So let's bring in the first spot.

6  That would be Juror Number 80.

7          MS. BLISS:  Your Honor, you want us to ask questions

8  from our chairs?

9          THE COURT:  Yes, please.

10          MS. BLISS:  Thank you.

11          THE COURT:  Ma'am, if you could come forward, we're

12  going to have you seated right here in the Juror Number 1 spot.

13          Ma'am, what's going to happen now is the lawyers are

14  going to ask you a few specific questions.  Okay?  And so you

15  just answer the questions to the best of your ability.  Okay?

16          PROSPECTIVE JUROR:  Thank you.

17          THE COURT:  All right.  Mr. Christin, we'll start with

18  the Government.

19          MR. MERRIAM:  Nothing from the Government, your Honor.

20          THE COURT:  Okay.  Mr. Brown?

21          MR. BROWN:  Thank you, ma'am.  Good afternoon.

22          PROSPECTIVE JUROR:  Good afternoon.

23          MR. BROWN:  I'm just curious.  You're a linen

24  attendant at Aria; is that correct?

25          PROSPECTIVE JUROR:  Correct.

2:22-cr-00030-RFB-DJA

1          MR. BROWN:  How much do you interact with customers in

2   that job?

3          PROSPECTIVE JUROR:  Say that again, sir.

4          MR. BROWN:  How often do you interact with customers?

5   I just don't know exactly what that --

6          PROSPECTIVE JUROR:  Not with customers.  With the

7   coworkers.  We stop the GRA's carts for linen for the next day

8   of working.

9          MR. BROWN:  Okay.  Thank you.

10          THE COURT:  Mr. Marsh?  Or Ms. Muralidhara?

11          MS. MURALIDHARA:  Good afternoon.

12          PROSPECTIVE JUROR:  Good afternoon.

13          MS. MURALIDHARA:  You had mentioned that you watch all

14   major TV networks for news sources?

15          PROSPECTIVE JUROR:  Correct.

16          MS. MURALIDHARA:  Do you have a favorite one?

17          PROSPECTIVE JUROR:  No favorite.  Just a point of view

18   from all sides.

19          MS. MURALIDHARA:  And how often do you watch all three

20   of them?

21          PROSPECTIVE JUROR:  As often as I can.

22          MS. MURALIDHARA:  Thank you.

23          THE COURT:  Thank you.

24          Ms. Bliss or Mr. Chatterjee?

25          MS. BLISS:  Good afternoon.  I'm Kathleen Bliss.

2:22-cr-00030-RFB-DJA

1           PROSPECTIVE JUROR:  Good afternoon.

2           MS. BLISS:  Just kind of out of curiosity, which John

3   Grisham book is your favorite?

4           PROSPECTIVE JUROR:  My apology.  I can't hear you.

5           MS. BLISS:  I'm so sorry.  Which of the John Grisham

6   books is your personal favorite?

7           PROSPECTIVE JUROR:  Just one of them, yes.

8           MS. BLISS:  Just one of them?  *The Pelican Brief*?

9           PROSPECTIVE JUROR:  Yes.  And I watched it.  I can't

10  hear you.  I'm sorry.

11          THE COURT:  Ms. Bliss, you need to pull that

12  microphone closer.

13          MS. BLISS:  I was just asking you about *The Pelican

14  Brief*.

15          PROSPECTIVE JUROR:  Correct.

16          MS. BLISS:  What about *The Pelican Brief* makes it your

17  favorite?

18          PROSPECTIVE JUROR:  It was my favorite because, well,

19  Julia Roberts and Denzel Washington and the way that it

20  portrayed as the justice that was trying to stop the oil in

21  the -- I think it was -- I can't remember, but it was in one of

22  the southern states.  And Julia Roberts figured it all out.

23  She was just a lawyer -- beginning in college for lawyer and

24  she figured it out.  And she couldn't trust no one but Denzel

25  Washington, which was a reporter, and they worked together to

—— 2:22-cr-00030-RFB-DJA ——

1    solve the case.

2            MS. BLISS:  Thank you.

3            THE COURT:  Thank you.

4            Mr. Tate?

5            MR. TATE:  Good afternoon.  No questions.

6            THE COURT:  All right.  Ms. Armeni?

7            MS. ARMENI:  No questions.

8            THE COURT:  Okay.  All right.  Ma'am, you're excused.

9    You can step back outside.  Thank you.

10           Someone can grab that microphone from her, please?

11   Thank you.

12           Juror Number 57.

13           So, ma'am, the attorneys are just going ask you a few

14   questions.  Try to answer them to the best of your ability.

15   Okay?

16           PROSPECTIVE JUROR:  Okay.

17           THE COURT:  We'll start with the defense.  Mr. Brown?

18           MR. BROWN:  Can you -- I know you work in human

19   resources, but can you just explain to me a little bit kind of

20   what your day to day is like?

21           PROSPECTIVE JUROR:  Yes.  I do work from home.  I do

22   work for an accounting firm, a public accounting firm.  Do you

23   need to know what that is?

24           MR. BROWN:  The name doesn't matter.

25           PROSPECTIVE JUROR:  Okay.  Perfect.  I work in

1   operations, so I work on the back end of human resources.  So I
2   do work with a lot of information systems.  So I process
3   background checks.  I do I-9s.  I do orientation.  I do
4   terminations internally within our systems.  So I'm not in the
5   employee relations aspect of human resources.  I was at one
6   point, but my -- more of my day-to-day job responsibilities are
7   dealing within our -- our internal systems.
8           MR. BROWN:  That's a very thorough answer.  Nothing
9   else.  Thank you.
10          THE COURT:  Mr. Marsh?
11          MR. MARSH:  Hi.  I think you said you got most of your
12   news from social media; is that right?
13          PROSPECTIVE JUROR:  Correct.
14          MR. MARSH:  Which sources on social media?
15          PROSPECTIVE JUROR:  I usually go on YouTube or
16   Instagram for the most part.  I look at social media creators
17   like Philip DeFranco, for example.  I don't particularly do
18   traditional media just due to I like things a lot more --
19   expressed more quickly to obtain my news.
20          MR. MARSH:  Okay.  Thank you.
21          THE COURT:  Ms. Bliss?
22          MS. BLISS:  I don't think I have any questions.  Thank
23   you very much.
24          THE COURT:  Thank you.
25          PROSPECTIVE JUROR:  Thank you very much.

2:22-cr-00030-RFB-DJA

1           THE COURT:  Mr. Tate?

2           MR. TATE:  No questions.

3           THE COURT:  Ms. Armeni?

4           MS. ARMENI:  I am going to ask one question.  Thank

5    you.  Hello.

6           PROSPECTIVE JUROR:  Hi.

7           MS. ARMENI:  Ma'am, can you tell us about the fact of

8    whether a defendant testifies or doesn't testify, how that

9    would play in your mind?

10          PROSPECTIVE JUROR:  I'm so sorry.  Can you repeat that

11   one more time?

12          MS. ARMENI:  Sure.  So if the defendant -- if one of

13   the defendants testifies or doesn't testify, how would that

14   affect your opinion about the defendants in this case?

15          PROSPECTIVE JUROR:  I guess it just depends on the --

16   I guess what is -- they're being testified for exactly.  I

17   would have to assess what that would entail, what they're

18   testifying for.  I don't -- I'm so sorry.  I'm not giving the

19   complete answer on that one.

20          THE COURT:  No, I think you were giving the answer

21   that can you.

22          PROSPECTIVE JUROR:  I'm a little nervous.

23          THE COURT:  That's fine.  It's okay.

24          MS. ARMENI:  Can I ask one more follow-up question?

25          PROSPECTIVE JUROR:  Yes.

2:22-cr-00030-RFB-DJA

1          MS. ARMENI:  No reason to be nervous.

2          THE COURT:  Related to this answer?

3          MS. ARMENI:  Yes.

4          THE COURT:  Let's move on from that topic, Ms. Armeni.

5    I'm going to give instructions on that.

6          MS. ARMENI:  Okay.

7          THE COURT:  And so let's move on from there.

8          MS. ARMENI:  Okay.  And I just wanted to ask a

9    follow-up to Mr. Brown.  He had asked you about the background

10   checks.  And you said you process them?

11         PROSPECTIVE JUROR:  Correct.

12         MS. ARMENI:  Can you tell us a little bit more when

13   you process them, what does that mean?

14         PROSPECTIVE JUROR:  I do submit it to a third party

15   vendor.  Entailed of what is in the background check, I cannot

16   (unintelligible).

17         (Court reporter interruption.)

18         PROSPECTIVE JUROR:  I cannot -- we do process

19   background checks through the third party vendor.  I cannot

20   disclose the details of what is processed in those background

21   checks due to our company policy.  And I cannot disclose that

22   information.

23         MS. ARMENI:  Thank you.

24         THE COURT:  All right.  Thank you.

25         PROSPECTIVE JUROR:  Thank you.

—2:22-cr-00030-RFB-DJA—

1          THE COURT:  Number 3.

2          Sir, if you come up and sit right here.  Watch your

3     step there.

4          So the lawyers are going to ask you a few specific

5     questions.  Just try to answer to the best of your knowledge

6     and your ability.  Okay?

7          PROSPECTIVE JUROR:  Okay.

8          THE COURT:  All right.  From the Government?

9          MR. MERRIAM:  So you said that you had a role as a law

10    enforcement investigator or working with law enforcement on

11    occasion?

12         PROSPECTIVE JUROR:  I did in the past, yes.

13         MR. MERRIAM:  Can you explain a little bit more about

14    what that entails, what agencies would you work with?

15         PROSPECTIVE JUROR:  I work for MGM so I worked at

16    Bellagio specifically.  And I was an investigator at the

17    property and we did a -- a joint task force with MGM -- or I'm

18    sorry -- with Metro and the FBI for fraud.

19         MR. MERRIAM:  I'm sorry.  You said for fraud?

20         PROSPECTIVE JUROR:  For fraud.

21         MR. MERRIAM:  And you said that despite that

22    experience and your background, you could be fair and evaluate

23    the evidence in the case in front of you?

24         PROSPECTIVE JUROR:  I could, yes.

25         MR. MERRIAM:  Nothing further.

1           THE COURT:  All right.  Mr. Brown?

2           MR. BROWN:  So you were actually on a task force with

3   federal and state law enforcement?

4           PROSPECTIVE JUROR:  We worked with them.  And they

5   came to our office and we did meetings and stuff like that,

6   exactly what we were going to do.  I wasn't on the task force.

7   I just worked for MGM.

8           MR. BROWN:  Did you feel like you were part of the

9   team, though?

10          PROSPECTIVE JUROR:  Yes.

11          MR. BROWN:  And was that work pretty meaningful to

12  you?

13          PROSPECTIVE JUROR:  It was.

14          MR. BROWN:  Did you enjoy it?

15          PROSPECTIVE JUROR:  At times.

16          MR. BROWN:  Do you look back on it fondly?

17          PROSPECTIVE JUROR:  Every now and then I do, yes.

18          MR. BROWN:  Okay.

19          THE COURT:  Thank you, Mr. Brown.

20          MR. BROWN:  Thank you.

21          THE COURT:  Mr. Marsh?

22          MR. MARSH:  Is your work now different from that?

23          PROSPECTIVE JUROR:  I went from an hourly employee to

24  now I'm a salaried employee.  I'm a manager now.  So now I have

25  my own team, my own shift that I'm responsible for.

1          MR. MARSH:  Okay.  Am I correct that you told the

2     judge that you might have a problem?

3          PROSPECTIVE JUROR:  Yeah.  The -- where I work,

4     there's only three managers.  There's one for day shift,

5     there's one for swing shift, and one for night shift.  I'm

6     swing shift.  And then we have another manager above us.  He's

7     our ops manager and, basically, that's it.

8          Our department is small.  We have 15 officers per --

9     per shift.  Our responsibilities -- each manager has their own

10    responsibilities.  Right now, mine is schedules.  And I do

11    schedules weekly.  Even when I go on vacation and put in for

12    PTO, I have to have the schedules done before I go.

13          MR. MARSH:  Thank you.

14          THE COURT:  Thank you.

15          Mr. Chatterjee?

16          MR. CHATTERJEE:  Thank you.

17          Good afternoon, sir.  So in terms of the incidents

18    that you used to investigate that were fraud related, can you

19    give us some examples of the type of incidents that you would,

20    you know, investigate?

21          PROSPECTIVE JUROR:  Mostly it was credit card fraud

22    and ticket fraud.

23          MR. CHATTERJEE:  Did you do any investigations of

24    money launderings or violations of the Bank Secrecy Act or

25    anything of that nature?

```
                        2:22-cr-00030-RFB-DJA
```

1          PROSPECTIVE JUROR:  Not to my knowledge, no.

2          THE COURT:  Thank you very much.

3          Mr. Tate?

4          MR. TATE:  No questions.

5          THE COURT:  Thank you.

6          Ms. Armeni?

7          MS. ARMENI:  No questions.

8          THE COURT:  Thank you, sir.  You can step back out in

9     the gallery.  I appreciate it.

10          Number 4.

11          Sir, if you could just come forward here and we'll

12    have you seated in this first seat right there.  There you go.

13    And the lawyers are going to ask you some questions.  Just try

14    to answer questions to the best of your ability.  Okay?

15          PROSPECTIVE JUROR:  Uh-huh.

16          THE COURT:  All right.  We'll start, I think, with

17    the -- Mr. Brown, the defense.

18          MR. BROWN:  I don't believe I have any questions.

19          THE COURT:  Okay.

20          MR. BROWN:  Thank you.

21          MS. MURALIDHARA:  Hi.  Good afternoon.  I think you

22    had mentioned that you were a receiving associate?  What is

23    that?

24          PROSPECTIVE JUROR:  I work in the receiving department

25    of a retail store.  So I receive in shipments and I also will

─── 2:22-cr-00030-RFB-DJA ───

1    remove items from the shelf, pack them, and have them be

2    shipped to people's homes.

3         MS. MURALIDHARA:  Do you have any employees that work

4    below you or do you report to a supervisor?

5         PROSPECTIVE JUROR:  I report to a supervisor.

6         MS. MURALIDHARA:  Thank you.

7         THE COURT:  Thank you.

8         MS. BLISS:  No questions, your Honor.

9         THE COURT:  Mr. Tate?

10        MR. TATE:  No questions.

11        THE COURT:  Ms. Armeni?

12        MS. ARMENI:  Mr. Barnum is going to ask the questions.

13        THE COURT:  Mr. Barnum?

14        MR. BARNUM:  Good afternoon, sir.  So you said that

15   you have a supervisor over top of you.  If your supervisor

16   gives you a job or direction, what do you do with that?

17        PROSPECTIVE JUROR:  I will do that job to the best of

18   my ability.

19        MR. BARNUM:  Okay.

20        THE COURT:  Okay.  From the Government?

21        MR. MERRIAM:  No questions, your Honor.

22        THE COURT:  Thank you.

23        You can step back outside.  Thank you.  Appreciate it.

24        Number 5.

25        If you could step right over here to the front seat

1  over here in the jury box.  We'll just have a few follow-up

2  questions for you.  The lawyers are going to ask you some

3  specific questions and you can just answer them to the best of

4  your ability.  Okay?

5            All right.  From the Government?

6            MR. MERRIAM:  No questions, your Honor.

7            THE COURT:  Okay.  Or not.  They don't have to ask any

8  questions.

9            Mr. Brown?

10            MR. BROWN:  Yeah.  Thank you.

11            Ma'am, you said you were a machine operator at a paper

12  company?

13            PROSPECTIVE JUROR:  Yes.

14            MR. BROWN:  And you may have said this.  I apologize.

15  What does that involve kind of day to day?

16            PROSPECTIVE JUROR:  Like, what do you mean?  Like,

17  what I go through?  Like --

18            MR. BROWN:  I just don't know what it means to be a

19  machine operator.

20            PROSPECTIVE JUROR:  Basically, it's just where we make

21  actual paper, like, processing and handling from, like, big

22  rolls that we may make from our actual paper machine side.  So

23  we do distribution, paper machine, and sending out products.

24  So it's, like, a whole thing.

25            And I just work on the machines.  I fix the machines

1    if they're broken, you know --

2            MR. BROWN:  Okay.

3            PROSPECTIVE JUROR:  -- day-to-day stuff.  I don't

4    really know.

5            MR. BROWN:  Any interaction with customers?

6            PROSPECTIVE JUROR:  No.  I don't do that, no.

7            MR. BROWN:  Great.  Thank you.

8            THE COURT:  Thank you.

9            MS. MURALIDHARA:  Hi.  Good afternoon.  You had

10   mentioned that you have all the streaming services?

