—2:22-cr-00030-RFB-DJA—

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )  Case No. 2:22-cr-00030-RFB-DJA
5                 Plaintiff,          )
                                      )  Las Vegas, Nevada
6         vs.                         )  Wednesday, May 29, 2024
                                      )  8:24 a.m.
7    KRISTOPHER LEE DALLMANN,(1)      )
     DOUGLAS M. COURSON,(3)           )  JURY TRIAL - DAY 2
8    FELIPE GARCIA,(4)                )  A.M. SESSION
     JARED EDWARD JAUREQUI,(5)        )
9    PETER H. HUBER,(6),                  *C E R T I F I E D   C O P Y*

10                Defendants.

11   _____

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           THE HONORABLE RICHARD F. BOULWARE, II,
                 UNITED STATES DISTRICT JUDGE

16

17

18

19   APPEARANCES:       See Pages 2 and 3

20

21

22   COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                         United States District Court
23                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada  89101
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

```
                    ─2:22-cr-00030-RFB-DJA─
```

 1 | APPEARANCES:

 2 | For the Government:

 3 |        **JESSICA OLIVA, AUSA**
        **EDWARD VERONDA, AUSA**
 4 |        U.S. ATTORNEY'S OFFICE
        501 Las Vegas Boulevard South, Suite 1100
 5 |        Las Vegas, Nevada 89101
        (702) 388-6268

 6 |
        and
 7 |
        **MICHAEL CHRISTIN, ESQ.**
 8 |        **CHRISTOPHER S. MERRIAM, ESQ.**
        U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
 9 |        1301 New York Avenue, NW, Suite 600
        Washington, DC 20530
10 |        (202) 514-1026

11 | For Defendant Kristopher Lee Dallmann:

12 |        **LARONDA R. MARTIN, ESQ.**
        **KEVIN ANDRE TATE, ESQ.**
13 |        **RICK MULA, ESQ.**
        OFFICE OF THE FEDERAL PUBLIC DEFENDER
14 |        411 E. Bonneville Avenue, Suite 250
        Las Vegas, Nevada 89101
15 |        (702) 388-6577

16 | For Defendant Douglas M. Courson:

17 |        **PAOLA M. ARMENI, ESQ.**
        **AUSTIN T. BARNUM, ESQ.**
18 |        CLARK HILL
        1700 South Pavilion Center Drive, Suite 500
19 |        Las Vegas, Nevada 89135
        (702) 862-8300

20 |
For Defendant Felipe Garcia:
21 |
        **WILLIAM H. BROWN, ESQ.**
22 |        **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
23 |        911 N. Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
24 |        (702) 816-2200

25 |

```
                          2:22-cr-00030-RFB-DJA
```

 1 | APPEARANCES CONTINUED:

 2 | For Defendant Jared Edward Jaurequi:

 3 |         **RUSSELL MARSH, ESQ.**
          **SUNETHRA MURALIDHARA ESQ.**
 4 |         WRIGHT MARSH & LEVY
          300 S. 4th Street, Suite 701
 5 |         Las Vegas, NV 89101
          (702) 382-4004
 6 |
   | For Defendant Peter H. Huber:
 7 |
   |         **KATHLEEN BLISS, ESQ.**
 8 |         KATHLEEN BLISS LAW
          170 South Green Valley Parkway, Suite 300
 9 |         Henderson, Nevada 89012
          (702) 318-7375
10 |
   |         and
11 |
   |         **MILAN CHATTERJEE, ESQ.**
12 |         MILAN'S LEGAL
          3172 N. Rainbow Boulevard, Suite 1406
13 |         Las Vegas, Nevada 89109
          (702) 538-3749
14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

2:22-cr-00030-RFB-DJA

1          LAS VEGAS, NEVADA; WEDNESDAY, MAY 29, 2024; 8:24 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Please be seated.

5          COURTROOM ADMINISTRATOR:  The matter now before the

6  Court is the *United States of America versus Kristopher Lee*

7  *Dallmann, et al.*, Case Number 2:22-cr-030-RFB-DJA.

8          Counsel, please make your appearances, beginning with

9  the Government.

10          MR. CHRISTIN:  Good morning, Your Honor.  Michael

11  Christin for the United States and my colleagues:  Chris

12  Merriam, Edward Veronda, and Jessica Oliva.

13          THE COURT:  Good morning.

14          MR. MERRIAM:  Good morning, Your Honor.

15          MR. BROWN:  Oh, do you want to start our new --

16          THE COURT:  No, that's all right.

17          MR. BROWN:  Okay.  Good morning, Your Honor.  William

18  Brown and Christopher Mishler for Mr. Felipe Garcia, who's

19  present.  Also with our team is Lisa Smith.

20          THE COURT:  Okay.  Good morning.

21          MR. MARSH:  Good morning, Your Honor.  Russell Marsh

22  and Sunethra Muralidhara, along with our client, Jared Jaurequi,

23  who is present and at liberty.

24          THE COURT:  Good morning.

25          MS. BLISS:  Good morning, Your Honor.  Kathleen Bliss

 1  with Mr. Huber and Mr. Chatterjee.

 2          THE COURT:  Good morning.

 3          MR. TATE:  Good morning.  Kevin Tate present with

 4  LaRonda Martin and Rick Mula from the Federal Defender's Office,

 5  Nikki Seubert, our assistant, and plus Mr. Dallmann appears in

 6  person.

 7          MS. ARMENI:  Good morning, Your Honor.  Paola Armeni

 8  and Austin Barnum on behalf of Douglas Courson, who is present

 9  and out of custody.

10          THE COURT:  Okay.  Good morning.

11          So I wanted to come out so we could discuss the

12  demonstratives.

13          Mr. Christin, why don't we just start off going through

14  what you're going to show.

15          MR. CHRISTIN:  Yes, Your Honor.

16          THE COURT:  I have it up on my screen.  I have the

17  first one.  And we did receive the objections, so I want to go

18  through them.

19          So the main objection appears to be to this -- there's

20  a foundational objection, I believe, as it relates to this

21  particular notice.  So explain to me what this is and how it

22  comes in.

23          MR. CHRISTIN:  Thank you, Your Honor.

24          This notice was seized from Mr. Dallmann's residence on

25  the date of the search warrant of November 16th of 2017.  This

—2:22-cr-00030-RFB-DJA—

1  is going to come in through Special Agent Cox, who will be

2  testifying -- scheduled to testify likely tomorrow.

3  Mr. Dallmann also mentions this letter when he was interviewed

4  by the FBI on that same day.  He noted that he received a cease

5  and desist letter from HBO.

6          So the purpose of this would be to show the effect on

7  the listener, not -- so this would not be hearsay.  And also, it

8  is a command.  It is demanding Mr. Dallmann stop infringing

9  HBO's content, and the effect on the listener is that he did not

10  do that.  He continued to stream HBO's content, and we know that

11  because Special Agent Cox streamed HBO content five years after

12  this letter was sent.

13          THE COURT:  So the purpose of this is to show that he

14  received this information, not for the truth of the matter.

15          MR. CHRISTIN:  Correct, Your Honor.

16          THE COURT:  All right.

17          Mr. Tate?

18          MR. TATE:  Your Honor, if you note at the time --

19          THE COURT:  So let me start with this.  Are you in any

20  way disputing the fact that this was found in Mr. Dallmann's

21  residence?

22          MR. TATE:  No, no argument.

23          THE COURT:  Okay.

24          (Court reporter interruption.)

25          MR. TATE:  No, I'm not --

—2:22-cr-00030-RFB-DJA—

1          THE COURT:  He can raise -- he can raise the podium.

2          MR. TATE:  No, I'm not --

3          THE COURT:  The podium can be raised.

4          MR. TATE:  Oh, okay.

5          THE COURT:  So there's no foundational objection here,

6    right, because it was seized from his residence, right?  And

7    they're saying it was -- that an agent will testify to that.

8    You're not disputing that, right?

9          MR. TATE:  No, we're not.

10          THE COURT:  Okay.  So what is the issue, then?

11          MR. TATE:  The issue is the use of it in opening

12   statements.  Now, it might be authenticated, but is it really

13   admissible?

14          THE COURT:  What's inadmissible about it?  So that's

15   what I'm getting into.  Like --

16          MR. TATE:  Because it's offered by --

17          THE COURT:  Let me stop you for a second.

18          State -- exhibits that may be admitted and the Court

19   finds they may be admitted certainly can be used in opening,

20   right?  No exhibit is going to be admitted, obviously, not --

21   in, generally speaking, preopening.  So for me, the question is,

22   is this a document that is likely to be admitted during the

23   trial?

24          So my question to you is, why wouldn't this document be

25   admitted during the trial?  Because the law's pretty clear.  If

—2:22-cr-00030-RFB-DJA—

1   I think that a document is and will likely be admitted, then the

2   document can be used in the opening by any party.  So why

3   wouldn't this document be admissible during the trial?

4          MR. TATE:  Because it's offered by Steven Rosenthal,

5   who is not a witness.  It's hearsay.  And --

6          THE COURT:  He's not offering it for the truth of the

7   matter.  He's offering it for the fact that your client had it

8   in his possession, which means that it's not being offered for

9   the truth, so it doesn't make it hearsay, right?

10          MR. TATE:  Is the Court going to so instruct the jury

11   on that?

12          THE COURT:  What?  That it's being offered for the fact

13   that he had it in his possession?

14          MR. TATE:  Yes.

15          THE COURT:  If you ask me to instruct that as relates

16   to this particular exhibit when it comes in, certainly.

17          MR. TATE:  Yeah.  And that it's not offered for the

18   truth of the matter asserted.

19          THE COURT:  Well, we -- right.  We can certainly say

20   the fact that the document says "notice of copyright

21   infringement" does not establish copyright infringement; that

22   it's offered for the fact that this document was received in

23   your client's -- was received by your client and was in his --

24   was in his residence.  I'm certainly happy to give that

25   instruction when this document comes in, right?

─2:22-cr-00030-RFB-DJA─

1          And so long as in the opening that's exactly how they

2    use it, that seems to me to be appropriate.  If Mr. Christin is

3    saying, "Look, this document was found in Mr. Dallmann's

4    presence" -- excuse me -- "in his residence at the time," right,

5    "and even after this, he continued to operate the business,"

6    right, that's what it could be used for.  And if you want the

7    instruction as relates to this particular document, I'm happy to

8    give it.

9          MR. TATE:  Thank you.

10         THE COURT:  So with that, is there any further

11   objection to it?

12         MR. TATE:  No, other than we don't think it still

13   should be used in opening statements ahead of any evidence

14   being -- coming in.

15         THE COURT:  So what law -- what law says that,

16   Mr. Tate?  Because all of the law I've looked at says if a

17   document is going to be an admitted exhibit and there's no real

18   issue about it being admissible, the document can be used in

19   opening.  So I'm not sure of case law that says --

20         MR. TATE:  Well --

21         THE COURT:  -- that the Court should keep out exhibits

22   that would be admitted.  Now, if it wasn't going to be admitted,

23   that would be something different, but that's not what seems to

24   be the case here.

25         So is there any case law that tells me that I shouldn't

—2:22-cr-00030-RFB-DJA—

1  allow exhibits in opening from either side if they're likely to

2  be admitted?

3          MR. TATE:  The position that we've taken is --

4          THE COURT:  The question is very specific.

5          MR. TATE:  Yeah.

6          THE COURT:  Is there case law that says the Court

7  cannot allow a party to use --

8          MR. TATE:  I'm not aware of it.  They say it's in the

9  Court's discretion.

10          THE COURT:  Right.  Okay.  And you're saying that it

11  shouldn't be used in my discretion because?

12          MR. TATE:  I don't see how the Court is going to give a

13  limiting instruction on the evidentiary purpose of this during

14  their opening statement.  So I don't see an opportunity for the

15  Court to give the same limiting instruction during their opening

16  statement.

17          Certainly they can -- if the Court wants to admit it

18  over our objection and give that limiting instruction once it's

19  time to be put in and somebody can say, "We got this out of

20  Mr. Dallmann's house," then that's a difference than using it

21  ahead of time in an opening statement, which is just really

22  supposed -- it's not argument.  It's supposed to be forecasting

23  the evidence in the case.  I think this goes to -- to argument,

24  especially when they take the position that, well, it's not

25  being admitted for the truth of the matter asserted.  It's being

—2:22-cr-00030-RFB-DJA—

1  admitted for state of mind or whatever the reason was.  That's

2  argument.

3          And so that's -- that's another reason why we don't

4  think it should be admitted during opening statements.

5          THE COURT:  Okay.  Thank you.

6          MR. TATE:  Thank you.

7          THE COURT:  Anyone else?

8          MR. MARSH:  Your Honor, obviously our client has never

9  seen this and it doesn't relate to him, but I did notice

10  something on there that's troubling and I wanted to flag this

11  before the opening.  But Steven Rosenthal is the director of

12  anti-piracy, and I would object to anybody using the term

13  "piracy" today or during the trial.  I think that's

14  inflammatory.  And the question is whether there was a

15  conspiracy to commit copyright infringement by reproduction, not

16  whether it was a pirate organization.

17          Thank you.

18          THE COURT:  Well, Mr. Marsh, I guess my question is,

19  again, this document is being offered for the fact that

20  Mr. Dallmann had it and received it, right?  And that goes to

21  state of mind, including the title.  So I don't know if you have

22  any further response or you just wanted to make the record that

23  you did.

24          MR. MARSH:  No, I don't, Your Honor.  Thank you.

25          THE COURT:  All right.

———2:22-cr-00030-RFB-DJA———

1          Anyone else?

2          (No response.)

3          THE COURT:  Okay.  So, Mr. Christin, I take it when you

4    open on this document, you're still going to say that this was

5    found in his --

6          MR. CHRISTIN:  Yes, Your Honor.  I would intend to say

7    that this document was found in Mr. Dallmann's residence --

8          THE COURT:  Residence.

9          MR. CHRISTIN:  -- when they -- when they searched his

10   home and that it was a demand to stop infringing on copyrights

11   and he didn't do that.

12         THE COURT:  Okay.  All right.  Let's move onto the next

13   document.

14         MR. CHRISTIN:  Your Honor, with respect to this

15   document, this is somewhat similar in that the Government is

16   using it for the same purpose, to show that Mr. Dallmann

17   received this document.  This is going to come in through

18   Mr. Guill, who personally hand-served this document on

19   Mr. Dallmann at 2154 Tona Circle.  So this was not found in his

20   residence, but Mr. Guill will testify that he hand-served

21   Mr. Dallmann this document.

22         THE COURT:  Okay.

23         MS. BLISS:  Your Honor, is there a way for them to be

24   displayed on the monitors?  I'm kind of at a --

25         THE COURT:  Oh, it's not being displayed on your

—2:22-cr-00030-RFB-DJA—

1  monitor?

2          (Defense counsel conferring.)

3          MS. BLISS:  Yeah, I don't know how.

4          THE COURT:  Well, it's not up to you, Ms. Bliss.  We'll

5  figure out how we connect it.  Just give us a moment.

6          MS. BLISS:  Okay.  I'm sorry.

7          THE COURT:  That's all right.

8          MS. BLISS:  In the meantime --

9          THE COURT:  Well, let's see -- hold on.  Wait, wait,

10  wait.  Let's try to fix it.

11          MS. BLISS:  Okay.

12          (Court conferring with courtroom administrator.)

13          MS. BLISS:  All right.  We're all set, Your Honor.

14          THE COURT:  Okay.

15          MS. BLISS:  Thank you.

16          THE COURT:  Of course.

17          So, Mr. Tate, is it the same objection that you have?

18          MR. TATE:  Yes.  And one additional thing I think the

19  Court should be aware of is that while Mr. Guill was essentially

20  a process server, he was not the author of the document.  The

21  author of the document is a Mr. Marc Miller.  He's not

22  testifying in this case as far as we know.  We think that the

23  document itself is hearsay in number -- and, really, because

24  they're -- the way they're -- they're -- shaped the case, notice

25  of infringement, it's really testimonial.  And really the best

─2:22-cr-00030-RFB-DJA─

1  evidence of that would be Marc Miller, and it may infringe on

2  the --

3          THE COURT:  If it's being offered for the same reason,

4  which is for your client's state of mind, not for the fact that

5  it's true, but for the fact that he received it, then it

6  wouldn't be hearsay.  We wouldn't need to have Marc Miller here.

7  We'd simply need to have here the person who can confirm that

8  your client received it, correct?

9          MR. TATE:  Yes, that would -- that would just be that

10 he received it.  So I guess the same limiting instruction would

11 be in order --

12         THE COURT:  Uh-huh.

13         MR. TATE:  -- and I just don't know -- it just seems

14 premature.  I don't know how the Court would -- would do that

15 during their opening presentation.

16         THE COURT:  Well, I wouldn't do it during the opening

17 presentation.  I'd do it when the evidence came in.  So I would

18 simply, when the evidence came in, say that this evidence is

19 offered for the -- is being admitted for the fact that it was

20 received, not for the truth of the matter.  So while it says

21 "notice of infringement," it doesn't establish infringement.  It

22 simply establishes the fact that the document was received.

23         And that's what -- the instruction the Court will give

24 when the document comes into evidence, which I think would

25 address any issue with this particular piece of evidence.

1              So thank you, Mr. Tate.

2              MR. TATE:  All right.

3              THE COURT:  Anyone else?  Mr. Mishler.

4              MR. MISHLER:  Your Honor, yes.  On behalf of

5    Mr. Garcia, the Government says that the foundation they're

6    going to lay for this is through Mr. Guill, who is going to say

7    that it was hand-delivered.  If you look underneath the name,

8    Marc Miller, it says this was delivered via Federal Express and

9    e-mail.  There's nothing on this document that would support

10   that.  So I think there is some question whether --

11             THE COURT:  If a witness comes in and says, "I

12   hand-delivered this," the fact that it was also delivered by

13   Federal Express and mail doesn't necessarily mean it wasn't also

14   hand-delivered, right?

15             MR. MISHLER:  I understand that, Your Honor, but until

16   he lays that foundation, based on this document and what we're

17   seeing, there is some question on how it was delivered.  So I

18   think it --

19             THE COURT:  Well --

20             MR. MISHLER:  -- would be presumptive to assume until

21   he testifies how --

22             THE COURT:  But, Mr. Mishler, that would apply to any

23   piece of evidence that's used in opening; that until the actual

24   foundation is laid, it cannot be established, and that's of

25   course true unless it's stipulated evidence.  But as far as I

1  know, the law doesn't require that I find only stipulated

2  evidence can be used so long as I find that there's a likelihood

3  that the evidence would be admitted.

4       As far as I can see, it looks like Mr. Guill's going to

5  testify as to this coming -- excuse me -- as this being

6  delivered.  So if that is the case, would there be an objection

7  as to that particular testimony?

8       MR. MISHLER:  Your Honor, if he does testify to that,

9  then there wouldn't be an objection.  The problem is, is showing

10 this in openings, you can't unring that bell if he later doesn't

11 testify or testifies not as the Government has represented.  And

12 I have no reason to doubt the Government nor their

13 representation, but considering that testimony is going to come

14 weeks later, you're -- you're allowing the Government to show

15 something that there is a chance may not be admitted and you

16 can't unring it.

17       I have no problem if they want to discuss that there

18 also was this and we expect it to come in, but letting them see

19 it where there is a chance in this case where the testimony may

20 not be --

21       THE COURT:  What is -- what is the chance?  I guess

22 you're saying that, but do you have any information that would

23 suggest that Mr. Guill is going to testify otherwise?

24       MR. MISHLER:  Not otherwise, but I've done trials and I

25 know the Government always expects all of their witnesses to

—2:22-cr-00030-RFB-DJA—

1  testify, but in trial, things happen.  There's always a chance

2  that this witness can't travel for some reason and so they just

3  exclude him as a witness, but it's too late.  The Government --

4  the jury's already seen it.  That's my only concern, Judge.

5           THE COURT:  Okay.  I appreciate that.  Thank you.

6           Mr. Christin, next exhibit.

7           MR. CHRISTIN:  And just for the record, Your Honor,

8  Mr. Guill is a local witness as well.

9           THE COURT:  Okay.

10          MR. CHRISTIN:  This is Exhibit 126, Your Honor.  This

11 is an e-mail from PayPal which was preauthenticated when the --

12 when Your Honor granted the Government's motion in limine.  This

13 is a certified business record from PayPal that was sent to

14 Mr. Dallmann at Jetflicks.com or Kris Dallmann at Jetflicks.com.

15          And, again, the purpose of this is to show that

16 Mr. Dallmann received this notice he could no longer do business

17 with PayPal, and he talks about this in his interview with the

18 FBI where he says that he sent PayPal documents, but couldn't

19 get the PayPal to do business with him anymore.  So he pivots

20 and opens up a new account at a different payment processor,

21 which is where the next exhibit comes in.