11           PROSPECTIVE JUROR:  Huh?

12           MS. MURALIDHARA:  You had mentioned that you have all

13   of the streaming -- streaming services?

14           PROSPECTIVE JUROR:  I believe so, yeah.  Uh-huh.

15           MS. MURALIDHARA:  You have Amazon Prime or Netflix or

16   Hulu?

17           PROSPECTIVE JUROR:  Yes.

18           MS. MURALIDHARA:  Okay.  And what's your favorite

19   show?

20           PROSPECTIVE JUROR:  On, like, just any of them?  Like,

21   not --

22           MS. MURALIDHARA:  Any show that you enjoy watching.

23           PROSPECTIVE JUROR:  I was watching this show.  It's

24   called *On My Block*.  I don't know.  It's on Netflix.  It's,

25   like, a little thing where they find money or something like

—— 2:22-cr-00030-RFB-DJA ——

1  that from, like, a gang that hid it before.

2          MS. MURALIDHARA:  Thank you.

3          PROSPECTIVE JUROR:  Uh-huh.

4          THE COURT:  Any questions?

5          MS. BLISS:  I just want to understand a little bit

6  more about the -- your job and you -- I think I heard you say

7  that if a machine malfunctions or breaks, you fix it?

8          PROSPECTIVE JUROR:  Yeah.  If it's not, like,

9  electrical, we usually are the ones that goes in there and

10 fixes the problem.

11         MS. BLISS:  So are you like a -- a mechanic?

12         PROSPECTIVE JUROR:  Yes and no.  So it's, like -- if

13 it's too severe and I can't do anything, then I would call

14 them, but if not, then I would be the one to -- me and my

15 partner that I work with would be the one to fix whatever needs

16 to be fixed.

17         MS. BLISS:  Okay.  And did you receive any special

18 training for that or just on the job?

19         PROSPECTIVE JUROR:  No.  It's just on the job.

20         MS. BLISS:  And how long have you been working for the

21 paper company?

22         PROSPECTIVE JUROR:  I want to say six years.

23         MS. BLISS:  Okay.  Thank you.

24         PROSPECTIVE JUROR:  Uh-huh.

25         THE COURT:  Mr. Tate?

1          MR. TATE:  Thank you.

2          Good afternoon, ma'am.  Kevin Tate.  I represent

3  Kristopher Dallman.  One question for you.  As part of your job

4  (unintelligible).

5          (Court reporter interruption.)

6          MR. TATE:  Do you have union representation?

7          PROSPECTIVE JUROR:  No.

8          MR. TATE:  Okay.  Thank you.

9          THE COURT:  Thank you.

10          Ms. Armeni or Mr. Barnum?

11          MS. ARMENI:  Just one follow-up question.

12          I think, ma'am, you talked about getting your news on

13  the internet?

14          PROSPECTIVE JUROR:  Yes.

15          MS. ARMENI:  I did hear that right?

16          PROSPECTIVE JUROR:  Yes.

17          MS. ARMENI:  Can you explain how do you go about

18  getting it?  Do you search something or?

19          PROSPECTIVE JUROR:  No.  It usually just pops up on,

20  like, Instagram.  It be, like, a story.  Or on Tik Tok.  I

21  mean, I don't really go and look for it.  If it's not, like,

22  something I've heard -- like, if I -- my mom tells me, then it

23  just comes up just to come up.

24          MS. ARMENI:  Okay.  Thank you.

25          THE COURT:  Thank you.

—— 2:22-cr-00030-RFB-DJA ——

1          Thank you.

2          PROSPECTIVE JUROR:  Uh-huh.

3          THE COURT:  You can step back out.  Thank you.

4          Number 71.

5          If you could come up here right to the front seat

6  here.  We have a few follow-up questions.

7          Okay.  The lawyers are going to ask you a few

8  follow-up questions.  Just answer the questions to the best of

9  your ability.  Okay?

10          PROSPECTIVE JUROR:  Yes, your Honor.

11          THE COURT:  Not sure where we start next.  I think

12  it's -- is it the Government?  We'll -- from the Government?

13  Or from defense?

14          Okay.  Mr. Brown?

15          MR. BROWN:  Yeah.  Sir, I think earlier you said that

16  you recently deleted your social media accounts?

17          PROSPECTIVE JUROR:  My Facebook.

18          MR. BROWN:  Just curious what led you to delete your

19  Facebook?

20          PROSPECTIVE JUROR:  Personal reasons.  Because it has

21  Messenger and a lot of my friends, Philippines, calling every

22  time and some ask for money and things like that.  And they

23  need help.  Like that.  So I can't give them any -- you know,

24  financially -- mostly financially they ask, but they --

25  that's -- that's one way of -- for them to contact me, have

—2:22-cr-00030-RFB-DJA—

1   connection with me.

2           MR. BROWN:  Okay.  So they don't bug you if they can't

3   go through Facebook?

4           PROSPECTIVE JUROR:  Yes.  Exactly.

5           MR. BROWN:  Thank you.

6           THE COURT:  All right.  Mr. Marsh?

7           MR. MARSH:  Sir, I think you said that you barely

8   watch the news?

9           PROSPECTIVE JUROR:  Yes, sir.

10          MR. MARSH:  Is there a particular reason for that?

11          PROSPECTIVE JUROR:  No.  No.

12          MR. MARSH:  Too busy or something else?

13          PROSPECTIVE JUROR:  Something else.  After work, I

14  just hear some sounds, music, and then turn on the TV and then

15  that's it.  I fall asleep.

16          MR. MARSH:  You'd rather do something else?

17          PROSPECTIVE JUROR:  Yeah.  Sometimes I watch movies

18  and then just -- just close my eyes and that's it.  Just turn

19  on the TV.

20          MR. MARSH:  Thank you, sir.

21          THE COURT:  Ms. Bliss?

22          MS. BLISS:  Yes, your Honor.  Thank you.

23          Hi.

24          PROSPECTIVE JUROR:  Hello.

25          MS. BLISS:  I understand the reason for getting rid of

1  family members and friends who bother you, your Messenger.

2          But I had a -- a question about your job.  And forgive

3  me.  But what -- what do you do as a floor supervisor for the

4  casino?

5          PROSPECTIVE JUROR:  Yeah.  Table games, watch floor,

6  the play -- the table racks.  So players.

7          MS. BLISS:  And which casino do you work at?

8          PROSPECTIVE JUROR:  Orleans.

9          MS. BLISS:  Orleans?

10          PROSPECTIVE JUROR:  Yes, ma'am.

11          MS. BLISS:  Okay.  And do you coordinate with

12  security?

13          PROSPECTIVE JUROR:  Sometimes we have lost and found

14  or something like that.  Or watch players play, call security,

15  surveillance.

16          MS. BLISS:  Do you have any employees you supervise?

17          PROSPECTIVE JUROR:  Dealers.

18          MS. BLISS:  The dealers?

19          PROSPECTIVE JUROR:  Supervise dealers.

20          MS. BLISS:  Okay.  Thank you.

21          THE COURT:  Thank you.

22          Mr. Tate?

23          MS. MARTIN:  Yes, your Honor.

24          As a floor supervisor, do you have any contact with

25  the customers or just the individual employees that are in

1    charge of the tables?

2         PROSPECTIVE JUROR:  Yes.  Some customers, the players

3    ask for comps like that.  That's all.  We give them comps if

4    they play games or points, something, we call it.

5         MS. MARTIN:  If you were selected as a juror -- you

6    know, there are, like, 12 jurors to go in the back -- do you

7    think that you would be able to make up your own mind based

8    upon the evidence that comes into the trial?

9         PROSPECTIVE JUROR:  I'm not sure yet.  This is my

10   first time to --

11        MS. MARTIN:  I guess my question is that -- so each

12   juror has to decide what --

13        THE COURT:  Well, Ms. Martin, let me try it this way.

14        All right.  Do you think that you could be a fair and

15   impartial juror in this trial?

16        PROSPECTIVE JUROR:  Yes, your Honor.

17        THE COURT:  Okay.  Let's move on from there,

18   Ms. Martin.

19        MS. MARTIN:  It says you have no streaming services.

20   That may be -- did I write that down wrong, that you have no

21   streaming services?

22        PROSPECTIVE JUROR:  Internet.  Browse internet.

23   That's -- that's what I understand about streaming services.

24   You mean --

25        MS. MARTIN:  Like, Hulu?  Netflix?

1          PROSPECTIVE JUROR:  No.  No.

2          MS. MARTIN:  So how do you watch movies then?

3          PROSPECTIVE JUROR:  TV and my wife -- what's his

4    name? -- YouTube TV.

5          MS. MARTIN:  YouTube TV?

6          PROSPECTIVE JUROR:  Yeah.  My wife.

7          MS. MARTIN:  No other questions, your Honor.

8          THE COURT:  Thank you.

9          Ms. Armeni?

10          MS. ARMENI:  Sir, I know that you told us that you cut

11   off Facebook to get rid of some of the family that was

12   asking --

13          PROSPECTIVE JUROR:  Yes.

14          MS. ARMENI:  -- you to help, but has there been a time

15   in your life where you have helped family or friends that hit

16   hard times?

17          PROSPECTIVE JUROR:  Through my wife, mother, and

18   brother, we still have, I believe, Facebook.  Yeah.

19          MS. ARMENI:  How -- I'm sorry.

20          PROSPECTIVE JUROR:  If I want to talk to somebody out

21   there, I just ask my wife, "Can you contact this cousin and

22   connect me?"  Just like that.  I just -- just for my -- you

23   know, something like that.

24          MS. ARMENI:  Okay.  I'm sorry.  Maybe my question

25   wasn't clear.  I was asking about if -- have you helped family

─────────── 2:22-cr-00030-RFB-DJA ───────────

1   members in the past that have had a hard time?

2        PROSPECTIVE JUROR:  Yes, ma'am.

3        MS. ARMENI:  Yeah.  Can you give examples of that?

4        PROSPECTIVE JUROR:  Name?  Pardon?

5        MS. ARMENI:  Can you give me examples of how you've

6   helped those family members?

7        PROSPECTIVE JUROR:  During pandemic and some for their

8   vacation, something like that.  Or hospitalization, assist

9   them.  Or sometimes accident.  Mostly.  Yeah.

10       MS. ARMENI:  Thank you.

11       THE COURT:  Thank you.  Thank you.

12       PROSPECTIVE JUROR:  You're welcome.

13       MR. CHRISTIN:  I don't think the Government went.

14       THE COURT:  I'm sorry.  Do you have questions?  Sorry.

15   I apologize.  The Government needs to go.

16       PROSPECTIVE JUROR:  Yes, your Honor.

17       MR. MERRIAM:  I don't think this was worth walking

18   back, but you did say, out here, I believe, that you did like

19   to watch sports?

20       PROSPECTIVE JUROR:  Yes.  Most --

21       MR. MERRIAM:  What sports?

22       PROSPECTIVE JUROR:  Baseball, football, hockey, any --

23   golf.  Almost every sports.

24       MR. MERRIAM:  Thank you.

25       THE COURT:  Thank you.

1          Okay.  Number 43.

2          You can just come sit in this seat right here.  We

3  just have a few follow-up questions for you.  The lawyers are

4  going to ask some questions.  Answer them to the best of your

5  ability.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  From the Government?

8          MR. MERRIAM:  Good afternoon again.  So you have some

9  familiarity with (unintelligible)?

10          (Court reporter interruption.)

11          MR. MERRIAM:  Tech industry?

12          PROSPECTIVE JUROR:  Yes, that is correct.

13          MR. MERRIAM:  Okay.  And you worked in that for a

14  number of years?

15          PROSPECTIVE JUROR:  25 years.

16          MR. MERRIAM:  Now, in discussing what you've done, you

17  said that you've got some familiarity with a variety of

18  internet sites, right?

19          PROSPECTIVE JUROR:  Correct.

20          MR. MERRIAM:  And I think you mentioned some of the

21  ones that are listed in there as sites that you have particular

22  familiarity with?

23          PROSPECTIVE JUROR:  That is correct.

24          MR. MERRIAM:  And also some of the programs that are

25  out there?

1           PROSPECTIVE JUROR:  Yes.

2           MR. MERRIAM:  One of them was torrent sites, right?

3           PROSPECTIVE JUROR:  Yes.

4           MR. MERRIAM:  Is it your understanding that torrent

5   sites, it's a neutral way that you can share files across the

6   internet?

7           PROSPECTIVE JUROR:  That's a good way of putting it, a

8   very politically correct way.

9           MR. MERRIAM:  The technology itself --

10          PROSPECTIVE JUROR:  Yes.

11          MR. MERRIAM:  -- isn't designed to only carry legal or

12  illegal content?

13          PROSPECTIVE JUROR:  Correct.

14          MR. MERRIAM:  And you could probably say the same for

15  programs such as SickRage and Sick Beard, right?

16          PROSPECTIVE JUROR:  Correct.  Correct.

17          MR. MERRIAM:  So as a juror, you would need to look at

18  the evidence for the use of a particular technology or

19  something to evaluate whether it was illegal?

20          PROSPECTIVE JUROR:  That's absolutely correct.

21          MR. MERRIAM:  And --

22          THE COURT:  Let me just follow up on that.

23          I understand you have experience, obviously, in this

24  area, but if I were -- if you were selected and I were to

25  direct you to put aside your personal and professional

1  experience and just decide this case on the facts and as I give

2  it to you, could you do that?

3           PROSPECTIVE JUROR:  Yes, I could.

4           THE COURT:  All right.  Thank you.  Thank you.

5           From the defense?  Mr. Brown?

6           MR. BROWN:  So, yeah, following up on those questions,

7  I remember, you know, when the question was asked, are you

8  familiar about Sick Beard and SickRage, you went -- and you

9  kind of smiled and you said, "Yes, I'm aware of the illegal

10 sites."

11          PROSPECTIVE JUROR:  It was -- it was a red flag in one

12 of your comments -- in one of your questions.  I'll put it that

13 way.

14          MR. BROWN:  Right.  Those were the Court's questions,

15 actually.

16          (Indiscernible simultaneous crosstalk.)

17          (Court reporter interruption.)

18          THE COURT:  Hold on.  Let me say this.

19          And when you made the comment about them being,

20 quote-unquote, illegal sites, again, if I were to direct you to

21 put aside any views or beliefs you have as it relates to

22 particular sites and simply follow the law and instructions in

23 this case and the evidence, could you do that?

24          PROSPECTIVE JUROR:  I would do my best, yes.

25          THE COURT:  All right.  Thank you.

—————— 2:22-cr-00030-RFB-DJA ——————

1              MR. BROWN:  May I ask another question, your Honor?

2              THE COURT:  We'll see what it is, but, yes.

3              MR. BROWN:  I'll go as far as you allow me.

4              As you sit here, can you imagine that a lawful

5    business could operate from what you call --

6              THE COURT:  We'll move on from there, Mr. Brown.

7    We'll move on from the next question.

8              PROSPECTIVE JUROR:  I don't think I could answer that

9    question anyway.

10             THE COURT:  Yeah.  Yeah.  Yeah.

11             MR. BROWN:  Okay.  Thank you, Judge.

12             THE COURT:  Uh-huh.

13             MS. MURALIDHARA:  Hi.  Good afternoon.  Hi.  Do you

14   believe that defendants should have to prove their innocence?

15             PROSPECTIVE JUROR:  Well, yeah, I guess so.  I mean --

16   right?  You have to --

17             THE COURT:  Well, let me --

18             PROSPECTIVE JUROR:  I can't --

19             THE COURT:  Stop.  Stop.  I'm going to give you

20   instructions --

21             PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  -- as to how to view the law and the fact

23   that defendants are presumed innocent.

24             PROSPECTIVE JUROR:  Uh-huh.

25             THE COURT:  And can you follow that instruction?

1        PROSPECTIVE JUROR:  Absolutely.

2        THE COURT:  Okay.  Let's move on.

3        MS. MURALIDHARA:  Why is *Indiana Jones* your favorite

4   movie?

5        PROSPECTIVE JUROR:  I don't know.  I've always wanted

6   to be an archeologist when I was a kid.  I'm a very analytical,

7   scientific type of person.  So I enjoy those types of things.

8        MS. MURALIDHARA:  Thank you.

9        PROSPECTIVE JUROR:  So it wasn't the adventure side as

10  much as the exploration part.