22          And just so Your Honor is aware, there's going to be

23 some demonstratives -- not demonstratives, but some callouts

24 that just look like that so that the jurors can see the language

25 being used.

—2:22-cr-00030-RFB-DJA—

1          THE COURT:  Mr. Christin, are you going to talk about

2    what PayPal's Acceptable Use Policy is?

3          MR. CHRISTIN:  I don't plan on talking about it in the

4    opening.  I plan on talking about the fact that Mr. Dallmann

5    received a notice for violation of the Acceptable Use Policy,

6    one of those reasons potentially being infringement of

7    copyrights, and that PayPal refused to do business with him

8    anymore.  And as a result of that, he had to go open up a new

9    account at a new payment processor and in doing so made false

10   representations to that processor about the type of business

11   that Jetflicks was.

12         THE COURT:  Okay.

13         Mr. Tate?

14         MR. TATE:  Thank you, Your Honor.

15         Again, this document here is really classic.  It's

16   hearsay.  It hasn't been admitted yet.  I don't know how it goes

17   to his state of mind when they're talking about conclusory

18   comments made in a form letter from PayPal that says that it was

19   e-mailed to Mr. Dallmann.  It doesn't put it in full context.  I

20   think it's confusing.  I think there has to be a foundation and

21   actually be admitted before they should be able to show it in

22   opening statements.

23         I just don't know if this is something that was

24   extracted during one of the computer searches or not.  But the

25   fact that it was there doesn't --

2:22-cr-00030-RFB-DJA

1        THE COURT:  I'm sorry.  When you say you don't know, I
2   thought that we already went through this.  So let's separate
3   out what are the different arguments here.  As far as I know,
4   this document was previously produced and we've discussed this,
5   right?
6        MR. TATE:  I don't know we specifically discussed this
7   document, no.
8        THE COURT:  But we discussed this category of
9   documents.
10       MR. TATE:  Yeah.
11       THE COURT:  Are you saying you've never seen this
12   document?
13       MR. TATE:  No, I've seen the document.
14       THE COURT:  Okay.  And are you saying that this is not
15   Mr. Dallmann's e-mail?
16       MR. TATE:  I see that on the document, yes.
17       THE COURT:  Okay.  So you're not disputing the fact
18   that this e-mail was sent to Mr. Dallmann based upon the Court
19   already having decided, sort of, the preauthentication of these
20   documents.  What you're saying to me, as I understand it, is
21   that you think there is an issue with context of this document
22   and you think it's also hearsay?
23       MR. TATE:  It's still hearsay, yes.
24       THE COURT:  Okay.
25       MR. TATE:  It's an out-of-court statement.

THE COURT: Okay. Thank you, Mr. Tate.

MR. TATE: All right.

THE COURT: So, Mr. Christin, I -- my concern with this document, in addition to that, is that there's not going to be any explanation of the Acceptable Use Policy, and I think there's an issue as it relates to what's being described here. So I think that context is important for this particular document. So I'm not going to allow this particular demonstrative. If you want to mention the fact that this happened, that they will learn of this, you can do that. But I'm not going to allow this document to be used.

MR. CHRISTIN: Thank you, Your Honor.

And we will comply with that ruling. I will only note for the record that a certified business record is -- is excepted from the hearsay rule, so --

THE COURT: It's not that. It's not that, Mr. Christin.

MR. CHRISTIN: I understand.

THE COURT: I'm not saying I'm not going to admit it. What I am saying is in the opening, particularly when you're using the callouts, what is the Acceptable Use Policy, what that means, and how that's related to infringement, I think can be particularly confusing when an exhibit is not admitted in its context. And so for that reason, I'm not going to allow it, not because I think you can't admit it later.

1          MR. CHRISTIN:  Understood.

2          THE COURT:  So let's move on.

3          MR. CHRISTIN:  We will remove it.  Thank you.

4          THE COURT:  Okay.

5          MR. CHRISTIN:  The next exhibit, Your Honor, is

6   Exhibit 136.

7          So for context, when PayPal stopped doing business with

8   Mr. Dallmann, he needed a new payment processor, the company

9   did.  And so they opened an account at Stripe.  Stripe e-mailed

10  Mr. Dallmann and said, "We need to verify that that" -- "We need

11  to verify what your business is, and we went to go visit your

12  website, and it's password-protected.  We need to see the

13  contents of your website before we can do business with you."

14         So four days later, Mr. Dallmann sent this e-mail to

15  coconspirator, Mr. Vaillant.  And these images were used in the

16  creation of a fake website to trick Stripe into thinking that

17  Mr. Dallmann's business was, in fact, an aviation services

18  business rather than the streaming business that -- that he was

19  actually running.

20         This -- this e-mail itself was extracted from

21  Mr. Dallmann's computer that was retrieved from the Tona Circle

22  address and will come in through our forensic examiner,

23  Ms. Peterson.  I would also note that one of the objections to

24  this e-mail is that it is hearsay.  There are no statements in

25  this e-mail.  This is an e-mail from Mr. Dallmann to

—2:22-cr-00030-RFB-DJA—

1  Mr. Vaillant with images in it.

2          THE COURT:  Okay.

3          Mr. Tate?

4          MR. TATE:  Your Honor, we have outlined our objection

5  to this.  It is hearsay.  Whether there is a statement it or

6  not, the --

7          THE COURT:  What truth is it being offered for?

8          MR. TATE:  That's what I don't know.  And --

9          THE COURT:  But they're not offering it -- in other

10 words, every exhibit that's offered isn't always offered for the

11 truth.  It can be offered for different purposes.  They're

12 saying this exhibit is being offered for the fact that it was

13 sent.  I'm not sure -- other than the fact that the images were

14 sent, what is it you're specifically objecting to?

15          The images were sent, right?  You can't dispute that.

16 They were sent to a coconspirator in this case.  What is it

17 specifically you're disputing about this e-mail and the images?

18          MR. TATE:  Everything that he said around the image

19 that -- that this was sent to Mr. Vaillant for the purpose of

20 creating a fake website.  That's not spoken of anywhere in this

21 image.  I mean, it's confusing.  I mean, just to have an image

22 of a jet and then to have, you know -- the Government have

23 conjecture as to what the -- what the image meant in an opening

24 statement before the -- the image has ever been introduced into

25 evidence and given any context, I just think that's improper.

—2:22-cr-00030-RFB-DJA—

1          THE COURT:  Okay.  Well, as I understand it, there's

2   going to be some evidence of the fact that they tried to pass

3   the company off as an aviation company, and there's some e-mails

4   to that effect, right, and that's going to be part of their

5   theory of the case, right?

6          MR. TATE:  Right.  Yes, and that's fine, but I think

7   the evidence will show they were an aviation company, too.  But

8   I just don't see, in the context of an opening statement, what

9   this really means.  I mean, to me, it's just, you know -- maybe

10   I thought --

11          THE COURT:  They may just be trying to argument that,

12   in fact, your client allegedly passed off this illegal

13   copyrighting company as an aviation company to be able to get

14   this other company to allow it to accept payments.  That's their

15   theory.  I'm not saying that, you know, I believe that or not,

16   but that's their theory.  They're allowed to put their theory of

17   the case on.

18          I don't see anything about this that is inconsistent

19   with that or misleading about that.  They're simply saying these

20   images were sent as part of that.  So I appreciate your

21   comments.  I'll allow this exhibit --

22          MR. TATE:  All right.

23          THE COURT:  -- to be used.

24          Mr. Christin, the next exhibit.

25          MR. CHRISTIN:  Thank you, Your Honor.

———2:22-cr-00030-RFB-DJA———

1          I think we should, just for efficiency, take the next

2   two at the same time.  This is 62A, and that's the callout for

3   it.  And this is 182, and this is the callout for it.  Again,

4   these are --

5          THE COURT:  So, Mr. Christin, let me stop you here.

6          MR. CHRISTIN:  Yes, Your Honor.

7          THE COURT:  I'm not going to allow these exhibits in

8   part, and I'm going to explain this to you when they come in,

9   too, which is we need a forensic person to explain how these --

10         MR. CHRISTIN:  These were not extractions.  These were

11  preauthenticated exhibits from Google.

12         THE COURT:  Mr. Christin, I appreciate that.  For most

13  individuals looking at, sort of, a Google account or history,

14  this is not what they would understand or would see as it

15  relates to a search or results from a search.  So my concern

16  with these exhibits is they require explanation as to how they

17  appear.

18         And so that is my concern about these particular

19  exhibits because whoever is going to testify as to the exhibits

20  coming in will simply need to explain that this is how the

21  information is received.  But you cannot tell that looking at

22  the exhibits.  And so my concern with these exhibits really

23  relates to that.

24         I'm not sure, Mr. Christin, honestly, why you need the

25  exhibits themselves.  I think you can certainly say the jury

1  will learn that he searched for these -- this information.

2       But I'm not going to allow these exhibits not because,

3  again, I don't think they can come in, but I think they require

4  explanation.  And I just want you to notice that -- to know

5  that, excuse me, when you admit them because we had this

6  conversation, I think you recall, before when looking at the

7  exhibits I asked you, "How do these appear when you receive them

8  from Google?"  And you gave me this explanation about this is

9  how you would get the information, but we need someone to

10  explain that.

11       MR. CHRISTIN:  Yes, Your Honor.

12       THE COURT:  Okay.  So --

13       MR. CHRISTIN:  Understood.  And I think that -- just

14  for the clarity of the record, I believe that conversation was

15  related -- was in relation to some of the Google chats and the

16  iCloud messagings that were actually extracted from devices, but

17  I understand your point and will remove these exhibits.

18       THE COURT:  Okay.  But also, as I said, when the

19  exhibits come in, I think it will be important to sort of lay

20  that foundation as to this is how the information is received.

21       MR. CHRISTIN:  Understood.

22       THE COURT:  All right.  Let's move on.

23       MR. CHRISTIN:  This is Exhibit 1107, Your Honor.

24       THE COURT:  Okay.

25       MR. CHRISTIN:  I think that the jury will recognize

1    immediately what this is.  This is a chat message between two of

2    the defendants in this case.  And so, in fact, there -- it is

3    both a coconspirator statement as well as a statement by a party

4    opponent.

5         Again, this is relevant because it takes place around

6    the time of the PayPal shutdown, around the time of opening up

7    the new website, and Mr. Dallmann indicates that he's going to

8    be moving the Jetflicks business away from the gray area.

9         THE COURT:  Okay.

10        MR. CHRISTIN:  And this was -- just Court's indulgence,

11   this was actually at the time that PayPal shut them out.  This

12   was not -- this was before they opened the account at Stripe.

13        THE COURT:  Okay.

14        Mr. Tate.

15        MR. TATE:  Thank you, Your Honor.

16        I think I laid out the proper use of coconspirator

17   statements.  You don't get to skip a step.  They first have to

18   establish that there is a conspiracy and who's involved.  Then

19   that's when the exception comes in in terms of a coconspirator

20   statement.

21        THE COURT:  And I've already found that they've

22   proffered enough evidence for the Court to be able to make the

23   preliminary determination that they'll be able to present

24   evidence of a conspiracy in this case.  So why can't they

25   present this evidence in the opening?  These are statements of

—2:22-cr-00030-RFB-DJA—

1 your client allegedly in furtherance of the conspiracy.  It

2 seems to me on the face of them that they would establish that.

3 If I make the finding, which I have, that they've demonstrated

4 through the record thus far sufficient amount of evidence that

5 the Court would find that they'll be able to present evidence of

6 a conspiracy, why, then, would they be admissible if I make that

7 finding?

8         MR. TATE:  We don't know who compared this chart, for

9 one.  This is an actual --

10         THE COURT:  I'm sorry?

11         MR. TATE:  This chart itself is compiled by -- it's cut

12 and splice.  That's the other problem with it, too.  It's

13 confusing to the jury.  When it comes in, when it's properly

14 admitted in a trial, it will be subject to challenge at that

15 time.

16         THE COURT:  Why is that?

17         MR. TATE:  Right now, we can't because --

18         THE COURT:  Why is that?  I mean, are you -- so explain

19 to me why.  These are statements that were allegedly made

20 through text messages, right, that were provided via request

21 from the provider.  What about these exhibits do you anticipate

22 would render them subject to challenge as relates to

23 admissibility?

24         MR. TATE:  I believe that they were downloaded from

25 a -- from separate sources.  Some came through -- some documents

1  came through subpoena.  Some came through extraction of what was

2  on the cloud on devices.

3         Right in front of me now, I can't say, but what I do

4  know is that they didn't look like that.  They -- they -- and

5  they put that together from something that's bigger than that.

6  That's why I called it an abstract.

7         And basically all of that has to be laid and admitted

8  separately and is subject to challenge.  You can't do --

9         THE COURT:  Okay.  But you're not telling me what the

10  challenge is.  What you're saying is you think it's subject to

11  challenge.  What I understand you to be saying is that the

12  appearance of these statements is not exactly as they appear.

13  In other words, when the information was extracted and they

14  received it, it appeared differently than this.  Is that what

15  you're saying?

16         MR. TATE:  Right, and the information was cherry-picked

17  as well.

18         THE COURT:  Are you saying that the order of these text

19  messages is incorrect?  In other words, that there was messages

20  in between?

21         MR. TATE:  I think there were and --

22         THE COURT:  You can't tell me you think there were,

23  right.  Either there were or there were not.  So, in other

24  words, if you're proffering to me that there were messages that

25  were in between that they skipped over, then you need to show

—2:22-cr-00030-RFB-DJA—

1  me --

2          MR. TATE:  Yeah.

3          THE COURT:  -- that, in fact, that is the case.  So you

4  can't say simply say to me, "I think that there were," without

5  presenting to me information that, in fact, this is a

6  misrepresentation, which is what you're suggesting, of the order

7  of the text messages.

8          Do you have anything that you can show me that would

9  indicate --

10          MR. TATE:  I don't have that with me right now, so I'm

11  not comfortable saying that that's not the order of it.  But

12  what I'm saying is the information that came in was not like

13  that.  They put that together themselves.  Somebody created

14  that.

15          THE COURT:  Okay.  Let's distinguish between how it's

16  presented and the actual content of the messages.  Are you

17  saying the content of these messages is incorrect or a

18  misrepresentation?

19          MR. TATE:  No.

20          THE COURT:  Okay.  What you're saying is how they're

21  presented, right, is inconsistent with how they were received?

22          MR. TATE:  Yes.

23          THE COURT:  Okay.  And what about the presentation

24  makes them prejudicial in any way to your client?  I mean, this

25  is the way that a chat or a text message might appear.  And, in

1  fact, the reason why I didn't allow the other messages is

2  because they didn't appear in a way that people might generally

3  understand how a search occurred.

4       This seems to look more consistent with what a text

5  message would look like in the context of it being sent.  You're

6  not disputing the content.  So why would this be prejudicial to

7  your client?

8       MR. TATE:  Because it's not proper in an opening

9  statement.

10      THE COURT:  Okay.  All right.  Thank you.

11      MR. TATE:  All right.

12      THE COURT:  Anyone else?

13      MS. ARMENI:  Your Honor, just to the extent from

14  Mr. Courson that we had joined in in Mr. Tate's objection.

15      THE COURT:  Okay.  Do you have anything else you wish

16  to add to the argument, Ms. Armeni?

17      MS. ARMENI:  No, Your Honor.

18      THE COURT:  All right.  I'll allow this exhibit.  Let's

19  move on.

20      MR. CHRISTIN:  Thank you, Your Honor.  And just for the

21  benefit of the Defense, this was an extraction from

22  Mr. Dallmann's phone.

23       So the last two exhibits are -- I don't believe there

24  were any objections to, that I received.  And so this is the

25  first slide.  These are quotes that were extracted from the

─────2:22-cr-00030-RFB-DJA─────

 1   officer -- from the agent's notes, and they will be testified

 2   to, as well as this second slide.

 3          MR. MARSH:  We did have an objection.

 4          THE COURT:  Okay.  Let's put --

 5          (Court reporter clarification.)

 6          MR. MARSH:  We did have an objection.  We sent it

 7   precisely at 8:30 yesterday to --

 8          THE COURT:  Let's go back -- okay.  So go ahead, Mr. --

 9   oh, there we go.  That's it.

10          So what's your objection, Mr. Marsh, as relates to

11   these particular --

12          MR. MARSH:  The objection is that this is taken out of

13   context and are just snippets from a much more lengthier 302

14   where Mr. Jaurequi is talking about how he was trying to make

15   ends meet and what he had done to do that, including coming out

16   of his own pocket to keep his household going.

17          THE COURT:  So, Mr. Marsh, let me ask you this

18   question.  Is it the fact that it appears in a demonstrative?

19   Because I don't know that -- if Mr. Christin stood up and said,

20   "You will hear that Mr. Jaurequi said, 'Illegal things are just

21   illegal things, but one does not think about it when one is just

22   trying to make ends meet,'" I don't know that there would be an

23   objection to that.  That's a statement of your client that would

24   be admissible.  Is it simply the fact that it's on this

25   demonstrative?  Because I --

———2:22-cr-00030-RFB-DJA———

1        MR. MARSH:  I think that's part of it, and particularly

2   when you have these quotation marks and you've got agents who

3   aren't using tape recorders, even though they could, and --

4   yeah, that's a quote.  It's a quote from a 302, which is

5   different than what's in the agent's notes.  I mean, I don't

6   think Mr. Jaurequi says, "One does not think about it when one

7   is trying to make one's ends meet," like a Stanford English

8   professor.

9        THE COURT:  But my question to you, Mr. Marsh, is this.

10  As you understand it, is this statement going to come in like

11  this in quotes or is he going to say that that's what he said in

12  terms of testimony?  I agree that you could challenge the

13  credibility of the recollection of the agent.  You can say that

14  "My client doesn't speak this way," right; that "This is not a

15  probable statement."  That's different, as you know, than them

16  saying, "This is what the agent's going to say Mr. Jaurequi said

17  and we're going to present that."  And certainly that would be

18  admissible.

19        And again, as I said with Mr. Tate, as you know,

20  Mr. Marsh, if I think it's going to be admissible, then it can

21  be used in opening.  Really, the issue is about misuse or its

22  misunderstanding.  You're not disputing, as I understand it,

23  that they're going to present evidence that this was a quote

24  that your client actually made.  What you're disputing is its

25  use in opening and the fact that you think that it may be taken

1   out of context?  Is that your -- is that your argument?

2           MR. MARSH:  That's part of it, and particularly the use

3   of the quotation marks as if it were recorded when it wasn't.

4           THE COURT:  So, again, I guess let me -- let me ask

5   Mr. Christin in terms of how this will come in in terms of the

6   quotation marks or not.  Because obviously there are no

7   recordings here.  But is the agent going to say that this is

8   exactly the words that were used by Mr. Jaurequi?  Because

9   obviously he'd have to say that if there are quotation marks.

10          MR. CHRISTIN:  Your Honor, so the -- some of the 302s

11  contain specific quotes of what the defendants said, and when

12  those quotes are used, that -- that is an indication that it

13  was -- it was written down exactly how the defendant said it.

14          So I would lay the foundation as to what exactly did he

15  say.  "Were those his words or are you describing it?"  And I

16  think the agent could say those -- that, "That was his words.  I

17  put quotation marks around it."

18          THE COURT:  Again, so just so we're clear, right, the

19  agent's going to say, "These were his exact words"?  Because,

20  again, I agree that it should be quotation marks around the

21  content of a 302.  That's different.  If the agent wrote what he

22  thought Mr. Jaurequi said and then you're quoting a 302, then

23  you should not put quotation marks.  If the agent's going to

24  say, "This is the exact quote that Mr. Jaurequi made word for

25  word," then that's different.  So which is it?

─────────2:22-cr-00030-RFB-DJA─────────

1           MR. CHRISTIN:  My -- Your Honor, I'm not quoting the

2   agent's words.  I'm quoting the agent quoting Mr. Dallmann.  So

3   I would ask, "What exactly did Mr. Dallmann say" -- or Jaurequi.

4   Sorry.  And he would say, "Illegal things are just illegal

5   things, but one does not think about it when one is just trying

6   to make ends meet."