11       MS. MURALIDHARA:  Thank you.

12       THE COURT:  Thank you.

13       Ms. Bliss?  Mr. Chatterjee?

14       MS. BLISS:  Yes, I'll take it.

15       I think I -- I heard you say that you write code?

16       PROSPECTIVE JUROR:  Yes.  I'm familiar with -- part of

17  my job is writing -- is understanding scripts that are being

18  run and things like that.  So understanding Python and, you

19  know, HTML scripts, things like that.

20       MS. BLISS:  Okay.  So -- and do you write them or do

21  you just oversee people who write those scripts?

22       PROSPECTIVE JUROR:  I oversee people who do those

23  things.

24       MS. BLISS:  Okay.  And then I think you said that --

25  let's see.  I want to make sure I have it right.

1           Back to the reference you made about recognizing what
2    you referred to as illegal sites --
3           THE COURT:  Ms. Bliss, let's move on.
4           MS. BLISS:  Okay.  I think you responded that you use
5    all social media?
6           PROSPECTIVE JUROR:  To give an example right now, the
7    State of Florida banned Tik Tok in classrooms.  So we had to go
8    through and load Tik Tok on a bunch of phones and make sure
9    that we were actually properly blocking it for the State of
10   Florida.  So yes, I'm familiar with most social media platforms
11   from a security standpoint.
12          MS. BLISS:  Okay.  From a security standpoint.  That's
13   part of your job.
14          But do you have a particular social media site that
15   you refer to?
16          PROSPECTIVE JUROR:  I absolutely hate social media.
17          MS. BLISS:  I'm with you.
18          PROSPECTIVE JUROR:  I use it for work only.
19          MS. BLISS:  Okay.  Thank you, your Honor.
20          THE COURT:  Mr. Tate?
21          MR. TATE:  Sir, have you had any direct use of, like,
22   Sick Beard or SickRage?
23          PROSPECTIVE JUROR:  No.  No direct use.  I know what
24   they are, but no, I don't use them, no.
25          MR. TATE:  And you said that they were illegal because

1   that's what you believe?

2           THE COURT:  Mr. Tate, let's move on from this subject,

3   please.

4           MR. TATE:  Nothing further.

5           THE COURT:  Let's move on.  I'm sorry?

6           MR. TATE:  Nothing further.

7           THE COURT:  All right.  Thank you.

8           Ms. Armeni?

9           MS. ARMENI:  Your Honor, I wanted to ask

10  clarification.

11          THE COURT:  I've said this three or four times, and

12  I'm not going to do it again.  So if you have a question about

13  a different subject, you can.  Otherwise, we'll end there.

14          MS. ARMENI:  I do not have a question on a different

15  subject.

16          THE COURT:  Thank you.  Thank you.

17          PROSPECTIVE JUROR:  Thank you.

18          THE COURT:  So I want to be clear before we bring in

19  the next potential juror.  I don't want to have to repeat

20  myself if I'm moving on from a subject area.  I don't want to

21  do it in front of jurors, but if you see me say you should move

22  on, I really don't expect you guys to revisit it.

23          If you want to make a record when someone's not

24  present, you can certainly do that.  But I'm saying this to you

25  now because I really don't want to have to say it three or four

—2:22-cr-00030-RFB-DJA—

1  times.  I understand well why you're asking these questions,

2  but once I've decided to move on, I don't want to repeat

3  myself.

4         Again, if you want to make a record as it relates to a

5  particular juror, you're free to do so, but I don't want to

6  have what happened with this past juror happen with all of you.

7  Okay?

8         So --

9         MS. MARTIN:  Excuse me, your Honor?

10         THE COURT:  Yes.

11         MS. MARTIN:  Mr. Dallman really needs to use the

12  facilities for a medical issue and so --

13         THE COURT:  Okay.

14         MS. MARTIN:  -- can we take, like, a three minute

15  break so he can run down the hallway or whatever?

16         THE COURT:  Sure.  Again, we'll take a five minute

17  recess and -- and then we'll come back.

18         MS. MARTIN:  Thank you.

19         THE COURT:  Okay.

20         (Recess taken from 3:04 p.m. to 3:09 p.m.)

21         THE COURT:  All right.  All right.  Let's bring in

22  Juror Number 59.

23         Ms. Bliss, we're going to go back -- Ms. Bliss, we

24  need to go back on the record.

25         MS. BLISS:  I'm sorry.

2:22-cr-00030-RFB-DJA

1            THE COURT:  You can come right up here, please.  I'm

2   going to ask you to sit right here.  So we just have a few

3   follow-up questions.  Okay?  The lawyers are going to ask some

4   questions.  If you could answer those questions to the best of

5   your ability.  Okay?

6            PROSPECTIVE JUROR:  Okay.

7            THE COURT:  Mr. Brown?

8            MR. BROWN:  Yeah.  Thank you.

9        I -- I'm sorry.  I had a follow-up question.  You said

10  earlier you were familiar with torrents or torrenting and

11  Pirate Bay?  Did I write that down right?

12           PROSPECTIVE JUROR:  Yeah.

13           THE COURT:  Can you just explain what that familiarity

14  is?

15           PROSPECTIVE JUROR:  I became familiar with those sites

16  through a prior friend years ago friend.  So that's how I know

17  about them.  I don't know if that answers your question.

18           MR. BROWN:  Yeah.  How -- how were they explained or

19  described to you?

20           PROSPECTIVE JUROR:  You could get videos for free off

21  of them, any videos.  Sometimes the videos had just come out

22  from movies and stuff like that.  You could get them on that

23  site or those sites.  And that's -- that's how I knew about

24  them was from this friend.

25           MR. BROWN:  Do you use them?

1          PROSPECTIVE JUROR:  I never did, but he did.  And I

2    would admit I did watch a movie or two from his collection.

3    So...

4          MR. BROWN:  Okay.  Okay.

5          THE COURT:  Thank you, Mr. Brown.

6          Mr. Marsh?

7          MR. MARSH:  My apologies if you explained this

8    earlier, but what do you -- what do you do as a program

9    manager?  What's that involve?

10          PROSPECTIVE JUROR:  So I manage an enterprise-wide

11    application.  It's an information resource.  It's used not just

12    in the U.S. but in Europe, Canada, Philippines, other

13    countries.  And I primarily manage our new features that get

14    released to this application.  So I work closely with the

15    developers.  I'm technically on the business side so I'm not a

16    developer, but I work really closely with them.

17          MR. MARSH:  All right.  And do you have a master's in

18    information systems?

19          PROSPECTIVE JUROR:  Yes, that's correct.

20          MR. MARSH:  What does that entail?

21          PROSPECTIVE JUROR:  So when I was learning about the

22    different, you know, degrees that I could get, this one fit, I

23    think, the best in that knowledge management systems.  Those

24    are what I primarily learned about and it aligned a lot with

25    what I was doing at the time, CMS systems, stuff of that

1  nature.  Again, really more the business side, not the IT side

2  of it.

3          MR. MARSH:  Can I ask just one more, your Honor?

4          THE COURT:  Yes.

5          MR. MARSH:  What's a CMS system?

6          PROSPECTIVE JUROR:  Content management system.  Sorry.

7  I assume everybody knows.  I'm sorry.

8          THE COURT:  That's all right.

9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Ms. Bliss?  Mr. Chatterjee?

11          MS. BLISS:  I don't have any questions.  Thank you

12  much so much.

13          THE COURT:  Mr. Tate?

14          MR. TATE:  No questions.

15          THE COURT:  Ms. Armeni?

16          MS. ARMENI:  Ma'am, can I just follow up on one thing?

17  I had in my notes that you had mentioned something about

18  SharePoint?

19          PROSPECTIVE JUROR:  Yes.

20          MS. ARMENI:  Can you tell me what you meant by that?

21          PROSPECTIVE JUROR:  So SharePoint's an application

22  within Microsoft's Office 365 suite.  It's primarily what our

23  enterprise application is built on top of and so that's what

24  I'm most familiar with at the time.  We've had other bottom

25  line applications that we've used for our information system,

─────────── 2:22-cr-00030-RFB-DJA ───────────

1   but that is the current one right now.  And again, it houses

2   information, different various types of information for the

3   company.

4            MS. ARMENI:  Thank you.

5            PROSPECTIVE JUROR:  Uh-huh.

6            THE COURT:  Thank you.  Thank you.  You can step back

7   out, please.  Thank you.

8            PROSPECTIVE JUROR:  Okay.

9            THE COURT:  Before we move on to our next juror, and

10  Mr. -- I understand why you asked the question, but I'm not

11  going to permit any question about whether or not anyone used

12  these sites.  They don't have lawyers here.  There could be

13  implications as it relates to liability.  But they may feel

14  compelled to answer the question, which they're not compelled

15  to answer the question.

16           So if you want to ask about these sites, right, you

17  can simply reiterate that they're familiar with them.  Please

18  do not ask them to comment on their usage or their knowledge of

19  them because they are not represented here and there is

20  potential liability here.  So that will be the extent of the

21  questions.

22           Okay.  Any questions or concerns about that?

23           So I will permit you, again, to confirm it, but I

24  think they've all answered relative to their familiarity with

25  those sites.  So I don't really want any follow-up questions

─── 2:22-cr-00030-RFB-DJA ───

1    about "How do you know about this?  What does this site do?"

2    They are, again, not represented here.  I just get concerned

3    about their statements with that -- in that regard.

4         MR. MERRIAM:  Your Honor, if I could just maybe

5    clarify a little bit?

6         So as we discussed with the one juror, there's

7    different categories of things.  Almost every potential juror

8    identified Roku and that's a -- a legitimate service that can

9    be used for bad things.  And there's Pirate Bay, which probably

10   is the other end of the spectrum and is unlikely to have

11   legitimate content.  Or that's where you would go look for it.

12        I don't think merely being familiar or having accessed

13   it raises those liability concerns, but I understand the

14   Court's concern that if somebody says, "Yeah, I ran a giant web

15   file sharing service with Pirate Bay," that could be a problem.

16        But I guess I -- it is an area where the jurors may

17   have a pre-developed bias one way or another.  And we've heard

18   some jurors coming in very -- with very set thoughts.  And

19   so --

20        THE COURT:  Right.  But I asked them and I've asked

21   them all, right, whether or not they can be fair and impartial

22   and they've all answered "yes" to that question.  And so you --

23   you get what you get as it relates to the information you have

24   thus far.  I don't want to highlight some sides versus others

25   because that can highlight the difference between legitimate,

1    quote-unquote, sites versus illegitimate sites in that list.  I

2    thought it was important to include that question so you all

3    have the information about who's familiar with these sites

4    because I think that's significant.

5          But beyond that, I don't want any probing with Roku

6    versus another site because, again, that may lead to areas of

7    question that I don't think are appropriate and I don't want to

8    highlight any so-called differences.  Okay?

9          MR. MERRIAM:  I understand.  And thank you for the

10   clarification, your Honor.

11         THE COURT:  All right.

12         MR. BROWN:  Just so I don't -- I can't ask how they

13   became familiar with it and what their understanding of it?

14         THE COURT:  No.

15         MR. BROWN:  No?

16         THE COURT:  No.

17         MR. BROWN:  Nothing about --

18         THE COURT:  No.

19         MR. BROWN:  Okay.

20         THE COURT:  Again, I want to be very clear.  The last

21   juror's response is a perfect example of her potentially about

22   to say something that -- I don't know what she was going to say

23   about her usage that could lead to liability.  So I don't want

24   them to feel compelled to answer and I don't want to have to

25   explain that to them while they are seated there.

1          And so I think probably just avoiding the issues.  I

2     think they all answered the questions.  Let's avoid any

3     additional follow-up, period, because it could still lead to

4     that.  They've all answered which sites they're aware of.

5     Let's just move on from there.

6          So I don't -- actually, as I think about it, I think

7     it could lead to a further explanation that she did.  We're not

8     going to have any follow-up as it relates to that particular

9     question.

10          Let's bring in Juror Number -- what are we on? --

11     Number 9.

12          If you could just take a seat right here.  The lawyers

13     may have some follow-up questions.  So if you could just answer

14     to the best of your ability.

15          PROSPECTIVE JUROR:  Okay.

16          THE COURT:  Why is that door still open?

17          PROSPECTIVE JUROR:  Sorry?

18          THE COURT:  Don't hold that open, please.  Thank you.

19          All right.  All right.  For Government?

20          MR. MERRIAM:  I think when we were asking questions

21     before, you mentioned that you recently sold a tech company?

22     Can you describe really quickly what was involved there?

23          PROSPECTIVE JUROR:  Sure.  I owned a company.  We were

24     a data center.  In it, we put Mac minicomputers.  Did that for

25     about ten years.  It was -- it was acquired seven years ago.

─────── 2:22-cr-00030-RFB-DJA ───────

1   And I worked with the acquiring company up until recently.  No

2   longer day-to-day, but I do have ownership in it still.

3         MR. MERRIAM:  And in your role with that business, did

4   you have -- were you hands-on technical or were you on the

5   business side?

6         PROSPECTIVE JUROR:  Yeah, when it -- sorry.  When it

7   was my company, I was very hands-on.  Part of the acquisition

8   was letting go of the data center part of it, but when I ran

9   it, I was in the data center and very hands-on.

10         MR. MERRIAM:  All right.  Thanks.  No further

11   questions.

12         THE COURT:  Thank you.

13         Mr. Brown?

14         MR. BROWN:  Did I hear right that PayPal was a client

15   of yours?

16         PROSPECTIVE JUROR:  I'm -- I'm bound by some

17   employment agreements on who our customers were.  Am I allowed

18   to say --

19         THE COURT:  You don't have to -- if you feel like

20   you're bound by that, you don't have to say more than that.

21         PROSPECTIVE JUROR:  Okay.  We had -- we had more than

22   half of the Fortune 100 companies were customers of ours.  I

23   never dealt with them directly, but they bought our services.

24         MR. BROWN:  Do you feel like those relationships would

25   affect how you evaluate testimony or evidence related to those

─────────── 2:22-cr-00030-RFB-DJA ───────────

1   entities in this case?

2           PROSPECTIVE JUROR:  I don't think so, no.

3           MR. BROWN:  Thank you.

4           THE COURT:  Mr. Marsh?

5           MR. MARSH:  Sir, I think I heard you say that you had

6   some relatives that were in the law?  Did you mean they were

7   lawyers or cops?

8           PROSPECTIVE JUROR:  Oh, yeah, lawyers.  They have law

9   firms here in town, a number of them.

10          MR. MARSH:  Okay.  How many?

11          PROSPECTIVE JUROR:  Two brothers, three cousins, four

12  uncles, and a grandpa.

13          MR. MARSH:  That's why I asked that instead of having

14  you just list it.

15          Any particular area that they all practice in?

16          PROSPECTIVE JUROR:  Mostly personal injury.

17          MR. MARSH:  All right.

18          THE COURT:  Thank you, Mr. Marsh.

19          Ms. Bliss?

20          MS. BLISS:  Thank you.

21          Sir, I understood you to say that you maintain a blog,

22  a blog site?

23          PROSPECTIVE JUROR:  Yes.

24          MS. BLISS:  Is that right?

25          PROSPECTIVE JUROR:  Yeah.

1          MS. BLISS:  What is the nature of that blog site?

2          PROSPECTIVE JUROR:  I've had dozens over the years.

3   Currently, it's just family, personal things that I write

4   about.

5          Also, a website that's not updated but is more current

6   business venture capital, things like that, things I invest in.

7          MS. BLISS:  Okay.  So more of, like, a -- a -- an

8   investment --

9          PROSPECTIVE JUROR:  Yeah.  Nobody reads it and it just

10  sits there, but it gives me something to do.

11         MS. BLISS:  Come on, now.  Did you ever have any blog

12  sites that were directed toward conversations about technology?

13         PROSPECTIVE JUROR:  Yeah.  Many over the years.  Yeah.

14  When I ran the data center, we would talk about, you know, ways

15  to use -- obviously, I was trying to sell services.  So I would

16  talk about ways to use our servers and things like that.  And

17  tutorials, things like that.

18         THE COURT:  Thank you, Ms. Bliss.

19         MS. BLISS:  Thank you.

20         THE COURT:  Mr. Tate?

21         MS. MARTIN:  We did have one question.

22         THE COURT:  Ms. Martin?

23         MS. MARTIN:  In reference to -- one of the questions

24  the judge asked was if anyone had any concerns as to whether or

25  not they could be fair and impartial if someone was -- sexual

————2:22-cr-00030-RFB-DJA————

 1   orientation was other than heterosexual.