7           And if the agent is unable to recall the specific exact

8   words, then we would refresh their recollection if they said, "I

9   can't recall."

10           "Is there anything that would refresh your

11   recollection?"

12           "Yes.  My notes where I drew quotation marks around

13   exactly what was said."

14           THE COURT:  So your understanding is that, again, just

15   so we're clear, these are not quotation marks around a section

16   of a 302.  These are quotation marks within the 302 where the

17   agent has recorded what he believes to be the exact words.

18           MR. CHRISTIN:  That's my understanding, and I will even

19   double-check that before I put this line into opening.  That's

20   my --

21           THE COURT:  Because here's what I'm going to tell

22   you...

23           (Prosecution conferring.)

24           THE COURT:  Here's what I'm going to tell you,

25   Mr. Christin.

 1          MR. CHRISTIN:  Yes, Your Honor.

 2          THE COURT:  If I -- and I'm contemplating this.  If I

 3  were to allow this and the agent doesn't say that, then I'm

 4  going to tell the jury, "You were told at the opening that the

 5  agent said this was going to happen and that didn't happen, and

 6  you can take that into consideration in the context of the

 7  Government's case and the credibility of this agent."  I will

 8  make that specific statement --

 9          MR. CHRISTIN:  Understood, Your Honor.

10          THE COURT:  -- to the jury if it doesn't come in as you

11  say it comes in.

12          MR. CHRISTIN:  Understood.

13          THE COURT:  Because I think that might be the only way

14  to address it if that's not the way that it comes in.

15          The other issue I have with the second quote is that

16  it's partially not a quote.  So that one, you can't use at all

17  because you have to -- it starts off with language that's not

18  quoted.

19          But if you want to use the first quote -- and I'll

20  think about this just for a moment here, looking at it again --

21  you can, with the understanding that it needs to come in exactly

22  that way.

23          MR. CHRISTIN:  Understood, Your Honor.

24          THE COURT:  All right.  Next -- the next slide.

25          MR. CHRISTIN:  And this is the final one, Your Honor.

——2:22-cr-00030-RFB-DJA——

1          THE COURT:  Mr. Tate.

2          MR. TATE:  Thank you, Your Honor.

3          I think that, again, these are quoted statements of

4   Mr. Dallmann from a police report.  And, of course, police

5   reports themselves are inadmissible.  They're hearsay.  It's not

6   Mr. Dallmann's statement.  He didn't adopt it.  It's subject to

7   cross-examination should the agent testify and said he said this

8   in quotes.  But I just think this is improper for an opening

9   statement.  It's not his statement at all.  It's the agent's

10  statement, and so that would be the objection to that.

11         And they took bits and pieces out of a whole statement

12  and then compiled it in a way that makes it look like one

13  statement filed -- followed the other.  I just think it's

14  improper for an opening statement.  It might be good for

15  closing, but for just a forecast of the evidence, this just

16  seems to be improper before any statement of Mr. Dallmann comes

17  into evidence.

18         THE COURT:  Okay.

19         Mr. Christin, I guess my question is, this is a little

20  bit different than the earlier demonstrative where you have

21  these messages.  So maybe you can explain to me this

22  back-and-forth because it's not clear to me if they're separate

23  statements or if it's part of a conversation.

24         MR. CHRISTIN:  Yes, Your Honor.  This is -- these

25  quotes come from -- throughout an interview.  So it's not --

─────2:22-cr-00030-RFB-DJA─────

1  it's not just a back-and-forth.  It's, "Oh, the aircraft

2  customers?  We only had two."  And then, "To PayPal or that

3  e-mail to Stripe, well, maybe I didn't disclose everything I

4  would have.  Yes, I know that that's a lie.  I'm not saying

5  everything I did was right."  That those three kind of come in

6  around the same time of the interview.

7            And might I inquire with the Court, if I removed the

8  quotes, would that appease the Court?

9            THE COURT:  No.  Here's my concern, Mr. Christin.  I'll

10  let you make reference to these statements.  I'm not going to

11  let you use the demonstrative.

12            MR. CHRISTIN:  Understood, Your Honor.

13            THE COURT:  And part of the reason why is it's

14  difficult to see what the order is.  If they're -- in this

15  situation, it may appear that they're meant to be sequential,

16  but they're not sequential.  And I think, particularly because

17  I'm going to allow the earlier slide where they are sequential,

18  this slide is not appropriate to be used.  If you again want to

19  reference statements by saying, you know, "You will learn that

20  he said this," obviously that's something you can do in opening.

21            MR. CHRISTIN:  Understood.

22            THE COURT:  But I will not allow this demonstrative.

23            MR. CHRISTIN:  Thank you.

24            THE COURT:  All right.

25            So, Mr. Marsh, I didn't come back to you on the one

——2:22-cr-00030-RFB-DJA——

1  particular quote, but I don't know if there's anything that you

2  wanted to add.  But I'm going to allow it with the

3  understanding -- and I'm sure you'll remind me -- if it does not

4  come in in the way that was described, then I will give that

5  specific instruction to the jury.

6          MR. MARSH:  I will surely remind you, Your Honor.

7          THE COURT:  Okay.  Is there -- okay.  I think that

8  addressed the Government's demonstratives.  Then I believe we

9  had demonstratives from, I think, Ms. Bliss.

10          Did you have a demonstrative?

11          MS. BLISS:  Yes, but I didn't see -- well, there was

12  the objection by the Government previously, but then I didn't

13  see an objection last night.  The objection was based on

14  relevance.

15          THE COURT:  So which -- again, can we switch over to --

16  are you plugged into the system?  Can we see Ms. Bliss's

17  demonstrative exhibits, please.

18          MS. BLISS:  7002, 3, and 4D, just demonstrative.

19          MR. CHRISTIN:  And, Your Honor, for the -- to clarify

20  the record, the Government did, in fact, object last night --

21          THE COURT:  That's what I thought.

22          MR. CHRISTIN:  -- at approximately 6 o'clock in its

23  e-mail with its demonstratives.

24          MS. BLISS:  I didn't see that.  I'll double-check.

25          THE COURT:  So I'm not really sure the particular

—2:22-cr-00030-RFB-DJA—

1  relevance of these images, Ms. Bliss.  I don't --

2          MS. BLISS:  Well, it's --

3          THE COURT:  -- really know why they are here.  I mean,

4  people can see who your client is.  There's no real context to

5  these demonstratives either.  It would be one thing if it was

6  just a picture of him by himself, but he's here.  I don't really

7  know why we would add to these particular -- add these

8  demonstratives, in part, because I think they're confusing

9  because they don't have context.  And you can't explain it.

10          MS. BLISS:  Well --

11          THE COURT:  I mean, he's here.  So what is it that you

12  want to use them for?

13          MS. BLISS:  Well, the context is that I have a good

14  faith belief that there will be evidence coming in about

15  Mr. Huber's story, how he came to the United States and why.

16  And his wife, Agnes, who is in the picture, she was there when

17  the -- the FBI interviewed Mr. Huber.  So it puts a name with a

18  face.

19          And so I -- it's part of his story and who he is.  And

20  it is relevant.  He's not confined to the four corners of

21  accusations contained in the Government's indictment.

22          THE COURT:  So are you going to be putting on character

23  evidence?  Because that's -- that what it sounds like you're

24  saying.

25          MS. BLISS:  That's not character evidence, Judge.

2:22-cr-00030-RFB-DJA

1          THE COURT:  If you're going to say that this is part of

2    his story and he came here and this is who he is, that is, from

3    my view, character evidence.  And so are you going to be

4    offering this exhibit at the trial?

5          MS. BLISS:  No.  No, I'm not.

6          THE COURT:  Okay.

7          MS. BLISS:  That's why it's a demonstrative aid.

8          THE COURT:  Yeah.  No.  Then if you're not going to

9    offer it, right, and it's not going to be admitted, then I'm not

10   going to allow it.

11         MS. BLISS:  All right.  I understand.  But, Your Honor,

12   talking about who he is, why he came here, why he applied for a

13   job, what his work background -- that's not character evidence.

14         THE COURT:  You and I can disagree about that.  It

15   depends upon where you go with that.  It certainly can be

16   character evidence.  You're describing it to me generally.

17          So there's a point at which that line is crossed.  I

18   haven't heard what you're going to say in detail, Ms. Bliss.

19   But there is a point at which when you tell a person's story and

20   who they are, that is, in fact, character evidence.  When you

21   talk about their particular traits or habits in terms of what

22   may or may not have made them successful, what they believe in,

23   that can be character evidence.  Again, I don't know how deeply

24   you're going to get into that.

25          That being said, again, if this is not going to be

2:22-cr-00030-RFB-DJA

1    offered in the case, then I'm not going to allow it.

2              MS. BLISS:  Very well, Your Honor.  We'll withdraw it.

3              THE COURT:  Okay.

4              Any other demonstratives, then?

5              MR. CHRISTIN:  Well, Your Honor, just given the Court's

6    rulings, I've now removed those exhibits from the presentation.

7    But I wanted to make sure it was okay with the Court that

8    instead of the PayPal slide, it would just be a blank slide that

9    says:  "PayPal Evidence."

10             THE COURT:  Well, I'm sorry.  Why do we need a blank

11   slide?  Because you need to fill the space?

12             MR. CHRISTIN:  So that as I talk about it, they're not

13   looking at something that's -- that's not what I'm talking

14   about, right.  It falls in the middle of the presentation.

15             THE COURT:  Oh, I see what you're saying.  Just because

16   you don't want there to be a blank screen, per se.

17             MR. CHRISTIN:  Correct.

18             THE COURT:  That's fine.

19             MR. CHRISTIN:  And then same thing with -- there will

20   be one that says:  "Google Evidence," and there will be one

21   thing that says:  "FBI Interviews."

22             THE COURT:  That seems to be fine.

23             Any objection to that?

24             MR. TATE:  No objection.

25             MR. CHRISTIN:  Thank you, Your Honor.

1          THE COURT:  All right.

2          All right.  Well, with that, that's also helpful for me

3    as we finalize -- we're going to go back and finalize the

4    preopening instructions.  Then we'll send them out to you.  Then

5    we'll come back out around probably 10-ish or so or maybe a

6    little bit earlier, depending upon how quickly we get these to

7    you now that we've had this discussion and discussed the

8    preopening instructions.

9          Is there anything else that we need to do today -- or

10   this morning, I should say?

11         MR. CHRISTIN:  Yes, Your Honor.  The Government moved

12   to unseal its trial brief that was filed as Document Entry 381

13   so that it can provide it to Defense counsel.

14         THE COURT:  Any objection to that?

15         MR. TATE:  No objection.

16         THE COURT:  All right.

17         So that motion will be granted.

18         MR. CHRISTIN:  Thank you.

19         MR. MISHLER:  381?

20         MR. CHRISTIN:  381.

21         THE COURT:  Okay.  And as I've indicated, we'll get

22   started probably around 10:30-ish with the openings and start,

23   obviously, with the Government.  And then, as I said, we'll do

24   the order starting with Mr. Dallmann and then Mr. Courson and

25   then Mr. Huber, then Mr. Jaurequi, and then Mr. Garcia.  That

─2:22-cr-00030-RFB-DJA─

 1  will be the order of the opening statements.

 2          And then, Mr. Christin, we'll have your first witness

 3  probably, depending upon how long we go, after lunch.  So we'll

 4  probably go for about, I would imagine, two hours, two and a

 5  half hours for the openings and the instructions.  We'll take a

 6  lunch break, and then we'll have your first witness.

 7          MR. CHRISTIN:  Understood.

 8          THE COURT:  And that will be?

 9          MR. CHRISTIN:  Special Agent Tim Lynch, who interviewed

10  Mr. Dallmann.

11          THE COURT:  Okay.  All right.

12          All right.  Anything else we need to do before I take a

13  break here and we finalize the instructions?

14          (No response.)

15          THE COURT:  All right.  All right.  Thank you all for

16  your time.  We'll be adjourned.

17          (Recess taken at 9:15 a.m.)

18          (Resumed at 10:11 a.m.)

19          THE COURT:  Please be seated.

20          Okay.  We're back on the record here.

21          Did you all receive a copy of the instructions?

22          MR. MERRIAM:  Yes, Your Honor.

23          MR. CHRISTIN:  Yes, Your Honor.

24          MS. BLISS:  Yes, Your Honor.

25          THE COURT:  All right.  Let's see about any

—2:22-cr-00030-RFB-DJA—

1    recommendations for modifications.

2         (Pause.)

3         THE COURT:  All right.  Let's just go through.  Does

4    the Government have any objections to the Court's instructions

5    or requests for changes?

6         MR. MERRIAM:  Your Honor, we did get a chance to read

7    these and appreciate the Court giving us that opportunity.  Our

8    only concern is on Page 11, there's a deliberate ignorance page

9    that, at least in the copy we got, retains some language

10   apparently about a drug case.

11        THE COURT:  Oh.

12        MR. MERRIAM:  And so we could suggest some

13   modifications for that that would --

14        THE COURT:  Yeah, yeah.  That was -- okay.

15        MR. MERRIAM:  That's at Page 11.

16        THE COURT:  Uh-huh.  Yeah, I'm not sure what happened

17   with that language.  Okay.  What would you suggest?

18        MR. MERRIAM:  So I think that the title, and I don't

19   know exactly how the Court reads this, but it -- the standard

20   will be willfully for the copyright matter.  I don't know that

21   that needs to be in the title.

22        THE COURT:  So here's what I think, actually, as

23   relates to this.  I actually think, because I did not intend to

24   include this instruction, I'm just going to take this out.  I

25   think it needs to be placed in a larger context.  I think the

—2:22-cr-00030-RFB-DJA—

1   conspiracy language covers what we're talking about here.

2        I actually didn't -- in looking at this, I didn't want

3   to include this particular instruction.  We can have a willful

4   instruction that gives more detail and a deliberate ignorance

5   instruction that happens later, but it was not my intention to

6   include this one now.

7        MR. MERRIAM:  Your Honor, with that, no objection.  And

8   having reviewed the others, we think they accurately restate the

9   law at the level of specificity that -- that's necessary at this

10  point.  So no other objections or concerns.

11       THE COURT:  Okay.

12       From the Defense?

13       MR. TATE:  Your Honor, on behalf of Mr. Dallmann, with

14  respect to the substantive instructions, of course the Court can

15  give those ahead of evidence, but I think the problem that it

16  presents is that there hasn't been any evidence in the case, and

17  I'm looking at the essential elements, particularly as it

18  relates to Count Four and Five, public performance.  It's not

19  defined.  And in the substantive instruction, public performance

20  should be defined.

21       THE COURT:  Are you going to offer an instruction?

22  Because, I mean, this instruction's more or less straight from

23  the statute and the indictment.  So are you offering something?

24  Because I'm -- I don't -- again, if you want to add an

25  instruction, I'll consider that, but --

2:22-cr-00030-RFB-DJA

1          MR. TATE:  Okay.

2          THE COURT:  -- I am going to instruct on the counts.  I

3  think it's important for them to be instructed on the counts.

4  If you have language you want to add, suggest, go ahead.

5          MR. TATE:  Your Honor, I don't have one drafted

6  because, as I mentioned, I'm not accustomed to doing a

7  substantive instruction ahead of trial.  Normally that's done at

8  a charge conference.  I would be -- like to reserve the right to

9  tender instructions based on the evidence adduced at the trial,

10  but --

11          THE COURT:  We're going to have -- again, we're going

12  to have detailed instructions at the end.  This is not a

13  substitute, obviously, for that.  And I think I referenced that.

14  This is just so they understand the nature of the charges.  I

15  mean, that's why, again, the instructions are somewhat

16  abbreviated compared to what they will be at the end, and to the

17  extent we need to address substantive aspects of the charges,

18  I'm happy to do that.

19          I just want to make sure that these instructions are

20  consistent with the statute and the charges.  I don't think

21  there's anything that is inaccurate about them, but if there is,

22  that's what I want the parties to tell me.  If you think somehow

23  it misstates the statute or the elements, I'm happy to consider

24  that and make any modifications to that.

25          MR. TATE:  We would reserve any objection at this time,

—2:22-cr-00030-RFB-DJA—

1   Your Honor.  But I think it does outline the elements of the

2   offense.

3            THE COURT:  Okay.  Thank you.

4            From anyone else?

5            MS. ARMENI:  Your Honor, Paola Armeni on behalf of

6   Mr. Courson.

7            Your Honor, I don't have any objections to the

8   instructions you provided.  We did -- on behalf of Mr. Courson,

9   however, we submitted a preliminary instruction in docket --

10  it's Document 350.  And so we would ask the Court to at least

11  consider giving that instruction.

12           THE COURT:  I'll go back and look.  I looked at them

13  all, Ms. Armeni.  Perhaps, you can tell me what it is

14  specifically you want to have added.

15           MS. ARMENI:  Certainly, Your Honor.  So our preliminary

16  instruction we submitted on May 21st of this year in

17  Document 350 was based on the Federal Rule of Evidence Rule 105,

18  and it was the preliminary instruction that read:  "This is a

19  multi-defendant case.  There will be times throughout this case

20  that evidence will be admissible for one purpose or against one

21  defendant, but not for -- not another.  If the Court admits this

22  type of evidence, I will instruct you on the limited purpose for

23  which it can be used."

24           THE COURT:  Okay.  I did have this one for separate

25  consideration for each defendant, but I think that's fine.

—2:22-cr-00030-RFB-DJA—

1   That's an instruction I would normally give in this case at the

2   end.

3          Let's do this.  I'm happy to add that.

4          Is there any objection to that from the Government?

5          MR. MERRIAM:  If we could have the Court's

6   indulgence --

7          THE COURT:  I think it's the -- it's a standard

8   instruction actually from -- I think it's a standard circuit

9   instruction, if I'm recalling correctly.

10          Is that the Ninth Circuit standard instruction,

11  Ms. Armeni?

12          MS. ARMENI:  No, Your Honor, it's not a Ninth Circuit

13  standard instruction.  It's just straight from the Federal Rules

14  of Evidence.

15          THE COURT:  Well, I think there's a standard

16  instruction that actually says that, but I don't think that

17  that's a misstatement of the law.  I think that's accurate.

18          Mr. Merriam?

19          MR. MERRIAM:  So, Your Honor, we think this is covered

20  by the multiple defendants and consideration.  We also -- this

21  is not the time to revisit this, but there is some ongoing

22  discussion that the Court's taken under advisement about the

23  timing of these types of instructions in all.  We don't object

24  to the language specifically --

25          THE COURT:  So I guess I don't understand.  Like, I'm

—2:22-cr-00030-RFB-DJA—

1   going to -- I'm actually going to say that at certain points in

2   the trial, right?  I'm going to say, right, and they've asked me

3   to say at certain points in the trial:  "Evidence may be

4   admitted against one defendant, but not necessarily against

5   another defendant."  And then they can take that into

6   consideration.

7          We are going to take that on a day-by-day basis, but

8   I'm going to give that instruction anyway.  So I'm not sure why

9   there would be an issue with giving it preliminarily.

10          MR. MERRIAM:  And I was just seeking clarification from

11   the Court on that point.  We last discussed that on May 16th.

12   And with that, we don't object to the standard instruction.

13          THE COURT:  Okay.

14          Ms. Armeni, if you could do me a favor -- I don't know

15   if you have access to your e-mail.  If you could e-mail us that

16   language, we could just more easily add it.  Can you do that?

17          MS. ARMENI:  I can.

18          THE COURT:  Thank you.

19          Do any of the other defendants have any requests for

20   modifications or objections to the preliminary instructions?

21          Mr. Marsh?

22          MR. MARSH:  Good morning, Your Honor.

23          Given that you won't be using the deliberate ignorance

24   instruction, that was one of my points.  So thank you.

25          The second was in the elements for Count One,

—2:22-cr-00030-RFB-DJA—

1  conspiracy.  We had filed some alternate instructions that made

2  clear that for the conspiracy count the Government is only going

3  forward on the reproduction theory.  So in our view, as part of

4  the element, the first element should say:  "There was an

5  agreement between two or more persons to commit criminal

6  copyright infringement" and insert "by reproduction."  And

7  that's only limited to the first Count.