 2           Given your faith, do you have any concerns?

 3           PROSPECTIVE JUROR:  No, not at all.

 4           MS. MARTIN:  And on your personal websites, do you

 5   ever talk about faith?

 6           PROSPECTIVE JUROR:  I do, yeah.

 7           MS. MARTIN:  But no concerns you can be fair to

 8   everyone?

 9           PROSPECTIVE JUROR:  Absolutely.

10           THE COURT:  Ms. Armeni?  Mr. Barnum?

11           MS. ARMENI:  We have no questions.  Thank you.

12           THE COURT:  Thank you.

13           PROSPECTIVE JUROR:  Okay.

14           THE COURT:  You can step back out.

15           Number 45.

16           Just a few follow-up questions.  The lawyers have a

17   few follow-up questions.  Just answer them to the best of your

18   ability.  Okay?

19           All right.  Let's see.  We'll start -- Mr. Brown?

20           MR. BROWN:  Yeah, thank you.

21           I think you mentioned something about having a case

22   that was pled down to a misdemeanor?

23           PROSPECTIVE JUROR:  Yes, that is correct.

24           MR. BROWN:  And you felt that that was unfair?

25           PROSPECTIVE JUROR:  Well, I feel still that I was

1   innocent, but I learned something known as risk versus reward

2   from my attorney.  So I went ahead and accepted the plea

3   bargain agreement.

4                MR. BROWN:  Thank you.

5                THE COURT:  Thank you very much.

6                Mr. Marsh?  Ms. Muralidhara?

7                MS. MURALIDHARA:  Thank you.

8                Hi.  Good afternoon.

9                PROSPECTIVE JUROR:  Yes.

10               MS. MURALIDHARA:  Do you feel comfortable asserting

11  yourself when you have a contrary position to someone else?

12               PROSPECTIVE JUROR:  I don't like conflict, but, yes, I

13  will stand my position and say, hey, this is what I feel is

14  right or wrong based on what I read and understand.

15               MS. MURALIDHARA:  Thank you.

16               PROSPECTIVE JUROR:  No problem.

17               THE COURT:  Ms. Bliss?

18               MS. BLISS:  I don't have any questions.  Thank you so

19  much.

20               THE COURT:  Thank you.

21               Mr. Tate?  Ms. Martin?

22               MS. MARTIN:  Your Honor, I'm sorry.  Thank you.

23               You stated that your daughter is a police officer?

24               PROSPECTIVE JUROR:  Yes, that is correct.

25               MS. MARTIN:  In Nevada?

1          PROSPECTIVE JUROR:  No.  It's in the State of

2    California, San Diego.

3          MS. MARTIN:  I'm sorry.  I didn't hear you.

4          PROSPECTIVE JUROR:  San Diego, California.

5          MS. MARTIN:  Do you ever discuss cases with her,

6    anything like that?

7          PROSPECTIVE JUROR:  Not cases, but she has discussed

8    to me, like, stuff she's done, you know, and escorting gunshot

9    wound victims to hospitals, things like that, deescalating.

10   Especially her first month on the force.  You know what I'm

11   saying?

12         After she got her first month on the force after she

13   got -- graduated from the academy there, she was telling me

14   that, you know, she had to pull her gun out, like, three, four

15   times, you know what I'm saying, to deescalate things.  She's

16   talked about that kind of stuff, basically, what she's done out

17   in the field.

18         And then, of course, a lot of paperwork.  She says

19   there's a lot of paperwork associated with the job, which was a

20   shock to me.  You know what I'm saying?

21         MS. MARTIN:  Anything about what you've discussed with

22   your daughter that would cause you to be unfair to either side?

23         PROSPECTIVE JUROR:  No, not that I can think of.  Not

24   when it comes to that -- that stuff.

25         THE COURT:  Mr. Barnum?

2:22-cr-00030-RFB-DJA

1          MR. BARNUM:  Thank you, your Honor.

2          Good afternoon, sir.

3          PROSPECTIVE JUROR:  Yes.

4          MR. BARNUM:  Have you or anybody in your family ever

5    hit hard times financially?

6          PROSPECTIVE JUROR:  Oh, yes.  Most definitely.

7          MR. BARNUM:  Can you explain how you handled that?

8          PROSPECTIVE JUROR:  Oh.  Well, I learned something

9    about the financial system when it comes to financing cars and

10   credit cards.

11         If you do it all within one bank and you voluntarily

12   repossess your car and you still continue to make payments on

13   your other car -- that's the car I was utilizing for my

14   survival, you know, of a pizza delivery guy.  Next thing you

15   know, they sold the other car at auction at a lower value.

16   Then they continued to keep the repo order on the second car.

17   So I actually had to go into an agreement with them, basically

18   a $12,000 car securing a loan for like $48,000 and I couldn't

19   make those kind of payments.  So about two months later, I had

20   to file bankruptcy.  So I did that.

21         MR. BARNUM:  Did you ever turn to anybody for help

22   when that was going on?

23         PROSPECTIVE JUROR:  Can you repeat that question?

24         MR. BARNUM:  I said:  Did you ever turn to anybody for

25   help when that happened?

―――2:22-cr-00030-RFB-DJA―――

1           PROSPECTIVE JUROR:  Yes, of course.  I had to start

2    over.  I had to move in with my brother.  You know, I went from

3    a six figure job down to delivering pizzas and had to start my

4    life over at the age of 44.  You know what I'm saying?

5           MR. BARNUM:  That six figure job --

6           THE COURT:  Thank you, Mr. Barnum.

7           From the Government?

8           MR. MERRIAM:  Thank you, sir.  No questions, your

9    Honor.

10           THE COURT:  Thank you.

11           Let's see.  84.

12           Okay.  A few follow-up from the lawyers.  Just answer

13    the questions to the best of your ability.  Okay?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  All right.  Let's see.  From the

16    Government?

17           MR. MERRIAM:  Thank you.

18           I believe you mentioned that your husband was a

19    retired federal employee?

20           PROSPECTIVE JUROR:  Yes.

21           MR. MERRIAM:  What service or area of the Government

22    was that?

23           PROSPECTIVE JUROR:  He was with the Navy for about 12,

24    13 years and then later moved on to be a merchant marine.  And

25    that -- that was it.

—————— 2:22-cr-00030-RFB-DJA ——————

1          MR. MERRIAM:  Would anything about his career with the

2   Navy and merchant marine affect your ability to be fair in a

3   case in federal court?

4          PROSPECTIVE JUROR:  No, I don't think so.

5          THE COURT:  Thank you.

6          Mr. Brown?

7          MR. BROWN:  I wrote down that in Orange County, you

8   worked in social service?

9          PROSPECTIVE JUROR:  In -- that was here in Clark

10  County.  In Orange County, I worked with the probation

11  department and public works.

12         MR. BROWN:  What did you -- what did that involve?

13         PROSPECTIVE JUROR:  Probation department -- all

14  departments, I worked under the finance department.  That's it.

15  Just finance.  Accounting stuff.

16         MR. BROWN:  Got you.  So not the actual act of

17  supervising people or anything?

18         PROSPECTIVE JUROR:  No.  No.

19         MR. BROWN:  Thank you.

20         THE COURT:  Thank you.

21         Mr. Marsh?  Ms. Muralidhara?

22         MR. MARSH:  No questions, your Honor.

23         THE COURT:  Ms. Bliss?

24         MS. BLISS:  Just a quick follow-up.

25         So you were social services with Clark County?

—— 2:22-cr-00030-RFB-DJA ——

1          PROSPECTIVE JUROR:  That's correct.

2          MS. BLISS:  Were you providing, like, social work,

3   outreach?

4          PROSPECTIVE JUROR:  No.  No social work.  Still on the

5   financial side.  I was a finance -- accounting specialist.

6          MS. BLISS:  Okay.  But you have a -- a bachelor's in

7   psychology?

8          PROSPECTIVE JUROR:  Yes.  But I never got to use it.

9          MS. BLISS:  And English?

10          PROSPECTIVE JUROR:  English, yes.

11          MS. BLISS:  Literature?

12          PROSPECTIVE JUROR:  No.  Just English.

13          THE COURT:  Thank you, Ms. Bliss.

14          MS. BLISS:  Yes, your Honor.

15          THE COURT:  Mr. Tate?

16          MR. TATE:  No questions.

17          THE COURT:  Ms. Armeni?

18          MS. ARMENI:  No questions.

19          THE COURT:  Thank you.

20          Number 12.

21          I may move you all along a bit because I want to make

22   sure we get through this process, just so you understand.

23          You can come on up here.  We're going to have a few

24   follow-up questions.  The lawyers have a few follow-up

25   questions.  Just answer them to the best of your ability.

1    Okay?

2          Mr. Brown?

3          MR. BROWN:  Hi, there.  You said you worked on TV

4    shows.  Can you explain?

5          PROSPECTIVE JUROR:  Before I came here to Vegas, I

6    worked as a lighting technician, director of lighting, a few

7    lighting and grip positions on some television shows and series

8    back in the '90s.

9          MR. BROWN:  Thank you.

10          THE COURT:  Thank you.

11          Mr. Marsh?  Ms. Muralidhara?

12          MR. MARSH:  I understand you work as a general manager

13    at the Colosseum Caesars?

14          PROSPECTIVE JUROR:  That's correct.

15          MR. MARSH:  Sounds like a fascinating job.

16          PROSPECTIVE JUROR:  Yes.  I cannot get you tickets to

17    Adele.

18          MR. MARSH:  That's what I was going to ask.

19          I actually have a different question, which is if

20    Adele or -- I'm blanking on the country singer.

21          PROSPECTIVE JUROR:  Garth Brooks?

22          MR. MARSH:  Yeah.  Okay.  If they sing a song that's

23    somebody else's song, does Caesars have to pay a royalty?

24          PROSPECTIVE JUROR:  We pay ASCAP and BMI fees and it's

25    a calculation that's based on volume and the number of tickets

—— 2:22-cr-00030-RFB-DJA ——

1  sold.  It's a whole -- it's a long process, but they don't -- I

2  don't think they pay per song as you would do -- as a royalty

3  type thing.  It's paid through ASCAP/BMI.

4          MR. MARSH:  Thank you.

5          THE COURT:  Thank you.

6          MS. BLISS:  You said ASCAP?  I'm sorry.  I didn't

7  understand.

8          PROSPECTIVE JUROR:  ASCAP and BMI are the two music

9  licensing groups.

10          MS. BLISS:  I see.  Okay.  I don't have any other

11  questions.  Thank you.

12          THE COURT:  Okay.  Thank you.

13          Mr. Tate?  Ms. Martin?

14          MR. TATE:  I'll ask the question.

15          THE COURT:  Mr. Tate, you have to --

16          MR. TATE:  Sorry.  In your -- in your position, do you

17  have performers that do what's called a cover or, you know,

18  they're singing somebody else's song?

19          PROSPECTIVE JUROR:  Sure.  Yeah.

20          MR. TATE:  Do you know whether they pay any royalties

21  when they do that?

22          PROSPECTIVE JUROR:  Well, again, I believe it's

23  covered under our licensing agreement with ASCAP, BMI.  They

24  don't pay individual songs.  We pay a blanket -- a blanket

25  arrangement for every performance that happens.

1           THE COURT:  Thank you, Mr. Tate.

2           Ms. Armeni?

3           MS. ARMENI:  Thank you.

4           Sir, I have in my note -- I didn't know if it was you

5     personally or somebody close to you that had filed a trademark?

6           PROSPECTIVE JUROR:  My wife and I had a company about

7     15 years ago that filed for a trademark, yes.

8           MS. ARMENI:  Thank you.

9           THE COURT:  Thank you.  Thank you.

10          Number 46.

11          If you could come up here to the seat right here, we

12    just have a few follow-up questions.  The lawyers have a few

13    follow-up questions.  Just answer them to the best of your

14    ability, please.  Okay?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  All right.  Let's see.  For the

17    Government?

18          MR. MERRIAM:  No questions, your, Honor.

19          THE COURT:  All right.  Thank you.

20          Mr. Brown?

21          MR. BROWN:  Hi.  I think you said you hate watching

22    the news?

23          PROSPECTIVE JUROR:  I do.

24          MR. BROWN:  I'm just curious why.

25          PROSPECTIVE JUROR:  I was in the military during war.

1    So I just generally don't -- it's not something that I engage

2    myself in very much unless it's a tornado, something, you know.

3    Yeah.

4            THE COURT:  Thank you.

5            Ms. Muralidhara?

6            MS. MURALIDHARA:  Hi.  Good afternoon.

7            PROSPECTIVE JUROR:  Hi.

8            MS. MURALIDHARA:  Do you -- what are your thoughts on

9    conflict or how do you handle conflict in your daily life?

10            PROSPECTIVE JUROR:  It has to be solved.  There's a

11    right way.  There's a wrong way.  It has to be solved.  I deal

12    with it on a daily basis.

13            MS. MURALIDHARA:  How do you deal with it on a daily

14    basis?

15            PROSPECTIVE JUROR:  We have rules that we have to

16    follow.  We have regulations we have to follow.  Pretty much by

17    the book.

18            THE COURT:  Okay.  Thank you.

19            Ms. Bliss?

20            MR. CHATTERJEE:  Good afternoon, ma'am.  From my

21    notes, it's my understanding, correct, that you and your

22    husband work in the same place?

23            PROSPECTIVE JUROR:  Yes.  But we work in different

24    departments.

25            MR. CHATTERJEE:  Okay.  Do you interact at work, any

1   overlap, anything like that?

2           PROSPECTIVE JUROR:  No.

3           MR. CHATTERJEE:  Okay.  What was your job again,

4   ma'am?

5           PROSPECTIVE JUROR:  Program specialist.

6           THE COURT:  Thank you, Mr. Chatterjee.

7           MR. CHATTERJEE:  Thank you.

8           THE COURT:  Ms. Martin?

9           MS. MARTIN:  It says your -- your husband is a

10  computer support person?

11          PROSPECTIVE JUROR:  No, ma'am.  Peer --

12          MS. MARTIN:  Did I get that wrong?

13          PROSPECTIVE JUROR:  Peer support specialist.  He

14  works --

15          MS. MARTIN:  Peer.

16          PROSPECTIVE JUROR:  He works with homeless veterans.

17          MS. MARTIN:  Oh.  Okay.  All right.  Thank you.

18          PROSPECTIVE JUROR:  You're welcome.

19          THE COURT:  Ms. Armeni?

20          MS. ARMENI:  Sure.  Just a follow-up.  I know you had

21  shared with us that you had some college.  What kind of classes

22  were you taking when you were in college?

23          PROSPECTIVE JUROR:  I was in human...

24          MS. ARMENI:  Sorry?

25          PROSPECTIVE JUROR:  Health and human management.

2:22-cr-00030-RFB-DJA

1            MS. ARMENI:  What kind of -- what -- did you have a --

2     was there a reason you were taking those specific classes?

3            PROSPECTIVE JUROR:  At the time, there was.  I just

4     decided I didn't want to do that.  I was a surgery technician

5     in the military.  So whenever I got out, I just kept building

6     on my medical career and I didn't want to work behind a desk,

7     per se, by myself.  I wanted to do something different.

8            THE COURT:  Okay.  Thank you.

9            Thank you, Ms. Armeni.  Thank you.

10           Number 14.

11           If you could come right up here.  There may be a few

12    follow-up questions from the lawyers.  Okay?  Just answer the

13    questions to the best of your ability.  Okay?

14           PROSPECTIVE JUROR:  Okay.

15           THE COURT:  All right then.

16           Mr. Brown?

17           MR. BROWN:  Thank you, your Honor.

18           So I'm wondering, as a photojournalist, do you have

19    opinions on copyright or trademark or intellectual property,

20    anything like that?

21           PROSPECTIVE JUROR:  Well, yes, I'm supportive of

22    copyright, especially for photography.

23           MR. BROWN:  Thank you.

24           THE COURT:  Thank you.

25           Mr. Marsh?

1          MR. MARSH:  I appreciate the work you do for the Sun.

2    I take it the work you do for them is -- is work for hire that

3    belongs to the company, right?

4          PROSPECTIVE JUROR:  That is true.

5          MR. MARSH:  Okay.  Do you do any photography on the

6    side, like art photography that you try to sell?

7          PROSPECTIVE JUROR:  I do photography on the side, but

8    it's all news.  It's all work for hire.

9          MR. MARSH:  All right.  Thank you.

10          THE COURT:  Thank you.

11          Ms. Bliss?  Mr. Chatterjee?

12          MS. BLISS:  I don't have any questions.  Thank you so

13    much.