8       THE COURT:  Any objection to that?

9       MR. MERRIAM:  Your Honor, I think that just gets too

10 specific for the purposes of these preliminary instructions.

11      THE COURT:  Was that incorrect?  Because, I mean, it --

12 first of all, let me ask you this, Mr. Merriam.  Is that

13 incorrect?

14      MR. MERRIAM:  That is a correct statement of --

15      THE COURT:  Okay.

16      MR. MERRIAM:  -- what we had represented to Defense.

17      THE COURT:  You're just saying you don't think it's

18 necessary, but you're not saying it's incorrect.

19      MR. MERRIAM:  That's correct, not incorrect.

20      THE COURT:  All right.  I mean, I think that's fair.  I

21 mean, I think that they may not fully appreciate that until the

22 end, and I think it will be pretty clear, Mr. Marsh, but I'm

23 happy to make that change which I will make to the instructions.

24      Anything else?

25      MR. MARSH:  We would also request since it's an

─────2:22-cr-00030-RFB-DJA─────

 1  extremely important element that you define "willfully" because

 2  it's not a word that somebody would automatically know what it

 3  means in this legal context where it's, you know, knowing what

 4  the law is.

 5          And -- and we did submit, again, a proposed willfulness

 6  instruction.  We would even be okay if you used the Government's

 7  proposal, and we can argue about, you know, what you give as a

 8  final -- final instruction.  But I do think that's a term that

 9  should be defined for the jury before they hear opening

10  statements.

11          THE COURT:  And why is that, Mr. Marsh?

12          I mean, saying -- and I say that, in part, because I

13  appreciate the definition, but I also think that these

14  particular instructions are meant to help clarify certain

15  aspects of the law that may not be as well-known to jurors.  I

16  don't know that there's anything about the willfulness

17  definition itself that is, sort of, counterintuitive to the

18  point that I would feel that we need to do it ahead of time.

19          So, in other words, they're going to get it at the end,

20  which I think will probably be more helpful because you all are

21  going to be making more specific arguments about what was and

22  was not --

23          MR. MARSH:  Okay.

24          THE COURT:  -- known.  And so I don't necessarily

25  disagree with the fact that it should be given at some point,

1  but preliminarily, again, I try to keep the instructions

2  somewhat shorter and then we'll have more detailed instructions

3  later.  So unless you think it's sort of essential, which I

4  don't know that it is here, I'm inclined to keep it out.

5       MR. MARSH:  I --

6       THE COURT:  And the other reason why I'm saying that,

7  too, Mr. Marsh, is there is going to be some issue which we'll

8  have to parse a little bit at the end about the fact there are

9  multiple counts here against Mr. Dallmann, there's basically one

10 count against the other defendants.  And the willfulness is a

11 little bit different as relates to the different counts in terms

12 of the participate in the conspiracy willfully and intentionally

13 versus Mr. Dallmann's willfulness or not or intent as relates to

14 these other counts.

15      That's another reason why I wanted to stay away from

16 the willfulness instruction at the beginning because I think

17 it's important to distinguish between the individual counts and

18 the conspiracy count so they understand that, but willfulness is

19 something that we will have to parse with a little more detail

20 at the end.

21      MR. MARSH:  I agree with you 100 percent on that it is

22 different for the conspiracy count versus the substantive

23 counts.  Same for the deliberate -- deliberate ignorance

24 instruction.  So I -- we maintain our instruction -- or

25 objection, ask for the willfulness instruction, but I understand

─────2:22-cr-00030-RFB-DJA─────

 1  what you're planning to do.

 2          I will tell you that I may mention the term briefly

 3  during opening just to --

 4          THE COURT:  That's fine.

 5          MR. MARSH:  -- make sure the jury has something to look

 6  for during the trial --

 7          THE COURT:  Okay.

 8          MR. MARSH:  -- because it's obviously important to our

 9  client.

10          THE COURT:  That's fine.

11          MR. MARSH:  Thank you.

12          THE COURT:  Ms. Bliss.

13          MS. BLISS:  Yes, Your Honor.  I also share the same

14  concerns as Mr. Marsh, and there was a proposed willfulness

15  defined within that conspiracy instruction that Mr. Brown

16  proposed.  And the reason why I think it's important on behalf

17  of Mr. Huber is because this is going to be a long trial, there

18  are over 700 exhibits, and the jury needs to understand given

19  the length, the complexities, and the amount of exhibits

20  introduced -- so many of which have nothing to do with

21  Mr. Huber -- they need to understand what willfulness means.

22  Because that's the agreement --

23          THE COURT:  What is not captured in the description of

24  what it means for someone to participate in a conspiracy?  What

25  do you believe is so essential to the preliminary instruction

—2:22-cr-00030-RFB-DJA—

1  that is not captured in the description of participating or not

2  in a conspiracy?

3          MS. BLISS:  But it's part --

4          THE COURT:  Okay.  I want you to answer my question.

5  My question is, what do you believe is part of the willfulness

6  instruction that is so essential that is not captured to a

7  certain extent in the instruction regarding participation in a

8  conspiracy?

9          MS. BLISS:  Because the willfulness instruction is part

10 and parcel of the agreement that a defendant joins to

11 participate in this type of conspiracy.

12         THE COURT:  Ms. Bliss, but you're not actually

13 answering my question.  What is it that's in the willfulness

14 instruction that's not captured in the instruction regarding

15 participating in the conspiracy that you think is so essential

16 that it should be highlighted preliminarily?

17         MS. BLISS:  "Willfulness, in the criminal copyright

18 context, means a voluntary, intentional violation of a known

19 legal duty.  That is, a defendant must first have actual

20 knowledge of the law, and then he must voluntarily and

21 intentionally violate it."  That's the agreement -- that's the

22 crux of the agreement that forms the conspiracy that is being

23 alleged.

24         So that's why I think it's -- it's an unusual

25 circumstance in this particular type of case.  Because copying

1    in and of itself --

2          THE COURT:  But the conspiracy instruction says you

3    willfully participate in an unlawful plan with the intent to

4    advance the objective purpose of the conspiracy or the plan.

5    How is that not willfully participating and understanding

6    copyright infringement?

7          MS. BLISS:  Because it gives context to what the

8    unlawful behavior entails.

9          THE COURT:  I appreciate that.  I just don't think it

10   needs to be done preliminarily.  I appreciate that.  But I'm not

11   going to give it at this point.  Thank you.

12         MS. BLISS:  Thank you, Your Honor.

13         THE COURT:  Okay.  Anything else from any of the

14   defendants?

15         Mr. Brown?

16         MR. BROWN:  May I sit just so I can look at my computer

17   here.

18         THE COURT:  What's that?

19         MR. BROWN:  May I sit just so I can look --

20         THE COURT:  Yes, yes, yes.

21         MR. BROWN:  So I have a problem -- as Ms. Bliss was

22   saying, the Government has charged a conspiracy to commit felony

23   copyright infringement.  That means a very specific kind of

24   copyright infringement, more than $2,500 retail value, 180-day

25   period, and more than 10 copies.

2:22-cr-00030-RFB-DJA

1        That is the requisite intent that a defendant would

2   have to have to satisfy the mens rea necessary to enter into

3   this conspiracy.  The Government says as much at ECF 200 at 6,

4   and I'll just quote this:  "Because the object of the conspiracy

5   is criminal copyright infringement, the agreement element

6   requires the Government to show that the defendants joined

7   together for purposes of willfully infringing a copyrighted work

8   for commercial advantage or private financial gain by

9   reproducing or distributing within 180-day period 10 or more

10  copies of the copyrighted work, having a total retail value of

11  more than $2,500."

12       Each coconspirator must have specifically agreed to

13  each of those elements and sub-elements.  Otherwise, they lack

14  the intent to enter a conspiracy to commit felony copyright

15  infringement.

16       My concern is that if conspiracy -- the elements of

17  copyright infringement essentially become embedded into the

18  agreement element of conspiracy, and if those two things are

19  separated, my concern is that the jury will say, "Okay, we need

20  to decide whether they conspired."  And let's say, "Yeah, we

21  think they did."  And then they'll actually go to the elements

22  of felony copyright infringement.

23       And say, "Yeah, we think it was more than 10 copies.

24  We think it was more than $2,500."  They can't make that first

25  decision without making that second decision.

1          THE COURT:  Okay.

2          MR. BROWN:  So what I would request is one instruction

3   on conspiracy that embeds the felony infringement elements into

4   the agreement element of conspiracy.

5          THE COURT:  Let me pull up...

6          MR. BROWN:  So I have a --

7          THE COURT:  This is your proposed instruction?

8          MR. BROWN:  Yeah, ECF 348, at Page 2.

9          THE COURT:  Give me a moment to pull this up.

10         And are you requesting, Mr. Brown, that the instruction

11   that I have on conspiracy be -- that this be given -- because I

12   have the conspiracy instruction, and then I have the substantive

13   instruction.  And then are you proposing then after those two

14   are given, this final instruction which embeds them together, or

15   are you proposing it be part of the conspiracy instruction?

16         MR. BROWN:  My request would be that there be one

17   instruction, the one that I've proposed, and I would request

18   removing the proposed elements of criminal copyright

19   infringement and the proposed -- and the conspiracy to commit

20   criminal copyright infringement.  So one instruction instead of

21   those two separate instructions.

22         THE COURT:  Mr. Merriam, I'm just pulling this up now.

23         MR. MERRIAM:  Your Honor, at this point for these

24   purposes, we agree with the Court's proposed example.  There's

25   going to be a lot of discussion based on the evidence and before

—2:22-cr-00030-RFB-DJA—

1  the final jury instructions are prepared and sent to the jury

2  for deliberations.  At this point familiarizing them with the

3  concept of conspiracy, the willful agreement to participate, the

4  concept of copyright infringement, and the willfully conduct

5  that's embedded in there are going to be sufficient for these

6  purposes.  We would need a much longer hearing than we have

7  today to go through this.  Particularly when we discuss

8  willfully in the context of the conspiracy, it's a known

9  violation of a legal duty, not that a particular defendant is a

10 legal expert who knows the interplay between Title 17 and

11 Title 18 in order to be able to specify when context -- conduct

12 reaches various levels of infringement.

13         THE COURT:  Right.

14         MR. MERRIAM:  And I think that's far too detailed for

15 the purposes of these preliminary instructions, something we

16 will certainly be monitoring as the evidence comes in and in

17 preparation for our final jury deliberations and the

18 instructions we send back with them.

19         THE COURT:  Okay.

20         So, Mr. Brown, I guess my question to you is the same

21 one I had asked Ms. Bliss, which is I appreciate what you're

22 arguing, which you can argue in a detailed manner in closing.

23 And I'm not preventing anyone in opening from saying, "They're

24 not going to be able to demonstrate that, in fact, my client

25 willfully and knowingly participated.  They'll have to be able

—2:22-cr-00030-RFB-DJA—

1  to prove the different aspects of copyright infringement, and

2  they won't be able to do that."  I'm not going to stop you from

3  doing that.  I don't think this instruction in any way suggests

4  otherwise.

5        So, again, part of the -- the purpose of the

6  instruction is to give them, sort of, broad strokes of this.

7  They will receive detailed instructions when they go in, which I

8  think will be, of course, the most significant time as to when

9  they deliberate.

10       So is there anything about this that you think somehow

11  would prevent those arguments or in some way misstates or

12  misrepresents what the law is?

13       MR. BROWN:  My concern is that, you know, the

14  Government said, "This is just to provide a broad conceptual

15  framework of the crime that's charged here."  My concern is that

16  my client will be convicted of a conceptual conspiracy instead

17  of the conspiracy that the Government has alleged here.

18       THE COURT:  But, Mr. Brown, what I'm saying is they're

19  going to get detailed instructions at the end.

20       MR. BROWN:  Right, but they're --

21       THE COURT:  So it's not as if before they deliberate

22  they're not going to get these instructions.  And, in fact,

23  right, I think that's -- that is an important time to give the

24  more detailed instructions because they've received the

25  evidence.

2:22-cr-00030-RFB-DJA

1          If someone makes a statement as it relates to evidence

2    or argument or a questioning that suggests elements otherwise,

3    then certainly we can address that during the trial.  Again,

4    these are not meant to be the full detailed instructions.  And

5    so the purpose of these instructions is to give the jury an

6    understanding of these elements, what they represent, and so

7    they can put the evidence in a particular framework.

8          But I'm not saying that you can't argue this in your

9    opening, and I'm not saying you can't say, "They're not going to

10   be able to satisfy these elements."  So, again, I'm not sure why

11   I would add them now.  I'm not saying that they can't be added

12   later, but I'm just sort of trying to understand why I would add

13   them now.

14          MR. BROWN:  My concern is that the framework the jury

15   is being given is misleading.  It suggests --

16          THE COURT:  In what way?

17          MR. BROWN:  It suggests there's two things to determine

18   here.  Number one, was there a conspiracy?  Number two, was

19   there felony copyright infringement?

20          THE COURT:  Well, no, I -- look, I think that -- one, I

21   do think that the -- they do have to determine whether or not,

22   in fact, there was a conspiracy.  If there's no conspiracy and

23   there's no agreement, then none of the defendants on that count

24   can be found guilty.  There has to at least be an agreement.

25   Even if there's copyright infringement -- let's say people were

———2:22-cr-00030-RFB-DJA———

1  doing it separately even -- your client is not specifically

2  charged with that, right.  There may be issues there.

3       I do think the law says they have to at least find that

4  there was an agreement or a conspiracy, and then they have to

5  find that that conspiracy involved a specific crime that they

6  all agreed to participate in, which is what the conspiracy

7  instruction says.

8       And so I don't agree that it's one step.  I think they

9  first have to decide there's a conspiracy.  I think the law says

10  that.  And as part of deciding there's a conspiracy, they have

11  to decide there was an agreement, but there was also an

12  agreement to do something specifically unlawful.  And it can be

13  an agreement to do three different things that are unlawful, as

14  you know.  So there is a separate two-part aspect to this, and

15  it seems like you're suggesting that there isn't, but even in

16  your instruction, there's two aspects to it, which is the

17  conspiracy and the unlawful, sort of, object of the conspiracy.

18       And so I'm trying to understand the legal distinction

19  you're making because I don't think that that is the statement

20  of the law.  I think there still has to be at least a two-step

21  process, is there a conspiracy, one, and did this conspiracy

22  involve an unlawful act.  Because certainly people just working

23  together towards a legal purpose is not an unlawful conspiracy,

24  just as people working together.  And so I'm trying to

25  understand what you mean by one step.

─2:22-cr-00030-RFB-DJA─

1        MR. BROWN:  The -- the mens rea, the scienter required

2  to enter into the kind of conspiracy that the Government has

3  alleged here, is very specific and very technical.  These

4  defendants could not have simply agreed to violate copyright law

5  in a general sense.  That would be insufficient for a

6  conviction.  Because the conspiracy they've been accused of is

7  conspiring to violate -- is conspiring to commit felony criminal

8  copyright infringement, which has very specific elements.

9        So in order -- in order for Mr. --

10        THE COURT:  So are you asking me, because what I could

11  do -- if you're asking me to be more detailed about the elements

12  of criminal copyright infringement, I guess that's separate.  If

13  you're saying that the instructions that we have as it relates

14  to criminal copyright infringement are incorrect --

15        MR. BROWN:  Well, I think --

16        THE COURT:  -- and they need to be more specific, then

17  that's a separate argument.  So if you're saying, for example, I

18  have here under Count One, elements of criminal copyright

19  infringement, four elements here.  If you're saying that you

20  think that those elements need to be more specifically defined

21  in this case, that's separate.  I'm not going to change the

22  conspiracy --

23        MR. BROWN:  Okay.

24        THE COURT:  -- instruction because I think that's

25  consistent with the law.  But it seems to me what you're saying

—2:22-cr-00030-RFB-DJA—

1 is, is that in this case, yes, there has to be a conspiracy, but

2 it's a conspiracy for a very specific type of copyright

3 infringement --

4          MR. BROWN:  Exactly right.

5          THE COURT:  -- that there's a subsection.

6          MR. BROWN:  Exactly right.

7          THE COURT:  That, Mr. Brown, speaks to me about the

8 detail of the elements of the criminal copyright infringement

9 versus the issue of the conspiracy.

10          Now, the challenge here is we have multiple counts that

11 have to be considered in the context of this.  What I don't want

12 to do is confuse them before they've heard the evidence in this

13 case.  The other reason why I give the instructions this way is

14 it's difficult to understand some aspects, particularly with

15 this type of a charge, until they hear the evidence in the case.

16 So I just want to be clear, I'm not preventing any defendant

17 from saying or arguing or asking questions about the details of

18 the elements of copyright infringement.  I just don't know that

19 we need to be that detailed in a preliminary instruction at this

20 point.

21          So, Mr. Brown, are there specific recommendations you

22 would have as relates to the -- again, this is Page 5 we're

23 talking about.

24          MR. BROWN:  Yeah.  Yeah, yeah, yeah.  What I would ask

25 is that the felony aspects of copyright infringement be added as

─────2:22-cr-00030-RFB-DJA─────

1  elements to this.  That being 10 or plus copies having retail

2  value of more than $2,500 within 180-day period.

3           MR. TATE:  Your Honor, on behalf of Mr. Dallmann --

4           THE COURT:  Hold on.  Hold on a second, please.

5           Mr. Brown, are you asking, then, that the Court include

6  language after this -- these four elements to say -- because

7  they have to find these four on top of those, right?  So it

8  wouldn't be sufficient to replace them --

9           MR. BROWN:  Correct.

10           THE COURT:  -- to say, in effect, you know, in this

11  case the defendants have been charged with conspiracy to commit

12  felony criminal copyright infringement.  This also requires

13  these elements.

14           MR. BROWN:  I think that would satisfy.

15           THE COURT:  Is there any objection to that?

16           Now, the reason I say this is because this is also

17  going to open the door to something else, which I know the

18  Government is going to come back to as relates to value and the

19  amount of value that they want to add in.  And I'm happy to add

20  this instruction in, but this means that I'm not going to put a

21  restriction on them as it relates to the dollar amounts that are

22  lost, right.  You all remember that conversation we had about me

23  limiting them and Ms. Oliva standing up repeatedly to remind me

24  about the fact that they wanted to be able to do this.  I think

25  that's accurate, but I also think it means that then they get to

put in this more detailed information, which I think is appropriate given what I've seen of the trial briefs and the arguments here. But I'm happy to add this instruction.

Mr. Merriam?

MR. MERRIAM: So I think that the way the Court just described that, adding those additional in order to prove felony copyright infringement and the way the Court set out those additional elements is accurate. There is some risk that we're getting into too much detail with the jurors preliminarily, but I don't object to the substance of that. And the Government does not object to placing that into the substantive discussion as the Court suggested --

THE COURT: Okay.

MR. MERRIAM: -- on Page 5 and the elements.

THE COURT: Hold on just a moment.

(Court conferring with courtroom administrator.)

THE COURT: And I don't have in front of me -- I'm just typing this in now -- the document regarding the additional elements.

So, Mr. Brown, repeat them for me because I just don't -- I can't pull up the document right now.

MR. BROWN: The Government will correct me if I'm wrong. It's 10 or more copies of copyrighted works in a 180-day period having a total retail value of more than $2,500.

MR. MERRIAM: And I know --

```
                      ─2:22-cr-00030-RFB-DJA─
```

1            THE COURT:  I'm sorry.  10 or more copyrighted works --

2            MR. MERRIAM:  Your Honor, I know that this would never

3    come back to bite us given counsel's read of it.  "10 or more

4    copies of one or more copyrighted works."

5            THE COURT:  "10 or more copies" -- okay.  That's why we

6    do this.

7            MR. MERRIAM:  Yep.

8            THE COURT:  "10 or more copies of one or more

9    copyrighted works," and then these works -- I'm sorry?

10           MR. MERRIAM:  Total retail value --

11           THE COURT:  Oh, there's a time -- the time frame.

12           MR. MERRIAM:  Yeah, I apologize.  Within a 180-day time

13   period.

14           (Pause.)

15           THE COURT:  So I'm going to put in "the defendants

16   conspired to" -- because that's just about the conspiracy

17   count -- "the defendants conspired to reproduce 10 or more

18   copies of one or more copyrighted works within"?