14          THE COURT:  Ms. Martin?

15          MR. MULA:  Did you complete any coursework when you

16    were in school about copyright?

17          PROSPECTIVE JUROR:  No.

18          MR. MULA:  Nothing further.

19          THE COURT:  Thank you.

20          Ms. Armeni?

21          MS. ARMENI:  Sure.  Sir, I wanted to follow up with

22    you.  You had mentioned, I think, some family members, your

23    sister and a cousin, were attorneys?

24          PROSPECTIVE JUROR:  I'm sorry.  Could you say it

25    again?

—— 2:22-cr-00030-RFB-DJA ——

1          MS. ARMENI:  Sure.  If I have my notes correctly, I
2     think you shared with us that some family members are
3     attorneys?
4          PROSPECTIVE JUROR:  Oh.  I have a sister who's an
5     immigration attorney.
6          MS. ARMENI:  And is -- does your sister practice in
7     Las Vegas?
8          PROSPECTIVE JUROR:  No.  She practices in Tucson,
9     Arizona.
10          MS. ARMENI:  Thank you.
11          THE COURT:  Thank you.
12          Number 61.
13          Come right up here.  The lawyers might have some
14     follow-up questions.
15          PROSPECTIVE JUROR:  Okay.
16          THE COURT:  Okay.
17          PROSPECTIVE JUROR:  Yeah.
18          THE COURT:  From the Government?  Mr. Merriam?
19          MR. MERRIAM:  I'm going to cross off the judge here
20     and not have any follow-up questions, but I appreciate it, your
21     Honor.  Thank you.
22          THE COURT:  Or not.  They don't have to ask questions.
23          MR. BROWN:  I'm going to follow the Government's lead
24     here.  No questions.  Thank you.
25          THE COURT:  Ms. Muralidhara?

2:22-cr-00030-RFB-DJA

1          MS. MURALIDHARA:  Good afternoon.

2          PROSPECTIVE JUROR:  Hi.

3          MS. MURALIDHARA:  How do you feel about conflict?

4          THE BAILIFF:  About what?

5          MS. MURALIDHARA:  Conflict.

6          PROSPECTIVE JUROR:  How I do feel about conflict?

7          MS. MURALIDHARA:  Yeah.  Do you feel comfortable

8   engaging in conflict?

9          PROSPECTIVE JUROR:  I mean, if I have to.  Like, I'm

10  a -- I'm like a manager so sometimes you have to engage in

11  that.  So I wouldn't necessarily, like, say it's the best but

12  if you have to.

13         MS. MURALIDHARA:  And how many people do you oversee

14  at your job?

15         PROSPECTIVE JUROR:  80.

16         MS. MURALIDHARA:  Thank you.

17         THE COURT:  Thank you.

18         Ms. Bliss?

19         MS. BLISS:  Just as a little bit of a follow-up on

20  that because I can understand there would be conflicts at a

21  restaurant.

22         What is your preferred approach for resolving

23  conflicts among the staff?

24         PROSPECTIVE JUROR:  I like to hear them -- each of

25  them out, or however many parties there are, kind of come to a

1  conclusion on my own end.  Then maybe sit them down.  But also,

2  we have HR.  So we kind of go up there and help them -- have

3  them guide you.  But I like to hear both sides and kind of, you

4  know, settle it somewhere.

5           THE COURT:  Thank you.

6           MS. BLISS:  Thank you.

7           THE COURT:  Mr. Tate?  Ms. Martin?

8           MR. TATE:  No questions.

9           THE COURT:  Ms. Armeni?

10          MS. ARMENI:  Just really quick.

11          Sir, you had mentioned that you had done some college?

12          PROSPECTIVE JUROR:  Yes.

13          MS. ARMENI:  Can you tell us what you were studying

14  when you were in college?

15          PROSPECTIVE JUROR:  I went to school for broadcast

16  journalism.

17          THE COURT:  Thank you.  You can step back out.

18          Number 16.

19          Just a few follow-up questions.

20          One of the questions I believe you had was about just

21  the cost of getting here.  And I've been able to confirm that,

22  in fact, you can be reimbursed for your bus passes.  It

23  wouldn't happen daily.  It would probably take about -- you

24  said -- ten days for you to get reimbursed.  Is that something

25  you could do or is that too long?

———— 2:22-cr-00030-RFB-DJA ————

1          PROSPECTIVE JUROR:  I only have $3 left in my bank

2    account for another week and a half.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  Yeah.

5          THE COURT:  So that's not something you could do.

6          Okay.  Any objection to excusing Juror Number 16?

7          MR. MERRIAM:  No, your Honor.

8          THE COURT:  All right.  You are -- you're excused.

9    Thank you.

10          PROSPECTIVE JUROR:  Am I excused to go?

11          THE COURT:  Yes, ma'am.

12          THE COURTROOM ADMINISTRATOR:  We are at 85.

13          THE COURT:  Are we at 85?

14          THE COURTROOM ADMINISTRATOR:  Yeah.

15          THE COURT:  85.  If you could -- actually, come over

16    and sit right over here.

17          PROSPECTIVE JUROR:  Hi.

18          THE COURT:  A couple questions.

19          PROSPECTIVE JUROR:  Okay.

20          THE COURT:  Is there anything about this schedule that

21    would prevent you from being able to sit?

22          PROSPECTIVE JUROR:  Yes, a few.  Single, full-time

23    mom, full-time realtor, four-and-a-half-year-old son.  I have a

24    funeral to go to in California with him the 6th through the

25    10th of June.  Then I have clients in town the 11th through the

1   15th of June.  I'm not on a team, so if I don't show my clients

2   the houses, they don't see them.  And then I have clients in

3   town the 25th through the 28th of June.  And my parents, who

4   usually watch my son while he's out from school, are traveling

5   out of the country until the second week in July.

6           THE COURT:  Okay.  Any reason why we can't excuse

7   Juror Number 85?

8           MR. MERRIAM:  No, your Honor.

9           THE COURT:  All right.  You're excused, ma'am.  Thank

10  you.

11          So I'll tell you that's our last spare juror.  So

12  we're going to go through what we have left, and, obviously, no

13  one slides forward.

14          The other thing that we may need to do is -- and I'm

15  telling the defense now -- I may need to revisit the number of

16  additional peremptory challenges that I gave you.  The law does

17  permit me to do that, but -- and I do so reluctantly, but the

18  fact of the matter is we've had some scheduling issues here.

19  So I'm just letting you know that the Court may reduce the

20  number of challenges back to ten with each of you getting two.

21  But we'll see how we do with the jurors as they go -- as we

22  come through.

23          MR. MISHLER:  Would that reduce the Government's, as

24  well?

25          THE COURT:  The Government's was never increased or

1    reduced so they're the same.

2           All right.  Let's bring in -- who's next?  Number 17.

3           If you could come up right here to the seat here.

4    There may be some additional questions from the lawyers.  Just

5    answer the questions to the best of your ability.  Okay?

6           All right.  For the Government?  Mr. Merriam?

7           MR. MERRIAM:  No questions, your Honor.

8           THE COURT:  Okay.  They don't have to ask any

9    questions.

10          Mr. Brown?

11          MR. BROWN:  Also no questions from me.  Thank you.

12          THE COURT:  Ms. Muralidhara?  I'm going to ask you, if

13   you ask the same question, to be more specific.

14          MS. MURALIDHARA:  It's not the same question, Judge.

15          THE COURT:  Okay.

16          MS. MURALIDHARA:  But thank you.  And I take that

17   note.

18          Hi.  Good afternoon.  May I ask how old you are?

19          PROSPECTIVE JUROR:  20.

20          MS. MURALIDHARA:  And where did you go to high school?

21          PROSPECTIVE JUROR:  Harbor View and Odyssey.

22          MS. MURALIDHARA:  Thank you.

23          THE COURT:  Mr. Chatterjee?  Ms. Bliss?

24          MS. BLISS:  I understood you to say that you're -- you

25   don't have a job right now?

2:22-cr-00030-RFB-DJA

1          PROSPECTIVE JUROR:  No, ma'am.

2          MS. BLISS:  Do you have any job applications pending

3   or do you plan on going to school?

4          PROSPECTIVE JUROR:  I put in an application for

5   Sephora not too long ago so they might be texting me in the

6   next couple days or weeks.

7          MS. BLISS:  Okay.  And an application pending is

8   with -- with whom?

9          PROSPECTIVE JUROR:  Sephora warehouse.

10          MS. BLISS:  Oh.  Sephora?

11          PROSPECTIVE JUROR:  Yes.

12          MS. BLISS:  Okay.  No further questions.  Thank you.

13          THE COURT:  Thank you.

14          Mr. Tate?

15          MR. TATE:  Nothing.

16          THE COURT:  Okay.  Ms. Armeni?

17          MS. ARMENI:  No, your Honor.  Thank you.

18          THE COURT:  All right.  Thank you.

19          Number 62.

20          Right up here.  The lawyers here are going go have

21   some follow-up questions.  Answer them to the best of your

22   ability.  Okay?

23          Mr. Brown?

24          MR. BROWN:  Hi, there.  Can you tell me a little bit

25   more about what kind of IT stuff you do for Venetian?

1            PROSPECTIVE JUROR:  Yes.  So my official title there

2    is Analyst I.  So we're sort of the first responders to

3    anything that breaks in the Venetian, in the Palazzo.  So this

4    could consist of computers, printers, lots of different types

5    of printers, basic networking, and things like that.

6            So we personally don't handle any of, like, the table

7    games or, like, slots and things like that.  So we do have a

8    separate team for that.  So I would say we're kind of the entry

9    level before we escalate it to the correct team.

10           MR. BROWN:  Thank you.

11           THE COURT:  All right.

12           Mr. Marsh?

13           MR. MARSH:  Could you speak up a little bit so I can

14   hear you?

15           PROSPECTIVE JUROR:  Yeah.  Sorry about that.

16           MR. MARSH:  Yeah, no worries.

17           It sounds like do you a lot of work with hardware.  Do

18   you ever do things in installing software or software related?

19           PROSPECTIVE JUROR:  Yes.  We do install basic software

20   needs, like Microsoft Office and things like that.  We work

21   with a lot of POS and front of house and back of house.  So we

22   work with a lot of different applications.  So depending on

23   what machines need -- that needs to be installed on, we are the

24   team to install that for our team members.

25           MR. MARSH:  Thank you very much.

1          MS. BLISS:  Do you do any programming?

2          PROSPECTIVE JUROR:  No, I do not do any programming.

3    The most I do with any type of, like, coding is helping fix

4    scripts that are broken because we work a lot with a software

5    center.  So we do have our hands in that.  It's not our main

6    goal as we do have a separate team for that, but that's pretty

7    much my experience in that.

8          MS. BLISS:  Thank you.

9          THE COURT:  Thank you.

10         Mr. Tate?

11         MR. TATE:  Nothing.

12         THE COURT:  All right.  Ms. Armeni, any questions?

13         MS. ARMENI:  Oh, I'm sorry.  No, that's okay.  Thank

14   you.

15         THE COURT:  Thank you.

16         72.

17         Right up here.  So the lawyers are going to have some

18   follow-up questions.  Just answer the questions to the best of

19   your ability, but they don't have to ask any questions.

20         So we'll start with the Government.

21         MR. MERRIAM:  I have no questions, your Honor.

22         THE COURT:  Okay.  Mr. Brown?

23         MR. BROWN:  Hi.  I just wondering if you serve on

24   any -- or you're involved in any kind of committees or

25   organizations?

2:22-cr-00030-RFB-DJA

1          PROSPECTIVE JUROR:  No, I'm not.

2          MR. BROWN:  Okay.  Thank you.

3          THE COURT:  All right.  Mr. Marsh?

4          MR. MARSH:  Do you do any volunteering with your

5     church or any other organizations?

6          PROSPECTIVE JUROR:  No, I'm not.

7          MR. MARSH:  Thank you.

8          THE COURT:  Thank you.

9          MS. BLISS:  I understood you -- I'm Ms. Bliss.  I

10    understood you to say that your -- your husband works at New

11    York Life.  Is it the insurance company?

12         PROSPECTIVE JUROR:  Yes.

13         MS. BLISS:  What does he do there?

14         PROSPECTIVE JUROR:  He's a developer manager.  So he

15    trains all the new agents who come in for, like, a life

16    insurance.

17         MS. BLISS:  Thank you.

18         MR. TATE:  Nothing.

19         THE COURT:  Nothing?

20         Ms. Armeni?

21         MS. ARMENI:  Yes.  Thank you.

22         I know that you're a stay-at-mom right now, which is a

23    big job.  Before you did that, did you have other employment?

24         PROSPECTIVE JUROR:  Yeah.  I was a veterinary

25    assistant for 15 years.  So I worked at a vet hospital.

———— 2:22-cr-00030-RFB-DJA ————

1           THE COURT:  All right.  Thank you.

2           PROSPECTIVE JUROR:  Thank you, guys.

3           THE COURT:  Although, we're making our way through

4    this, one of the things I will tell you is that, you know, some

5    of the prospective jurors, we don't have enough seats for them

6    outside, so unless there's an objection, I'm going to allow the

7    jurors who have already been questioned to come inside and sit

8    down so that we can make space for people outside.  Is there

9    any objection to that?

10          So they'll hear some of the questions, but they've

11   already been questioned.  Any objection to that?

12          (No response.)

13          THE COURT:  So Brandon, if you want to first ask the

14   people -- if we want to make some space, because I don't want

15   people sitting on the floor.  If they've already been

16   questioned, tell them they can come in and sit in the gallery.

17          Number 64.

18          Right up here.

19          So the lawyers may have some follow-up questions, but

20   they don't have to ask follow-up questions.

21          We'll start with the defense.  Mr. Brown?

22          MR. BROWN:  Yeah, right here.  I think you said you

23   did some work for Verizon, Beats, and Apple; is that right?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BROWN:  What did you do for them?

2:22-cr-00030-RFB-DJA

1          PROSPECTIVE JUROR:  I was a senior operation manager
2   in charge of customer care.
3          MR. BROWN:  So customer care?
4          PROSPECTIVE JUROR:  Yeah.  Call center.
5          MR. BROWN:  Thank you.
6          THE COURT:  All right.
7          MS. MURALIDHARA:  Hi.  Good afternoon.  Do you listen
8   to any podcasts?
9          PROSPECTIVE JUROR:  No.
10         MS. MURALIDHARA:  And you said you have all the
11  streaming services?
12         PROSPECTIVE JUROR:  Yes.
13         MS. MURALIDHARA:  Which one's your favorite?
14         PROSPECTIVE JUROR:  Probably Netflix.
15         MS. MURALIDHARA:  And do you have a favorite show
16  you're watching?
17         PROSPECTIVE JUROR:  Show?  Currently right now or?
18         MS. MURALIDHARA:  Doesn't matter.
19         PROSPECTIVE JUROR:  *Game of Thrones* was my favorite
20  show, but anything from Marvel.
21         MS. MURALIDHARA:  Thank you.
22         MS. BLISS:  Just to clarify -- hi.  I'm Kathleen
23  Bliss.  Is your -- your sister-in-law is a patent attorney?
24         PROSPECTIVE JUROR:  She's an executive assistant for a
25  patent attorney.  Been doing that for 30 years.

2:22-cr-00030-RFB-DJA

1          MS. BLISS:  Is that here in Las Vegas?

2          PROSPECTIVE JUROR:  No.  In New York.

3          MS. BLISS:  Is that where you're from?

4          PROSPECTIVE JUROR:  Originally, yes.  But my parents

5    move out here when I was, like, seven.

6          MS. BLISS:  Okay.  Thank you.

7          THE COURT:  Thank you.

8          Mr. Tate?

9          MR. TATE:  No questions.

10         THE COURT:  Ms. Armeni?

11         MS. ARMENI:  No, thank you, your Honor.

12         THE COURT:  All right.  Number 60 -- you can take a

13   seat in the gallery if you'd like, sir.

14         Is there an objection to bringing everyone in?

15   Because I want everyone to have a seat.  Or you can all come

16   in.  I didn't realize there weren't going to be seats for all

17   of you out there.  Just have everyone come in.  They can sit in

18   the gallery.  We'll just call them by their numbers one at a

19   time.  Bring them all in.  There's only 20 people.

20         MS. BLISS:  Your Honor, I may stand up for a little

21   bit?

22         THE COURT:  Any of you, if you want to stand up, if

23   you want to stretch, if you need to stretch -- if you've

24   already been questioned, if you need to, for example, step out

25   to go to restroom, that's fine.  Okay?