19           MR. BROWN:  10 or more copies --

20           MR. MERRIAM:  10 or more copies of one or more

21   copyrighted works --

22           THE COURT:  Within a 180-day period and?

23           MR. MERRIAM:  The exact wording is "with a retail value

24   of more than $2,500" -- "total retail value of more than

25   $2,500."

2:22-cr-00030-RFB-DJA

1          THE COURT:  And so these copyrighted works or their...

2          Had a total retail value of $10,000 or more?

3          MR. MERRIAM:  $2,500.

4          THE COURT:  I'm sorry.  What was it?

5          MR. MERRIAM:  $2,500 or more.

6          THE COURT:  Oh, okay.

7          Okay.  So the way that it will read now is that same

8    section that we have at the top, then it's going to say:  "In

9    this case, the Government is alleging the defendants engaged in

10   a conspiracy specifically to commit felony criminal copyright

11   infringement.  This means the Government must also establish

12   beyond a reasonable doubt the following elements:  first, the

13   defendants conspired to reproduce 10 or more copies of one or

14   more copyrighted works within a 180-day period and, second,

15   these copyrighted works or the copy of these copyrighted works

16   had a total retail value of $2,500 or more."

17          MR. MERRIAM:  "More than" is the wording in the

18   statute.  That -- I think the Court -- Court's instruction

19   captures that, but --

20          THE COURT:  "Had a total retail value of more than."

21   I'm happy to -- that's all right.  We can do detail.  Okay.

22          And then it will proceed to that final sentence, which

23   is:  "To find the defendant guilty of conspiracy to commit

24   felony criminal copyright infringement, you'd need to find the

25   defendant successfully completed" -- there's that rest of that

 1   section there.

 2          MR. MERRIAM:  And I apologize, Your Honor, just

 3   scrolling up just a bit.  Did the Court say "10 or more copies,"

 4   or was there a different formulation?

 5          THE COURT:  "The defendants conspired to reproduce 10

 6   or more copies of one or more copyrighted works within a 180-day

 7   period."

 8          MR. MERRIAM:  Thank you, Your Honor.

 9          THE COURT:  All right.

10          All right.  There we go.

11          And, Mr. Brown, does that capture what you are

12   suggesting?

13          MR. BROWN:  Yes.  Thank you.

14          THE COURT:  All right.

15          Okay.  We'll make that adjustment.

16          Anything else?

17          MR. TATE:  Yes, Your Honor.  On behalf of Mr. Dallmann,

18   I did find the passage with respect to the copyright

19   infringement counts.  We had submitted under Document 357 a

20   supplemental instruction that captured the whole statute that

21   reads:  "Evidence of reproduction or distribution of copyrighted

22   work by itself is not sufficient to establish willful

23   infringement of a copyright."  That's -- that comes right out of

24   the statute itself, 17 U.S.C. 506(a)(2).

25          To the extent that the Government -- that the Court is

1   giving an instruction on 506, we would ask that that 506 be --

2          THE COURT:  Hold on.  Let me pull up yours --

3          MR. TATE:  Okay.

4          THE COURT:  -- see if I can find your -- which document

5   is it again?

6          MR. TATE:  357.

7          (Pause.)

8          THE COURT:  Where -- okay.  Hold on.

9          (Court conferring with courtroom administrator.)

10         THE COURT:  So I'm sorry, Mr. Tate.  I'm coming back to

11  you.  Your instruction is not a full instruction.  It's just a

12  one sentence.  Where's the rest of the instruction this should

13  be embedded in?  Because that -- I appreciate that, but I also

14  have to explain when the reproduction is a violation.  So I

15  guess my question to you is, where would you want me to put

16  this?

17         MR. TATE:  Right on Page 5, right -- the first part of

18  the instruction is given, which is 506(a)(1).  I'm just saying

19  that since that's being given pre-evidence and preliminarily

20  that 506(a)(2), which is part of the same statute, should be

21  included in that.

22         THE COURT:  Mr. Merriam?

23         MR. MERRIAM:  So, Your Honor, with apologies to

24  everyone here, but we have Title 17, the copyright code, we have

25  Title 18, the criminal code, and their -- the interplay here.

─────2:22-cr-00030-RFB-DJA─────

1  This is -- I think it's best described as an affirmative defense

2  that can be raised in the general discussion of copyright.  So

3  if the Court were comfortable with the original proposed

4  instruction, here are the general elements of copyright

5  infringement, this could arguably go with it.

6        The Government would suggest this is -- there's more

7  possibility for confusion here.  It's certainly something we can

8  raise in the final jury instructions and the Government won't

9  object to.  But it's separate from the elements of the offense.

10        THE COURT:  Well, we could certainly put it at the end

11  of the fourth element.  I mean, it is to say -- I mean, because

12  it's obviously true that simply having something be reproduced

13  doesn't necessarily satisfy these elements, but the elements are

14  laid out.  There actually are four elements there.  And I think

15  the other aspect to this will be further definition.

16        But we can put that after the fourth element on that --

17  on Page 5.  Would there be an objection to that, Mr. Merriam?

18  We can insert the sentence there.

19        MR. MERRIAM:  We don't object to the language.  It is

20  an accurate reflection of what's contained in 506.

21        THE COURT:  And I'm saying we could just put it after

22  the four elements are read out.  If you look at that -- the

23  instruction we have, it would just come after the fourth

24  element.

25        MR. MERRIAM:  Yes.  And so that would be before the

---2:22-cr-00030-RFB-DJA---

1  Title 18 specific elements?

2          THE COURT:  Yes.  So it would say -- no, it would --

3  right.  So we'd go through "The elements of criminal copyright

4  infringement are," and we'd go through the first four.  And then

5  we'd put that sentence, and then we'd -- then move on to "In

6  this case, the Government's alleging the defendants agreed --

7  engaged in a conspiracy to commit felony criminal copyright

8  infringement.  This means the Government must also establish

9  beyond a reasonable doubt" those elements.

10          So it would go, again, after the fourth element, but

11  before the insert which I just added based upon Mr. Brown's

12  request.

13          MR. MERRIAM:  Court's indulgence.

14          (Prosecution conferring.)

15          MR. MERRIAM:  Your Honor, this wades back into the

16  willfulness component --

17          THE COURT:  But, Mr. Merriam, I'm going to ask you this

18  same question.  Is it inaccurate in any way?

19          MR. MERRIAM:  It's not inaccurate.  It -- we would need

20  to revisit our position on the -- on the deliberate ignorance

21  and -- and willfulness with the other instruction.

22          THE COURT:  That's fine.  I mean, again, the purpose of

23  the instruction is to provide the jury with some idea of the

24  elements and the law that -- my goal is to make sure that they

25  are not inaccurate or they do not misrepresent, do not misstate

―――2:22-cr-00030-RFB-DJA―――

1   the law.  They will be provided with more detail in the end.

2   But this is to provide some context for the openings and the

3   receipt of the evidence.  So absolutely, right, they will be

4   provided more information in the end as it relates to these

5   instructions.

6          MR. MERRIAM:  Our concern -- and I'm not saying this is

7   an inaccurate statement of the law.  It is verbatim from the --

8   Title 17.  Our concern is that we will now insert an affirmative

9   defense into this without the fuller discussion of willfulness

10  that was dropped with the deliberate ignorance instruction that

11  the Court doesn't intend to give and the other components that

12  balance that.

13         THE COURT:  Well, okay.  Again, I think the conspiracy

14  instruction talks about how much or how little you need to know

15  and gives some context of what I understand the Government's

16  theory to be.  And certainly I think the Government's going to

17  be arguing that these individuals were aware of and knew what

18  was happening in terms of the evidence I've seen for the

19  opening.  So I agree with you, Mr. Merriam, that we will need to

20  provide more context, but, again, that's going to be detailed in

21  the end.

22         So I think it's fine as is, and certainly you can add

23  these instructions -- request instructions at the end of the

24  case.  But I think we'll go with it as it is right now.  Okay?

25         MR. MERRIAM:  Thank you, Your Honor.

—————2:22-cr-00030-RFB-DJA—————

1          THE COURT:  All right.

2          Okay.  Anything else?

3          So we received a couple of requests from specific

4   jurors.  So Juror Number 61 -- the juror, Mr. Christin, that you

5   referenced not taking the oath -- had indicated to my clerk that

6   he doesn't want to be on the jury and that he's too busy.  I'm

7   going to bring him out, obviously, and question him about this.

8          I'm not going to ask for you all to ask him any

9   questions, but if he is of a mind that he simply is not going to

10  want to be on the jury, then there's a chance that I would

11  obviously need to excuse him.

12          Now, I'm certainly contemplating whether or not I would

13  hold him in contempt or take other action against him.

14          But I think we need to address it before the openings,

15  obviously, to deal with this issue.  I'll hear from counsel if

16  you have any particular suggestions, but I'm just going to bring

17  him out and question him at this point.

18          (Counsel conferring.)

19          THE COURT:  Mr. Christin.

20          MR. CHRISTIN:  Yes, Your Honor.

21          I think given what I put on the record yesterday and

22  what we're hearing today, if he's not willing to be a productive

23  member of the jury, take the oath, and deliberate and

24  participate, he should be stricken for cause.

25          THE COURT:  Any other comments?

—2:22-cr-00030-RFB-DJA—

1              (No response.)

2              (Court conferring with law clerk.)

3              MR. CHRISTIN:  Your Honor, if I may just make one more

4    point for the record.  I recall that Juror 61 did raise his hand

5    early on in the questioning and indicate that he had a conflict

6    that would not allow him to sit for the jury.  And in reflecting

7    back on who's in the box now, my recollection is that he, I

8    think, is the only one that raised a conflict and that is

9    currently in the box.  I just wanted to point that out to Your

10   Honor's attention.

11             THE COURT:  Okay.  All right.

12             Well, Darci, before we do that, let's see what he says,

13   Darci.  Darci, That's all right.  Let's bring him out first.

14             We'll deal with the oath first.

15             (Whereupon juror enters the courtroom.)

16             COURTROOM ADMINISTRATOR:  First chair?

17             THE COURT:  First chair.  Do we have the microphone?

18             So, sir, I understand that you have a concern about

19   sitting on this jury.  I mean, you've been sworn in as a juror.

20   You're under court order to be here as a juror, and I understand

21   that you raised an issue about that.  I wanted to ask you about

22   that at this point in time.

23             A JUROR:  Okay.  You want me to raise my issues?

24             THE COURT:  Yes.

25             A JUROR:  So I forgot about a wedding I have to go to

PATRICIA L. GANCI, RMR, CRR   (702) 385-0670

1  at the end of this month in L.A., so I have to be at that.  I

2  also have --

3           THE COURT:  What date is that and is that during the

4  week or on the weekend?

5           A JUROR:  It's on the 28th, which I believe is a

6  Friday.

7           Then my kid is sick right now, so she's home alone.

8           THE COURT:  I'm sorry.  How old is your child?

9           A JUROR:  Fourteen.  So she's puking this morning.  I

10  also just have -- I don't know if I can really do this.

11          THE COURT:  I'm saying this to you because we went

12  through quite a process to select a jury.

13          A JUROR:  Yes, I understand.

14          THE COURT:  Right now you're -- you're under court

15  order now.

16          A JUROR:  I understand.

17          THE COURT:  I have different options here, and I'm not

18  saying that lightly, right?  The Court can hold you in contempt,

19  in violation of a court order.  It's not my intention to do that

20  necessarily --

21          A JUROR:  Yeah.

22          THE COURT:  -- without there being a good reason to do

23  that.  But this is a long trial, and us potentially excusing you

24  creates significant inconvenience for us as relates to the

25  number of jurors that we have, which is why I went through that.

———2:22-cr-00030-RFB-DJA———

1  We spent the whole day yesterday.

2          A JUROR:  Yes.

3          THE COURT:  And so it is a little concerning to me that

4  we're hearing this now when we could have selected someone else

5  yesterday.

6          The other thing that I want to ask you about is when

7  you -- we swore in the jurors, you did not take the oath, or at

8  least it didn't appear that you did.  It didn't appear that you

9  said, "I do."  Can you explain to me why that happened?

10          A JUROR:  Why what?

11          THE COURT:  Did you not take -- did you not say or

12  affirm -- when we swore the jury in, it looked like that you

13  actually didn't say anything, at least that's what I understand.

14          A JUROR:  Yes.

15          THE COURT:  Is that a misunderstanding that you didn't

16  take the oath, or did you intentionally not take the oath?

17          A JUROR:  I didn't say anything.

18          THE COURT:  And why is that?

19          A JUROR:  That's because I wanted to talk to you about

20  my concerns.

21          THE COURT:  And you were concerned that if you took the

22  oath, what would happen?

23          A JUROR:  I would be, like, abided.

24          THE COURT:  On the jury?

25          A JUROR:  Yes.

───────2:22-cr-00030-RFB-DJA───────

1          THE COURT:  Okay.  Well, that actually already happened

2    because you were already impaneled as a juris.  So taking the

3    oath or not is really more or less a violation of the duty of a

4    juror and, again, potentially something that you can be held in

5    contempt for.  I'm saying all this to you because obviously I

6    have to explore this as it relates to jury service.

7          If you're saying to me that you do not want to

8    participate in the jury because of your schedule, I will take

9    that into consideration.  But it may involve other steps that I

10   have to consider as well.  I wanted to give you a chance to

11   explain yourself, but I have to tell you in my years on the

12   bench, this is probably the first time that this has ever

13   happened like this without there being an emergency when I just

14   picked a jury.

15         Now, you are here today.  You came on time.  I

16   appreciate the fact you came for that.  But it sounds to me like

17   you're saying that you don't want to be on the jury.  But other

18   than these particular dates, can you explain to me why it is

19   that you can't serve?

20         A JUROR:  Number one, I have a very busy job.  I go --

21   my phone goes off all day long.  I know that's not, you know,

22   going to maybe change you guys' minds, but I have a lot of

23   responsibility at work that I have to kind of be there for.

24         THE COURT:  Well, you know, there are very specific

25   laws about employers and their ability to -- or not take action

1    against individuals who are on jury service.

2            A JUROR:  Yes.

3            THE COURT:  As other individuals have requested, I

4    certainly will write letters, and if an employer has a question,

5    I'm happy to order them to appear.  If your employer had

6    questions about your service --

7            A JUROR:  Yeah.

8            THE COURT:  -- I'd be happy to order your employer to

9    appear in court and explain to me why you should potentially be

10   excused or why they would be violating the law.

11           A JUROR:  Yeah.

12           THE COURT:  I'm happy to do that --

13           A JUROR:  I also --

14           THE COURT:  -- if you think that's something that would

15   be appropriate.  I mean, because there are -- law explicitly

16   prohibits employers from taking action against certain employees

17   because of jury service.  And if an employer is doing that, I

18   want to know about that.

19           A JUROR:  Well, they're not -- they're not threatening

20   me or anything like that.  It's just, like, I have stuff I've

21   set up over the next month because I do have a restaurant that I

22   kind of have to be there for, that this is going to kind of, you

23   know, throw everything off.  Like, I have a breakfast tomorrow

24   morning that I have to be there at, like, 8:30 in the morning

25   for.

—————————2:22-cr-00030-RFB-DJA—————————

1          THE COURT:  And remind me again, where do you work?

2          A JUROR:  El Dorado Cantina.

3          THE COURT:  El Dorado Cantina.  Okay.

4          Okay.  Well, I need to take this information into

5    consideration.  Is there anything else you want me to consider

6    as it relates to what I should do at this point in time?

7          A JUROR:  Basically I just don't know how much I can

8    put forth to this.  I have -- I'll be here all day.  Then I have

9    to go to work at night now since I can't do it during the day.

10   So I'll just be kind of -- I don't know if I can put my best

11   focus and, you know, be able to give what I need to give to be

12   fair to everyone.

13         THE COURT:  Okay.  Well, let me take that into

14   consideration.  I will let you know what I'm going to do.  But

15   thank you.  I appreciate your comments.

16         A JUROR:  Thank you.

17         (Whereupon a juror exits the courtroom.)

18         (Court conferring with courtroom administrator.)

19         THE COURT:  I'll hear from counsel on this.

20         Mr. Christin?

21         MR. CHRISTIN:  Thank you, Your Honor.

22         Your Honor, I think he's made it very clear that he

23   does not want to participate in this jury.  It's the

24   Government's concern that he would give whatever verdict he

25   would want in order to get off the jury the soonest.  He hasn't

---2:22-cr-00030-RFB-DJA---

1  taken the oath, and we think he should be struck for cause.

2          THE COURT:  Is there any objection to the Court

3  striking this juror for cause?

4          MR. TATE:  No objection on behalf of Mr. Dallmann.

5          THE COURT:  Any objection from anyone else?  I don't

6  see any.

7          All right.

8          (Court conferring with courtroom administrator.)

9          THE COURT:  All right.  I'm going to, then, strike him.

10  That would move our first alternate into position.  But we also

11  have heard from two other jurors.  We need to explore this as

12  well.  One of the jurors -- I am going to ask her about this --

13  says that she may have seen or recognized Mr. Courson

14  previously, but she's not sure.  So I'm going to ask her about

15  that and bring her out.

16          And so I'm not going to ask for you all to question

17  this juror, but I'm just going to ask her if she's clear about

18  whether or not she's seen him or how she may have seen him or

19  what the nature of the interaction is.  She communicated to my

20  clerk she just wasn't sure, and so I'm going to ask her about

21  that.

22          Ms. Armeni, anything else you would suggest that I ask?

23          MS. ARMENI:  No, Your Honor.  I mean, depending on what

24  her first -- answer to your first question is, I think that will

25  dictate.

————2:22-cr-00030-RFB-DJA————

1          THE COURT:  Okay.  She also said that she's had some

2   anxiety about serving on the jury, so...

3          MS. MURALIDHARA:  Judge, which juror is this?

4          THE COURT:  We'll see what she says.

5          This is Juror Number 57.

6          MS. BLISS:  Is that Seat 2?

7          MS. ARMENI:  Your Honor, can I inquire something?  And

8   I don't know -- I know Ms. Smith went back there.  Are these

9   jurors -- did they pull Ms. Smith aside and tell her this?  I

10  guess my concern -- okay.  She's shaking her head yes.

11         THE COURT:  Yes, they contacted --

12         MS. ARMENI:  Her directly.

13         THE COURT:  -- they contacted my deputy, and I said,

14  "This is not the way for you to contact the Court."  So I'm

15  communicating this to you all, what was communicated to me

16  through Ms. Smith.

17         But it seems that there was some discussion this

18  morning and some of them had voiced potentially their

19  displeasure about being on the jury.  I don't know if that's

20  part of the conversation.  That part, I don't know anything

21  about.  I just know that what I was told, three of the jurors

22  contacted Ms. Smith and asked to communicate the information I'm

23  communicating to you to me.

24         (Court conferring with courtroom administrator .)

25         MS. MARTIN:  And, Your Honor, for -- when Juror -- I

—2:22-cr-00030-RFB-DJA—

1  believe it's Juror Number 2 -- 57, in Position Number 2, was

2  also the one who had select words when the Court called her name

3  as she approached, along with her physical response to being

4  selected as one of our jurors.

5            THE COURT:  Okay.

6            MR. MISHLER:  Your Honor, I apologize.  So I just have

7  a brief concern.  I don't know if this is what Ms. Armeni was

8  talking about.  If that juror that we've already spoken to was

9  back there talking about he has conflicts --

10            THE COURT:  We don't -- we have no idea what they're

11  talking about.

12            MR. MISHLER:  I know.  I just have a concern that if he

13  was back there discussing "I have conflicts.  I'm going to try

14  to get off the jury," and then the jury members see him no

15  longer on the panel, we may see, like, five more of these.  So

16  if that is what happened, I don't want to end up --

17            THE COURT:  And what would you suggest that I do about

18  that, Mr. Mishler?

19            I mean, one of the things I certainly could potentially

20  do, which the Court is contemplating, is I have the ability to

21  hold him in contempt and make him sit through this jury and make

22  him sit potentially in the lockup.  Now, I've never done that in

23  my history of sitting on the bench.  I'm not generally inclined

24  to do that because I think that jury duty should be something

25  that people want to participate in.  And so my inclination,

1  obviously, is for the case to proceed as is.  And I hate to use

2  punitive coercive measures to keep people on the jury or as an

3  example.

4          So I agree with you that we may have to take some

5  action, but I can't stop them from talking about what they're

6  talking about beforehand.  We could bring them out, and I

7  could -- if you want me to, to say, "Look, we have particular

8  instances in this case, but I expect you to uphold your oath and

9  remain on this jury.  If I need to take steps to do so, I will."