1          So the people who have not been questioned, we'll put

2    you over here.  Again, we're trying to move through this as

3    quickly as possible, but given the number of you, it's taking a

4    little bit of time.  I apologize again.  We didn't realize we

5    didn't have seats for all of you.  That's why I'm bringing you

6    all in now.  Okay?

7          And for those of you over here, I still have some

8    questions for you so if you haven't been questioned, you sit on

9    this side, please.  But if at any point in time, you just need

10   to stand up and stretch, that's fine.  Okay?

11         So Juror Number 65.

12         Before we do that, I want to bring Juror Number 78 up

13   here, please.

14         I understand you have a scheduling issue?

15         PROSPECTIVE JUROR:  Well, today.  So I was under the

16   impression that they had let you know I have a flight tonight

17   to pick up my grandmother.  And the flight's going to leave in,

18   like, two hours.  So I was trying --

19         THE COURT:  You'll be coming back?

20         PROSPECTIVE JUROR:  I come back tomorrow.  I'm

21   literally -- she's, like, 75.  Her brain is -- she's called me

22   six times thinking we're leaving today.  Just for her safety,

23   I'm bringing her back tomorrow.  I come back at, like, 12:30

24   tomorrow.

25         THE COURT:  Okay.  What we're going to do is we'll

1    take you out of order and have you come up and answer the

2    questions right here.

3              MS. BLISS:  I'll sorry, your Honor.  What's the

4    number?

5              PROSPECTIVE JUROR:  78.

6              MS. BLISS:  Thank you.

7              THE COURT:  So was in position Number 28, actually.

8              Mr. Brown?

9              MR. BROWN:  No questions.  Thank you, Judge.

10             THE COURT:  Mr. Marsh?

11             MR. MARSH:  Just a moment, your Honor.

12             MS. BLISS:  No questions, your Honor.

13             THE COURT:  Mr. Marsh?

14             MR. MARSH:  Did I hear you say you worked in VIP

15   services?

16             PROSPECTIVE JUROR:  Yes.  I work in VIP services for

17   Caesars Entertainment.  I work in their room reservations

18   department.

19             MR. MARSH:  What does that involve?

20             PROSPECTIVE JUROR:  I'm sorry?

21             MR. MARSH:  What do you do for your job?

22             PROSPECTIVE JUROR:  So basically, when you're calling

23   for any of their properties in the U.S., you're talking to me.

24   I do room reservations, I do show bookings, I do flights.

25   Anything you need coming to any of our properties, that's what

—— 2:22-cr-00030-RFB-DJA ——

1    I take care of.

2            MR. MARSH:  Okay.  And is that just for VIPs or is it

3    anybody who calls?

4            PROSPECTIVE JUROR:  Ideally, it's technically for our

5    higher card tier players, but if any calls come through, we're

6    able to help them.

7            MR. MARSH:  Thank you very much.

8            PROSPECTIVE JUROR:  You're welcome.

9            THE COURT:  Mr. Tate?

10           MR. TATE:  No questions.

11           THE COURT:  Ms. Armeni?

12           MS. ARMENI:  No questions.  Thank you.

13           THE COURT:  From the Government?

14           MR. MERRIAM:  Good luck catching your flight.  No

15   questions, your Honor.

16           PROSPECTIVE JUROR:  Thank you.

17           THE COURT:  If you could leave us -- do we have

18   contact information?  Do you have a cell phone?

19           PROSPECTIVE JUROR:  I do.

20           THE COURT:  We can let you know whether or not you've

21   been selected for the jury.

22           PROSPECTIVE JUROR:  That's totally fine.  I appreciate

23   it.

24           THE COURT:  If you could just write the number down.

25           All right.  Juror Number 65.  I'm sorry.  We had you

——— 2:22-cr-00030-RFB-DJA ———

1    coming forward.  You had to step back.

2            Again, thank you all for your patience.  I appreciate

3    it.

4            You're going to sit in the same spot.  For the

5    Government?  They may have a few follow-up questions.

6            MR. MERRIAM:  Good afternoon.  I believe I wrote this

7    down correctly, but you -- when you were asked that list of

8    various sites and programs and things, you said you had some

9    familiarity with Pirate Bay and torrenting?

10           PROSPECTIVE JUROR:  Yes.

11           MR. MERRIAM:  That's all, your Honor.

12           THE COURT:  Okay.

13           MR. BROWN:  I wrote down that your stepdad and your

14   uncle are in tech; is that right?

15           PROSPECTIVE JUROR:  Correct.  My stepfather is IT.  I

16   think he works for NV Energy.  And my uncle is an IT technician

17   for Citibank.

18           MR. BROWN:  Thank you.

19           THE COURT:  Mr. Marsh?

20           MR. MARSH:  You said you were a full-time student now?

21           PROSPECTIVE JUROR:  Correct.

22           MR. MARSH:  What are you studying?

23           PROSPECTIVE JUROR:  IT.

24           THE COURT:  Okay.  Ms. Bliss?  Mr. Chatterjee?

25           MR. CHATTERJEE:  We're good.  Thank you, your Honor.

—— 2:22-cr-00030-RFB-DJA ——

1          MS. BLISS:  Thank you, your Honor.

2          THE COURT:  Mr. Tate?

3          MR. TATE:  No questions.

4          THE COURT:  Ms. Armeni?

5          MS. ARMENI:  Sure.  What are you hoping to do with

6   IT -- your IT degree?

7          PROSPECTIVE JUROR:  Ideally, it's between

8   cybersecurity and coding.

9          MS. ARMENI:  Thank you.

10          THE COURT:  Thank you.  All right.  Thank you.

11          Number 66.

12          A few follow-up questions.

13          We'll start with the defense.  Mr. Brown?

14          MR. BROWN:  I don't have any questions.  Thank you,

15   Judge.

16          THE COURT:  All right.  Mr. Marsh?  Ms. Muralidhara?

17          MR. MARSH:  I don't have any questions, your Honor.

18   Thank you.

19          THE COURT:  All right.  Ms. Bliss?

20          MS. BLISS:  Let's see.  Did I understand you -- your

21   favorite movie was *Grown-Ups*?

22          PROSPECTIVE JUROR:  Yes.  Yes.

23          MS. BLISS:  Okay.  I've never heard of that.

24          PROSPECTIVE JUROR:  It's a --

25          MS. BLISS:  Is it a comedy?

1           PROSPECTIVE JUROR:  It's a comedy, yeah.

2           THE COURT:  Do we have to explain all the plots?  We

3     don't have time for that, Ms. Bliss.

4           MS. BLISS:  Oh, I'm sorry, your Honor.  I'll look it

5     up then.

6           THE COURT:  All right.

7           MS. BLISS:  Thank you.

8           THE COURT:  No worries.  Just trying to get us moving

9     forward here.

10          Mr. Tate?

11          MR. TATE:  Nothing further, your Honor.

12          THE COURT:  Ms. Armeni?

13          MS. ARMENI:  I do have a follow-up.

14          I think I heard you say that you worked with something

15    with Pandora?

16          PROSPECTIVE JUROR:  Yeah.  Pandora jewelry.

17          MS. ARMENI:  What's your position?

18          PROSPECTIVE JUROR:  The team lead.  So I do printing.

19    So all the orders that come in, I print them and load them onto

20    the cart so the pickers can pick the items for the orders.

21          MS. ARMENI:  Do you supervise anybody in that

22    capacity?

23          PROSPECTIVE JUROR:  I have a supervisor.  So I'm right

24    below him.  So I run the area for him and he supervises it all

25    together.

1          MS. ARMENI:  Thank you.

2          THE COURT:  All right.  Thank you.  Thank you.

3          Number 23.  Some may have some follow-up questions

4     here.

5          Let's see.  From the Government?

6          MR. MERRIAM:  No questions, your Honor.

7          THE COURT:  Thank you very much.

8          Mr. Brown?

9          MR. BROWN:  No, thank you, judge.

10         THE COURT:  Ms. Muralidhara?

11         MS. MURALIDHARA:  Hi.  Good afternoon.  I think you

12    had mentioned that you were once on a jury but they pled on the

13    first day?

14         PROSPECTIVE JUROR:  Yes.

15         MS. MURALIDHARA:  How that was experience for you?

16         PROSPECTIVE JUROR:  Just quick.

17         MS. MURALIDHARA:  What did you -- what did you think

18    about the party pleading on the first day --

19         THE COURT:  Let's move on from there, Ms. Muralidhara.

20         MS. MURALIDHARA:  Nothing further.

21         THE COURT:  All right.  Ms. Bliss?

22         MS. BLISS:  I don't have any further questions.

23         THE COURT:  Mr. Tate?

24         MR. TATE:  Nothing.

25         THE COURT:  Ms. Armeni?

1          MS. ARMENI:  Sure.  Ma'am, you talked about doing some

2   college.  Can you tell me what you were studying when you were

3   college?

4          PROSPECTIVE JUROR:  Just business.

5          MS. ARMENI:  Thank you.

6          THE COURT:  Thank you.

7          Number 24.

8          All right.  We may have some, again, follow-up

9   questions or not from the lawyers.

10          From the Government?

11          Actually, I'm sorry.  From the defense?

12          MR. BROWN:  Hi.  Which podcast do you like?

13          PROSPECTIVE JUROR:  *Start Here* from ABC News.

14          MR. BROWN:  *Star Care*?

15          PROSPECTIVE JUROR:  *Start Here*.

16          MR. BROWN:  *Start Here*.  Okay.  Anything else?

17          PROSPECTIVE JUROR:  That's the only news podcast I

18   listen to.

19          MR. BROWN:  Okay.  What about non-news?

20          PROSPECTIVE JUROR:  Mostly the non-news podcasts I

21   listen to are audio fiction stories.

22          MR. BROWN:  Thank you.

23          MS. MURALIDHARA:  Hi.  Good afternoon.  Have you ever

24   been a victim of a scam?

25          PROSPECTIVE JUROR:  I have, yes.

1          MS. MURALIDHARA:  Can you tell us a little bit more

2     about that?

3          PROSPECTIVE JUROR:  I went in on a preorder for a set

4     of makeup brushes and the person who was supposed to

5     manufacture them never did and ran away with everyone's money

6     and closed that business and reopened it under a different name

7     and is now doing very well successfully.

8          MS. MURALIDHARA:  How much money did you lose?

9          PROSPECTIVE JUROR:  About $40.

10         MS. MURALIDHARA:  Okay.  Thank you.

11         THE COURT:  Thank you.

12         MS. BLISS:  Okay.  Just some follow-up.  I'm Kathleen

13    Bliss.  You're a teacher?

14         PROSPECTIVE JUROR:  I am an aide, a classroom aide for

15    special education.  And that is what I'm studying in college.

16         MS. BLISS:  What grade level?

17         PROSPECTIVE JUROR:  Elementary autism.

18         MS. BLISS:  Thank you so much.

19         THE COURT:  Mr. Tate?

20         MR. TATE:  Nothing.

21         THE COURT:  Ms. Armeni?

22         MS. ARMENI:  Ms. Bliss asked my question.

23         THE COURT:  Okay.  Thank you.

24         Number 25?

25         All right.  For the Government, any follow-up

1   questions?

2           MR. MERRIAM:  No, your Honor.

3           THE COURT:  All right.  Thank you.

4           Mr. Brown?

5           MR. BROWN:  No, thank you, Judge.

6           THE COURT:  Mr. Marsh?

7           MR. MARSH:  (Unintelligible).

8           (Court reporter interruption.)

9           MR. MARSH:  You're an engineer at Planet Hollywood.

10  What does that involve?

11          PROSPECTIVE JUROR:  I take care of all of the

12  mechanical and electrical stuff for the hotel.

13          MR. MARSH:  I also think you said that you had a

14  cousin or cousins who are lawyers?

15          PROSPECTIVE JUROR:  Yeah.

16          MR. MARSH:  What -- where do they live?

17          PROSPECTIVE JUROR:  Las Vegas.

18          MR. MARSH:  What type of law do they practice?

19          PROSPECTIVE JUROR:  I think one is a social service --

20  works with social services.  And I'm not sure about the other

21  one.

22          MR. MARSH:  All right.  Thank you very much.

23          THE COURT:  Ms. Bliss?

24          MS. BLISS:  Hi.  You get your news from social media?

25          PROSPECTIVE JUROR:  Yes.

1          MS. BLISS:  And what is your -- what is the -- the

2    site you mainly use?

3          PROSPECTIVE JUROR:  Twitter and Tik Tok and Reddit.

4          MS. BLISS:  Thank you.

5          THE COURT:  Thank you.

6          Mr. Tate?

7          MS. MARTIN:  I just have a quick question.  How far

8    did you go in school?

9          PROSPECTIVE JUROR:  College.  I didn't graduate.

10          MS. MARTIN:  Okay.  College.  What was your major?

11          PROSPECTIVE JUROR:  HVAC technology.

12          MS. MARTIN:  Okay.  Perfect.  Thank you.

13          THE COURT:  Thank you.

14          Ms. Armeni?

15          MR. BARNUM:  Good afternoon, sir.  You said that you

16    have all the different streaming services, right?

17          PROSPECTIVE JUROR:  Yeah.  Pretty much.

18          MR. BARNUM:  What's your favorite show?

19          PROSPECTIVE JUROR:  I like a lot of different animes.

20          MR. BARNUM:  What platform do you use to watch your

21    animes?

22          PROSPECTIVE JUROR:  Crunchyroll.

23          THE COURT:  Thank you.

24          Number 73.

25          We have some follow-up questions here.

1          Let's see.  Mr. Brown?

2          MR. BROWN:  I'm sorry.  What number?  73?

3          THE COURT:  73.  In the 26th spot.

4          MR. BROWN:  No questions.  Thank you, Judge.

5          THE COURT:  Thank you.

6          MS. MURALIDHARA:  Hi.  Good afternoon.

7          PROSPECTIVE JUROR:  Good afternoon.

8          MS. MURALIDHARA:  How long was your husband a

9    bartender for?

10          PROSPECTIVE JUROR:  He's been a bartender nine years

11   at Planet Hollywood.

12          MS. MURALIDHARA:  Thank you.

13          THE COURT:  All right.  Ms. Bliss?  Mr. Chatterjee?

14          MS. BLISS:  No questions.  Thank you so much.

15          THE COURT:  Mr. Tate?

16          MR. TATE:  Nothing further.

17          THE COURT:  Ms. Armeni?

18          MS. ARMENI:  Ma'am, before you were a full-time mom

19   job, what did you do for work?

20          PROSPECTIVE JUROR:  So about six years ago, I was a

21   front desk agent at Cannery Casino.  And then prior to that, I

22   was an admin assistant for Red Rock Country Club.

23          THE COURT:  Thank you.

24          PROSPECTIVE JUROR:  Thank you.

25          THE COURT:  Number 76.

1            Okay.  So we're going to get a few follow-up questions

2   from the lawyers or not.

3            From the Government?

4            MR. MERRIAM:  Did I correctly write down that your

5   niece is a district attorney?

6            PROSPECTIVE JUROR:  Yes.

7            MR. MERRIAM:  Where is that?

8            PROSPECTIVE JUROR:  Over here in Vegas.

9            MR. MERRIAM:  Then did you also say you were familiar

10  with the Pirate Bay?

11           PROSPECTIVE JUROR:  No.  I've heard of it.

12           MR. MERRIAM:  Okay.  And last question:  Do you

13  describe yourself as a beginner in Java, the programming

14  language?

15           PROSPECTIVE JUROR:  Yeah.  What I learned off YouTube.

16  I didn't go to any classes.

17           MR. MERRIAM:  Very good.  Thank you.  Thank you.

18           Mr. Brown?

19           MR. BROWN:  Are you and your niece close, the DA?

20           PROSPECTIVE JUROR:  Kind of.  I mean, we go to my

21  mom's house every -- every week.  We meet there.

22           MR. BROWN:  Do you talk about work?

23           PROSPECTIVE JUROR:  No.  No.

24           MR. BROWN:  Thank you.

25           MS.  Muralidhara:  Hi.  Good afternoon.  I think you

1   had mentioned that you -- do you have a Facebook or you don't

2   have a Facebook?

3           PROSPECTIVE JUROR:  I used to.  I don't have anymore.

4   Not anymore.

5           MS. MURALIDHARA:  When did you deactivate Facebook?

6           PROSPECTIVE JUROR:  It's been probably six,

7   seven years maybe.