10 But, again, that could also, I think, have a negative impact on

11 the jury.  So I'm not sure what you would suggest that I do in

12 this instance.

13         MR. MISHLER:  I understand, Your Honor.  The only thing

14 I could suggest would be to inquire of that juror whether they

15 discussed that before we excuse him so that we have some idea of

16 who might have been exposed to it ahead of time.

17         THE COURT:  And then what would I do if they were

18 exposed?

19         MR. MISHLER:  Just so we're aware.

20         THE COURT:  And then -- but, again, even if we're aware

21 or not aware, I'm not sure it matters at this point what I do.

22         Well, hold on a second.

23         (Court conferring with courtroom administrator.)

24         THE COURT:  Mr. Christin.

25         MR. CHRISTIN:  Yes, Your Honor.  I just wanted to

—2:22-cr-00030-RFB-DJA—

1   quickly response in that just because the Court may or may not

2   be contemplating striking Juror 61, I think everybody's -- each

3   of these jurors is uniquely situated and is going to have

4   different circumstances, obviously.  And I think with this

5   particular juror refusing to take the oath and raising his

6   conflict yesterday and being sat and then -- and then his

7   statements today put him in a box.  And that doesn't necessarily

8   mean that other people are going to be as similarly situated as

9   he is, whether he did or did not raise his concerns with the

10  other jurors.

11          So just because we strike one juror doesn't mean we

12  need to strike three more, I guess, is the Government's point.

13          THE COURT:  Well, what I'm inclined to do is this,

14  because I think there may be issues.  I am inclined to defer

15  ruling on 61 and keep him on the jury and say, "You're ordered

16  to stay here and I'm not excusing you," and then we can revisit

17  the issue, but I don't want to start a stampede to the door.  So

18  he'll have to sit here all day as he agreed to do, and then I'll

19  decide maybe tomorrow or the day after or at the end of the

20  week.  We can raise this issue.  We've got four weeks of trial.

21  So for now, I'm going to order him to stay on the jury and to

22  sit.

23          MR. CHRISTIN:  That's fine, Your Honor.  But I think

24  given --

25          THE COURT:  We'll address the issue.  He hasn't

1  deliberated yet, and I'm going to order him not to discuss his

2  concerns with the other jurors about that.  But he will, I

3  think, remain on the jury at least for today.

4           Is there any objection to that?

5           MR. MISHLER:  No, Your Honor.

6           MR. TATE:  Your Honor, I think the better solution

7  would be, as we discussed, is to strike him.  He could be -- we

8  don't know what might happen in the jury room.  That's the

9  concern.  You got a disgruntled juror now who clearly doesn't

10 want to be here.  He could somehow influence the other jurors

11 even by body language.

12          THE COURT:  But that could happen, Mr. Tate -- if I

13 instruct him not to do -- to discuss it with the jurors, what

14 else would you want me to do in this case?

15          MR. TATE:  I just don't know --

16          THE COURT:  I think at least for today, he's agreed to

17 be here today.  He should be required to serve today.  Because

18 obviously there's been some discussion -- I don't know what the

19 discussion is.  And, again, I'm not inclined to inquire because

20 I think there is real issues about the Court inquiring about

21 juror discussions at this point in time.

22          So if you're saying that you think that I should just

23 go ahead and excuse him, I can excuse him after -- after today.

24 I can simply say, "I wanted to hear from all of the jurors and

25 I'll defer ruling on that so that I can consider that."  I don't

1    know that that would necessarily impact it.  I would simply say

2    to him, "For now, I'm going to consider this.  I will let you

3    know at the end of the day or tomorrow what I decide," as it

4    relates to his jury service.  He did show up today.  He did

5    explain his reasons today.  So that tells me that he understands

6    that he has an obligation.  And he will serve.

7         But I don't think there's any harm or prejudice to

8    telling him for now that he's on the jury and I'll defer ruling

9    on his request until the end of the day or tomorrow.  In that

10   case, I'm not saying -- I'm not saying that I'm going to order

11   him to stay on the jury.  I'm just going to say I appreciate his

12   request.  I'm going to consider it and defer ruling on it until

13   we get through the day.  And that way, he'll know about that

14   today or tomorrow.  And then we can discuss it.

15        MR. TATE:  That's in the Court's sound discretion.

16        THE COURT:  All right.

17        Any other comments?  Again, we still have two other

18   jurors we've got to bring out.  We haven't even opened yet.

19        Ms. Armeni?

20        MS. ARMENI:  Your Honor, I was just going to ask that,

21   but perhaps we --

22        (Court reporter clarification.)

23        MS. ARMENI:  I was just going to suggest what I think

24   the Court's doing, that until any ruling is made, let's hear

25   what the other two have to say and then we can, I think, take

─────2:22-cr-00030-RFB-DJA─────

1  them all together and decide at that point.

2          THE COURT:  Okay.  Okay.  Yes, I think that makes

3  sense.

4          So let's bring out Juror Number -- who is it -- 57.  61

5  is still back there, right.  So what I am going to instruct my

6  clerk to tell Juror 61 is that the Court hasn't ruled yet on his

7  request.

8          All right?

9          COURTROOM ADMINISTRATOR:  Okay.

10          THE COURT:  Go ahead.

11          (Pause.)

12          (Whereupon a juror enters the courtroom.)

13          THE COURT:  Hello.

14          A JUROR:  Hi.

15          THE COURT:  Hi.  I understood you had communicated to

16  my deputy that you thought you might know one of the defendants,

17  but you weren't sure.

18          A JUROR:  Yeah, I just want to make sure.  Maybe I'm

19  just overthinking.  I'm a little overwhelmed.

20          THE COURT:  Well, that's all right.  You thought it was

21  Mr. Courson?  Is that what you thought?

22          A JUROR:  Possibly.  He just looks like somebody that I

23  probably interacted with before.

24          THE COURT:  So let me ask you a question.  Do you have

25  a specific recollection of interacting with him?

—2:22-cr-00030-RFB-DJA—

1           A JUROR:  He just looks like an old -- somebody I used

2    to work with at a previous employer.  That's just -- he just

3    looks like him.

4           THE COURT:  So other than the fact that he looked like

5    someone who you may have worked with, you don't know whether or

6    not -- and I'm sorry.  Which employer was this?

7           A JUROR:  This was with -- at Target.

8           THE COURT:  Target.  Okay.  Target stores here in Las

9    Vegas?

10          A JUROR:  Correct.

11          THE COURT:  Okay.  And when was that approximately?

12          A JUROR:  Uhm.  I left the company almost two years

13    ago, so a little bit before that, maybe four.

14          THE COURT:  And to the extent that you might have

15    interacted with Mr. Courson at all, do you remember those

16    interactions at all?

17          A JUROR:  No, not really.

18          THE COURT:  Okay.  So you're just saying he looked

19    familiar.

20          A JUROR:  Yeah, he just looks familiar.  That's all.

21          THE COURT:  Okay.  And the fact that he looked

22    familiar, would that in any way prevent you from being fair and

23    impartial in this case?

24          A JUROR:  Uhm.  It might be a possibility.

25          THE COURT:  How would it be a possibility if you didn't

─2:22-cr-00030-RFB-DJA─

1  really remember him?

2          A JUROR:  I just remember maybe he looks like somebody

3  who has the same name who worked at a certain department

4  similar.  So I just -- just seeing him is just --

5          THE COURT:  You're saying it's disorienting that you

6  saw him.

7          A JUROR:  Yeah.

8          THE COURT:  But I'm saying, right, why would that make

9  it difficult to be fair and impartial if you don't really

10  remember who he was?

11          A JUROR:  Oh, that's true.  Yeah.  You're right.

12          THE COURT:  I'm saying if you had a specific

13  recollection, it was a positive or a negative one, then that

14  might sort of influence it.  I'm just trying to figure out

15  whether or not it's just the memory of being familiar with the

16  face or did you have a specific positive or negative

17  interaction?

18          A JUROR:  It's just the memory of, like, the face.

19  That's it.

20          THE COURT:  Okay.  But you're not even sure about that

21  exactly.

22          A JUROR:  Yeah, I'm not sure about that.

23          THE COURT:  So if I told you, again, to be fair and

24  impartial and just consider the facts of this case, do you think

25  you could do that?

1        A JUROR:  Correct.

2        THE COURT:  Do you think you could do that?

3        A JUROR:  Yeah.

4        THE COURT:  Okay.  All right.  Perfect.  Thank you.

5        A JUROR:  Thank you.

6        THE COURT:  No, no.  Here's the other thing.  It's

7  important that you clarify.  So I don't want you to feel upset

8  or nervous about the fact that you communicated the information.

9  It's better for us to have information --

10        A JUROR:  Okay.

11        THE COURT:  -- and to be able to ask you questions

12 about it than for you to be wondering about whether or not you

13 should have communicated it.  Okay?

14        A JUROR:  Okay.  Sorry.

15        THE COURT:  No, don't apologize.  Again, it's important

16 for us to have the information.  Thank you for letting us know.

17        A JUROR:  Okay.  Thank you.

18        THE COURT:  Uh-huh.

19        (Whereupon a juror exits the courtroom.)

20        THE COURT:  Ms. Armeni, I don't know that I would see a

21 reason to excuse this juror, but I'm happy to hear from you on

22 this.

23        MS. ARMENI:  No, but I will tell the Court that he does

24 work at Target.

25        THE COURT:  Okay.  Well, again -- I just dropped my

—2:22-cr-00030-RFB-DJA—

1   pen.

2          Are you making a specific request at this time?

3   Because based upon what she said, I didn't see that she had --

4   she didn't really have a positive or negative association one

5   way or the other.  And she said she could be fair, she just

6   wanted to communicate that, which I think is honest.  But the

7   fact that she may have interacted, I don't think in and of

8   itself would excuse her.

9          MS. ARMENI:  I guess the concern is I don't know what

10  the interactions would be, if they were positive or negative

11  because that --

12         THE COURT:  But I asked her, right?

13         MS. ARMENI:  Right.

14         THE COURT:  Unless you thought there was something else

15  I should ask her, she actually specifically seemed to say, "I

16  don't have a particular recollection of him one way or the

17  other."  And when I asked her could she be fair and impartial,

18  she said yes.

19         So is there a particular concern beyond that,

20  Ms. Armeni?

21         MS. ARMENI:  No, I just wanted to alert the Court that

22  the person she thought she may have saw was probably the person

23  she saw.

24         THE COURT:  Okay.  Are you saying you're asking her to

25  be struck for cause?

2:22-cr-00030-RFB-DJA

1              (Defense conferring.)

2         MS. ARMENI:  Court's indulgence.

3         THE COURT:  Sure.

4              (Defense conferring.)

5         MS. ARMENI:  Your Honor, we are making a motion to move

6    for cause.

7         THE COURT:  On what grounds?

8         MS. ARMENI:  Well, we're concerned on the fact that she

9    did recognize Mr. Courson and that knowledge of him, we're

10   concerned, will not give him a fair trial.

11        THE COURT:  Based upon?  Okay.  So you're saying the

12   knowledge of him by itself would mean that he's not going to get

13   a fair trial, even without her saying one way or the other --

14        MS. ARMENI:  Well, once she realizes that it is the

15   person that she thought it was, I think there is the ability or

16   that she may start remembering exactly how she knew him.  Right

17   now she's still wavering because she doesn't know.

18        THE COURT:  So you're saying it would be different if

19   he didn't work at Target.

20        MS. ARMENI:  Absolutely.

21        THE COURT:  Well, but she wouldn't know that either

22   because we're going to communicate that to her.

23        MS. ARMENI:  Well, we are.

24        THE COURT:  Okay.  Well, tell me about that because

25   that's --

———2:22-cr-00030-RFB-DJA———

1              MS. ARMENI:  We are.  No, we are going to communicate

2     that to her because -- or to the jury.  I shouldn't say "her."

3     We are going to communicate that.  That's going to be in opening

4     statement.  The Government has stipulated, we have stipulated to

5     -- that Doug works at Target.  It's an exhibit.

6              THE COURT:  Okay.  Well, okay.  That's information that

7     I needed to have, then.  So you're saying at some point she's

8     going to realize that this is the person that she does know, and

9     then at that point when she's on the jury, we can't really go

10    into what her recollection is because she then might start

11    recalling interactions she had --

12             MS. ARMENI:  That's correct, Your Honor.

13             THE COURT:  -- over the course of the case.

14             MS. ARMENI:  If we weren't bringing up Target, then I

15    think you're right, it may be different, but we are going to be

16    specifically talking about that.

17             THE COURT:  Mr. Christin.

18             MR. CHRISTIN:  Thank you, Your Honor.

19             Ms. Armeni is correct that the Government has

20    stipulated or is agreeing with Ms. Armeni.  We're not contesting

21    that Mr. Courson worked at Target.

22             I think there are two important things that came out of

23    the Court's questioning with Juror Number 57, I think it was.

24    Number one is she said that this interaction took place four or

25    five years ago and that she doesn't really have any specific

─2:22-cr-00030-RFB-DJA─

 1  recollection of what that interaction -- of an actual

 2  interaction, just that she recognized him.  The evidence in this

 3  case is from 2007 to 2017, which is seven years ago,

 4  significantly beyond what her memory was.

 5          I do not believe that she needs to be stricken for

 6  cause, particularly because Your Honor asked her if she could be

 7  fair and impartial and she said yes.

 8          THE COURT:  Well, Mr. Christin, let me ask you this

 9  question, because the issue that comes up is that once she hears

10  that, in fact, it is Mr. Courson that she remembers,

11  potentially --

12          MR. CHRISTIN:  Or could be Mr. Courson.  We don't know.

13          THE COURT:  Or could be Mr. Courson.  But there's a

14  fair chance --

15          MR. CHRISTIN:  Yes.

16          THE COURT:  -- that it is him.  She could then start to

17  have, which would be natural, recollections about

18  interactions --

19          MR. CHRISTIN:  We should I think --

20          THE COURT:  -- which -- I would not want to call her in

21  here over the course of the trial and say, "What do you remember

22  now," right?  "What do you remember this week," right?  I'm just

23  saying, it's natural that she would start to think about this,

24  right, or maybe even talk to people about it.  And so that's the

25  concern for me, is that --

—2:22-cr-00030-RFB-DJA—

1          MR. CHRISTIN:  So --

2          THE COURT:  -- I could address it by I guess

3    potentially instructing her not to talk to anyone about it or we

4    could tell her that, in fact, she probably did see Mr. Courson

5    there and then say would that impact her interactions.

6          MR. CHRISTIN:  I think that's entirely appropriate.  I

7    think if the Court calls her back out and asks her, "If you did

8    find out that Mr. Courson worked at Target, would that affect

9    the answer that you gave me previously about being fair and

10   impartial?  And if I instruct you not to speak to other jurors

11   about Mr. Courson working at Target, could -- would you listen

12   to that?"  I don't think it's uncommon that a juror has seen a

13   defendant around, and I --

14         THE COURT:  Yes, but this is different if she worked

15   with someone.

16         So here's what I'm going to do.  I think I'm going to

17   also -- because, look, I want to at least get the openings done

18   today -- I'm going to defer ruling on this, too.  Because the

19   other thing is I don't want there to appear to be, like, a mass

20   exodus from the jury before we even started the openings.  So

21   I'm going to defer ruling on her particular position on the jury

22   because I don't think her being on there for one day is going to

23   have necessarily an impact, but I also want to just think about

24   the arguments that counsel have and then we'll make the

25   determination afterwards.

1          MR. CHRISTIN:  Thank you, Your Honor.

2          We would just ask that any ruling be preceded by

3    additional questioning.  And we can ask her which Target she

4    thinks it was and that may clarify matters as well.

5          THE COURT:  Okay.

6          All right.  Darci.

7          (Court conferring with courtroom administrator.)

8          THE COURT:  So, lastly, Juror Number 72 communicated to

9    my clerk that -- to my deputy that it is expensive for her to

10   put her child in day care and asked if we could pay for that or

11   reimburse her for that.  My deputy told her that we could not.

12   She would get what she gets as it relates to witness

13   reimbursement pursuant to the statute, but we could not

14   reimburse her for that.  And she just communicated it's more

15   expensive than she thought it was going to be, but she really

16   wanted to be on the jury.

17         I don't see a basis to bring her out.  She didn't

18   request to speak to me, but I wanted to communicate this

19   information to all of you because it was communicated to me.

20         So unless there is an objection, I'm not going to bring

21   her out.  If there's further communication about her ability to

22   serve based upon this particular impediment, then we can address

23   it.

24         So does any party want me to bring her out to question

25   her further?

———2:22-cr-00030-RFB-DJA———

1        MR. CHRISTIN:  No objection, Your Honor.

2        THE COURT:  I don't see anyone indicating that they

3  want me to do that.

4        So what I do think I should do is before we start, I

5  will bring out Juror 61 and Juror 57 and tell them I've

6  considered the information that they've provided.  I'm not going

7  to rule on it right now.  I'm going to defer ruling on it, but

8  I'm going to instruct them not to discuss these matters with

9  other jurors during their time in the jury room.  Is there any

10  objection to me doing that?

11        MR. CHRISTIN:  No objection, Your Honor.  Just would

12  inquire with the Court as to procedurally whether 61 should be

13  asked to take the oath again, or for the first time.

14        MR. MISHLER:  If that's un- --

15        THE COURT:  Well, and that's a fair point.  I mean, I

16  think what I can do, which I will do, is I'm going to tell him

17  I'm going to rule on his request to be relieved from the jury,

18  but I am going to order him to take the oath.  If he refuses to

19  do so, then that's then something that I have to deal with.  But

20  I think it's appropriate.  So for 61, I'm going to tell him that

21  he does need to take the oath, that I'm going to consider his

22  request to be off the jury, but he needs to take the oath and

23  I'll defer ruling on that.

24        And for 57, I will tell her that I'm considering the

25  information that she's provided and I'm going to defer ruling on

———2:22-cr-00030-RFB-DJA———

1   that, but she's ordered not to discuss it with the other jurors.

2          Any objections to that course of action by the Court

3   for those two jurors?

4          MR. MISHLER:  I think it's understood, but I just want

5   to ask a clarifying question.  On 61 when you do that with the

6   oath, you're going to do that while he's in here on his own,

7   right?

8          THE COURT:  Yes.

9          MR. MISHLER:  Then I have no objections, Your Honor.

10         MR. CHRISTIN:  Your Honor, I think just with respect to

11  57, I don't think she was making a request.  And so we would

12  just ask the Court not to say that there's going to -- that you

13  haven't figured out a ruling, but just instruct her to not talk

14  about this with other jurors.

15         THE COURT:  Okay.  Let's bring out 61, first.

16         (Court conferring with courtroom administrator.)

17         MR. TATE:  Your Honor?  Your Honor, just as a courtesy

18  to the Court ahead of it.  My understanding is that jurors

19  don't -- some jurors for religious reasons don't have to take

20  the oath, but perhaps we should have standby counsel for him, in

21  the event he's going to be taken into custody, to discuss what

22  his options are.

23         THE COURT:  Okay.

24         MR. TATE:  And we could have some -- I don't think it

25  would be a conflict to have someone from our office --

—2:22-cr-00030-RFB-DJA—

1          (Whereupon a juror enters the courtroom.)

2          THE COURT:  Well, why don't we -- we'll see what

3   happens, Mr. Tate.  I appreciate that.

4          MR. TATE:  Okay.

5          THE COURT:  So I just wanted to follow up with what we

6   talked about, which is I need some time to consider the

7   information you've given to me.  Okay.  And so I'm not going to

8   rule today on your request to be removed.  But I do want you to

9   sit today.  Excuse me.  So we do need you to take the oath for

10  today, and I'll let you know about my ruling on you being

11  relieved later.  But I do need you to take the oath since you're

12  on the jury.  Okay?

13         So I'll just have them administer it, and then you'll

14  go back.  And then what will happen is I'll let you know either

15  at the end of today or tomorrow what the ruling will be as it

16  relates to your request to be off the jury.  Okay?

17         A JUROR:  Okay.

18         THE COURT:  All right.  So if you could please stand

19  and raise your right hand.

20         (Whereupon juror is duly sworn.)

21         THE COURT:  All right.  And so, again, then what will

22  happen is -- as I said, I've heard the information you gave me.