8           MS. MURALIDHARA:  Why did you deactivate?

9           PROSPECTIVE JUROR:  I didn't like being -- asking

10  questions and looking at people's posts all the time.  So I

11  just discontinued it.

12          MS. MURALIDHARA:  Thank you.

13          THE COURT:  Thank you.

14          Ms. Bliss?  Mr. Chatterjee?

15          MS. BLISS:  Just one quick one.  How long has your

16  niece been an assistant DA in Clark County?

17          PROSPECTIVE JUROR:  I think a little less than a year

18  now.

19          MS. BLISS:  Thank you.

20          THE COURT:  Thank you.  Mr. Tate?

21          MR. TATE:  No questions.

22          THE COURT:  Ms. Armeni?

23          MS. ARMENI:  Sir, I know that you're retired now.  I

24  did -- no?  I have that wrong?

25          PROSPECTIVE JUROR:  No.  No.  I'm not retired.

1          MS. ARMENI:  Okay.  What do you do for work?

2          PROSPECTIVE JUROR:  I'm a systems network technician,

3   traffic.

4          MS. ARMENI:  What do you do in that position?

5          PROSPECTIVE JUROR:  I fix -- I make sure that the

6   traffic cabinets are all talking together for the timing.

7          MS. ARMENI:  Thank you.

8          THE COURT:  Thank you.  You can step down.

9          Number 78.

10         THE COURTROOM ADMINISTRATOR:  We took her out of

11  order.

12         THE COURT:  That's right.  Okay.

13         Number -- I can't read my own handwriting -- 74.

14         Okay.  Potential few follow-up questions here starting

15  with the Government.

16         MR. MERRIAM:  Just one for me.

17         I did write down correctly that you said you were

18  familiar with the Pirate Bay website?

19         PROSPECTIVE JUROR:  I'm aware of it, but I don't have

20  a lot of experience with it.

21         MR. MERRIAM:  Thank you for that.

22         PROSPECTIVE JUROR:  Sure.

23         MR. MERRIAM:  That's all, your Honor.

24         THE COURT:  Okay.

25         MR. BROWN:  Hi.  I think you said you had a BA in

1   science?

2           PROSPECTIVE JUROR:  Science of biology, yeah.

3           MR. BROWN:  Okay.  I was going to ask what field.  So

4   biology?

5           PROSPECTIVE JUROR:  Biology.  Correct.

6           MR. BROWN:  Thank you.

7           MR. MARSH:  You work as a director of operations for a

8   research company, you said?

9           PROSPECTIVE JUROR:  Yeah.  We conduct clinical

10  research trials.  I oversee several states that have clinics.

11          MR. MARSH:  Thank you.

12          THE COURT:  All right.

13          MR. CHATTERJEE:  Good afternoon, ma'am.  So based on

14  my notes, it's my understanding, correct, that you're a

15  director of operations research company?  Can you tell us a

16  little bit about the company, what it does?

17          PROSPECTIVE JUROR:  Yeah.  So my company, they

18  contract with different pharmaceutical companies to run

19  clinical trials.  I oversee clinical clinics, like clinics in

20  Tennessee, Nevada, Utah, and Missouri.  So different clinics in

21  all the states and staff at all those clinics that I help

22  oversee the quality and integrity of the data.

23          MR. CHATTERJEE:  Thank you.

24          THE COURT:  Mr. Tate?  Ms. Martin?

25          MR. TATE:  No questions.

1          THE COURT:  Ms. Armeni?

2          MS. ARMENI:  Just one question.

3          Ma'am, have you or anyone close to you ever hit

4    financial hardship?

5          PROSPECTIVE JUROR:  Yes.

6          MS. ARMENI:  Can you tell us what -- just generally in

7    those situations how you handled that?

8          PROSPECTIVE JUROR:  Yes.  So I mentioned that my

9    husband was in construction previously.  And because we were in

10   Arizona, he was in and out of work a lot, so a lot of the

11   financial stability did fall to me.  So for a little while when

12   he was out of work, we did fall behind in our mortgage and

13   everything so we had to kind of work with the companies to

14   catch us back up, I guess.  But it did take a good two years to

15   do that.  And we had a lot of debt at the time.

16         MS. ARMENI:  Thank you.

17         THE COURT:  Thank you.  Thank you.

18         Number 30.

19         There's potentially a few follow-up questions.

20         Mr. Brown?

21         MR. BROWN:  You mentioned that if -- your main source

22   of news is, I guess, friends and family.  Do I have that right?

23         PROSPECTIVE JUROR:  Yes.

24         MR. BROWN:  Then you said if something kind of piques

25   your interest, you research it independently?

1          PROSPECTIVE JUROR:  Yes, that's correct.

2          MR. BROWN:  How do you do that?

3          PROSPECTIVE JUROR:  Through the internet.  Just

4    research it through the internet.

5          THE COURT:  Thank you, Mr. Brown.

6          Mr. Marsh?  Ms. Muralidhara?

7          MS. MURALIDHARA:  Hi.  Good afternoon.  I think you

8    mentioned something about trademarks or having a copyright or a

9    trademark?

10         PROSPECTIVE JUROR:  Yes.

11         MS. MURALIDHARA:  Can you tell us a little bit more

12   about that?

13         PROSPECTIVE JUROR:  So my business partner has a

14   trademark and then this business that I'm currently trying to

15   purchase has a -- I believe a copyright because they have,

16   like, a TV show.

17         MS. MURALIDHARA:  I'm sorry.  They have a TV show?

18         PROSPECTIVE JUROR:  A TV show, yeah.

19         MS. MURALIDHARA:  And are you involved in obtaining

20   that copyright for your business?

21         PROSPECTIVE JUROR:  No, not yet.  Because we're still

22   working on the -- the business part of it.  So it's two parts

23   to the business.

24         MS. MURALIDHARA:  Did you hire attorneys to assist you

25   with that process?

1           PROSPECTIVE JUROR:  Not yet.

2           MS. MURALIDHARA:  Okay.

3           PROSPECTIVE JUROR:  No.

4           MS. MURALIDHARA:  Thank you.

5           PROSPECTIVE JUROR:  You're welcome.

6           THE COURT:  Ms. Bliss?

7           MS. BLISS:  Hi.  What kind of TV show?

8           PROSPECTIVE JUROR:  It's a art show.

9           MS. BLISS:  Art?

10          PROSPECTIVE JUROR:  Yeah.

11          MS. BLISS:  Like painting?

12          PROSPECTIVE JUROR:  I'm sorry?

13          MS. BLISS:  Like painting?

14          PROSPECTIVE JUROR:  No.  So it's a special -- it's a

15  Porsche auto show, basically.

16          MS. BLISS:  Oh.  Okay.  Porsche.  Thank you.  Thank

17  you.

18          THE COURT:  Thank you.

19          Mr. Tate?

20          MR. TATE:  Nothing.

21          THE COURT:  Okay.  Ms. Armeni?

22          MS. ARMENI:  Sure.

23          So sir, I think I had written in my notes that you

24  used to write computer codes?

25          PROSPECTIVE JUROR:  I did, yeah.

—————— 2:22-cr-00030-RFB-DJA ——————

1          MS. ARMENI:  You did.  And how long did you do that

2     for?

3          PROSPECTIVE JUROR:  About two years.  Yeah.  When I

4     was fully in the IT industry, yeah.

5          MS. ARMENI:  Okay.  Thank you.

6          THE COURT:  Thank you.  You can step back down.

7          Number 51.

8          All right.  Any follow-up questions from the lawyers

9     starting with the Government?

10         MR. MERRIAM:  No questions, your Honor.  Thank you.

11         THE COURT:  Okay.  Mr. Brown?

12         MR. BROWN:  Hi.  I wrote down that you had family who

13    are lawyers or have law firms; is that right?

14         PROSPECTIVE JUROR:  My uncle is a retired Air Force

15    lawyer.

16         MR. BROWN:  Okay.

17         PROSPECTIVE JUROR:  Yeah.  And I never asked him to

18    elaborate on whatever he did.  But I just know that he was

19    upset at a lot of things.  That's it.

20         MR. BROWN:  Huh.  Okay.  Thank you.

21         MS. MURALIDHARA:  I think you said you share -- you

22    currently live with your family?

23         PROSPECTIVE JUROR:  Uh-huh.

24         MS. MURALIDHARA:  Who does that include?

25         PROSPECTIVE JUROR:  My father and my grandmother.

1            MS. MURALIDHARA:  And I think you also said that you

2    have attended some college?

3            PROSPECTIVE JUROR:  Yeah.

4            MS. MURALIDHARA:  What college was that?

5            PROSPECTIVE JUROR:  CSN.

6            MS. MURALIDHARA:  And what were you pursuing there?

7            PROSPECTIVE JUROR:  I was trying to become a med tech.

8            MS. MURALIDHARA:  Thank you.

9            PROSPECTIVE JUROR:  Yep.

10           THE COURT:  Thank you.

11           Ms. Bliss?

12           MS. BLISS:  Is that something you still want to do?

13           PROSPECTIVE JUROR:  Yeah, it is.  It's just hard right

14   now with just one singular income right now.  So, yeah, I have

15   to support my family.

16           MS. BLISS:  Thank you.

17           THE COURT:  Thank you.

18           Mr. Tate?

19           MR. TATE:  No questions.

20           THE COURT:  Ms. Armeni?  Mr. Barnum?

21           MR. BARNUM:  Good afternoon, sir.  You said that you

22   have all the streaming services, yes?

23           PROSPECTIVE JUROR:  Yeah.

24           MR. BARNUM:  What's your favorite show?

25           PROSPECTIVE JUROR:  Right now, I'm going through

───────── 2:22-cr-00030-RFB-DJA ─────────

1    *Bridgerton* and I'm really liking that.

2              MR. BARNUM:  That's on Netflix, yeah?

3              PROSPECTIVE JUROR:  I think I was just borrowing my

4    friends's Netflix at the time, but it's really good.  So

5    probably going to use that again.

6              MR. BARNUM:  Thank you.

7              THE COURT:  Thank you.

8              Number 68.

9              Just possibly a few follow-up questions here.

10             Mr. Brown?  Mr. Brown?

11             MR. BROWN:  Do you work for Amazon?  Do I have that

12   right?

13             PROSPECTIVE JUROR:  Yeah.

14             MR. BROWN:  What do you do there?

15             PROSPECTIVE JUROR:  I'm a return customer -- like,

16   return fulfillment center.

17             MR. BROWN:  Okay.  What's that involve?

18             PROSPECTIVE JUROR:  Well, I inspect, like, the returns

19   that customers make --

20             MR. BROWN:  Okay.

21             PROSPECTIVE JUROR:  -- and I decide if they're

22   sellable or unsellable.

23             MR. BROWN:  Okay.  Thank you.

24             THE COURT:  Thank you.

25             Mr. Marsh?

1          MR. MARSH:  I remember at the beginning of all this,

2     you stood up and --

3          THE COURT:  Mr. Marsh, make sure you pull the

4     microphone in front of you, please.

5          MR. MARSH:  I'm sorry.  There's two of us.

6          At the beginning of the day, you stood up and you

7     raised a concern.  I'm trying to recall what that was about.

8          PROSPECTIVE JUROR:  No, I don't think I did that.  I

9     don't think that was me.

10          MR. MARSH:  So you don't have a concern anymore?

11          PROSPECTIVE JUROR:  No.  I never had a concern.  I

12     think you got the wrong person.

13          MR. MARSH:  All right.  Thank you.

14          THE COURT:  Ms. Bliss?

15          MS. BLISS:  You -- do you have all of the streaming

16     services?  Is that right?

17          PROSPECTIVE JUROR:  Yeah.

18          MS. BLISS:  Which one do you use the most?

19          PROSPECTIVE JUROR:  Probably HBO Max.

20          MS. BLISS:  Do you have a favorite show?

21          PROSPECTIVE JUROR:  Yeah.  *Breaking Bad*, but that

22     one's on Netflix.

23          MS. BLISS:  Okay.  Thank you.

24          THE COURT:  Thank you.

25          Mr. Tate?

——— 2:22-cr-00030-RFB-DJA ———

1          MR. TATE:  No questions.

2          THE COURT:  Ms. Armeni?

3          MS. ARMENI:  Okay.  What year did you graduate high

4    school?

5          PROSPECTIVE JUROR:  2021, I believe, if I remember.

6          MS. ARMENI:  What high school did you go to?

7          PROSPECTIVE JUROR:  Canyon Springs.

8          THE COURT:  Thank you.

9          Number 75.

10         Maybe some follow-up questions here.

11         From the Government?

12         MR. MERRIAM:  No questions, your Honor.  Thanks.

13         THE COURT:  All right.  Thank you.

14         Mr. Brown?

15         MR. BROWN:  Thank you.

16         You said earlier that you mentioned a lot of YouTube

17   and found it -- and you found it annoying how much copyright

18   stuff was on there?

19         PROSPECTIVE JUROR:  It's just -- it's -- just the fact

20   that on YouTube there's like a very, very heavy amount of,

21   like, copyright strike abuse, like -- about, like, people try

22   and, like, strike other people's videos to try to get, like,

23   the income made from the videos or just to spite that person or

24   whatever.  It's -- it's -- it's just really annoying to watch

25   it happen as YouTube does nothing about it.

—— 2:22-cr-00030-RFB-DJA ——

1          MR. BROWN:  Thank you.

2          PROSPECTIVE JUROR:  Or they do, but it's very minimal.

3          MR. BROWN:  Thank you.

4          THE COURT:  All right.  Thank you.

5          Mr. Marsh?  Ms. Muralidhara?

6          MS. MURALIDHARA:  I think I heard you say that you had

7    no streaming services?

8          PROSPECTIVE JUROR:  No.  I have -- I have none.

9    Neither me or my grandma.  I know my -- the one side of my

10   family has Netflix, but I -- we don't use it.

11         MS. MURALIDHARA:  Okay.  Do you watch anything on TV?

12         PROSPECTIVE JUROR:  I have not looked at TV the years.

13   I mainly -- if I do watch a movie or something like that, I

14   usually watch it through the disks through -- on a disk reader

15   for my computer that I got about a year or so ago.

16         MS. MURALIDHARA:  Thank you.

17         THE COURT:  Thank you.

18         Ms. Bliss?

19         MS. BLISS:  I don't have any questions.

20         THE COURT:  Mr. Tate?

21         MR. TATE:  No questions.

22         THE COURT:  Ms. Armeni?

23         MS. ARMENI:  No questions.  Thank you.

24         THE COURT:  All right.  Thank you.  You can step down.

25         Number 69.

—— 2:22-cr-00030-RFB-DJA ——

1           We may have some follow-up questions or not from the

2   lawyers.

3           Starting from Mr. Brown?

4           MR. BROWN:  Thank you, Judge.  No questions.

5           THE COURT:  Mr. Marsh?  Ms. Muralidhara?

6           MS. MURALIDHARA:  Hi.  Good afternoon.

7           PROSPECTIVE JUROR:  Hi.

8           MS. MURALIDHARA:  I think you said your sister works

9   at a law firm?

10          PROSPECTIVE JUROR:  Yeah, she works -- she used to

11  work at, I think, Princeton Law Group or Prince Law Group.

12          MS. MURALIDHARA:  Was she an attorney or part of the

13  staff?

14          PROSPECTIVE JUROR:  Part of the staff.

15          MS. MURALIDHARA:  Thank you.

16          THE COURT:  Thank you.

17          Ms. Bliss?

18          MS. BLISS:  I don't have any questions.

19          THE COURT:  Mr. Tate?  Ms. Martin?

20          MS. MARTIN:  You mentioned that you are out of town

21  June 14th through July 9th?  Or someone is?

22          PROSPECTIVE JUROR:  June 14th through June 19th.

23          MS. MARTIN:  You will be out of town?

24          PROSPECTIVE JUROR:  Yes.

25          MS. MARTIN:  And no further questions.

1          THE COURT:  All right.  And you purchased tickets for

2     this trip already?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  Okay.  Thank you.  All right.

5          MS. ARMENI:  No questions, your Honor.

6          THE COURT:  All right.  Thank you.  You can step down.

7          PROSPECTIVE JUROR:  Thank you.

8          THE COURT:  Number 35.

9          Okay.  Maybe some follow-up questions here from the

10    lawyers.

11         Mr. Merriam?

12         MR. MERRIAM:  So I was interested in your -- your

13    answer this morning about the friend who asked you to write a

14    letter of recommendation, correct?