23  I just need to consider that and the law.  And then I'll let you

24  know either at the end of today or tomorrow as relates to

25  whether or not you would stay on the jury after today.  Okay?

—2:22-cr-00030-RFB-DJA—

1        A JUROR:  Yes.

2        THE COURT:  Okay.  The other thing is I don't want you

3   to and I'm going to direct you not to discuss your personal

4   request as it relates to being released from the jury with any

5   other jurors at this time.

6        A JUROR:  All right.

7        THE COURT:  All right.  Thank you.

8        A JUROR:  Thank you.

9        THE COURT:  Uh-huh.

10        (Whereupon a juror exits the courtroom.)

11        MR. BROWN:  Your Honor, if we're going to do two hours

12   or so of opening statements, could I ask for a short break

13   before that?

14        THE COURT:  Sure.  Who would have anticipated we would

15   be doing this?  So --

16        COURTROOM ADMINISTRATOR:  Do you want 57, then?

17        THE COURT:  Yes.  Well, hold on one second.  So what

18   we'll do is we'll take 57.  We'll take a short break.  I haven't

19   even been able to print out the instructions yet that we

20   discussed.  And then we'll come back and we'll open.  But we're

21   not going to take our lunch break, but we'll take 10, 15 minutes

22   for people to be able to use the restroom, and then we'll come

23   back.

24        MR. BROWN:  Great.  Thank you.

25        THE COURT:  All right.

—2:22-cr-00030-RFB-DJA—

1            (Whereupon a juror enters the courtroom.)

2            THE COURT:  Hello again.

3            A JUROR:  Hey there.

4            THE COURT:  Is that on?  It's not on.

5            A JUROR:  Hi.

6            THE COURT:  Hi.  I wanted to say again, thank you again

7    for bringing the information to my attention.  The only thing I

8    wanted to let you know is that it's important that you not

9    discuss your recollections or not regarding Mr. Courson with

10   other jurors.  And to the extent that you do or don't recall

11   him, I don't want you to discuss that with any other jurors.

12   Okay?

13           A JUROR:  Okay.

14           THE COURT:  All right.  And I appreciate you sharing

15   the information with us.  Okay?

16           A JUROR:  Okay.

17           THE COURT:  All right.  Thank you.

18           A JUROR:  Thank you.

19           (Whereupon a juror exits the courtroom.)

20           THE COURT:  Okay.  I know we're requesting -- so

21   basically let's take five, ten minutes, and then we'll come back

22   and open.  So I just want to ask, though, because I'm trying to

23   figure out lunch break time, how long we anticipate our openings

24   to actually be.

25           Mr. Christin?

─────2:22-cr-00030-RFB-DJA─────

1          MR. CHRISTIN:  Thank you, Your Honor.  I would

2   anticipate approximately 20 minutes.

3          THE COURT:  Twenty minutes for the Government.

4          Mr. Tate?

5          MS. MARTIN:  Twenty, Your Honor.

6          THE COURT:  Twenty.

7          Ms. Armeni?

8          MS. ARMENI:  Ten.

9          THE COURT:  Ten.

10          Ms. Bliss?

11          MS. BLISS:  Your Honor, I would say about 15 to 20, but

12   more --

13          THE COURT:  Let's call it 20.

14          MS. BLISS:  -- 15.  Okay.  Thank you.

15          THE COURT:  Okay.

16          Ms. Muralidhara?  Mr. Marsh?

17          MR. MARSH:  About the same.

18          THE COURT:  About 20?

19          MR. MARSH:  Probably about 15.

20          THE COURT:  Mr. Brown?

21          MR. BROWN:  Ten, Your Honor.

22          THE COURT:  Ten?

23          MR. BROWN:  Maybe eight.

24          (Court conferring with courtroom administrator.)

25          THE COURT:  Okay.  So we're about to take a break, but

─────2:22-cr-00030-RFB-DJA─────

1  here's what's going to happen.  We'll take basically a five,

2  ten-minute break.  We'll come back at, like, 12:05.  Okay?  And

3  then the Court will do the preopening instructions.  The

4  Government will open.

5          We'll need to take about, at that point, a five or

6  ten-minute break to swap out for the court reporters, which will

7  also probably be about an hour or so, so that we can take a

8  bathroom break then, and then the defendants will open.

9          We may take another break after that, and then we'll

10 start with witnesses, because we're not going to necessarily

11 finish with the direct today, but we'll start it at least today.

12 Okay?

13         Any questions about that, Mr. Christin?

14         MR. CHRISTIN:  Just logistically, Your Honor, would

15 Your Honor object to me slightly tilting that very gently for

16 the six of us that are going to be up there so we can look at

17 the jurors?

18         THE COURT:  So here's my rule about openings.  You can

19 leave the podium if you have the lapel mic, but you cannot cross

20 in front of -- let's just say where this table is right here --

21 right there, that's what you have to stop, right.  So you can

22 get all the way up there, but you can't go up and put your hands

23 on the railing.  Okay?

24         MR. CHRISTIN:  And can we twist this to stand at the

25 podium for the microphone?

—2:22-cr-00030-RFB-DJA—

1           THE COURT:  Well, as long as we don't have any wiring

2   come loose and Ms. Smith helps you with that, yes, and she can

3   do that in the next five, ten minutes certainly.

4           MR. CHRISTIN:  Thank you, Your Honor.

5           THE COURT:  All right.  Thank you.  We'll be in recess.

6   I'm going to stay here while we finish on the instructions.

7           (Recess taken at 11:54 a.m.)

8           (Resumed at 12:10 p.m.)

9           THE COURT:  Please be seated.

10          (Court conferring with courtroom administrator.)

11          THE COURT:  Okay.  We are back on the record here.

12          I'm going to bring the jurors out and instruct them,

13  and then we'll have the Government open.  Take a short break.

14  And then have Defendants open, and then we'll take our lunch

15  break.  Okay?

16          COURTROOM ADMINISTRATOR:  Ladies and gentlemen, please

17  rise for the jury.

18          (Whereupon jury enters the courtroom at 12:14 p.m.)

19          THE COURT:  Oh, you all can take your seats.  We wait

20  for you all to be seated.  We stand out of respect for your

21  service.

22          Please be seated.  So thank you all for being here.  I

23  will tell you, I hope you enjoyed the breakfast pizza.  We

24  cannot promise that every day.  That was a special treat from

25  the court staff today, but we will try to have sweets and

—2:22-cr-00030-RFB-DJA—

1   coffees and things in there for you in the morning.

2          I appreciate your patience.  We had a few issues that

3   we had to deal with, but I thank you all for being on time.  I

4   heard from all of the court staff that you all were able to say

5   the magic words this morning, "Judge Boulware's trial."  That's

6   why you all were able to get in.  And so I appreciate, again,

7   you all being here on time and your patience, but now what's

8   going to happen is we're going to start hearing the evidence in

9   the case.  Before we do that, I'm going to give you some

10  instructions.  Okay?

11         You can take notes or not if you want to on the

12  instructions.  I'm going to give you more detailed instructions

13  in the end, but I'm going to read through these preliminary

14  instructions, and then we'll hear opening statements.  Okay?

15         You are now the jury in this case, and I want to take a

16  few minutes to tell you something about your duties as jurors

17  and to give you some preliminary instructions.  And the end of

18  the trial, I'll give you more detailed instructions that will

19  control your deliberations.  When you deliberate, it will be

20  your duty to weigh and to evaluate all of the evidence received

21  in the case and, in that process, to decide the facts.

22         To the facts as you find them, you will apply the law

23  as I give it to you, whether you agree with the law or not.  You

24  must decide the case solely on the evidence and the law before

25  you and must not be influenced by any personal likes or

—2:22-cr-00030-RFB-DJA—

1  dislikes, opinions, prejudices, or sympathy.  Please do not take

2  anything I may say or do during the trial as indicating what I

3  think of the evidence or what your verdict should be.  That is

4  entirely up to you.

5       This is a criminal case brought by the United States

6  Government.  The Government alleges that the defendants:

7  Mr. Kristopher Dallmann, Mr. Douglas Courson, Mr. Felipe Garcia,

8  Mr. Jared Jaurequi, and Mr. Peter Huber conspired to violate

9  copyright laws.  The Government also alleges that Mr. Dallmann

10 violated money laundering laws.  The defendants have pleaded not

11 guilty to the charges and are presumed innocent unless and until

12 the Government proves the defendants are guilty beyond a

13 reasonable doubt.

14      In addition, the defendants have the right to remain

15 silent and never have to prove innocence or to present any

16 evidence.  The defendants do not have to testify in this case,

17 but may choose to do so.  The fact that a defendant not testify

18 cannot be used in any way against them, and you may not use this

19 fact in deciding the case.

20      I repeat, the defendants are presumed innocent unless

21 and until the Government proves the defendants are guilty beyond

22 a reasonable doubt.

23      In order to help you follow the evidence, I will now

24 give you a summary of the elements of the crimes which the

25 Government must prove to make its case.

———2:22-cr-00030-RFB-DJA———

1          All five defendants are charged in Count One of the

2     indictment with conspiring to commit felony criminal copyright

3     infringement.  For the defendants to be found guilty of

4     conspiracy, the Government must prove each of the following

5     elements beyond a reasonable doubt:  first, beginning on or

6     about 2007 and ending on or about November 2017, there was an

7     agreement between two or more persons to commit criminal

8     copyright infringement by reproduction; second, the particular

9     defendant became a member of the conspiracy knowing of at least

10    one of its objects and intending to help accomplish it; third,

11    one of the members of the conspiracy performed at least one

12    overt act for the purpose of carrying out the conspiracy.

13          A conspiracy is a kind of criminal partnership, an

14    agreement of two or more persons to commit one or more crimes.

15    The crime of conspiracy is the agreement to do something

16    unlawful.  It does not matter whether the crime agreed upon was

17    committed.

18          For a conspiracy to have existed, it is not necessary

19    that the conspirators made a formal agreement or that they

20    agreed on every detail of the conspiracy.  It is not enough,

21    however, that they simply met, discussed matters with common

22    interests, acted in similar ways, or perhaps helped one another.

23    You must find that there was a plan to commit at least one of

24    the crimes alleged in the indictment as an object of the

25    conspiracy with all of you agreeing as to the particular crime

—2:22-cr-00030-RFB-DJA—

1  which the conspirators agreed to commit.

2       One becomes a member of a conspiracy by willfully

3  participating in the unlawful plan with the intent to advance or

4  further some object or purpose of the conspiracy, even though

5  the person does not have full knowledge of all of the details of

6  the conspiracy.  Furthermore, one who willfully joins an

7  existing conspiracy is as responsible for it as the originators.

8  On the other hand, one who has no knowledge of a conspiracy, but

9  happens to act in a way which furthers some object or purpose of

10  the conspiracy does not thereby become a conspirator.

11       Similarly, a person does not become a conspirator

12  merely by associating with one or more persons who are

13  conspirators nor merely by knowing that a conspiracy exists.

14       An overt act does not itself have to be unlawful.  A

15  lawful act may be an element of a conspiracy if it was done for

16  the purpose of carrying out the conspiracy.  The Government is

17  not required to prove that the defendant personally did one of

18  the overt acts.

19       In this case, the object of the conspiracy alleged in

20  Count One is criminal copyright infringement in violation of

21  Section 506(a)(1)(A) of Title 17 and Section 2319(b)(1) of the

22  Title 18 of the United States Code.  The elements of criminal

23  copyright infringement are:  first, the work involved was

24  copyrighted; second, the defendant infringed on the copyright of

25  that work; third, the defendant did so willfully; and, fourth,

1  the defendant did so for the purposes of commercial advantage or

2  private financial gain.

3      Evidence of reproduction or distribution of a

4  copyrighted work by itself is not sufficient to establish

5  willful infringement of a copyright.  In this case, the

6  Government is alleging that the defendants engaged in a

7  conspiracy to commit felony criminal copyright infringement.

8  This means that the Government must also establish beyond a

9  reasonable doubt the following elements:  first, that the

10  defendants conspired to reproduce 10 or more copies of one or

11  more copyrighted works within a 180-day period and, second,

12  these copyrighted works or the copy of these copyrighted works

13  had a total retail value of more than $2,500.

14      To find a defendant guilty of conspiracy to commit

15  felony criminal copyright infringement, you do not need to find

16  that the defendant successfully completed felony criminal

17  copyright infringement, only that, as previously discussed, the

18  defendant or defendants agreed to commit this crime.

19      Defendant Kristopher Dallmann is charged in Counts Two

20  and Three of the indictment with criminal copyright infringement

21  by reproduction and aiding and abetting.  For Mr. -- excuse me.

22  For Mr. Dallmann to be found guilty of that charge, the

23  Government must prove each of the following elements beyond a

24  reasonable doubt:  first, Mr. Dallmann -- excuse me -- for

25  Count Two, Mr. Dallmann willfully infringed a copyright of the

—2:22-cr-00030-RFB-DJA—

1  episode of Blood Washed Away from the television series

2  12 Monkeys for the purpose of commercial advantage and private

3  gain, and Mr. Dallmann willfully infringed a copyright of the

4  episode of Memory of Tomorrow from the television series

5  12 Monkeys for the purposes of commercial advantage and private

6  gain.

7          Mr. Dallmann is charged in Counts Four and Five of the

8  indictment with criminal copyright infringement by public

9  performance and aiding and abetting.  For Mr. Dallmann to be

10 found guilty of these charging -- charges, the Government must

11 prove each of the following beyond a reasonable doubt:

12 Mr. Dallmann willfully infringed a copyright of the episode

13 Paradise from the television series The OA for purposes of

14 commercial advantage and private financial gain; Mr. Dallmann

15 willfully infringed a copyright of an episode of Norman Saves

16 the World from the television series Ray Donovan for purposes of

17 commercial advantage and private financial gain.

18         Mr. Dallmann is also charged in Counts Twelve to

19 Fourteen of the indictment with money laundering and aiding and

20 abetting.  Mr. Dallmann is charged in Counts Twelve to Fourteen

21 of the indictment with conducting and attempting to conduct a

22 financial transaction to promote criminal copyright infringement

23 and conspiracy to commit criminal copyright infringement in

24 violation of Section 1956(a)(1)(A) of Title 18 of the United

25 States Code -- of the United States Code.

―2:22-cr-00030-RFB-DJA―

1        For him to be found guilty of that charge, the

2   Government must prove each of the following elements beyond a

3   reasonable doubt:  first, that the defendant conducted a

4   financial transaction involving property that represented the

5   proceeds of criminal copyright infringement; second, the

6   defendant knew that the property represented the proceeds of

7   some form of unlawful activity; and, three, the defendant acted

8   with the intent to promote the carrying on of criminal copyright

9   infringement or a conspiracy to commit criminal copyright

10  infringement.

11       A financial transaction is a transaction involving the

12  movement of funds by wire or other means that affects interstate

13  or foreign commerce in any way.

14       The phrase "knew that the property represented the

15  proceeds of some form of unlawful activity" means that the

16  defendant knew that the property involved in the transaction

17  represented proceeds from some form, though not necessarily

18  which form, of activity that constitutes a felony.

19       In this case, it's criminal -- excuse me -- felony

20  criminal copyright infringement, which, of course, is and I

21  instruct you is a felony.

22       Mr. Dallmann is also charged in Count Fifteen of the

23  indictment with money laundering and aiding and abetting in

24  violation of Section 1956(a)(3)(A) of Title 18 of the United

25  States Code.  For him to be found guilty of that charge, the

—2:22-cr-00030-RFB-DJA—

1  Government must prove each of the following elements beyond a

2  reasonable doubt:  the defendant knowingly conducted and

3  attempted to conduct a financial transaction involving

4  interstate and foreign commerce; second, the defendant knew that

5  the property represented the proceeds of some form of unlawful

6  activity -- excuse me -- unlawful activity, namely, criminal

7  copyright infringement; third, the defendant acted with the

8  intent to promote the carrying on of that specified unlawful

9  activity; and, fourth, the defendant acted with the intent to

10 conceal and disguise the nature, location, source, ownership,

11 and control of property believed to be proceeds of that

12 specified unlawful activity.

13       A defendant may be found guilty of aiding and abetting

14 as charged in the indictment even if the defendant personally

15 did not commit the act or acts constituting the crime, but aided

16 and abetted in its commission.  To aid and abet means to

17 intentionally help someone else commit a crime.

18       To prove a defendant guilty of these charges by aiding

19 and abetting, the Government must prove each of the following

20 beyond a reasonable doubt:  someone else committed the crime of

21 copyright infringement, conspiracy to commit copyright

22 infringement, or money laundering; the defendant aided,

23 counseled, commanded, induced, or procured that person with

24 respect to at least one element of the crime or crimes; the

25 defendant acted with the intent to facilitate the crime or

—2:22-cr-00030-RFB-DJA—

1  crimes; and, fourth, the defendant acted before the crime or

2  crimes was completed.

3        It is not enough that the defendant merely associated

4  with the person committing the crime or unknowingly or

5  unintentionally did things that were helpful to that person or

6  was present at the scene of the crime.  The evidence must show

7  beyond a reasonable doubt that the defendant acted with the

8  knowledge and intention of helping that person commit the crime

9  charged.

10       Now I'm going to talk to you a little bit about what is

11 and what is not evidence.  Okay?

12       So let's talk first about what is evidence.  The

13 evidence you are to consider in deciding what the facts are

14 consists of the sworn testimony of any witness, the exhibits

15 which are received into evidence, and any facts to which the

16 parties agree or stipulate.

17       So let me tell you what's not evidence.  Okay?  The

18 following things are not evidence and you must not consider them

19 as evidence in deciding the facts of the case:  first, the

20 statements and arguments of the attorneys; second, questions and

21 objections of the attorneys; third, testimony that I instruct

22 you to disregard; and, fourth, anything you may see or hear when

23 the Court is not in session, even if what you see or hear is

24 done or said by one of the parties or by one of the witnesses.

25       Evidence may be direct or circumstantial.  Direct

─2:22-cr-00030-RFB-DJA─

1  evidence is direct proof of a fact such as testimony by a

2  witness about what the witness personally saw or heard or did.

3  Circumstantial evidence is indirect evidence; that is, it is

4  proof of one or more facts from which one can find another fact.

5      You are to consider both direct and circumstantial

6  evidence.  Either can be used to prove any fact.  The law makes

7  no distinction between the weight to be given to either direct

8  or circumstantial -- excuse me -- direct or circumstantial

9  evidence.  It is for you to decide how much weight to give to

10 any evidence.

11     By way of an example, if you wake up in the morning and

12 you see that the sidewalk is wet, you may from that fact find --

13 excuse me -- you may find from that fact that it rained during

14 the night.  However, other evidence, such as a turned-on garden

15 hose, may provide an explanation for the water on the sidewalk.

16 Therefore, before you decide that a fact has been proven by

17 circumstantial evidence, you must consider all of the evidence

18 in light of reason, experience, and common sense.

19     Although the defendants are being tried together, you

20 must give separate consideration to each defendant.  In so

21 doing, you must determine which evidence in the case applies to

22 each defendant, disregarding any evidence admitted solely

23 against some other defendant.

24     A separate crime is charged against one or more of the

25 defendants in each count.  The charges have been joined for

―――2:22-cr-00030-RFB-DJA―――

1  trial.  You must decide the case of each defendant on each crime

2  charged against that defendant separately.

3           Hold on.  There's a gap here.  Sorry.  There's a little

4  bit of a glitch here in my notes.

5           (Court conferring with courtroom administrator.)

6           THE COURT:  Just a moment.  My computer froze for a

7  second.

8           Here we go.  Again, this is a multiple-defendant case.

9  There will be times throughout the case that evidence will be

10 admissible for one purpose or against one defendant, but not

11 another.  If the Court, that being me, admits the evidence --

12 excuse me -- this type of evidence, I will instruct you on the

13 limited purpose -- limited purpose for which it can be used.

14          There are rules of evidence that control what can be

15 received in evidence.  When a lawyer asks a question or offers

16 an exhibit in evidence and a lawyer on the other side thinks

17 that it is not permitted by the rules of evidence, that lawyer

18 may object.  If I overrule the objection, the question may be

19 answered or the exhibit received.  If I sustain the objection,

20 the question cannot be answered or the exhibit cannot be

21 received.  Whenever I sustain an objection to a question, you

22 must ignore the question and must not guess what the answer

23 would have been.