15         PROSPECTIVE JUROR:  Yes, that's correct.

16         MR. MERRIAM:  And you declined to do that?

17         PROSPECTIVE JUROR:  Yeah, I declined to do that.

18         MR. MERRIAM:  But it wasn't a request to come testify

19    in a trial or something?

20         PROSPECTIVE JUROR:  No.  Just a character write-up.

21         MR. MERRIAM:  And would anything about that experience

22    make you have a hard time being fair to the Government or the

23    defense in trials on different facts with different parties?

24         PROSPECTIVE JUROR:  I think I need to examine the

25    facts and -- before I make the determination.

—— 2:22-cr-00030-RFB-DJA ——

1          The reason why I declined the -- the write-up is

2    because, one, I read the -- the case and, second, my friend

3    told me that he did it.  So that's the reason why.

4          And I work for a heavily regulated gaming industry.

5    So I take a lot of ethics courses.  So --

6          THE COURT:  So what you're saying is you need to be

7    able to hear all the facts in a particular case before you

8    decided the -- that particular situation; is that fair?

9          PROSPECTIVE JUROR:  It's fair, yes.

10         THE COURT:  So in this case, if I directed you to just

11   follow the law as I give it to you and apply the facts as you

12   find them here, you think you could do that?

13         PROSPECTIVE JUROR:  Absolutely.

14         THE COURT:  Okay.  Thank you.

15         All right.  From the defense?  Mr. Brown?

16         MR. BROWN:  So you mentioned earlier that if someone's

17   on trial, that most likely they did it.  Do you recall that?

18         PROSPECTIVE JUROR:  Yes, I did say that.

19         MR. BROWN:  What's the source of that belief?

20         THE COURT:  Well, let's -- okay.  Here.  I don't want

21   to have to go back and forth.  Let me ask you this question.

22   In this case, if you were directed to -- as I said, to be fair

23   and impartial and follow the facts and the law as you receive

24   them, can you do that?

25         PROSPECTIVE JUROR:  Yes.

2:22-cr-00030-RFB-DJA

1            THE COURT:  All right.  Let's move on.

2            MR. BROWN:  Thank you, Judge.

3            Mr. Marsh?

4            MR. MARSH:  I understand you work for IGT?

5            PROSPECTIVE JUROR:  Yes, sir.

6            MR. MARSH:  As a financial analyst?

7            PROSPECTIVE JUROR:  Correct.

8            MR. MARSH:  Is it fair to say that that's a company

9   whose entire value is based on its intellectual property?

10            PROSPECTIVE JUROR:  That is correct.

11            MR. MARSH:  All right.  Thank you.

12            THE COURT:  Ms. Bliss?

13            MS. BLISS:  No questions.

14            THE COURT:  All right.  Mr. Tate?

15            MR. TATE:  No questions.

16            THE COURT:  Ms. Armeni?

17            MS. ARMENI:  No questions.

18            THE COURT:  All right.  Number 70.

19            Thank you.  Okay.  May be some follow-up questions or

20   not from the lawyers.

21            Starting with the defense.  Mr. Brown?

22            MR. BROWN:  You mentioned that your son was a

23   programmer?

24            PROSPECTIVE JUROR:  Yes.

25            MR. BROWN:  What -- can you tell me just a little bit

1   more about what he does, if you know?

2           PROSPECTIVE JUROR:  Not really.

3           MR. BROWN:  Do you know what company he works for

4   maybe?

5           PROSPECTIVE JUROR:  I do not.

6           MR. BROWN:  Okay.  Fair enough.

7           PROSPECTIVE JUROR:  I don't ask.  I'm sorry.

8           MR. BROWN:  Thank you.

9           THE COURT:  Thank you.

10          Ms. Muralidhara?

11          MS. MURALIDHARA:  Hi.  Good afternoon.  Do you feel

12   comfortable asserting yourself when there is conflict in a

13   situation?

14          PROSPECTIVE JUROR:  Yes.

15          MS. MURALIDHARA:  Thank you.

16          THE COURT:  All right.  Ms. Bliss?

17          MS. BLISS:  Let's see.  I -- I think I understood you

18   to say that you don't have any social media?

19          PROSPECTIVE JUROR:  Correct.

20          MS. BLISS:  Or internet?

21          PROSPECTIVE JUROR:  I have it, but I -- I don't use

22   it.  I mean, not for entertainment.

23          MS. BLISS:  But you use Amazon Prime?

24          PROSPECTIVE JUROR:  Yes.  I do watch that on TV.

25          MS. BLISS:  On TV?

2:22-cr-00030-RFB-DJA

1        PROSPECTIVE JUROR:  On my Roku.

2        MS. BLISS:  Okay.  Thank you.

3        PROSPECTIVE JUROR:  You're welcome.

4        THE COURT:  Just a moment.

5        Okay.  Ms. Bliss, do you have something else?

6        MS. BLISS:  No.  Just my back.

7        THE COURT:  I'm sorry?

8        MS. BLISS:  My back.

9        THE COURT:  Okay.  No, I'm with you.  That's fine.

10        All right.  Mr. Tate?

11        MR. TATE:  Nothing.

12        THE COURT:  Ms. Armeni?

13        MS. ARMENI:  Sir, besides your son, do you have any

14   other adult children?

15        PROSPECTIVE JUROR:  I have a daughter.

16        MS. ARMENI:  What does your daughter do for work?

17        PROSPECTIVE JUROR:  She's a waitress.

18        MS. ARMENI:  Thank you.

19        THE COURT:  Thank you very much.

20        All right.  You can step down.

21        Number 55.

22        All right.  It's going to be a few follow-up

23   questions.

24        From the Government?

25        MR. MERRIAM:  Thank you.  No questions, your Honor.

2:22-cr-00030-RFB-DJA

1          THE COURT:  Thank you.

2          MR. BROWN:  Sir, you said you had a cousin who's a

3    retired police officer?

4          PROSPECTIVE JUROR:  Yes.

5          MR. BROWN:  Were you close with that cousin?

6          PROSPECTIVE JUROR:  Yeah, pretty close.  He's in --

7    they live in Utah now.

8          MR. BROWN:  Okay.  Where was he a police officer?

9          PROSPECTIVE JUROR:  What's that?

10          MR. BROWN:  Where was he a police officer?

11          PROSPECTIVE JUROR:  North Las Vegas.

12          MR. BROWN:  Oh, okay.  Thank you.

13          THE COURT:  Mr. Marsh?  Ms. Muralidhara?

14          MR. MARSH:  No questions, your Honor.

15          THE COURT:  All right.  Ms. Bliss?

16          MS. BLISS:  Yes, your Honor.

17          Sir, you work for Catholic Charities now?

18          PROSPECTIVE JUROR:  Yes, that's correct.

19          MS. BLISS:  And what do you do for Catholic --

20          PROSPECTIVE JUROR:  I'm an assistant facilities

21    director.

22          MS. BLISS:  What does that entail?

23          PROSPECTIVE JUROR:  It's entails running the

24    day-in-day [sic] maintenance operation and also some assistance

25    with the new instruction stuff that we're doing.

1          MS. BLISS:  Thank you.

2          PROSPECTIVE JUROR:  Uh-huh.

3          THE COURT:  Thank you.

4          Mr. Tate?

5          MR. TATE:  No questions.

6          THE COURT:  Okay.  Ms. Armeni?

7          MS. ARMENI:  I just wanted to follow up.  I think we

8   were asking the question about education.  You said something

9   about vocational training?

10          PROSPECTIVE JUROR:  Yeah.  I was at VoTech, which is

11   Southern Nevada Vocational Center, HVAC and refrigeration.

12          MS. ARMENI:  Thank you.

13          THE COURT:  Thank you.

14          PROSPECTIVE JUROR:  Okay.  We have just, I think,

15   three more people left; is that right?

16          Number 56.  Just, perhaps, a few follow-up questions

17   here.

18          We'll start with defense.  Mr. Brown?

19          MR. BROWN:  Thank you, Judge.

20          Sir, you were involved in any kind of organizations or

21   committees, anything like that?

22          PROSPECTIVE JUROR:  I belong to a group that

23   volunteers at the state park and the national park here.

24          MR. BROWN:  Okay.  What do you do in the park?

25          PROSPECTIVE JUROR:  Whatever needs to be done,

—————— 2:22-cr-00030-RFB-DJA ——————

1   maintenance, cleaning up, picking up trash.

2           MR. BROWN:  Perfect.  Thank you for that.

3           THE COURT:  Thank you.

4           MS. MURALIDHARA:  Hi.  Good afternoon, sir.  I think

5   you had mentioned that your father has a patent?

6           PROSPECTIVE JUROR:  Yes, I believe so.

7           MS. MURALIDHARA:  Do you know what that patent's for?

8           PROSPECTIVE JUROR:  He's a civil engineer.  It has to

9   do with the foundation footings for a cooling tower.

10          MS. MURALIDHARA:  Do you know when he obtained that

11  patent?

12          PROSPECTIVE JUROR:  I believe in the '70s, mid '70s.

13          MS. MURALIDHARA:  Thank you.

14          THE COURT:  Thank you very much.

15          Ms. Bliss?

16          MS. BLISS:  Hi.  You have taken some college courses;

17  is that right?

18          PROSPECTIVE JUROR:  Many years ago, yes.

19          MS. BLISS:  Many years ago?  And what is your

20  employment now?

21          PROSPECTIVE JUROR:  I'm a inventory control clerk for

22  US Foods.

23          MS. BLISS:  Thank you.

24          THE COURT:  Thank you.

25          Mr. Tate?

1          MR. TATE:  No questions.

2          MS. ARMENI:  Sir, you have adult children?

3          PROSPECTIVE JUROR:  Yes.

4          MS. ARMENI:  How many?

5          PROSPECTIVE JUROR:  Three stepdaughters.

6          MS. ARMENI:  What do they do for work?

7          PROSPECTIVE JUROR:  The one in Boston works for a book

8    publishing company, oldest one is a -- that's a consulting --

9    business consulting, and the youngest works for a organ

10   donation organization.

11         MS. ARMENI:  Thank you.

12         THE COURT:  Thank you.  You can step down.

13         Number 39.

14         Some follow-up questions.

15         All right.  We'll start with the Government.

16         MR. MERRIAM:  No questions, your Honor.  Thank you.

17         THE COURT:  All right.  Mr. Brown?

18         MR. BROWN:  Sir, did I understand you have an uncle in

19   California who's an attorney or an uncle who owns a patent or

20   an uncle who's a patent attorney?

21         PROSPECTIVE JUROR:  He's -- I have an uncle that's a

22   lawyer and another uncle that has a copyright.

23         MR. BROWN:  Oh, one of each.  What's the copyright

24   for?

25         PROSPECTIVE JUROR:  It's for his business, his logo.

```
                  2:22-cr-00030-RFB-DJA
```

1            MR. BROWN:  His?

2            PROSPECTIVE JUROR:  Logo for his business.

3            MR. BROWN:  Logo.  Okay.  Thank you.

4            MS. MURALIDHARA:  Good afternoon, sir.  Did you say

5    that you had all the streaming services?

6            PROSPECTIVE JUROR:  Yes.

7            MS. MURALIDHARA:  Which one do you watch the most?

8            PROSPECTIVE JUROR:  Hulu.

9            MS. MURALIDHARA:  Which show on Hulu do you watch the

10   most?

11           PROSPECTIVE JUROR:  I watch my sports, live sports.

12           MS. MURALIDHARA:  Thank you.

13           THE COURT:  Ms. Bliss?

14           MS. BLISS:  And you're a drafter at a design company?

15           PROSPECTIVE JUROR:  Residential design, yes.

16           MS. BLISS:  Residential design?

17           PROSPECTIVE JUROR:  Uh-huh.

18           MS. BLISS:  Does that entail any kind of product

19   that's copyrighted?

20           PROSPECTIVE JUROR:  Yes.  There is a copyright on our

21   permit plans.

22           MS. BLISS:  On your what?  I'm sorry.

23           PROSPECTIVE JUROR:  On our permit plans.

24           MS. BLISS:  Okay.  Thank you.

25           MR. TATE:  Quick question for you.  Your uncle that

2:22-cr-00030-RFB-DJA

1   has a logo, is that logo a copyright or is it -- is it a

2   trademark?

3            PROSPECTIVE JUROR:  I believe it's a copyright.

4            MR. TATE:  Do you know the difference between a

5   trademark and a --

6            THE COURT:  Mr. Tate, let's move on.

7            MR. TATE:  And what you were speaking of with your

8   company, is that a copyright or a trademark?

9            PROSPECTIVE JUROR:  It's says copyright on the bottom.

10            MR. TATE:  Thank you.

11            THE COURT:  Thank you.

12            Ms. Armeni?

13            MS. ARMENI:  Sir, I think I had written down you use

14   all the streaming services.

15            PROSPECTIVE JUROR:  Yes.

16            MS. ARMENI:  Which one's your favorite?

17            PROSPECTIVE JUROR:  Hulu.

18            MS. ARMENI:  Hulu?

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  All right.  Thank you.

21            And finally, Number 40.

22            Mr. Brown?

23            MR. BROWN:  Sir, I understand you work at a personal

24   injury firm now; is that right?

25            PROSPECTIVE JUROR:  That's correct.

---
2:22-cr-00030-RFB-DJA
---

1            MR. BROWN:  Do you have any experience with criminal

2    law?

3            PROSPECTIVE JUROR:  Yeah, I was an intern at both the

4    Clark County Public Defender and the Clark County DA.

5            MS. BROWN:  Okay.  Thank you.

6            MR. MARSH:  How big of a firm is Big Guns?

7            PROSPECTIVE JUROR:  Sorry.  Could you repeat the

8    question?

9            MR. MARSH:  How big of a firm do you work at?

10           PROSPECTIVE JUROR:  So I'm the only associate attorney

11   and I have two managing partners.

12           MR. MARSH:  Okay.  You said -- do you work with your

13   dad?

14           PROSPECTIVE JUROR:  I did when I first graduated law

15   school, but no, we're at separate firms.

16           MR. MARSH:  Great.  What type of law did he practice

17   or does he practice?

18           PROSPECTIVE JUROR:  So personal injury.  When I worked

19   with him, he did plaintiff side.  Now he does the defense.

20           MR. MARSH:  Thank you.

21           THE COURT:  Ms. Bliss?

22           MS. BLISS:  Hi.  Did you go to UNLV?

23           PROSPECTIVE JUROR:  No.

24           MS. BLISS:  Okay.  But you went to law school?

25           PROSPECTIVE JUROR:  I did.

1          MS. BLISS:  And what was your favorite class?

2          PROSPECTIVE JUROR:  I actually liked criminal law.

3          MS. BLISS:  Thank you.

4          THE COURT:  Mr. Tate?

5          MS. MARTIN:  Your grandfather has a patent?

6          PROSPECTIVE JUROR:  I believe he did.

7          MS. MARTIN:  Do you know what it was for?

8          PROSPECTIVE JUROR:  He didn't talk about it much, but

9  I believe it had something to do with cement pipes.  He was a

10 geologist.

11         MS. MARTIN:  Okay.  Thank you.

12         MS. ARMENI:  Quick follow-up.  How long have you been

13 practicing?

14         PROSPECTIVE JUROR:  Four years.

15         MS. ARMENI:  Thank you.

16         THE COURT:  I have one final question for all of you

17 and I want you to raise your hand if you can answer "yes" to

18 this:  Have you ever heard of or been a subscriber to a service

19 called Jetflicks?

20         MS. BLISS:  There's one in the back.

21         THE COURT:  There's two, I think.

22         Okay.  So we'll need to take -- okay.  So what's going

23 to happen now, ladies and gentlemen -- you all answered

24 questions.  We're going to select the jury.

25         Those people who just raised their hand, I'd like for

2:22-cr-00030-RFB-DJA

1  you to stay.  Everyone else -- this actually will take about

2  ten minutes, but we're going to go through and we'll finalize

3  who's going to be on the jury.  So if you could step outside in

4  the gallery, please, except for the two people who raised their

5  hands.  You can go to the bathroom.  If you want to go to the

6  bathroom, please do.  But we're done asking you all questions

7  except for the two who raised their hand.

8              We're off the record.

9          (Recess taken at 4:45 p.m.)

10                          * * *

11

12

13

14                        --o0o--

15              COURT REPORTER'S CERTIFICATE

16

17      I, SAMANTHA N. MCNETT, Official Court Reporter, United

18  States District Court, District of Nevada, Las Vegas, Nevada

19  certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21

22  Date:  May 28, 2024

23

24                          /s/ Samantha N. McNett
                            Samantha McNett, RMR, CRR, CCR
25