24          Sometimes I may order that evidence be stricken from

25 the record and that you disregard or ignore the evidence.  That

———2:22-cr-00030-RFB-DJA———

1 means that when you are deciding the case, you must not consider

2 the evidence that I told you to disregard.

3        In deciding the facts in this case, you may have to

4 decide which testimony to believe and which testimony not to

5 believe.  You may believe everything a witness says or part of

6 it or none of it.

7        In considering the testimony of any witness, you may

8 take into account the following:  the witness's opportunity and

9 ability to see or hear or know the things testified to; the

10 witness's memory; the witness's manner while testifying; the

11 witness's interest in the outcome of the case, if any; the

12 witness's bias or prejudice, if any; whether other evidence

13 contradicted the witness's testimony; the reasonableness of the

14 witness's testimony in light of all of the evidence; and any

15 other factors that bear on believability.

16        The weight of the evidence as to a fact does not

17 necessarily depend on the number of witnesses who testify about

18 it.  What is important is how believable the witnesses are and

19 how much weight you think their testimony deserves.

20        Now, I will now say a few words about your conduct as

21 jurors.  First, keep an open mind throughout the trial and do

22 not decide what the verdict should be until you and your fellow

23 jurors have completed your deliberations at the end of the case.

24        Second, because you must decide this case based solely

25 on the evidence received in the case and on my instructions as

—2:22-cr-00030-RFB-DJA—

1  to the law that applies, you must not be exposed to any other

2  information about the case or to the issues it involves during

3  the course of your jury duty.  Thus, until the end of the case

4  or until I tell you otherwise, do not communicate with anyone in

5  any way and do not let anyone else communicate with you in any

6  way about the merits of the case or anything to do with it.

7  This includes discussing the case in person, in writing, by

8  phone or electronic means, via e-mail, text messaging, or any

9  internet chat room, blog, website, or other feature.

10        This applies to communicating with your fellow jurors

11  until I give you the case for deliberation.  It applies to

12  communicating with everyone else, including family members, your

13  employer, the media or press, and the people involved in the

14  trial.  Although you may notify your family and your employer

15  that you have been seated as a juror in the case, you may not

16  discuss your views or anything about the case with anyone.  But

17  if you're asked or approached in any way about your jury service

18  or anything about this case, you must respond that you have been

19  ordered not to discuss the matter and you must report that

20  contact to me immediately.

21        Because you will receive all of the evidence and legal

22  instruction you properly may consider to return a verdict, do

23  not read, watch, or listen to any news or media accounts or

24  commentary about the case or anything to do with it.  Do not do

25  any research such as consulting dictionaries, searching the

———2:22-cr-00030-RFB-DJA———

1  internet, or using other reference materials, and do not make

2  any investigation or in any other way try to learn about the

3  case on your own.  Do not visit or view any place discussed in

4  the case, and do not use internet programs or other devices to

5  search for or view any place discussed during the trial.

6         Also, do not do any research about this case, the law,

7  or the people involved -- including the parties, the witnesses,

8  or the lawyers -- until you have been excused as jurors.  If you

9  happen to read or hear something touching on the case in the

10 media, turn away and report it to me as soon as possible.

11        These rules protect each party's right to have this

12 case decided only on the evidence that has been presented here

13 in court.  Witnesses here in court take an oath to tell the

14 truth, and the accuracy of their testimony is tested through the

15 trial process.  If you do any research or investigation outside

16 the courtroom or gain any information through improper

17 communications, then your verdict may be influenced by

18 inaccurate, incomplete, or misleading information that has not

19 been tested by the trial process.  Each of the parties is

20 entitled to a fair trial by an impartial jury, and if you decide

21 the case based on information not presented in court, you'll

22 have denied the parties a fair trial.

23        Remember you have taken an oath to follow the rules,

24 and it is very important that you follow these rules.  A juror

25 who violates these restrictions jeopardizes the fairness of

2:22-cr-00030-RFB-DJA

1  these proceedings, and a mistrial could result that would

2  require the entire trial process -- trial process to start over.

3        If any juror is exposed to any outside information,

4  please notify me immediately.

5        Now, there will not be a transcript of the trial

6  available for you at the end of the trial.  You will have to

7  make your decision based upon what you recall of the evidence.

8  You will not have a written transcript of the trial.  I urge you

9  to pay close attention as the trial proceeds.  If you wish, you

10  may take notes to help you remember the evidence, and you've

11  been provided with notebooks, I think.

12        Does everyone have a notebook?  All right.  Perfect.

13        If you do take notes, please keep them to yourself

14  until you and your fellow jurors go to the jury room to decide

15  the case.  Do not let note-taking distract you from being

16  attentive.  When you leave the court for recesses, your notes

17  should be left in the jury room.  No one will read your notes.

18        Whether or not you take notes, you should rely on your

19  own memory of the evidence.  Notes are only to assist your

20  memory.  You should not be overly influenced by your notes or

21  those of your fellow jurors.

22        The next phase of the trial will now begin.  Each side

23  may make an opening statement.  An opening statement is not

24  evidence.  It is simply an outline to help you understand what

25  that party expects the evidence will show.  A party is not

—2:22-cr-00030-RFB-DJA—

1  required to make an opening statement.

2        The Government, after opening statements, will then

3  present evidence, and counsel for the defendant -- defendants

4  may cross-examine the witnesses and challenge the evidence.

5  Then if a defendant chooses to offer evidence, the counsel --

6  counsel for the Government may cross-examine the Defense

7  witnesses or challenge that evidence.

8        After the evidence has been presented, I will instruct

9  you on the law that applies to the case and the attorneys will

10  make closing arguments.  And I will instruct you on the law that

11  applies to the case based upon the facts that have come in.  You

12  will then go to the jury room to deliberate on your verdict.

13        So, now, we will begin with opening statements from the

14  Government.  Mr. Christin.

15        MR. CHRISTIN:  Thank you, Your Honor.

16        THE COURT:  Are their monitors on?

17        Are your monitors all working there?  Yep?  Okay.

18        MR. CHRISTIN:  Game of Thrones on HBO.  Law & Order:

19  SVU on NBC.  Grey's Anatomy on ABC.  Most of you have probably

20  heard of at least one of these shows.  Some of you have probably

21  seen at least one of these shows.  We are here today because the

22  five defendants in this case sitting over there stole these

23  shows along with hundreds of thousands of other episodes, and

24  they sold them to paid subscribers to stream and download

25  online.

—2:22-cr-00030-RFB-DJA—

1          They profited in the millions off of the creativity and

2    hard work of other people.  And they never paid a single cent

3    for the rights or the permissions to do that.

4          Let me be clear.  This is not a case about sharing your

5    Netflix password.  This is not a case about downloading some

6    shows to watch in the privacy of your own home.  This is a case

7    about an online streaming platform that offered customers paid

8    subscriptions for the ability to stream and download hundreds of

9    thousands of television programs.

10          Maybe that sounds like Hulu or Disney+ or Apple TV or

11    Netflix.  No.  Those companies create their content.  They own

12    their content.  And if they don't, they certainly pay for the

13    rights to provide it to their paying customers.

14          This company, they called themselves Jetflicks.  They

15    stole their content.  Over the course of nearly a decade,

16    various conspirators came and went, but with a common theme:

17    They all intended to successfully profit from this illegal

18    business.

19          Now, there was a short-lived attempt to run a different

20    type of business, something that you will hear referred to as an

21    aviation services company.  Mr. Dallmann had come up with the

22    idea of digitizing wealthy individuals' DVD collections so that

23    when they flew around the country in their private jets, they

24    could watch it on their private jets.  That business only ever

25    had two customers.  It never took off.

2:22-cr-00030-RFB-DJA

1          So Mr. Dallmann and his conspirators needed to pivot.

2   They came up with a new plan.  They were going to offer paid

3   subscribers the ability to stream and download content online.

4   It was going to be bigger than Netflix.  It was going to be

5   bigger than Hulu, and it was because they were stealing their

6   shows.

7          But they did this without the effort or expense of

8   creating an episode, without the effort or expense of paying a

9   single penny for the rights to do this.  The upside of this type

10  of business, massive profits.  The downside, it is 100 percent

11  illegal.

12         So how did this enterprise work?  Mr. Dallmann and his

13  coconspirators customized computer tools that were designed to

14  scour the internet night and day for pirated television shows.

15  Now, when I use the term "pirated," it simply means stolen.  So

16  these programs were designed to look on the internet for

17  television programs that were stolen, and when the software

18  found those programs, they made copies to servers that were

19  controlled by Mr. Dallmann and his coconspirators.  This

20  software was so efficient that it sometimes found programs

21  before they even aired on major networks.

22         Now, let me introduce to you the conspirators in this

23  case.  You have Mr. Dallmann sitting over there.  He was the

24  brains behind this entire operation.  He conceptualized it and

25  he created it.  And for nearly 10 years, he was involved in

—————2:22-cr-00030-RFB-DJA—————

1  every single aspect of this illegal business.

2          Now, Mr. Jaurequi, Mr. Garcia, sitting over here at the

3  front table, at different times during the conspiracy they acted

4  as the customer service.  You see, when the software identified

5  the television shows online and made copies to the servers, they

6  would ultimately be uploaded to the Jetflicks platform for its

7  customers to be able to view.  Well, because they were pulling

8  these shows from anywhere and everywhere, there were problems

9  with them sometimes.  Sometimes there were quality issues.

10  Sometimes shows were in foreign languages.  And so customers

11  complained.  They complained about specific television shows.

12  Mr. Jaurequi, Mr. Garcia were responsible for keeping these

13  customers happy.

14          Mr. Huber, sitting at the far end of the table, he was

15  the computer programmer.  He designed and he built the Jetflicks

16  website that was accessed by its customers.  He also took

17  television shows, those pirated shows I was talking about that

18  were pulled down to the servers, and he facilitated the

19  uploading of that to the Jetflicks website.  This was his role,

20  along with two other people that you're going to hear about in

21  this case, but are not sitting over there, Mr. Polo and

22  Mr. Vaillant.  At different times of the conspiracy, these

23  individuals were the computer programmers.

24          And, finally, you have Mr. Douglas Courson, sitting at

25  the back table, the director of acquisitions.  He specifically

─────────2:22-cr-00030-RFB-DJA─────────

1   programmed some of this software to identify the shows that

2   Jetflicks wanted to broadcast on its online streaming program.

3          Now, I've told you about the illegal business model,

4   and I've told you about the conspirators.  Let me just briefly

5   talk to you about the charges in this case.

6          As Mr. -- as Judge Boulware has mentioned, he's going

7   to instruct you in more detail at the end of the case on the

8   elements.  For now, all you need to understand is this.  The

9   Government has charged a conspiracy, and a conspiracy is simply

10  an agreement between two or more people to commit a crime.  And

11  in this case, that crime is criminal copyright infringement.  So

12  all five defendants in this case have been charged with

13  conspiracy to violate criminal copyright infringement.

14         Mr. Dallmann, for his role in the case, has been

15  charged with the actual commission of criminal copyright

16  infringement as well as money laundering.

17         Excuse me.

18         It's the Government's burden in this case to prove

19  beyond a reasonable doubt that the defendants are guilty.

20  You're going to hear that term a lot, "beyond a reasonable

21  doubt."  We accept that burden, and I submit to you that at the

22  end of this case, we will have more than satisfied it.  So let

23  me tell you how we're going to do that.

24         In November of 2016 -- sorry -- November of 2017,

25  Mr. Dallmann, Mr. Jaurequi were awoken by a knock at their door.

2:22-cr-00030-RFB-DJA

1  Standing outside that door were a group of federal agents from

2  the FBI.  They were there to execute a court-ordered search

3  warrant.  Mr. Courson lived directly next door.  He, too, was

4  awoken by a knock at his door, also by a group of federal agents

5  there to serve a court-ordered search warrant.

6       Now, when the agents arrived -- you're going to hear

7  about some of the agents that were there that day, and they are

8  going to tell you about the massive amount of electronic devices

9  that were seized from that -- from those residences.  Both of

10 those residences were owned by Mr. Dallmann.  They acted as the

11 headquarters and the tech center for Jetflicks.

12      The agents are going to tell you about the devices that

13 were seized as well as documents that they found in filing

14 cabinets, in backpacks, and on tables, and these documents are

15 going to show you the shows that they were downloading.  There

16 are printouts of the episodes and the shows that Jetflicks was

17 seeking to download using these piracy tools.

18      You will also hear from several digital forensic

19 examiners in this case.  They're going to tell you how they

20 preserved the data on those electronic devices and how they

21 extracted the data from those electronic devices.  It's that

22 data that is evidence in this case.

23      You're going to hear about a computer that was seized

24 from Mr. Dallmann's residence that contained a lot of e-mails

25 and text messages.  You're also going to hear about

1   Mr. Dallmann's iPhone and Mr. Jaurequi's iPhone because when the

2   FBI showed up that day, they had the authority to get those

3   iPhones and they did.  And you're going to hear from the digital

4   forensic examiners that extracted data from those iPhones:

5   chats, bookmarks for the piracy tools, contacts amongst the

6   conspirators.  It's this data that is going to be evidence in

7   this case.

8          You'll also hear from Supervisory Special Agent Clay

9   Chase.  He's sitting right here.  He will explain how all of

10  this evidence ties together and how it explains the various

11  roles of the different conspirators in this case.  He's also

12  going to tell you about the material that Google provided to him

13  in response to a court-ordered search warrant from

14  Mr. Dallmann's e-mail accounts.  You're going to see the e-mails

15  between these conspirators.  It's those e-mails, not my words,

16  that are going to show you what they did as part of this

17  conspiracy.  It's their statements, not mine.

18         You're also going to hear from representatives of

19  Netflix, NBCUniversal, Paramount Global, Warner Bros. Discovery.

20  They will tell you that they owned the rights to these

21  television programs, not Jetflicks, and they didn't give

22  permission to anybody sitting at those tables or anybody that

23  worked at Jetflicks to copy and distribute their content.

24         And they will tell you that when their content is

25  stolen, it affects everybody that's part of the industry.  It

1 affects their ability to recoup investment.  It affects

2 everybody from the people that work on the set to the people

3 that produce the shows.

4       But how did Jetflicks function?  How were they able to

5 generate millions of dollars working out of two homes in Las

6 Vegas, Nevada?

7       Special Agent Clay Chase is going to tell you about the

8 day that he logged onto the Jetflicks website and paid a

9 subscription fee to be a customer.  Subscriptions were offered

10 as low as 9.99.  How could you resist it?  Hundreds of thousands

11 of episodes.  He's going to tell you about his activity on their

12 website.  He's going to tell you about the NBC-owned show

13 12 Monkeys that he watched.  He's going to tell you about the

14 Netflix show, The OA, that he watched or Showtime's Ray Donovan

15 and many, many more.

16       He's going to tell you this, and we are going to show

17 you this.  Because when he logged onto those websites, he used a

18 program to be able to record his activity online.  You will get

19 to see what the Jetflicks interface looked like.  You will get

20 to see the programs that they were offering.  You will get to

21 see Special Agent Chase click on a show and watch it.

22       You will also meet Special Agent Jeff Schurott.  He is

23 going to tell you about the records that were obtained from

24 payment processors that Jetflicks used to collect its money from

25 its subscribers like PayPal and Stripe.  You're also going to

 1    hear about records from Bank of America and Wells Fargo, which

 2    is where that money went after it went through the payment

 3    processors.

 4         It's these records that will show you the subscription

 5    payments allowed Mr. Dallmann to use that money to promote his

 6    illegal business.  He used illegal profits to pay for his

 7    coconspirators' work, he used his illegal profits to pay for

 8    off-site servers, and he used his illegal profits to pay for the

 9    services to host his website.  So these records and transactions

10    that will also show you that the money was designed to -- it was

11    designed -- the transactions were designed to hide where the

12    money was coming from.  All of this evidence I've just described

13    to you will tell you how it began, how it came together, and how

14    they made money.

15         Now let me tell you how you are going to know that what

16    they were doing they knew was illegal.  You've heard about the

17    documents that were seized in this case.  You've heard about the

18    electronic evidence that was seized in this case.  You've heard

19    about financial records.  It's this same evidence that's going

20    to answer that question for you.

21         Documents like this.  This is a letter from HBO that

22    was retrieved from Mr. Dallmann's house when the FBI showed up

23    in November of 2017 demanding that Mr. Dallmann and Jetflicks

24    stop committing criminal copyright infringement.  The date on

25    this letter is 2011.  The FBI found it in 2017.

1            Special Agent Clay Chase, you're going to see the video

2    in 2016 when he watched HBO content on Jetflicks, five years

3    after this letter.  Mr. Dallmann and Jetflicks did not stop.

4            You're going to hear about this letter, another letter

5    from the Motion Picture Association of America.  You are going

6    to hear from the person that hand-delivered this letter to

7    Mr. Dallmann in 2012 demanding that Mr. Dallmann and Jetflicks

8    stop committing copyright infringement.  They did not.

9            You are going to see and hear about evidence from

10   PayPal.  You're going to see evidence and hear about how PayPal

11   stopped doing business with Mr. Dallmann because they suspected

12   that the Jetflicks business was violating their Acceptable Use

13   Policy.  Mr. Dallmann pivoted.  He needed a new payment

14   processor.  So what did he do?

15           He opened up a new account at Stripe, but Stripe also

16   needed to see what Jetflicks was offering.  They needed to see

17   the content.  Mr. Dallmann couldn't show them that content

18   because it was criminal copyright infringement.  So he came up

19   with a new plan.  He e-mailed one of his conspirators,

20   Mr. Vaillant.  He provided to him some images that were

21   ultimately used to trick Stripe into thinking that Jetflicks was

22   an aviation services company, like in 2007, except now we're in

23   2016.  It was not an aviation services company.

24           You are going to hear and see evidence that

25   Mr. Dallmann became so paranoid that as early as 2015, he

 1  started Googling "Jetflicks indictment," "Jetflicks indicted."
 2  He wanted to know had he been caught yet.  The answer to that is
 3  no.  There was no indictment yet.  So he couldn't have possibly
 4  known that there was going to be an indictment unless he knew
 5  that what he was doing was illegal.
 6         He did it again in 2016.  You're going to hear and see
 7  some of those same records about his Google searches.  This
 8  time, "Kristopher Dallmann warrant," "wire fraud punishment."
 9  He knew what he was doing was illegal.
10         He was so paranoid a couple hours after making those
11  Google searches in 2016, he sent a text message to Mr. Courson,
12  and he said, "It's time to move the Jetflicks business out of
13  the gray area."  Mr. Courson said, "Good."
14         But that's not all.  You're going to hear about when
15  the FBI showed up on their doorstep.  They had a chance to
16  interview Mr. Jaurequi and Mr. Dallmann.  What did Mr. Jaurequi
17  say?  "Illegal things are just illegal things."  "Started out
18  innocent, but then the money got involved."
19         What did Mr. Dallmann say?  "Aircraft customers, we
20  only ever had two."  "Oh, that e-mail to Stripe about Jetflicks
21  being an aviation services business, that was a lie."  Those are
22  his words, not mine.
23         Ladies and gentlemen, at the end of this case on behalf
24  of my colleagues, Mr. Merriam, Ms. Oliva, and Mr. Veronda, we
25  are going to ask that you find the five defendants guilty of all

—2:22-cr-00030-RFB-DJA—

1  charges in this case.  Thank you.

2         THE COURT:  Thank you, Mr. Christin.

3         We're going to -- so we can swap out the -- Patty, are

4  we going to do it now -- court reporters here.  We'll take a

5  five, ten-minute recess.  You can go back and take a little

6  nature break.  And we'll come back out, and we'll hear the

7  opening arguments from the defendants.

8         So we'll be in recess for about 10 minutes.

9         COURTROOM ADMINISTRATOR:  Please rise.

10        (Whereupon jury leaves the courtroom at 1:04 p.m.)

11        THE COURT:  Please be seated.  We'll be in recess for

12  10 minutes.  We're just going to swap things out.

13        (Recessed at 1:04 p.m.)

14                        --oOo--

15              COURT REPORTER'S CERTIFICATE

16

17     I, PATRICIA L. GANCI, Official Court Reporter, United

18  States District Court, District of Nevada, Las Vegas, Nevada,

19  certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21

22  Date:  May 29, 2024.

23                              /s/ **Patricia L. Ganci**

24                              Patricia L. Ganci, RMR, CRR

25