2:22-cr-00030-RFB-DJA - May 29, 2024

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                        FOR THE DISTRICT OF NEVADA

 3    UNITED STATES OF AMERICA,      )
                                     ) Case No. 2:22-cr-00030-RFB-DJA
 4                 Plaintiff,        )
                                     ) Las Vegas, Nevada
 5    vs.                            ) May 29, 2024
                                     ) 1:20 p.m. - 4:11 p.m.
 6    KRISTOPHER LEE DALLMAN (1),    ) Courtroom 7C
      DOUGLAS M. COURSON (3),        )     JURY TRIAL
 7    FELIPE GARCIA (4), JARED       ) DAY 2, PM SESSION
      EDWARD JAUREQUI (5), and       )
 8    PETER H. HUBER (6),            )
                                     )
 9                 Defendants.       )
      _____    )  CERTIFIED COPY

10

11        REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 2, PM SESSION
             BEFORE THE HONORABLE RICHARD F. BOULWARE, II
12                UNITED STATES DISTRICT COURT JUDGE

13

14    APPEARANCES:

15    For the Government:  JESSICA OLIVA, AUSA
                           EDWARD G. VERDONDA, AUSA
16                         UNITED STATES ATTORNEY'S OFFICE
                           501 Las Vegas Boulevard South, Suite 1100
17                         Las Vegas, Nevada 89101
                           (702) 388-6336
18

19    (Appearances continued on pages 2 and 3.)

20

21    Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         (702) 384-0429 or AM@nvd.uscourts.gov

24    Proceedings reported by machine shorthand.  Transcript
      produced by computer-aided transcription.
25
```

2:22-cr-00030-RFB-DJA - May 29, 2024

```
 1    APPEARANCES CONTINUED:

 2    For the Government (Cont.):

 3        MICHAEL CHRISTIN, ESQ.
          CHRISTOPHER S. MERRIAM, ESQ.
 4        U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION
          1301 New York Avenue, NW, Suite 600
 5        Washington, DC 20530
          (202) 514-1026

 6

 7    For Defendant Kristopher Lee Dallmann:

 8        LaRONDA R. MARTIN, AFPD
          KEVIN ANDRE TATE, AFPD
 9        RICK MULA, AFPD
          OFFICE OF THE FEDERAL PUBLIC DEFENDER
10        411 East Bonneville Avenue, Suite 250
          Las Vegas, Nevada 89101
11        (702) 388-6577

12

13    For Defendant Douglas M. Courson:

14        PAOLA M. ARMENI, ESQ.
          AUTIN T. BARNUM, ESQ.
15        CLARK HILL
          1700 South Pavilion Center Drive, Suite 500
16        Las Vegas, Nevada 89135
          (702) 862-8300

17

18    For Defendant Felipe Garcia:

19        WILLIAM H. BROWN, ESQ.
          CHRISTOPHER MISHLER, ESQ.
20        BROWN MISHLER, PLLC
          911 North Buffalo Drive, Suite 202
21        Las Vegas, Nevada 89128
          (702) 816-2200

22

23

24    / / / / /

25    / / / / /
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Jared Edward Jaurequi:

 3        RUSSELL MARSH, ESQ.
          SUNETHRA MURALIDHARA, ESQ.
 4        WRIGHT MARSH & LEVY
          300 South 4th Street, Suite 701
 5        Las Vegas, Nevada 89101
          (702) 382-4004
 6

 7   For Defendant Peter H. Huber:

 8        KATHLEEN BLISS, ESQ.
          KATHLEEN BLISS LAW
 9        170 South Green Valley Parkway, Suite 300
          Henderson, Nevada 89012
10        (702) 318-7375

11   -and-

12        MILAN CHATTERJEE, ESQ.
          MILAN'S LEGAL
13        3172 North Rainbow Boulevard, Suite 1406
          Las Vegas, Nevada 89109
14        (702) 538-3749

15                            * * * * *

16                        I N D E X

17   OPENING STATEMENTS
```

```
18   Ms. Martin on behalf of Kristopher Dallmann . . . . Page 140

19   Ms. Armeni on behalf of Douglas Courson . . . . . . Page 147

20   Ms. Bliss on behalf of Peter Huber  . . . . . . . . Page 152

21   Mr. Marsh on behalf of Jared Jaurequi . . . . . . . Page 159

22   Mr. Brown on behalf of Felipe Garcia  . . . . . . . Page 167
```

```
23

24   / / / / /

25   / / / / /
```

1               *I N D E X   C O N T.*

2     Government's Witness:                                    Page

3     **TIM LYNCH**

4          *Direct Examination by Mr. Christin*          *180*

5

6                              * * * * *

7

8                         *E X H I B I T S*

9     EXHIBIT NO.:          OFFERED     RECEIVED   REJECTED

10    Gov't 202               189          189

11

12                              * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

2:22-cr-00030-RFB-DJA - May 29, 2024

```
 1          LAS VEGAS, NEVADA; WEDNESDAY, MAY 29, 2024; 1:20 P.M.

 2                            --o0o--

 3                    P R O C E E D I N G S

 4          THE COURT:  Please be seated.  Are we ready to go?

 5          MS. MARTIN:  Yes, Your Honor.

 6          THE COURT:  Whoa.  You're definitely ready to go.

 7          MR. MARSH:  Your Honor, can I raise something

 8   before --

 9          THE COURT:  Hang on a second.  Yes.

10          MR. MARSH:  I just wanted to raise again the use of

11   the term piracy because I heard it a bunch of times in the

12   Government's opening.

13          THE COURT:  And raise what?  I mean --

14          MR. MARSH:  Well, I mean, I don't think that it's

15   something that should be used.  It has a lot of connotations

16   that have nothing to do with copyright law, and I'm just

17   lodging that objection, Your Honor.  That's all.  I'd like to

18   ask that you instruct them not to use it, but that --

19          THE COURT:  Instruct them not -- so when you say --

20   what do you think is the confusion, Mr. Marsh, as it relates

21   to the issue of sort of piracy in this case?  Because I'm

22   going to give the instruction on copyright law.  I'm going to

23   tell them this is what the law is; right?  And so tell me a

24   little bit about what it is -- your concern in terms of the

25   term specifically?
```

2:22-cr-00030-RFB-DJA - May 29, 2024

1      **MR. MARSH:**  Well, I mean, I'm not going to give an

2  opening where I, you know, have a parrot and one wooden leg

3  and say argh all the time --

4      **THE COURT:**  Right.

5      **MR. MARSH:**  -- but --

6      **THE COURT:**  I would like to see that opening, but

7  yes.  But is the point that the term is both vague but also

8  potentially prejudicial?  Because, I mean, that seems --

9      **MR. MARSH:**  Exactly.

10      **THE COURT:**  -- to me, that the concern is that the

11  term is potentially not a legal term but nonetheless a

12  negative term.  And so I can appreciate that concern.

13      What I will say is this, Mr. Christin.  I didn't

14  realize that it was going to be used quite so extensively in

15  your opening, but I am going to instruct you not to use the

16  term in the future.

17      Now, if a witness comes in and talks about what is

18  what our division or department does -- I think it was like an

19  anti-piracy individual?

20      **MR. CHRISTIN:**  Yeah.

21      **THE COURT:**  That's different because then they're

22  talking about their work, but I don't know if it's going to

23  come up in any of your questions but let's avoid the use of

24  that term.

25      **MR. CHRISTIN:**  Your Honor, if I -- if I may say, one

2:22-cr-00030-RFB-DJA - May 29, 2024

```
1   of the places that they were going to get content is called
2   Pirate Bay.  This is a common term used in the industry when
3   copyrights are stolen.  People are -- so there's Pirate Bay.
4   There's people that work at the anti-piracy units.  I mean,
5   this is a very common term --
6        (Simultaneous crosstalk.)
7        THE COURT:  But -- so, Mr. Christin, I understand
8   that.  My concern is that copyright infringement and piracy
9   are not the same thing, right, in terms of how people may
10  understand it.  People may understand piracy simply as
11  illegally copying or using or downloading particular material.
12  That's not actually what's charged here; right?
13        So piracy is different.  In fact, there are
14  anti-piracy -- separate anti-piracy potential statutes.  My
15  concerns about the term being particularly ill-defined -- or
16  not ill-defined but undefined but nonetheless having negative
17  connotations.  If it comes up in a specific use -- for
18  example, Pirate Bay or something else -- that's different.  In
19  the context of your opening, I think you used it as a more --
20  at times it appeared to be more sort of a generic sense of
21  sort of illegally copying or retrieving material.
22        Now, I'm going to give them an instruction on that
23  and so they'll understand that.  I'm just saying, moving
24  forward, let's not use the term piracy unless a witness for
25  the Government uses that term.  Okay?
```

1    **MR. CHRISTIN:**  Yes, Your Honor.  We'd like to -- the

2  opportunity to readdress this argument before closings.

3    **THE COURT:**  That's fine.  Again, if it comes up in

4  the content of a particular witness or evidence, Mr. Christin,

5  if you can explain to me why it's necessary to use the term,

6  I'm happy to consider it.  And so it may be something we have

7  to do when it comes up in a particular witness' testimony or

8  the particular exhibits.  I'm happy to reconsider it then as

9  the evidence comes in.

10    **MR. CHRISTIN:**  Thank you, Your Honor.

11    **THE COURT:**  All right.  Okay.  Anything else before

12  we bring in the jury?  And, again, so we're just going to go,

13  again, from Ms. Martin to -- Ms. Armeni or Mr. Barnum, who's

14  going to be doing the opening?

15    **MS. ARMENI:**  It's me, Your Honor.

16    **THE COURT:**  And then who's going to be doing the

17  opening for Mr. Huber?

18    **MS. BLISS:**  I will, Your Honor.

19    **THE COURT:**  And for Mr. Jaurequi?

20    **MR. MARSH:**  I will today, Your Honor.

21    **THE COURT:**  Okay.  And then Mr. Brown.  Okay.  So

22  we'll just hand off -- are you all going to use the lapel mic

23  or who's going to -- is anyone going to use the podium?

24    **MS. BLISS:**  I'm going to use the podium, Your Honor.

25    **THE COURT:**  Okay.  All right.  Okay.  We'll bring the

```
 1    jurors in.
 2         (Jury in at 1:26 p.m.)
 3              THE COURT:  Please be seated.
 4         I will say to you, I admire you -- you come in in the
 5    proper order each time.  I can tell you some jurors it's taken
 6    them days to figure this out, but you-all, from day 1, the
 7    first time you came in, you came in in order.  So you-all are
 8    doing great.
 9         We are now going to hear from the defendants in terms
10    of their opening statements.  We'll start with counsel for
11    Mr. Dallmann, Ms. Martin.
12              OPENING STATEMENTS FOR MR. DALLMANN
13              MS. MARTIN:  He toed the line, but he didn't believe
14    that he crossed it.  He toed the line, but he didn't believe
15    that he crossed it.  Kristopher Dallmann toed the line as a
16    businessman, but he didn't believe that he actually infringed
17    on the copyrights of others.
18         Now, the Government has told you part of the story.
19    I'd like to tell you what else you will learn.
20         Kristopher Dallmann struggled in his young years.  As
21    a teenager, he was gay.  And, unfortunately, his family was
22    disappointed, so much to the point that they threw him out of
23    the house.  So when he entered the world as a young man at the
24    age of 18, he entered it alone.  But Kristopher Dallmann is no
25    stranger to hard work.  He's no stranger to getting jobs.
```

```
1    Having to provide for himself, he took on various jobs.  He
2    went door to door selling vacuums.  He worked in restaurants.
3    He even worked in the bath bath -- bath, back, and body
4    industry.  He did what he needed to do to provide for himself.
5          But as a young man going through these things dealing
6    with the fact that he was rejected by his family, it took its
7    toll.  He became a little downtrodden.  In fact, he found
8    himself homeless.  But by the kindness of a gentleman who came
9    across Mr. Dallmann, he helped him get on his feet, gave him a
10   place to stay, gave him food to eat, helped him find a job.
11         And because Dallmann is no stranger to hard work, he
12   excelled.  He did well at Bed Bath & Beyond.  He moved on to
13   another company in the same industry, Melt (phonetic), and did
14   well there, too.  He became a manager.  And he's like, hmm.
15   As much as he enjoyed working for others, Kristopher Dallmann
16   always wanted to be an entrepreneur.  He always wanted to have
17   his own business.  Well, why not try that in Las Vegas,
18   Nevada?  Now, see, I had to make sure I said Nevada because
19   I'm not from here and they told me Nevada is wrong; right?  So
20   Nevada.
21         In order to create his own business, what he did was
22   he taught himself how to repair computers.  Now, don't confuse
23   repairing computers with being an IT guru, but he did excel at
24   repairing computers.  In fact, he came across a young lady who
25   needed her computer repaired, and he did just that.  And he
```

1    did such a great job that she introduced him to another

2    company, an aviation company, that, as the Government said,

3    asked if he could create some type of platform program where

4    they could make their customers more comfortable by watching

5    movies on the flight to the next destination.  It worked out

6    well.  This was Mr. Dallmann's idea.

7         So trying to get that business off, you know, to a

8    great start, he had other ideas.  He thought, hmm, since that

9    went so well, maybe -- maybe I can offer some type of

10   streaming something -- something to other people who either

11   couldn't, didn't know how, wanted to be able to watch

12   different episodes.

13        Now, remember, what the Government didn't tell you is

14   that, when the streaming business came along, Netflix wasn't

15   streaming.  Hulu wasn't streaming.  This was his novel idea.

16   Huh, let's -- let's try that.  He tried.  Now, remember, I

17   said Mr. Dallmann was a repairman, a computer repairman.  I

18   didn't say he was an IT guru.  So he needed help.

19        While working at an aviation -- or working with an

20   aviation service, Mr. Dallmann came across Darryl Polo.  See,

21   the Government wants you to believe that it was Mr. Dallmann's

22   great idea, but it was really Darryl Polo.  See, Darryl Polo

23   was just there to help assist, but, remember, it wasn't going

24   as well.  And so Mr. Dallmann asked, can you -- can you help

25   make it better or something?  It's just not working well.

1          Because back in the early 2000s, remember, there was

2     only 3G.  There were limited phone plans.  So we didn't have

3     unlimited access to the Internet as we do now.  So things were

4     a little difficult.  And Darryl Polo said, oh, okay -- now,

5     these are just words to the effect, obviously not the exact

6     words -- oh, so you want me to help get this started?  Okay.

7     Let's see what I can do.  Because Darryl Polo is the IT guru.

8     So Darryl Polo, working from his home, is doing what he needs

9     to do to try to get the business running better.

10         Now, obviously, I'm just an attorney so you can tell

11    I don't do computer stuff, but he put in his codes, his

12    scripts.  But he wasn't the type to share because he didn't

13    want folks to take what he was doing probably because -- and

14    you'll decide whether or not this is true -- probably because

15    Polo always had the intent to take this whole concept and make

16    it his own.  In fact, that's exactly what he did.

17         He took everything he put into Jetflicks and snatched

18    it back and started his own business, iStreamItAll.  He

19    started iStreamItAll.  And when he left Jetflicks, he crippled

20    them.  He crippled them, and the business went down.  And as

21    much as Mr. Dallmann tried to get it back, it just didn't work

22    the way it worked when Polo was there.

23         Now, fast-forwarding to 2017, [sound], there was a

24    knock at the door.  It was early in the morning.  Mr. Dallmann

25    [sound] opens up, and who's there but the FBI.  Oh, we believe

1    that there's someone engaging in copyright infringement, we

2    need to search your home.  Are you sure you have the right

3    house?  Yes, we believe we have the right house, and we need

4    to search your home.

5            Mr. Dallmann allows them in, and they search the

6    home.  And they search for whatever media they can find that

7    might have television, movies, whatever, that they're looking

8    for in the warrant in the home.

9            Now, one of the -- or two of the items that they

10   needed to collect were the iPhones, and the iPhones belonged

11   to Mr. Dallmann.  And for some reason the experts -- the

12   Government's experts on site couldn't access the phones.  So

13   they said, Mr. Dallmann, can we have your passcodes?  Well,

14   believing that he was operating a legitimate streaming

15   business, what does he say?  Of course, the passcodes are one,

16   two, three, four, five -- or whatever they were -- and they

17   were able to access the phones.

18           They were like, well, we can't seem to image it so

19   we're going to have to take the phones with us.  Mr. Dallmann

20   asked, well, I kind of need the phones.  Oh, we promise we'll

21   bring them back, we'll bring them back.  And they did.  Four

22   days later, they brought them back.

23           Meanwhile, Mr. Dallmann, putting his home back

24   together after the search, he comes across another piece of

25   media that the search team, despite being there for hours,

1    left behind.  So when the two agents showed back up with the

2    phones, [sound], Mr. Dallmann, we have your phones.

3    Mr. Dallmann says, oh, by the way, you know, you guys, I found

4    this piece of media that you-all missed and maybe you can use

5    this and find out what's on this to help you-all because he

6    believed he was operating a legitimate streaming service.  He

7    handed them the piece of equipment.  And you're going to hear

8    about that equipment later.

9            Now, the Government talked about two letters that

10   were received.  Now, remember, this indictment ranges from, as

11   the Government said, over a decade; 2007 to 2017.  And they

12   talk about some letter warning that was sent in 2011 and

13   another one in 2012, but what they didn't say and that you

14   will learn is that between 2007 and 2010, heard nothing from

15   anybody; not HBO, not the MPAA, not any copyright holder.

16   From 2013 to 2017, they didn't hear anything from the

17   copyright holders.  Just some warnings that have no real legal

18   significance.  Not a call, not a lawsuit, not a

19   knock-and-talk, not a anything.  And that these type of

20   information, eh, you know, what -- what did they really

21   provide?  You will decide was that enough.

22           Now, at this stage in the case, I'm going to have to

23   reiterate some of the things that the Court talked about.  You

24   all each had notebooks.  This case is going to last some weeks

25   so we really ask that you take notes because what you hear

2:22-cr-00030-RFB-DJA - May 29, 2024

1      this week you may not remember four weeks from now.  We ask
2      that you pay attention.  It's going to be a lot of exhibits, a
3      lot of evidence, a lot of witnesses.  We need you to be able
4      to take notes as to what each of the witnesses said.

5           What I really want you to pay attention to is that
6      box right there (indicating).  I want you to watch when the
7      witnesses testify and see are they [indiscernible].  Because,
8      see, the truth is the truth.  Are they fair in their
9      testimony, whichever attorney asks the questions, whether it
10     be the prosecution or the defense?  Keep an eye out on that
11     type of credibility.

12          Oh, one more thing.  The Government will not be able
13     to show -- oh, wait, they're still listening.  We believe
14     you'll be able to glean it for yourself, and when my trial
15     partner comes back, Mr. Tate, he will talk to you all about
16     this.  And it will be at that point that we ask for the only
17     just verdict in this case, ladies and gentlemen.  Because
18     Kristopher Dallmann believed he was operating a legitimate
19     streaming business because Kristopher Dallmann did not
20     willfully infringe on the copyrights of others, and because
21     Kristopher Dallmann was not trying to conceal or disguise any
22     aspects of his business.  The e-mails were in his name.  The
23     business was in his name.  The business was in his home.  He
24     advertised.  There was nothing to disguise about this
25     business; it was open.

1              And those verdicts, ladies and gentlemen, will be for

2      verdicts of not guilty.

3              **THE COURT:**  Thank you, Ms. Martin.

4              Ms. Armeni, we'll take a moment to pass the

5      microphone.

6              **MS. ARMENI:**  We have to switch.  Sorry.  Technical

7      challenge.

8              **THE COURT:**  That's all right.  Take your time.

9                  **OPENING STATEMENTS FOR MR. COURSON**

10             **MS. ARMENI:**  Convenience does not equal agreement.

11     The Government will have to prove beyond a reasonable doubt

12     that Douglas Courson agreed with at least one person to commit

13     a crime:  Criminal copyright infringement.

14             Twelve years ago in 2012 Doug was in his early 50s.

15     He hit hard times.  His relationship of 20 years collapsed.

16     He had no job, no income and he had no place to stay, and

17     Kristopher Dallmann stepped up and helped him.  Kris had known

18     Doug for several years back from Denver, Colorado, and Doug

19     actually helped Kris when Kris hit hard times helping him find

20     a job and giving him a place to stay, the kindness of a

21     gentleman.

22             So Kris offered Doug a place to stay and an

23     opportunity to make some money at his business, Jetflicks.

24     Jetflicks -- at the time that Doug got involved, Jetflicks had

25     been around for many, many years being in business.

1    Conveniently, Doug would live and work at 2216 Tona Circle,

2    which was where Jetflicks was running out of the business.

3    2216 Tona Circle was a modest home.  It had three bedrooms.

4    Doug occupied one bedroom, and the two other bedrooms were for

5    an office.  Doug shared an office with Peter Huber.

6           Doug, when he started at Jetflicks, received the

7    title director of aviation.  The role of director of aviation

8    was a perfect fit.  Doug had received his bachelors in

9    aviation aerodynamics from the University of Illinois, and

10   when he graduated from college, he spent about 12 years as the

11   director of a flight school.  So even though Doug had been

12   away from aviation for quite awhile, this opportunity was

13   convenient because it gave him -- it allowed him to go back to

14   something he knew, something he was familiar with.  And that

15   was important at that point in his life where he had hit such

16   hard times and it was just a difficult time.

17          Over the years, Doug taught himself graphics, Adobe

18   Illustrator.  He learned how to use Adobe Illustrator, and so

19   that also played a role when he started at Jetflicks.

20          Originally, as you've heard, Jetflicks was supposed

21   to be an in-flight entertainment system; hence, director of

22   aviation.  But as some businesses go, businesses don't always

23   go so great, and so you have to come up with some other ideas.

24   And that came, the Jetflicks and the streaming.

25          Doug had a couple roles.  He helped out where he

1    could, where his experience allowed him.  Doug does not have

2    any experience in programming or coding or computers or IT.

3    His two primary roles when he was at Jetflicks was graphics

4    and then helping with the content, the shows.  So with

5    graphics, like I shared with you, his -- his passion or his

6    fun time was the -- the Adobe Illustrator.  So he would use

7    the Adobe Illustrator to make buttons that they would put on

8    the Jetflicks website.

9         As far as the processing shows, it was a step-by-step

10   process for him.  Not a lot of IT needed for that, and so he

11   would be given a list of shows, he would get the shows, he

12   would download them into a interface, and then the interface

13   was actually something that was done by somebody other than

14   Doug.  Doug did not make the interface.  He just followed the

15   directions essentially.  And he would put the show in and then

16   the search mechanism would go out into the web and would hit

17   these websites, and then that's how they would get the content

18   of the shows, the websites that all of us can go to.  They are

19   public websites.

20        Jetflicks, as you heard, is open to the public.  You

21   know, they weren't trying to hide.  They did charity events

22   and just ran out where everybody could see them, plain view.

23        Now, for Doug helping out he was paid minimally.  And

24   what I mean by minimally is, when you do the math, when you

25   hear about how much he was making, it equals about $275 a week

1    for his work from the middle of 2012 through April of 2015.

2    So, in total, he made $46,000, around that.

3           In late 2014 Doug realized he needed a change, and so

4    in April of 2015 he applied for Target and got a job at

5    Target.  And, today, that's still where he works.

6           So a couple months after Doug started working -- and

7    Ms. Martin had shared with you how important it is.  This

8    trial is going to take us a little bit of time, and you're

9    going to hear a lot of information.  But what I will tell you

10   is dates are going to be very important in this case, and so

11   when you're listening to the witnesses, you're going to want

12   to make a note of what dates those are.

13          Towards the end of 2015, early 2016, Jetflicks

14   transitioned out of 2216.  So it was no longer running its

15   business in 2216.  Doug remained.  Kris allowed Doug and his

16   dog to remain in 2216 even after he started working at Target

17   and even after the business left 2216.

18          Now, despite that, there's no surprise -- Doug and

19   Kris had a history, had known each other -- and so they still

20   communicated, and Doug helped out at times when needed.

21   Convenience does not equal agreement.

22          Now, we've heard about these two letters, and you're

23   going to see them more as the evidence in this case transpires

24   and there's people on the stand to tell you about these

25   letters.  But what you'll notice is the first letter -- again,

1   I was talking about dates and how important dates are.  The

2   first letter allegedly was sent when Doug wasn't even working

3   for Jetflicks or living at 2216.  And the second letter

4   doesn't have 2216 on it, doesn't have Doug's name on it,

5   doesn't have Doug's e-mail address on it.  Doug did not

6   believe that Jetflicks was illegal.

7          The Government has to prove beyond a reasonable doubt

8   that a crime was committed.  Here, felony criminal copyright.

9   They have to show that there's an agreement.  There will be no

10  evidence of an agreement because convenience is not an

11  agreement.

12         At the end of this case, we'll stand up before you

13  and we will ask you to find Doug Courson not guilty.

14         **THE COURT:**  Thank you, Ms. Armeni.

15         Ms. Bliss.

16         **MS. BLISS:**  Thank you, Your Honor.

17         **THE COURT:**  Ms. Armeni, if you want to turn it off --

18         **MS. ARMENI:**  I am, Your Honor.  Sorry.  Just a little

19  slow.

20         **THE COURT:**  No, that's all right.  You're fine.

21         **MS. BLISS:**  I don't know if I need it, Your Honor.

22         **THE COURT:**  Well, I mean, if you're going to use --

23  you have to choose, Ms. Bliss.  Because it's a little bit

24  difficult -- if you wear it, you're going to get feedback.  So

25  are you're going to use it or not?  You can use the podium.

1   You can use either one.  I just think it -- it's a little

2   tricky.  I think if it gets close to the other microphone, it

3   may get feedback.  That's my concern.

4          **MS. BLISS:**  Oh.  I'm not going to use it.

5          **THE COURT:**  Oh.  Then okay.  You can put it away.  I

6   thought you said --

7          **MS. BLISS:**  No, no, no.  I'm just going to use the

8   podium.

9          **THE COURT:**  Oh, okay.  I'm sorry.

10         **MS. BLISS:**  I know it's hard to believe, but I will

11  be corralled today.

12         **THE COURT:**  Okay.  So then we can just hand it to

13  whoever's going to use it next.

14         **MS. BLISS:**  The only caution I have is I'm not going

15  to fall into a hole literally or figuratively.

16         **THE COURT:**  Okay.  Be careful there.

17         **MS. BLISS:**  I will.

18              **OPENING STATEMENTS FOR MR. HUBER**

19         **MS. BLISS:**  Ladies and gentlemen, my name's Kathleen

20  Bliss, and I represent Peter Huber.  Peter Huber never agreed

21  with anyone to willfully download copyrighted material.

22         Willfully is going to be the touch-tone of this case,

23  and willfully means that you have to know that something's

24  wrong, that you have to know that something's illegal.  And

25  with a conspiracy, you specifically have to know that you or

1    somebody else you're working with willfully violated the

2    copyright laws in this case.

3            Was Peter Huber an employee of Jetflicks?  Yes, from

4    late -- or mid 2012 to late 2015.  I think that the

5    termination date was January 5th, 2016.  Those dates are

6    really, really important because that's going to give you a

7    sense of what, if anything, Mr. Huber knew.  And I submit he

8    had no idea that anything was wrong or illegal or that his

9    programming furthered any type of crime.

10           As I said, being an employee is not enough, ladies

11   and gentlemen, especially an employee like Mr. Huber.  You'll

12   hear testimony and you'll see evidence that Mr. Huber is

13   Hungarian.  That's his birth language.  That he stayed to

14   himself.  There are even some employees out there who didn't

15   even know if Peter spoke English.  No, he -- he kept to

16   himself.  He left in late 2015 because he hadn't been paid for

17   months, and now he drives a taxi.

18           Little bit of context here, too.  Because the

19   Government's wide-net theory presupposes that just being an

20   employee at Jetflicks means you did something wrong.  It's

21   just not the case.

22           And ladies and gentlemen, as the Government rolls out

23   hundreds of exhibits they plan on introducing, you're hardly

24   ever even going to see mention of Peter.  Maybe a CC here or

25   there, fix this or that.  But there are literally hundreds of

1  exhibits that predate his employment and certainly postdate it

2  that have absolutely nothing to do Peter -- with Peter.

3          He kept to himself, he did his job, and in some

4  respects he was an outsider.

5          A little bit more about that.  Mr. Huber was born in

6  Transylvania.  Transylvania was a province of Romania.  But

7  he's Hungarian.  His family was Hungarian.  His grandfather

8  was a Baptist minister.  He was engaged and married to a

9  German woman.  In Romania, during those times -- which it was

10 a Soviet Bloc country.  It was run by a dictator --

11         **MR. CHRISTIN:**  Your Honor --

12         **MS. BLISS:**  -- and in those days --

13         **MR. CHRISTIN:**  Your Honor, I'm going to object.

14         **THE COURT:**  The objection being, Mr. Christin?

15         **MR. CHRISTIN:**  Relevance, Your Honor.  We're talking

16 about the Soviet Union right now.

17         **THE COURT:**  Ms. Bliss?

18         **MS. BLISS:**  Well, it's part of the background of

19 Mr. Huber.

20         **THE COURT:**  Is this evidence that's going to come in

21 through --

22         **MS. BLISS:**  Yes.  I have a good-faith belief that it

23 will.

24         **THE COURT:**  I'll allow it.  Go ahead.

25         **MS. BLISS:**  It's important, ladies and gentlemen --

1    and there will be objections like relevance, and the judge is

2    going to instruct you on what's relevant and what's not.

3    That's for you to decide.  And what's relevant is to

4    understand what Peter's role was and why, why he kept to

5    himself.

6         In Romania, during this time frame of oppression and

7    hate and discrimination against Hungarians, Mr. Huber, though

8    educated at university there in mathematics and informatics --

9    it's like information systems, like computer science.  By

10   1983, things were getting so bad that he knew he had to leave.

11   And so he took his wife and they entered Yugoslavia.  And in

12   Yugoslavia they were both captured and held in a detention

13   camp for three weeks.  Ultimately, his wife went to Germany.

14   Peter was there being held in an asylum camp by this time.  He

15   made a decision to escape because he knew things were not

16   going to go well.  So somehow he escaped.  He hitchhiked on a

17   VW Microbus, if anyone remembers those.  It had German plates.

18   He was dropped off by the Austrian border, and he sneaked

19   through the forest and made it back to Germany.

20         Now, with his background in math and computer

21   science, information systems, he was able to get a job, and he

22   worked at companies like Siemens and BMW, Adidas.  Back in

23   those days they used punch cards.  There was no such thing as

24   the Internet.  We're talking 1983 and beyond.  They used punch

25   cards.  Somebody would pick them up, they would take them to a

1    lab, and that's how they were processed.

2          By 2000 Mr. Huber, his marriage had failed, and he

3    met Agnes.  And you'll hear her name because Agent Cox

4    interviewed Agnes and Peter together.  I'm sure you'll hear

5    about that and the little checklist that Mr. Cox followed in

6    conducting his interviews.  They came to Las Vegas in 2006.

7    Agnes had already lived here.  Her marriage to someone in the

8    United States hadn't worked out either, but they came in 2006

9    on April 15th, and they were married the next day, on the

10   16th.

11         Mr. Huber worked projects to projects.  It's

12   important also to understand the industry from which he came.

13   These projects were narrow.  There was a task that was

14   assigned.  You complete that task.  You either move on to

15   another project, or you look for another job where a project

16   is needed with his skill set.  After he had finished a project

17   in San Diego -- he had been commuting back and forth -- he saw

18   an ad on Craigslist requiring certain skills, skills that he

19   had, skills that required programming experience and things

20   like PHP.  You may hear that term.  Or CSS, HTLM [sic], MySQL

21   databases, mobile app development, API integration, Lynx.

22   Those are programming software terms that he used and was

23   capable of doing.  You won't hear anything about Usenet or

24   Pirate Bay or any -- anything like that.  It -- that was just

25   software that was not something he was even familiar with.

1            So he applies for a job 2012 with Jetflicks.  He'd

2     also applied for a job at Allegiant Air, but he took the job

3     at Jetflicks and Allegiant Air was two days too late.

4            As you heard, there was a concept about the aviation

5     component, and that's why Peter was hired.  And that was to

6     create the ability for people with private jets to play their

7     own DVDs on a box while they flew around.  And so that's what

8     he worked on for a year.  He worked on it with others,

9     including a man whose name you'll probably hear or see, Grant

10    Dunmire.  And they worked on this project.  And, yes, it's

11    true it didn't -- it didn't work out.  There were two

12    customers; it didn't work out.

13           But around March of 2013 this person, Polo, Darryl

14    Polo, he had left the company, and Mr. Dallmann asked

15    Mr. Huber, Peter, to come and work on the network that had

16    already been set up.  I think the Government said that Peter

17    created the website.  He did so such thing.  Things were

18    already in process.  Maybe it was just a -- a misstatement or

19    I misheard it.  But less there be no confusion, Peter came in

20    and everything was already operating.

21           He worked on the interface with customers, yes, and

22    he also facilitated the transfer of libraries that had been

23    created to servers in Canada for customers with access of

24    that, the material, the content they wanted.

25           But I submit that knowing that a library exists,

```
 1   knowing that there's content, that -- that's not in and of
 2   itself a violation of the law.  How would you know?  If you
 3   see a title, how would you know?
 4          Well, the way you're probably going to hear about it
 5   is through this person, Darryl Polo.  You've already heard a
 6   little bit about him.  But Darryl Polo is cooperating with the
 7   Government, and Judge Boulware will instruct you about what
 8   that means when someone has an agreement with the Government
 9   to help them out.  And let's be perfectly clear.  This man has
10   a lot to lose, and he is definitely -- he's already -- he's
11   already -- well, let's just put it this way.  You don't have
12   to believe a single word that comes out of Mr. Polo's mouth.
13   And the judge will instruct you about how you assess his
14   testimony, and I submit to you the only person the Government
15   has partnered up with who can demonstrate this knowledge and
16   willfulness the Government's going to try and convince you of
17   is none other than Mr. Polo.
18          Now, I want you to think about it in these terms,
19   too, about Peter's role.  Back to that role and what he was
20   doing.  Think of it in terms of him being hired on as a
21   mechanic for a company that has a fleet of vehicles.  Okay?
22   And he -- he maintains the fleet, he works on the fleet, but
23   that doesn't mean you know that perhaps the -- the engine on
24   one of those trucks was stolen and installed.  That doesn't
25   mean that you know somebody at the company used that vehicle.
```

1    Like -- someone comes to mind -- but used that vehicle to

2    steal something.  That's just not enough.  Being an employee

3    is not enough, knowing that there are libraries, knowing there

4    are customers, especially with a company that's done nothing

5    to hide itself.

6          Ladies and gentlemen, when you assess this -- and

7    there are going to be so many exhibits that come in, and you

8    may get so tired of me objecting because it has nothing to do

9    with mister -- Mr. Huber.  You'll hear the judge instruct you

10   about limited use of certain exhibits or evidence, that it --

11   that it may apply to some people but not others.  It can get

12   pretty darn confusing, I think, so pay attention to it.  Pay

13   attention to the content -- the context of what a -- an e-mail

14   or a text may say.  Pay attention who's going to explain that

15   context for the Government's theory.

16         And when you assess all of this, I'll come back and

17   I'm going to ask you to find Mr. Huber not guilty because he

18   was just an employee who kept to himself and just did his job.

19         **THE COURT:**  Thank you, Ms. Bliss.

20         Mr. Marsh.

21      *(Pause in the proceedings.)*

22         **MR. MARSH:**  Can you hear me?  Great.

23            **OPENING STATEMENTS FOR MR. JAUREQUI**

24         **MR. MARSH:**  I know it's been a long day already with

25   no lunch.  It was a long day yesterday.  All right?  But what

1    you're doing is very important, and it's very important to my

2    client, Jared Jaurequi -- and I -- did I say it wrong again?

3            **MR. JAUREQUI:**  You got it.

4            **MR. MARSH:**  All right.  I'm going to call him Jared

5    because I keep getting his name wrong.  And when I do that, he

6    has the same reaction that some of you do when Ms. Martin was

7    talking earlier about saying Nevada; right?  So I'm not going

8    to do that to Jared.

9            And I'm going to call his husband, Kristopher

10   Dallmann, Kris or Kristopher.  Okay?

11           And like Mr. Dallmann, Jared had a tough time growing

12   up.  Although he was born in Southern California, his family

13   moved when he was in fifth grade to Fallon, Nevada.  And you

14   can imagine what it was like as a young person discovering his

15   sexuality in Rural Nevada.  Fortunately, they moved to

16   Las Vegas where he went to high school.  Then he went to UNLV,

17   took some courses at what was then called CCSN.  Did he study

18   computer science or IT programming?  No.  He studied marketing

19   and business and even thought about doing broadcasting.

20           He took a variety of jobs.  He worked for a phone

21   company that doesn't even exist anymore called PCS Sprint

22   [sic].  He worked retail.  For example -- I'm trying to

23   remember the name of the clothing companies because I don't

24   even -- again, ones that might not exist.  Recently he even

25   worked at -- at Williams-Sonoma.  So his background was in

1    retail and customer service.

2            What else was he doing?  He was also working as a

3    bartender.  He's working at a bartender [sic] called The

4    Garage in 2015, and he meets Kristopher Dallmann and they

5    start a relationship and soon he moves in.

6            Now, this case, in my mind, is about two things:

7    Evolving technology and a moment in time or you could say

8    moments in time.  And I'm going to start with this little

9    thing (indicating) that probably most of you have.  Some of

10   you can't imagine or have never had to deal with life without

11   an iPhone or an Android phone.  Others remember when it came

12   out.  Do you remember the year that was?  I remember.  I

13   remember it very well because I remember the first time I saw

14   one.  2007, the same year that Mr. Dallmann started Jetflicks.

15   And as one of the other lawyers mentioned, at that time

16   Netflix was mailing DVDs to people in the mail.  All right?

17   They weren't a streaming service.

18           So we take 2007, and we go forwards and backwards.

19   First, let's go backwards.  How did people watch movies and TV

20   shows and listen to music before then?  Well, we can go all --

21   all the way back to the 80s when the first videotapes came

22   out.  And do you remember what happened when that -- I mean,

23   you probably don't remember, the vast majority of you, but

24   people tried to stop that because the advertisers or the

25   people who did the TV shows didn't like people fast-forwarding

2:22-cr-00030-RFB-DJA - May 29, 2024

```
 1    through commercials --
 2             MR. CHRISTIN:  Objection, Your Honor.
 3             MR. MARSH:  I'll tie it up, Your Honor.
 4             THE COURT:  I'll allow it for now.
 5             MR. MARSH:  After -- and obviously we had videotapes
 6    all through the 80s.  We had Betamax; that went away.  We had
 7    other technology.  Then came along DVDs.
 8             And you'll find out that when the FBI executed its
 9    search warrant on my client and Mr. Dallmann's house and the
10    house next door, they went into a room -- I think it was a
11    converted bathroom -- and floor to ceiling is nothing but
12    Mr. Dallmann's DVDs.  Okay?  And you'll see how that becomes
13    relevant as we go through this process.
14             After DVDs -- that lasted for quite awhile before we
15    got to streaming; right?  But think about music.  What
16    happened before we had the iPhone?  For about a couple years
17    we had these things called iPods, and you had to actually go
18    on and download a song at a time.  It wasn't a service where
19    you could get all the music you wanted from Apple.  And before
20    that, we had Napster.  All right?  And when you hear about my
21    client talking about Napster or iPods when he's questioned by
22    the FBI, you can put that into context.  Because Napster was
23    another thing that people eventually said was illegal, but I
24    always think of it as a bunch of college kids --
25             MR. CHRISTIN:  Objection, Your Honor.
```

1    **THE COURT:**  Mr. --

2    **MR. MARSH:**  I'm sorry.

3    **THE COURT:**  Sustained.  Let's move into this case.

4    **MR. MARSH:**  I'll be happy to, Your Honor.

5         So think of those moments in time and how the

6    evolving technology fits with copyright law and how at various

7    points of time it's difficult to tell what's legal and what's

8    illegal and who decides that.

9         Fortunately, it's not going to have to be you because

10   all you're going to need to decide is did these defendants

11   know that what they were doing was illegal.  I shouldn't say

12   that's all because how do you read people's minds?  And also

13   remember the Government has the burden of proof.  They're the

14   ones who are supposed to show that the defendants, beyond a

15   reasonable doubt, knew that what they were doing was illegal.

16   And we'll get to that definition in a little bit.

17        So let's go back to another moment of time.  2015

18   when my client meets Mr. Dallmann.  He moves in.  He --

19   eventually they get married in June of 2017 before the raid

20   that you heard Ms. Martin describe.  And Jared starts helping

21   out with Jetflicks.

22        Now, you will find out that Jared is a loyal person,

23   he is a trusting person, and he hates bullies.  And he knows

24   about Kristopher's background growing up and being kicked out

25   of the house by his family, and he's going to do everything he

 1   can to protect Kristopher.  And that I think will explain a

 2   lot when you hear the evidence come in.

 3          The -- he starts working just to help out because the

 4   guy who's doing customer service is getting a paycheck but not

 5   really doing anything.  And Jared, he'd worked in retail and

 6   customer service his whole life, and so he starts to help out.

 7   Is he making a huge amount of money for this?  Is anybody

 8   making a huge amount of money for all of this?  You'll find

 9   out that Jared started draining his accounts to pay Kris'

10   debts, keep the -- literally keep the lights out -- on.  He

11   even cashed in his 401(k) in order to help out.  All right?

12   This is the -- where the business was at that time.  All

13   right?  And this is his motivation, is to help Kris, and

14   that's why he gets involved.  He doesn't have any IT

15   background.  He doesn't have anything to do with computers.

16          Now, I want to talk to you in a minute about the law,

17   but first I got to get a drink of water because it's been a

18   long day.

19          The next moment in time is on November 11th, 2000 --

20   I'm sorry, November 16th, 2017, when the FBI shows up at their

21   house, roused Kris and Jared out of bed, and takes them out on

22   the lawn -- they're standing there in their underwear -- and

23   then brings them in and, as Ms. Martin said, they give

24   statements.  All right?  They're cooperative.  What does that

25   tell you about where their heads are on the business that

1    Mr. Dallmann had founded that Jared ended up helping out a

2    little bit with customer service.  Okay?

3            Let's talk about the elements.  The judge touched on

4    some of them, but there's three words that I want you to keep

5    in your mind from those instructions as we -- as you go

6    through the trial.  And the first is the word conspiracy or

7    agreement.  All right?  But to be a crime, to be federal

8    felony copyright infringement, you have to agree to do

9    something specific, and in this case it's to violate federal

10   copyright law or infringe by reproduction.  Okay?

11   Specifically by reproduction.

12           There's a lot of ways that you can infringe on

13   copyright that don't have anything to do with reproduction.

14   You could perform a play that somebody else wrote without

15   their permission, for example.  Think about whether Jared

16   reached any sort of agreement that had anything to do with

17   reproducing.  He's dealing with this company at the tail end,

18   to use another jet analogy.  He is dealing with customer

19   service.  He doesn't have anything to do with reproduction.

20   And so, see if the Government has proven that beyond a

21   reasonable doubt.  So that's my second word, reproduction.

22           And then the third word -- and you've heard it a few

23   times this -- this afternoon -- is willful or willfulness, and

24   that -- that has a specific meaning in the law.  And that

25   meaning is a voluntary and intentional violation of a known

2:22-cr-00030-RFB-DJA - May 29, 2024

1    legal duty --

2         **THE COURT:**  Mr. Marsh, I didn't give this instruction

3    yet, so I think we should move on from there.

4         **MR. MARSH:**  Okay.  As the other folks have said, you

5    have to know that you're violating copyright law, and the

6    judge will instruct you more specifically at the end of the

7    case.

8         And the question will be:  Did my client and these

9    other defendants know that they were violating copyright?  Did

10   they act willfully?  That's what that means.  A lot of

11   times -- you probably heard the adage ignorance of the law is

12   no excuse.  When it comes to certain technical areas of the

13   criminal law, this is one of the protections you have, is the

14   Government has to prove that you knew that you were violating

15   the law.  And the Government in the end will not be able to

16   show that.  Thank you.

17        **THE COURT:**  Thank you, Mr. Marsh.

18        Mr. Brown.

19        And if you want to stand up and get a little stretch

20   in.  Periodically, when this trial goes on, we're going to do

21   what's called a 7th inning stretch, but just to get the blood

22   circulating because we're going to sit down a lot.  It's okay.

23   It's okay to take a drink.  It's okay to do what you need to

24   do.  But when we have these exchanges we do, I just like to do

25   a little courtroom yoga and just get the blood circulating.

1    Okay?  So feel free.  Because I know we sit for a long time,

2    but it's okay to do that and it's okay to take a drink, even

3    during testimony.  All right?

4            And also, after Mr. Brown gives us his opening, we're

5    going to take another sort of restroom/bathroom break and try

6    to break this up.  And we can come back out and hear

7    witnesses, but I just wanted to let you know that's what the

8    schedule will be.

9            **MR. BROWN:**  May I Judge?

10           **THE COURT:**  Yes, you may.

11                   **OPENING STATEMENTS FOR MR. GARCIA**

12           **MR. BROWN:**  First thing's first.  Felipe, would you

13   just stand up?  This is Felipe Garcia.

14           The Government's case against Felipe is going to turn

15   on one issue.  One.  That is Felipe's intent.  This case isn't

16   about what happened.  It's not about what Felipe did because

17   none of that is going to be disputed.  It's about Felipe's

18   intent.  When he went to work at Jetflicks, did he intend to

19   enter into a criminal conspiracy to violate copyright law?

20   That is the issue.  Was that his intent when he went to work

21   at Jetflicks?

22           So this is what the evidence is going to show you

23   about Felipe's time at Jetflicks.  Felipe begins at Jetflicks

24   around April 2013, and he's there until the end of

25   December 2015.  So the Government says Jetflicks is 2007 to

1   2017.  Felipe's there 2013 to 2015.

2          So 2013 when he first comes to Jetflicks, Jetflicks

3   is already up and running and operating, and nothing about

4   Jetflicks screams this is an ongoing criminal conspiracy.  It

5   didn't operate out of some corner on the dark web.  They don't

6   require payments be made in cryptocurrency so they can avoid

7   banks and monetary reporting policies.  They didn't use

8   encrypted communication platforms.  No one uses fake names or

9   code words.  It's operated out of a house.  It's a business

10  that's incorporated here, and the business' address is where

11  the business is operated out of.  So nothing about Jetflicks

12  outwardly says this is a criminal conspiracy, enter here.

13          In fact, everything about Jetflicks suggests this is

14  a successful, popular, growing, legitimate business.  They

15  have a website.  It's available to anyone and everyone who has

16  an Internet connection.  They publicly advertise their

17  services.  They say this is what we do.  There were developing

18  apps for mobile devices, and they want to offer those apps for

19  Android and for iPhones and for Roku.  They have a Facebook

20  page.  They have customers.  They sell subscriptions.  They

21  accept credit card payments, and they use standard processing

22  payment applications.  And they even have customer service

23  representatives.

24          So from the outside Jetflicks, in 2013 when Felipe

25  first gets there, it looks really indistinguishable from

 1    Netflix or from Amazon Prime or from Hulu.  There is nothing
 2    secretive or dodgy or obviously criminal about it.  So that's
 3    what Jetflicks was in 2013 when Felipe arrives.
 4         So customer service, what does that involve?  Well,
 5    the Government basically explained it.  Here's what happens.
 6    A customer wants to watch a TV episode.  They click on the
 7    link.  It doesn't work.  There's a problem.  What do they do?
 8    E-mail customer service.  They complain.  Oh, one other thing.
 9    They say there's a show I want to watch and it's not in your
10    library.  Hey, I want to watch this show.  Those customer
11    communications, they go to Felipe.  He takes the requests or
12    complaints about the broken shows and he turns them around and
13    he just sends them to someone else, someone who's in charge of
14    content.  The content people give him an answer.  He turns
15    around and gives that answer back to the customer.
16         Think of it this way.  Felipe takes the order, right,
17    and he brings you your food, but he's not the guy in the
18    kitchen doing the cooking.  So that's what he does from about
19    2013 to about 2015.  Felipe's in the front interfacing with
20    the customers while the content people are in the back.
21         Now, while Felipe is doing customer service, no one
22    ever serves him with a cease-and-desist letter.  HBO never
23    sends a letter to his house.  Motion Picture Association never
24    serves him with a letter.  No one ever tells him these shows
25    are being acquired illegally.  No one ever texts him about a

1    gray area or questionable illegality.  None of that happens

2    while he's at Jetflicks.  And these things are above his pay

3    grade anyway because, remember, he's the low man on the totem

4    pole.  He's not personally using the software to get the shows

5    or to populate the libraries; right?  He's not going into the

6    computer and fixing a broken link so that a show will run

7    properly.  That's someone else's department.

8           Focusing on Felipe's role at Jetflicks is going to be

9    critical because the Government is probably going to offer a

10   lot of evidence about other people, what other people knew,

11   what other people said, what other people did, what they knew

12   about copyright -- copyright law or what they knew about the

13   law generally; a lot of that about other people.  But Felipe

14   stands in a different -- different position.  He's in the

15   front.  He's doing the customer service.  The content stuff,

16   that's going on somewhere else.  That's a different

17   department.

18          And when you consider only the evidence against

19   Felipe, not other people, not what they knew or did or said,

20   it will be clear that, when Felipe went to work at Jetflicks,

21   he never intended to enter into a criminal conspiracy to

22   violate copyright law.  That will be clear.

23          So after all of the evidence has been presented, I

24   will stand here again and I will say the same thing:  Felipe

25   is not guilty of what the Government has accused him of.  I

1   will ask you to hold the Government to their burden and find

2   that Felipe is not guilty.

3          **THE COURT:**  All right.  Thank you, Mr. Brown.

4          So, ladies and gentlemen, we had a bit of a late

5   start today.  Although we didn't really technically take a

6   lunch break, the lawyers -- even though you-all came in at

7   10:30, we have been working here since a little bit earlier.

8   But I want to give you a little bit of time if you wanted to

9   go and grab lunch.  I'll give you about a half hour or so.

10  You may see both -- you may still be filled with the breakfast

11  pizza but probably not.  That was a few hours ago.  So why

12  don't we say this.  Why don't we say we'll come back --

13  actually, we'll say 3:15, and we'll probably just go for about

14  an hour, and then we'll end for the day.  Okay?  So if you can

15  be back here by 3:15.

16         Again, you don't have to leave.  If you'd like to

17  stay in the room, you can.  But if you want to go out and get

18  some fresh air or you want to grab something to eat, you can,

19  but just be back by 3:15.  Okay?  Thank you.

20         **COURTROOM ADMINISTRATOR:**  Ladies and gentlemen,

21  please rise.

22     *(Jury out at 2:30 p.m.)*

23         **THE COURT:**  Please be seated.

24         All right.  We're going to take our lunch break.

25  Anything we need to address?

1          **MR. CHRISTIN:**  Yes, Your Honor.  I think given some

2     of the statements that Mr. Marsh made in opening, the

3     Government would object to those statements about the history

4     of copyright law and Napster and its legality in the 80s and

5     the 90s.  In fact, defense counsel -- I don't know if it was

6     Mr. Marsh or not -- specifically tried to notice an expert to

7     discuss copyright law, and Your Honor precluded that because

8     the law comes from Your Honor and it doesn't come from

9     Mr. Marsh and it doesn't come from an expert on copyright law.

10    So we would ask that statements around those issues not be

11    allowed in.

12          **THE COURT:**  Well, I mean it's opening.

13          What I will say is this.  You-all gave closing

14    arguments, and I will permit it this time.  But those were

15    straight-up closing arguments.  I'm just going to say this to

16    you now because you're experienced trial attorneys.  Not all

17    of you but some of you -- and you know better -- gave

18    arguments that were not opening.  I will not generally

19    interrupt, but I'm saying that to you because it was very

20    clear to me that some of you were providing specific evidence

21    and were arguing things that are not appropriate for an

22    opening.  And you-all are experienced enough to know the

23    difference.  I did not interrupt you out of respect, but as

24    this case goes on, I will not expect to see something like

25    that happen.  And in the future, if I see something like that

1   happen, I will interrupt you and let you know that what you're

2   doing is improper.

3          Now, I'm not picking on you Mr. Marsh, but I'm saying

4   I did not give that willful instruction.  I specifically

5   didn't do that, and you were about to read to the jury an

6   instruction that I had not given.  And you asked for it; I did

7   not give it.  I didn't interrupt you at the time other than to

8   stay let's move on.  And, again, I'm not singling you out,

9   Mr. Marsh, necessarily, but that's not -- you're experienced.

10  You know that you should not be reading an instruction that

11  the Court has not given until it has been given.  And, again,

12  I'm not saying you were the sole person who did this.  But you

13  all engaged in certain forms of argument that I think were not

14  appropriate for an opening, but I did not interrupt more than

15  simply saying move on.  But I'm just saying that to you

16  because, if you're going to quote from language, it has to be

17  language that I've already approved.  And I know that you

18  understand that.  And you're standing.  I don't know if you

19  need to --

20          **MR. MARSH:**  Oh, I'm sorry.  I'm happy to take

21  whatever you have to say, and that's -- that's fine.  I simply

22  wanted to say I had asked you, I said I was going to talk

23  about willfulness in my opening and tie it to the evidence.

24  That's all I was trying to do, Your Honor.  And to the extent

25  I was reading an instruction, it's the one the Government

 1    proffered.

 2         **THE COURT:**  The point is I hadn't given the

 3    instruction; right?

 4         And the other thing that I'm going to say is this.

 5    From the defense standpoint, some of you made representation

 6    about evidence that may or may not come in.  If it doesn't

 7    come in, then obviously that's an issue that can be addressed.

 8    Because I'm saying that because, Ms. Bliss, I gave you some

 9    latitude about some evidence with respect to Mr. Huber.  I'm

10    not sure much of that or at least a portion of that were

11    relevant as it relates to the history there.  And I'm not sure

12    how much there's going to be in terms of any witness who's

13    going to offer that.  Again, I allowed it for the opening, but

14    I'm just saying that to you because you gave quite an

15    extensive factual detail about Mr. Huber's personal history.

16    And I would anticipate or hope that at some point there would

17    be some witness or way that that evidence will come in because

18    there was a -- a quite extensive sort of representation about

19    facts regarding his personal history.  And, again, I'm not

20    asking you necessarily to tell me how that's going to come in,

21    but I am saying that to you because I allowed it to go on but

22    it did seem to be a fair amount of that was not relevant.  His

23    personal history is somewhat relevant, but there were certain

24    statements that you made and other counsel made that seemed to

25    attempt to elicit sort of sympathy towards defendants as it

 1   relates to aspects of their personal history that I'm not sure

 2   are going to come in or how relevant they are.

 3          So, again, I'm just saying that to all of you because

 4   you're experienced attorneys.  And, again, I did not interrupt

 5   you, but I would hope not to see that -- quite an extensive

 6   pushing of the line as it relates to what is permitted

 7   regarding questioning and arguing.

 8          Ms. Bliss, I don't know if you had anything you

 9   wanted to add to that?

10          **MS. BLISS:**  No, I don't, Your Honor.  I definitely

11   considered everything.  I have a good-faith belief that most,

12   if not all, of what I represented will come in.  I think it's

13   important to understand my client's role in the company and

14   what he knew and didn't.  That's --

15          **THE COURT:**  What I'm saying, how he may have escaped

16   from parts of Europe, I'm not sure how that's particularly

17   relevant to his role in this alleged conspiracy.

18          **MS. BLISS:**  It's about minding your business, keeping

19   to yourself, exercising caution, and --

20          **THE COURT:**  And these are -- and this is what I

21   talked to you before about character traits.  If you're using

22   personal history to say that an individual has certain

23   particular character traits, certainly defendants can raise

24   issue about character traits.  But when we had that earlier

25   discussion where you said this is not character evidence and I

1    said to you it sounded like it was going to cross that line if

2    you're talking about someone's personal history regarding

3    facts unrelated to the conspiracy as a way to demonstrate

4    traits that may illustrate how he might not have gotten

5    involved -- which you're permitted to do -- I'm going to find

6    that to be character evidence, and there's certain rules that

7    apply to that.  Because it seemed to me, in terms of your

8    opening, you opened the door to that.  I'm just saying that to

9    you so you understand that as we move forward because that

10   opening certainly talked about what you viewed as sort of his

11   history and how his history would be related to potentially

12   his propensity or not to engage in the alleged conspiracy.

13          Again, we can have a further conversation about that,

14   but I just wanted to make you all aware of that.  Because,

15   again, for the most part I did not interrupt, but those were

16   the closest closing arguments to openings that I've ever seen

17   in a trial that I've presided over.  And, again, out of

18   respect I did not interrupt you but, again, let's be careful

19   about that as we proceed.  Thank you.

20          Mr. Christin, is there anything else?

21          **MR. CHRISTIN:**  No, Your Honor.  Thank you.

22          **THE COURT:**  All right.  Thank you, all.  We'll be

23   back here, again, at 315.  We'll be adjourned.

24       *(Lunch recess at 2:39 p.m., until 3:18 p.m.)*

25          **THE COURT:**  Please be seated.

1            All right.  Anything we need to address before we

2    bring the jury out?  The only thing I will say is we have a

3    hard stop at 4:00 o'clock.

4            **MR. CHRISTIN:**  Thank you, Your Honor.

5            There is one thing, Your Honor.

6            **THE COURT:**  Sure.

7            **MR. CHRISTIN:**  Early on in this case defense counsel

8    filed motions to exclude the evidence of certain relationship

9    evidence.  And Your Honor had indicated that, after hearing

10   openings, you would consider whether that evidence should or

11   should not come in.  And I would like to point out a couple of

12   things for Your Honor.

13           **THE COURT:**  Let me ask you a question, Mr. Christin.

14   Is that evidence going to come in for this -- in this

15   particular witness?

16           **MR. CHRISTIN:**  Other than the marriage of

17   Mr. Jaurequi -- Mr. Jaurequi and Mr. Dallmann with this

18   witness, no.

19           **THE COURT:**  Okay.  So why would -- I think it's more

20   helpful for me, Mr. Christin, is when there are particular

21   exhibits that you want to have admitted that you think may be

22   related to the Court's order that you want me to reconsider,

23   to show those to me and then we can go back and revisit them.

24   And so I do think, given the openings, that certainly a door

25   has been opened as it relates to these relationships

1    potentially.  But, again, I have to see that in the context of

2    the exhibit.

3         MR. CHRISTIN:  Understood, Your Honor.

4         THE COURT:  Okay.

5         MR. CHRISTIN:  Thank you.

6         THE COURT:  All right.  So anything from the defense

7    before we bring in the jury?  And, again, we will go until

8    4:00.  I assume -- will that be all direct, Mr. Christin?

9         MR. CHRISTIN:  Pardon me, Your Honor?

10        THE COURT:  I assume the direct will take us to

11   4:00 o'clock?

12        MR. CHRISTIN:  Yes, Your Honor.

13        THE COURT:  All right.  And even if you finish a

14   little bit early, we'll still -- if there's going to be cross,

15   we'll just wait until tomorrow.  Okay?  So we'll go ahead and

16   bring the jurors --

17        MR. CHRISTIN:  I would not anticipate finishing --

18        *(Reporter instruction.)*

19        MR. CHRISTIN:  Yes, I'm sorry.

20        I may not finish his direct --

21        THE COURT:  That's fine.

22        MR. CHRISTIN:  -- this evening.

23        THE COURT:  Okay.  We'll go ahead and bring the

24   jurors in.

25        *(Jury in at 3:21 p.m.)*

1        **COURTROOM ADMINISTRATOR:**  Ladies and gentlemen,

2   please rise.

3        **THE COURT:**  Please be seated.

4        Ladies and gentlemen of the jury, just so you know,

5   we will end at 4:00 o'clock today.  And then typically we'll

6   end around 3:30 every day.  We'll start around 8:30 and end at

7   3:30.  I'll let you know if that schedule changes, but we're

8   definitely going to end at 4:00 o'clock today, even if we're

9   not finished with all the testimony.  Okay?

10        All right.  Mr. Christin, who is the Government's

11   first witness?

12        **MR. CHRISTIN:**  Thank you, Your Honor.  The

13   Government's going to call Supervisory Special Agent Tim

14   Lynch.

15        **THE COURT:**  Okay.

16        **COURTROOM ADMINISTRATOR:**  Please raise your right

17   hand.

18    *(The witness is sworn.)*

19        **THE WITNESS:**  I do.

20        **COURTROOM ADMINISTRATOR:**  Thank you.  Please be

21   seated.  And please state and spell your name for the record.

22        **THE WITNESS:**  My name is Tim Lynch, L-y-n-c-h.  And

23   I'm a supervisory special agent for the FBI's Washington Field

24   Office.

25                        **DIRECT EXAMINATION**

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1    **BY MR. CHRISTIN:**

2    Q.   Good afternoon, sir.

3    **A.**   Good afternoon.

4    Q.   You beat me to my first question.  So let me move on.

5         What is it that you supervise, Mr. Lynch?

6    **A.**   Currently I supervise our bank fraud and money laundering

7    squad.

8    Q.   And how long have you worked at the FBI?

9    **A.**   Twenty years.

10   Q.   And how long have you been a supervisor?

11   **A.**   Four years.

12   Q.   During the course of your 20-year experience at the FBI,

13   have you ever been involved in a search warrant?

14   **A.**   Yes.

15   Q.   Approximately how many?

16   **A.**   Dozens.

17   Q.   Have you participated or conducted any interviews of

18   witnesses or defendants?

19   **A.**   Yes.

20   Q.   Approximately how many would you say?

21   **A.**   Hundreds.

22   Q.   Before joining the FBI, what did you do?

23   **A.**   I was an infantry officer in the United States Marine

24   Corps.

25   Q.   And how long were you in the Marine Corps?

1   **A.**   Four years.

2   Q.   Were you ever deployed?

3   **A.**   Yes.

4   Q.   Where to?

5   **A.**   Afghanistan and then later Iraq.

6   Q.   Were you involved in the investigation that led to

7   charges in this case?

8   **A.**   I was.

9   Q.   Generally speaking, what was your role?

10   **A.**   I was assigned to interview Mr. Dallmann.

11   Q.   And did you, in fact, interview Mr. Dallmann?

12   **A.**   Yes.

13   Q.   Do you see Mr. Dallmann in the courtroom today?

14   **A.**   I do.

15   Q.   Could you please identify him by an article of clothing

16   that he's wearing?

17   **A.**   He's the gentleman in the back row wearing the

18   light-colored, button-down shirt.

19        **MR. CHRISTIN:**  Your Honor, may the record reflect the

20   in-court identification of Mr. Dallmann?

21        **THE COURT:**  Yes, the record will so reflect.

22   **BY MR. CHRISTIN:**

23   Q.   Did you -- when you interviewed Mr. Dallmann, did you

24   have an occasion to meet anybody else that day?

25   **A.**   Yes.

1    Q.   And who was that?

2    **A.**   Mr. Jaurequi.

3    Q.   And do you see Mr. Jaurequi in the courtroom today?

4    **A.**   Yes.

5    Q.   And could you please identify him by an article of

6    clothing that he might be wearing?

7    **A.**   He's the gentleman in the front row wearing the glasses

8    and the collared shirt.

9         **MR. CHRISTIN:**   Your Honor, may the record reflect an

10   in-court identification of Mr. Jaurequi?

11        **THE COURT:**   The record will so reflect.

12        **MR. CHRISTIN:**   Thank you, Your Honor.

13   **BY MR. CHRISTIN:**

14   Q.   So directing your attention to November 16th of 2017, did

15   you have occasion for being at 2154 Tona Circle that day?

16   **A.**   Yes.

17   Q.   And what was your occasion for being there?

18   **A.**   The execution of a search warrant.

19   Q.   And were you alone, or were you with other people?

20   **A.**   I was with agents from both the FBI's Washington Field

21   Office and our Las Vegas Field Office.

22   Q.   Approximately how many agents would you say were there

23   that day?

24   **A.**   I would say approximately 30.

25   Q.   What time did that search begin?

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    **A.**    Approximately 6:00 a.m.

2    Q.    And could you please walk us through how that search

3    began?

4    **A.**    The search began at approximately 6:00 a.m. when agents

5    from the FBI's Las Vegas Field Office knocked and announced on

6    the front door of 2154 Tona Circle.

7    Q.    When you say knocked and announced, what is it that you

8    mean, sir?

9    **A.**    They knocked and then said FBI search warrant --

10        *(Simultaneous crosstalk.)*

11        **MS. MARTIN:**  -- Your Honor -- yeah, we're having

12    problems hearing.

13        **THE WITNESS:**  I can speak up.

14        **THE COURT:**  Hold on.  You're having problems

15    hearing --

16        *(Simultaneous crosstalk.)*

17        *(Reporter instruction.)*

18        **THE COURT:**  Wait.  Let me finish my question, please.

19        **MS. MARTIN:**  Sorry, Your Honor.

20        **THE COURT:**  Are you having problems hearing

21    Mr. Christin, or are you having problems hearing the witness?

22        **MS. MARTIN:**  We're having problems hearing the

23    witness.

24        *(Reporter instruction.)*

25        **MS. MARTIN:**  We're having problems hearing the

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    witness.

2          THE COURT:  Okay.  So, sir, the microphone is --

3    let's make sure it's on -- that bar there, and it's not the

4    microphone to your right.  Yep.  Okay.  So if you could just

5    speak up just a little bit, please.

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Okay.  And it might actually help to move

8    it a little bit away from you.  There we go.  Let's see if

9    that helps.

10          Go ahead, Mr. Christin.

11          MR. CHRISTIN:  Thank you, Your Honor.

12    BY MR. CHRISTIN:

13    Q.   Could you please explain what a knock and announce is?

14    A.   A knock and announce is when a team of FBI agents knock

15    on the front door and say, "FBI search warrant."

16    Q.   So after the agents knocked and announced, what happened

17    after that?

18    A.   After a brief period of time, Mr. Dallmann and

19    Mr. Jaurequi came to the front door.

20    Q.   And when they came to the front door, how did they

21    appear?

22    A.   They were in their underwear.

23    Q.   And what happened after that?

24    A.   There was a brief discussion through an intercom, but

25    they ultimately opened the front door.  I had stationed myself

1  on the front lawn and prior to the search warrant had asked

2  the entry team to direct them right to me so I could explain

3  to them what was happening.

4  Q.   Now, why was it important that they be directed to you by

5  the entry team?

6  **A.**   I wanted to speak to them and be able to tell them why we

7  were there that day.  I also wanted to give the entry team

8  time to do what's called a tactical clear or a security sweep

9  of the residence.  Before they did that, I also wanted to ask

10  them if there was anyone else in the house we needed to be

11  aware of.

12  Q.   So would you describe this as a standard procedure for a

13  search warrant?

14  **A.**   Yes.

15  Q.   So when Mr. Dallmann, Mr. Jaurequi are brought to you or

16  directed to you in the front lawn, did you say anything to

17  them?

18  **A.**   I did.

19  Q.   What did you say, sir?

20  **A.**   I told them that we were there to execute a federal

21  search warrant, that it related to the websites jetflicks.com

22  and iStreamItAll.com.  Specifically we were there trying to

23  recover evidence to investigate allegations that both websites

24  were engaged in illegal streaming.

25  Q.   Did you arrest them that day?

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1   **A.**   No.

2   Q.   Did you arrest them -- let me rephrase.

3        Did you put them in handcuffs while they were on the

4   front lawn?

5   **A.**   No.

6   Q.   Did you tell them that they were under arrest?

7   **A.**   No.  I made very clear that this was just a search

8   warrant, that they were not under arrest, they were not being

9   detained, and they were free to go at any time.

10  Q.   Did Mr. Dallmann leave?

11  **A.**   No.

12  Q.   Did Mr. Jaurequi leave?

13  **A.**   No.

14  Q.   What, if anything, did Mr. Dallmann say to you out on the

15  front lawn?

16  **A.**   Mr. Dallmann told me words to the effect that this was a

17  misunderstanding, that Jetflicks was an aviation services

18  business.  I told him, if that was the case, I would be

19  interested in talking to him and asked him if he would be

20  willing to do that once the house was clear, and he said that

21  he would.

22  Q.   Once the house was cleared, what happened after that?

23  **A.**   I went inside with both gentlemen, and we gave them an

24  opportunity to get dressed.

25  Q.   I'd like to show you what has been marked as

 1   Government's Exhibit 202.  And are you able to see something

 2   on that screen, sir?

 3   **A.**   Not now, no.

 4   Q.   Okay.

 5          **MR. CHRISTIN:**  And this is just the witness; correct?

 6          **THE COURT:**  Yeah.  And for counsel, are you connected

 7   to the...

 8          **COURTROOM ADMINISTRATOR:**  Nope.  Sorry.  You guys

 9   didn't give me a heads-up.  Whose computer?

10          **MR. CHRISTIN:**  Right there.

11   **BY MR. CHRISTIN:**

12   Q.   Are you able to see something on your screen now, sir?

13   **A.**   Yes.

14   Q.   And could you please describe for us what it is that you

15   see?

16   **A.**   This a floor plan sketch of 2154 Tona Circle.

17   Q.   And is that where --

18          **THE COURT:**  Mr. Christin.

19          **MR. CHRISTIN:**  Yes, Your Honor?

20          **THE COURT:**  Just so you all understand, before an

21   exhibit is actually admitted, it is shown just to myself, the

22   witness, and the attorneys for me to decide whether or not in

23   fact it can be admitted.  So your screens are not

24   malfunctioning, and the big screen is not malfunctioning.  But

25   in the process of the exhibits being admitted, I have to see

1    it, the witness has to see it, and the lawyers have to see it

2    and the defendants get to see it, but you don't just yet until

3    it's actually admitted as an exhibit.  So just so you

4    understand why your screens are dark.  At a point at which

5    either one of the attorneys or parties want you to see it,

6    they'll ask for me to publish it to the jury.  And if I agree

7    to do that, at that point it should appear on your screen.

8    And if I say that it should be published to the jury and it

9    doesn't appear, then you should raise your hand and say,

10   Judge, we have a malfunction, it's not appearing.

11          But for now it's supposed to be black, and we ask

12   these questions as a way to get the exhibit potentially

13   admitted or rejected.

14          Go ahead, Mr. Christin.

15          **MR. CHRISTIN:**  Thank you, Your Honor.

16   **BY MR. CHRISTIN:**

17   Q.   Do you recognize what this is, sir?

18   **A.**   Yes.

19   Q.   And what is this?

20   **A.**   This a floor plan sketch of 2154 Tona Circle.

21   Q.   And does it fairly and accurately represent the 2154 Tona

22   Circle as you understood it to be that day?

23   **A.**   Yes.

24          **MR. CHRISTIN:**  Your Honor, at this time the

25   Government would move to admit Government's Exhibit 202 into

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1   evidence and publish.

2      *(Government Exhibit No. 202, offered.)*

3         **THE COURT:**  Any objection from any of the defendants?

4         **MS. MARTIN:**  No, Your Honor.

5         **THE COURT:**  So here's what we'll do for all of you.

6   If you don't stand up and object, I'm going to say, I see no

7   objections, and then I will admit the exhibit.  That way

8   everyone doesn't have to pop up like Ms. Martin did each time.

9         So I don't see any objections.  Defendant's [sic] 202

10  will be admitted.

11        Would you like this published to the jury?

12     *(Government Exhibit No. 202, received.)*

13        **MR. CHRISTIN:**  Yes, Your Honor.  Please.

14        **THE COURT:**  Okay.

15  **BY MR. CHRISTIN:**

16  Q.   Could you please --

17        **THE COURT:**  Hold on one moment, please.

18        Can you-all see it now?  Perfect.  Okay.

19        Go ahead, Mr. Christin.

20  **BY MR. CHRISTIN:**

21  Q.   Now, you mentioned you brought Mr. Dallmann and

22  Mr. Jaurequi inside.  Do you recall where they were brought to

23  on this sketch?

24  **A.**   Yes.  Room N.

25  Q.   And after they were brought to room N, is that where they

1   were given the opportunity to get dressed?

2   **A.**   Yes.

3   Q.   Okay.  And after they got dressed, what happened after

4   that?

5   **A.**   We went to room B, the main living area of the house, to

6   sit down and talk.

7   Q.   And I think you might be able to draw on the monitor.

8   Could you draw a circle around that B?

9   **A.**   (Indicating.)

10   Q.   Perfect.

11          And did Mr. Dallmann and Mr. Jaurequi have a seat?

12   **A.**   Yes.

13   Q.   And where did they sit?

14   **A.**   They sat on the L-shaped couch.

15   Q.   And where do you recall sitting?

16   **A.**   I sat on either the couch or the ottoman across from

17   them.

18   Q.   Now, was anybody else with you that day?

19   **A.**   Yes.

20   Q.   Who was with you?

21   **A.**   Special Agent Lance Shakespeare from the FBI's Las Vegas

22   Field Office.

23   Q.   Now, while you and mister -- Special Agent Shakespeare

24   and Mr. Dallmann and Mr. Jaurequi are in this room, where

25   are -- where's the search team?

1    **A.**    The search team is all over the house preparing the house

2    to be searched, and they had set up in room C what we call our

3    evidence collection point.

4    Q.    Now, did there come a time where you interviewed

5    Mr. Dallmann and Mr. Jaurequi together?

6    **A.**    Yes.

7    Q.    For approximately how long?

8    **A.**    Approximately 60 to 90 minutes.

9    Q.    And is it your practice typically at the FBI to interview

10   two people at one time?

11   **A.**    No.

12   Q.    Could you please explain to me why in this instance you

13   permitted it this time?

14   **A.**    We prefer to interview people alone so we get their --

15   the purest recollection of their memories without anyone else

16   contaminating it.  Mr. Jaurequi stated that he wanted to stay

17   with Mr. Dallmann, and we allowed that to make him feel more

18   comfortable.

19   Q.    Who led the interview?

20   **A.**    I did.

21   Q.    And how would you describe your tone during that

22   interview?

23   **A.**    Professional and conversational.

24   Q.    At any point did you or Special Agent Shakespeare yell at

25   Mr. Dallmann?

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

 1   **A.**   Never.

 2   Q.   Yell at Mr. Jaurequi?

 3   **A.**   Never.

 4   Q.   How would you describe Mr. Dallmann's demeanor?

 5   **A.**   Nervous but talkative.

 6   Q.   And how would you describe Mr. Jaurequi's demeanor?

 7   **A.**   Nervous, talkative, and protective of Mr. Dallmann.

 8   Q.   At any point during the interview, did Mr. Dallmann

 9   appear to have trouble understanding you?

10   **A.**   No.

11   Q.   Did Mr. Jaurequi appear to have trouble understanding

12   you?

13   **A.**   No.

14   Q.   Was there any indication that Mr. Dallmann or

15   Mr. Jaurequi were under the influence of drugs or alcohol at

16   the time?

17   **A.**   No.  And if there were, we would not have done the

18   interview.

19   Q.   While you're giving the interview, do you take notes

20   during that interview?

21   **A.**   Yes.

22   Q.   And why is it that you take notes?

23   **A.**   So I can accurately recall and record what they're

24   saying.

25   Q.   Are your notes supposed to be a verbatim transcript of

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    the entire interview?

2    **A.**    No.

3    Q.    Is there anything that you do in your notes to capture

4    the exact words of Mr. Dallmann or Mr. Jaurequi?

5    **A.**    Any time I use quote in my notes, that is exactly what

6    the interviewee said.

7    Q.    Was any portion of this interview video or audio recorded

8    that day?

9    **A.**    No.

10   Q.    And why not?

11   **A.**    I was taking notes.  I had a partner interviewer in Agent

12   Shakespear, and we were in full view of the search team.

13   Q.    At that time would it have been FBI policy to audio or

14   video record the interview in Mr. Dallmann's house?

15   **A.**    No.

16   Q.    After you interviewed Mr. Dallmann, what is it that you

17   did with your notes?

18   **A.**    I wrote what's called an FD-302, Report of Interview

19   Form.

20   Q.    Did Special Agent Shakespeare play a role in the FD-302?

21   **A.**    Yes.

22   Q.    And what was his role?

23   **A.**    He reviewed it for accuracy.

24   Q.    And how soon after your interview with Mr. Dallmann and

25   Mr. Jaurequi did you begin drafting the 302 after the

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    interview?

2    **A.**    The search warrant was on a Thursday.  I returned to the

3    office the following Monday, and I began drafting the report.

4    Q.    Did you have an opportunity to review your notes and your

5    FD-302 before testifying today?

6    **A.**    Yes.

7    Q.    Now, getting back to the interview, did you -- what is it

8    that you said to start the interview, if anything?

9    **A.**    Again, when we sat down, I reiterated why we were there,

10   to investigate allegations that Jetflicks and iStreamItAll

11   were engaged in illegal streaming.  I also again reiterated

12   that they were not in custody, they were not being detained,

13   they did not have to be interviewed, and they could leave and

14   I could call them and let them know when the search was done.

15   Q.    Did you any forms with you that day?

16   **A.**    I did.

17   Q.    And what forms did you have with you that day?

18   **A.**    In a FD-395, Advice of Rights Form.

19   Q.    And did you go over that Advice of Rights Form with

20   Mr. Dallmann?

21   **A.**    Yes.

22   Q.    Did you go over it that Advice of Rights Form with

23   Mr. Jaurequi?

24   **A.**    Yes.

25   Q.    Did they have any questions?

1    **A.**    No.

2    Q.    Did Mr. Dallmann sign the form?

3    **A.**    Yes.

4    Q.    Mr. Jaurequi sign the form?

5    **A.**    Yes.

6    Q.    At any point in the interview, did you or Special Agent

7    Shakespeare make any promises to Mr. Dallmann or Mr. Jaurequi

8    about what the Government might do if they agreed to speak

9    with you?

10   **A.**    Never.

11   Q.    Did you or mister -- or -- excuse me.  Did you or

12   Special Agent Shakespeare make any promises about what the

13   Court might do if Mr. Dallmann or Mr. Jaurequi gave an

14   interview that day?

15   **A.**    Never.

16   Q.    Did Mr. Jaurequi stay with Mr. Dallmann for the entire

17   interview?

18   **A.**    No.

19   Q.    And once he was separated, did Mr. Jaurequi -- let me

20   rephrase.

21        Can you tell me about how it was that Mr. Jaurequi

22   became separated from the interview?

23   **A.**    We began the interview with Mr. Dallmann and Mr. Jaurequi

24   together seated on the couch.  Approximately 60 to 90 minutes

25   in there was a break in the interview, and I called one of my

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1   colleague from the Washington Field Office, Special Agent

2   Alexis Brown who I knew was next door at 2216 Tona Circle.  I

3   asked if she was available to help with an interview.  She

4   said she was.  So she and Special Agent Jessica Marrone from

5   the Washington Field Office came to 2154.

6           I introduced them to Mr. Jaurequi.  I asked if he

7   would reconsider doing a individual interview, that it would

8   expedite our process that day and speed things up, and at that

9   point he agreed to go to a separate room and be interviewed by

10  Special Agent Brown and Special Agent Marrone.

11  Q.   Before Mr. Jaurequi left to be interviewed in a separate

12  room, was there any discussion about iPhones?

13  **A.**   Yes.

14  Q.   Could you please tell us how that discussion came about?

15  **A.**   In the beginning stages of the interview, one of the

16  members of the search team from the FBI's Las Vegas Field

17  Office pulled me aside and told me that they had located some

18  digital devices and asked me if I would be willing to ask

19  Mr. Dallmann if he would be willing to give a consent search

20  of the phones which would enable us to image the phones on

21  site and allow us to give the phones back to him at the end of

22  the search.  If he did not do that, we would be --

23          **THE COURT:**  Bless you.  Someone sneezed.  Sorry.

24          **THE WITNESS:**  Sorry, Your Honor.

25          We offered this to them as a courtesy.  Because if we

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

```
 1    could image the phones on-site, we could leave the phones with
 2    them instead of taking them.
 3    BY MR. CHRISTIN:
 4    Q.   Did they provide a passcode to the phones?
 5    A.   Yes.
 6    Q.   Now, you mentioned imaging the phones.  Were you involved
 7    in the imaging process in any way?
 8    A.   No.
 9    Q.   And why's that?
10    A.   I was there solely as the interviewer.
11    Q.   Were there any breaks taken during this interview?
12    A.   Yes.
13    Q.   Approximately how many?
14    A.   At least two.
15    Q.   Is there any break that stands out in particular to you?
16    A.   Yes.
17    Q.   And which one is that?
18    A.   The first break at approximately 8:17 a.m.
19    Q.   And why is that?
20    A.   We took an approximately 30-minute break at the end of
21    which I requested permission to use the restroom, and when I
22    came back, Mr. Dallmann was crying.
23    Q.   And when you observed Mr. Dallmann crying, what did you
24    do?
25    A.   I had a brief nonverbal communication with Agent
```

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

 1   Shakespeare where I essentially shrugged my shoulders as if to

 2   ask him what was going on.  He shrugged his shoulders back at

 3   me that he did not know.

 4   Q.   And did you ask Mr. Dallmann anything at this point?

 5   **A.**   Yes.

 6   Q.   What happened?

 7   **A.**   Mr. Dallmann said, I got involved with people I didn't

 8   know would steal from me.  At that point I asked him if he had

 9   been entirely truthful with me, he said he had not, and then

10   we essentially restarted the interview.

11   Q.   So let's talk about the interview portion before that

12   break.  Did Mr. Dallmann provide any contact information to

13   you?

14   **A.**   Yes.

15   Q.   Did he provide a phone number?

16   **A.**   Yes.

17   Q.   Okay.

18        **MR. CHRISTIN:**  Could we please bring this exhibit

19   down?  And I'm going to bring up for the witness

20   Government's Exhibit 070.

21        Court's indulgence.  Is there a -- forgive me if

22   there's a way to remove the circle that -- to clear the

23   writing.  Thank you very much.

24   **BY MR. CHRISTIN:**

25   Q.   And could you please explain what it is that we're

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1    looking at here?

2    **A.**    This is a Cellebrite extraction report for an Apple

3    iPhone.

4         **MR. CHRISTIN:**  I'm going to ask, Edie, if you could

5    zoom in on the MSISDN column?  It's about four down.  Thank

6    you.

7    **BY MR. CHRISTIN:**

8    Q.    Do you see something marked as MSISDN?

9    **A.**    Yes.

10   Q.    And do you see a phone number there?

11   **A.**    Yes.

12   Q.    Do you recognize that phone number?

13   **A.**    Yes.

14   Q.    And how do you recognize it?

15   **A.**    That is the cell phone number Mr. Dallmann gave me when I

16   asked him for his cell phone number.

17   Q.    Could you please read that cell phone number?

18   **A.**    (702) 629-0629.

19   Q.    Thank you.

20        **MR. CHRISTIN:**  We can bring that down.

21   **BY MR. CHRISTIN:**

22   Q.    Did Mr. Dallmann provide an e-mail address?

23   **A.**    Yes.

24   Q.    I'm going to show you what's been marked as Government's

25   Exhibit 132.

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1           THE COURT:  Why don't we -- are we going to seek to
2   admit 70 for this witness?
3           MR. CHRISTIN:  No, Your Honor.
4           THE COURT:  Okay.  Well, if we're not going to seek
5   to admit it to the witness, I guess I'm not clear why we're
6   reading from it.  If he recalls it, then you can ask him.  But
7   I'd prefer that we do them in the order, Mr. Christin, we're
8   going to admit them.
9           MR. CHRISTIN:  Yes, Your Honor.
10           THE COURT:  Okay.  So are we going to be admitting
11   the next exhibit?
12           MR. CHRISTIN:  No, Your Honor.  I'll revise my
13   questioning.
14           THE COURT:  Okay.  Perfect.  Thank you.
15           MR. CHRISTIN:  Thank you.
16           You can bring it down.  Thank you, Edie.
17   BY MR. CHRISTIN:
18   Q.   Did Mr. Dallmann provide an e-mail address to you?
19   A.   Yes.
20   Q.   I know the interview was approximately seven years ago
21   and you've reviewed your notes and your 302 today before --
22   before today.  Sitting there, are you able to remember the
23   exact e-mail that Mr. Dallmann provided to you?
24   A.   I can remember fragments of it, but I don't think I can
25   remember the exact e-mail without being refreshed.

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1    Q.   If I showed you something to refresh your recollection,

2    might that help?

3    **A.**   Yes.

4    Q.   Okay.

5         **MR. CHRISTIN:**   Court's indulgence.

6    **BY MR. CHRISTIN:**

7    Q.   Do you recognize this document, sir?

8    **A.**   Yes.

9    Q.   And what is this document?

10        **THE COURT:**   We don't need to describe anything --

11        **MR. CHRISTIN:**   Okay.

12        **THE COURT:**   -- because it's not going to be admitted.

13   You can just have a look at it --

14        **MR. CHRISTIN:**   Yes, Your Honor.  I was just

15   establishing --

16       *(Reporter instruction.)*

17        **THE COURT:**   Hold on.

18        **MR. CHRISTIN:**   Sorry.  Sorry, Your Honor.

19        **THE COURT:**   You guys have to remember, the court

20   reporter cannot record if we're talking at the same time.

21        So you don't have to identify it.  He just simply can

22   review it and refresh his recollection.  That's sufficient.

23   **BY MR. CHRISTIN:**

24   Q.   Okay.  Special Agent Chase [sic], once you review this

25   document and your recollection is refreshed, let me know and

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1    we're going to take it down.  And then I would like for you to

2    tell me what the e-mail address was that you got that day.

3    **A.**   I'm ready.

4         **MR. CHRISTIN:**  Edie, could you please bring this

5    down?  Thank you.

6    **BY MR. CHRISTIN:**

7    Q.   And Supervisory Special Agent Lynch, what was that e-mail

8    address that he gave you that day?

9    **A.**   Kristopher.dallmann@icloud.com.

10   Q.   Thank you.

11        Did Mr. Dallmann identified any properties that he

12   owned?

13   **A.**   Yes.

14   Q.   What did he identify as owning?

15   **A.**   2154 Tona Circle and the house next door, 2216 Tona

16   Circle.

17   Q.   Now, you mentioned that Special Agent Brown and

18   Special Agent Marrone were next door.  Was that the residence

19   that they were at, 2216?

20   **A.**   Yes.

21   Q.   Thank you.

22        So for the first part of the interview, did

23   Mr. Dallmann explain to you the nature of the Jetflicks

24   business?

25   **A.**   Yes.

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    Q.   And what is it that he said to you?

2    **A.**   Mr. Dallmann told me that Jetflicks was an aviation

3    services business, and that their business plan was to take

4    clients' personal DVD libraries and digitize them, place them

5    on digital devices that the client could then take aboard

6    private aircraft and watch their own DVD library.

7    Q.   And according to Mr. Dallmann, when did he start

8    Jetflicks?

9    **A.**   2007.

10   Q.   Did the surprise you that he was talking about an

11   aviation services business at this point?

12   **A.**   No.

13   Q.   And why is that?

14   **A.**   Prior to doing the interview, Agent Chase told me that

15   the aviation --

16          **MS. MARTIN:**  Objection, Your Honor, as to hearsay.

17          **THE COURT:**  Sustained what -- Mr. Christin, that does

18   seem to be hearsay.  Any response to that?

19          **MR. CHRISTIN:**  Your Honor, I think it shows the

20   effect on Supervisory Special Agent Chase [sic] in continuing

21   the interview and not accepting these statements for face

22   value.

23          **THE COURT:**  I appreciate that, but I'll sustain the

24   objection.

25          **MR. CHRISTIN:**  Understood, Your Honor.

1    **BY MR. CHRISTIN:**

2    Q.   At the early stage of this interview, are you -- how

3    would you describe your questions, more open or direct

4    questions that require a yes or no?

5    **A.**   Open-ended questions.

6    Q.   During the prebreak portion of the interview, did

7    Mr. Dallmann make mentions of jetflicks.com or jetflicks.mobi?

8    **A.**   Both.

9    Q.   According to Mr. Dallmann, when did he create those

10   websites?

11   **A.**   Approximately 2007.

12   Q.   Did Mr. Dallmann describe what was on the jetflicks.com

13   website?

14   **A.**   Yes.

15   Q.   And what is it that he said?

16   **A.**   He said there was largely nothing there.

17   Q.   Did he describe what was on the jetflicks.mobi website?

18   **A.**   Yes.

19   Q.   And what is it that he said?

20   **A.**   He said they were using an app where they were, for

21   $14.99, streaming television shows that could not be -- that

22   were not currently available for purchase.

23   Q.   According to Mr. Dallmann, did he say anything about what

24   he wanted to do with the profits of the .mobi streaming

25   business?

1    **A.**   Yes.

2    Q.   What did he say?

3    **A.**   Mr. Dallmann intended to use the profits from the .mobi

4    business to fund the actual aviation services business he told

5    me about.

6    Q.   How much money did Mr. Dallmann claim to have made

7    through Jetflicks' aviation services business?

8    **A.**   He claimed at its height they were earning $30,000 a

9    month.

10   Q.   Did you ask Mr. Dallmann to identify the customers of the

11   aviation services business?

12   **A.**   Yes.

13   Q.   And how did he respond?

14   **A.**   I asked him to tell me about his very first customer for

15   Jetflicks.  He told me about that individual and told me that

16   they had paid him $50,000 for the service.

17   Q.   And did you ask him about any other customers?

18   **A.**   Yes.

19   Q.   And what is it that he said?

20   **A.**   I then asked him to tell me about his second customer,

21   and he told me about a customer in Texas that had paid him 30-

22   to $40,000.

23   Q.   Did you ask him about additional customers?

24   **A.**   Yes.

25   Q.   What did he say?

*Tim Lynch - Direct*
*2:22-cr-00030-RFB-DJA - May 29, 2024*

1    **A.**   He said there were only two.

2    **Q.**   So am I right that the total would have been 50 plus 30?

3    **A.**   Yes.

4    **Q.**   So $80,000?

5    **A.**   Correct.

6    **Q.**   Do you recall a meeting from December of 2019 with

7    prosecutors from another office in which you misremembered a

8    potential figure?

9    **A.**   Yes.

10   **Q.**   Could you please tell me about that?

11   **A.**   We had a pretrial meeting in approximately 2019.  I had

12   reviewed by FD-302, but while we were preparing I

13   misremembered the $30,000-a-month amount as $3 million.

14   **Q.**   And why might you have misremembered it?

15   **A.**   I just didn't review my FD-302 with enough detail.

16   **Q.**   And was there a later meeting where you recalled the

17   exact amount?

18   **A.**   Yes.

19   **Q.**   Did you subsequently review your FD-302?

20   **A.**   Yes.

21   **Q.**   Did you subsequently review your notes?

22   **A.**   Yes.

23   **Q.**   And did you see any mention of a 3-million-dollar number?

24   **A.**   No.

25   **Q.**   If Mr. Dallmann had mentioned $3 million in profits from

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1   the aviation business, would you have included it?

2   **A.**   Yes.

3   Q.   After Mr. Dallmann could only identify two customers of

4   the aviation services business, did you ask him whether

5   Jetflicks was, in fact, committing copyright infringement?

6   **A.**   Yes.

7   Q.   And what did he say?

8   **A.**   He said he believed there was a gray area but that he

9   believed he was engaged in what he termed secondary

10  infringement.

11  Q.   Now, you mentioned you're the supervisor of the bank

12  fraud and money laundering.  Have you ever heard of secondary

13  infringement?

14  **A.**   No.

15  Q.   Did you ask whether Mr. Dallmann had permission to stream

16  TV shows through Jetflicks?

17  **A.**   Yes.

18  Q.   And what did Mr. Dallmann say?

19  **A.**   He said no.

20  Q.   Did you ask him if he knew how to get permission to

21  stream?

22          **MS. MARTIN:**  I've actually been patient.  He's --

23          **THE COURT:**  Well, just give me the objection,

24  Ms. Martin.

25          **MS. MARTIN:**  The objection is leading, Your Honor.  I

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    think there are better ways to phrase the questions as to what

2    happened or what did you ask next.  But right now he's been

3    leading --

4        (Reporter instruction.)

5            **THE COURT:**  Okay.  The objection is leading.  I'll

6    let him respond.

7            **MS. MARTIN:**  Yes, Your Honor.

8            **MR. CHRISTIN:**  Your Honor, I'm asking him if he's

9    asked specific questions.  We can sit here and ask what

10   happened next, what happened next, but I'm not saying did

11   Mr. Dallmann --

12           **THE COURT:**  I appreciate that, but the objection's

13   sustained.  It may take a little bit more time, Mr. Christin,

14   but I'll sustain the objection.

15   **BY MR. CHRISTIN:**

16   Q.   Did you have a discussion with Mr. Dallmann on permission

17   to stream?

18   **A.**   Yes.  I asked Mr. Dallmann if he was streaming shows.  He

19   said yes.  I asked him if he had permission, and he said no.

20   Q.   Did you ask any follow-up questions?

21   **A.**   Yes.

22   Q.   Do you recall what those follow-up questions might have

23   been?

24   **A.**   I think I'd need to refresh my memory.

25   Q.   That's fine.  Would your FD-302 refresh your memory?

1    **A.**    Yes.

2    Q.    Okay.

3          **MR. CHRISTIN:**   Court's indulgence.

4    **BY MR. CHRISTIN:**

5    Q.    Supervisory Special Agent Lynch, I'd like to draw your

6    attention to the bottom of the page marked 3986.  Do you see

7    that last paragraph?

8    **A.**    Yes.

9    Q.    Could you please read that paragraph --

10          **THE COURT:**   We're not reading from it.  If you use it

11    to refresh your --

12    **BY MR. CHRISTIN:**

13    Q.    To yourself, in your head.  Could you please read that to

14    yourself, and once your recollection is refreshed, let us know

15    and we will pull that document down.

16    **A.**    I'm ready.

17    Q.    Did you ask any follow-up questions on permissions?

18    **A.**    Yes.

19    Q.    And what did you ask?

20    **A.**    I asked him if he was familiar with any rules relating to

21    copyright infringement and streaming of shows.  He said he

22    wasn't sure but he assumed it had to do with some sort of

23    licensing.

24    Q.    Did you ask Mr. Dallmann whether he had been contacted by

25    any copyright owners?

Tim Lynch - Direct
2:22-cr-00030-RFB-DJA - May 29, 2024

1    **A.**    Yes.

2    Q.    And what did Mr. Dallmann say?

3    **A.**    He said he had received one letter from HBO.

4    Q.    And did he explain the contents of that letter?

5    **A.**    He said that HBO wrote him saying he was illegally

6    streaming three shows and ordering that those shows be taken

7    down.  Mr. Dallmann told me that he immediately took those

8    shows down.

9    Q.    Did you ask him whether anyone else had contacted him

10   about copyright infringement?

11   **A.**    Yes.

12   Q.    And what did he say about that?

13   **A.**    He told me PayPal had contacted him.

14   Q.    And did he say why PayPal contacted him?

15   **A.**    PayPal accused him of using his sight to conduct illegal

16   streaming.  He told me that he tried to rectify it with PayPal

17   and provide them all his documentation, but no one from PayPal

18   ever got back to him.

19   Q.    At this stage of the interview, are you still asking

20   open-ended or more direct questions?

21   **A.**    More direct.

22   Q.    And as you begin to ask more direct questions, what

23   happened?

24   **A.**    He becomes more nervous and more guarded in his

25   responses.

1    Q.    How soon after asking him direct questions about HBO and

2    PayPal did Mr. Dallmann request a break?

3    **A.**    Relatively quickly.

4          **MR. CHRISTIN:**  Your Honor has indicated a hard stop

5    at 4:00.  This is a good breaking point if that's okay with

6    Your Honor?  Or I can continue.

7          **THE COURT:**  Sure.  It's five minutes -- no, this is

8    fine if this is a good breaking point as it relates to

9    questioning.

10         So unless an objection, we'll break about five

11   minutes early.  I assume there's no objection from the

12   defense, and I'm sure the jury wouldn't mind leaving a few

13   minutes early.

14         So, ladies and gentlemen, I'm going to excuse you for

15   the afternoon.  We will get started at 8:30 tomorrow.  Be here

16   around 8:15.  Again, you've all been great.  You've said the

17   magic words.  Pretty much said my name accurately -- which I

18   appreciate -- my clerks tell me.

19         And, again, we'll end tomorrow at 3:30.  At 3:30.

20   We'll take a lunch break and we'll take some breaks in the

21   middle, but we'll end tomorrow at 3:30.

22         And, again, if any of you need letters to confirm

23   your service as it relates to being on this jury, I'm happy to

24   personally sign those letters for you on my stationary to make

25   sure that anyone who needs to be made aware is aware of the

2:22-cr-00030-RFB-DJA - May 29, 2024

 1   fact that you're sitting on a federal case.  And I'm happy to
 2   do that to let them know that.  If you -- if you do need such
 3   a letter, please, when you recess, let my deputy know and to
 4   whom it should be addressed.  Or I can do a to whom it
 5   concerns letter.  But I will sign a letter on my stationary
 6   which explicitly indicates that you're servicing on this jury,
 7   and if they need to confirm that, they can contact my
 8   chambers.  Or if they want to come to court, I'm happy to
 9   confirm that with them directly.  But any of you who may need
10   such a letter, please feel free, we are happy to provide it
11   because we appreciate your service.  We know this is a long
12   trial.  If at any point in time you need any clarification or
13   you need an employer or someone else to be able to confirm
14   that you are, in fact, here, I will gladly do that.  And they
15   are welcome to come here and have me do it in person.  So just
16   let us know when we recess.
17          But, again, thank you for your time today.  We
18   appreciate your time and focus.  We'll see you tomorrow.
19   Again, try to be here by 8:15.  We'll have some doughnuts and
20   refreshments there for you.  Thank you, again.  Have a great
21   afternoon.  We'll be adjourned for you-all.
22          **COURTROOM ADMINISTRATOR:**  Ladies and gentlemen,
23   please rise.
24      *(Jury out at 3:58 p.m.)*
25          **THE COURT:**  Please be seated.

2:22-cr-00030-RFB-DJA - May 29, 2024

```
 1              Special Agent Lynch, you can step down from the
 2    witness box.
 3              THE WITNESS:  Thank you, Your Honor.
 4              THE COURT:  So we will get started at 8:30 tomorrow.
 5    I'd ask for you-all to be here at 8:00.  Hold on one moment.
 6    Okay.  Okay.  Okay.  And so we will start again tomorrow at
 7    8:30 with the testimony.  I'll ask you-all to be here at
 8    8:00 o'clock, and then we will have a hard stop at
 9    3:30 tomorrow.  I do have a hearing in the afternoon.  So I
10    will need you-all to make some room over here.  We'll figure
11    out how we do that tomorrow afternoon.
12              Anything we need to address today before we adjourn?
13              MR. CHRISTIN:  Nothing from the Government,
14    Your Honor.  Thank you.
15              THE COURT:  Okay.  From the defense, anything?
16              MS. ARMENI:  Your Honor, is the Court going to make a
17    decision on the two jurors?
18              THE COURT:  I am going to think about that.  I will
19    let you know.  If you have a particular position, Ms. Armeni,
20    as it relates to the jurors, you can let me know.
21              What I'm inclined to do is to bring back Juror
22    Number 61 and ask him if he still wishes to be removed from
23    the jury and we can remove him.  He seemed to be attentive
24    today, taking notes.  And sometimes people, after they've had
25    the experience, may change their mind.  I don't know if that's
```

1    the case for him or not.  He mentioned the one day that he was

2    going to be out, but we can potentially accommodate that.  I'd

3    hate to lose a juror if he changed his mind.  So unless

4    you-all think otherwise, I think it may be appropriate for me

5    to question him tomorrow morning when he returns.  I believe I

6    did tell him that I'd let him know either this afternoon or

7    tomorrow morning as it relates to that.

8          So is there any particular position?  I mean, the

9    other thing that we can do honestly is we could simply excuse

10   him, and then we wouldn't have to explain necessarily to the

11   other jurors why he was excused.  We could simply excuse him,

12   and they would simply know that he was gone without any

13   further explanation.

14         But I don't have a particular preferred approach, but

15   he did seem to be attentive and paying attention.  I just

16   wanted to give him a chance to reconsider.

17         Does anyone have any particular thoughts one way or

18   the other?

19         **MS. BLISS:**  Your Honor, I think that if he knows that

20   you can accommodate the date where he needs to be I think in

21   Los Angeles for something, I think if he knows that -- because

22   he did seem very attentive to me as well.

23         **THE COURT:**  Mr. Christin?

24         **MR. CHRISTIN:**  Your Honor, I would say with respect

25   to the schedule that we are, as the Government -- as

1    Your Honor has made clear, the Government has a time frame,

2    and we have a holiday in the middle of this trial and a dark

3    Friday at least.  And to take off another day to accommodate a

4    juror to go out of town may inhibit the Government from

5    finishing its case and the defense from finishing its case

6    before Ms. Armeni's vacation on July 5th.

7         THE COURT:  That's true.  But that's further down the

8    road, Mr. Christin.  I'm just saying as it relates to what he

9    said to us today.  You're right.  We may need to do that.  I

10   just think -- I have a concern about excusing him so early at

11   this point in time if he wants to stay on.  If he decides and

12   he still thinks it's going to be difficult, then he can let us

13   know tomorrow and then we can excuse him.  But I'm inclined to

14   do that.  And I understand that we may have to release him

15   later if we are behind schedule, but if he remains on the

16   jury, I would fully anticipate the possibility that we could

17   potentially accommodate an additional day.  But I'd rather

18   just keep him and ask him if he wants to stay.

19        Any other thoughts from counsel?

20        MS. MURALIDHARA:  No other thoughts, Your Honor, but

21   a question.  If the Government is amenable to letting us know

22   which witnesses they intend on calling tomorrow after S.A.

23   Lynch just for scheduling preparation purposes?

24        THE COURT:  I think we have a schedule.  I assume

25   it's in an order that they had previously sent.

1      **MS. MURALIDHARA:**  No.  We had a brief conversation

2   during one of the breaks that things had kind of gotten a

3   little switched because we are maybe a day behind the intended

4   schedule.

5      **THE COURT:**  Well, is it they're switched because of

6   when they're going to testify or the order?  If we can have

7   the Government clarify that.  Is it simply that there's a

8   difference in the day because of our being behind schedule or

9   is it that they're changed in the order as well?

10     **MR. CHRISTIN:**  Your Honor, sitting here right now, I

11   believe that the witness schedule we filed still remains

12   accurate right now.  And so tomorrow would be Special Agent

13   Umphress and Special Agent Cox following Supervisory

14   Special Agent Lynch, which is as it's reflected in the witness

15   list.

16     **THE COURT:**  So what I hear you saying is that the

17   order will be the same.  The days might be slightly different

18   because of when we started.  But as far as you know for right

19   now, the order of the witnesses you presented will be the same

20   as what you've presented to defense counsel?

21     **MR. CHRISTIN:**  For tomorrow, Your Honor, yes.  And I

22   believe for Friday as well.  We have unfortunately had to

23   contemplate a switch from Monday.  We would anticipate that

24   Special Agent Jeff Schurott is going to be moving up to Monday

25   along with Jake Phillips from Stripe on that Monday or

1    Tuesday.

2            Monday is a very challenging day because a lot of the

3    witnesses have a conflict on that day.  I think it maybe is

4    graduation weekend.  I'm not sure what's happening.  But -- so

5    the adjustment that we've made would be to have Special Agent

6    Schurott and Jake Phillips to testify on Monday and/or

7    Tuesday.  And as a part of that we would be asking Your Honor

8    to conditionally admit some of the exhibits that Special Agent

9    Schurott would be testifying to.  Otherwise, the Government

10   will not have a witness on Monday.

11           **THE COURT:**  Okay.  Well, let's address that then on

12   Friday.  We'll set aside some time to be able to do that.  But

13   as it relates to tomorrow and Friday, the order should be the

14   same; is that correct?

15           **MR. CHRISTIN:**  Yes, Your Honor.

16           **THE COURT:**  All right.  So what we will do is we'll

17   take -- we'll set aside a time -- and I'll let the jurors know

18   this later.  We'll -- we will stop earlier then -- because I

19   have something on Friday already.  We'll stop a little bit

20   early.  Let's say around, oh, 2:15 or so, so we can handle

21   this evidentiary issue on Friday.

22           **MR. CHRISTIN:**  Understood.  That's the Friday time,

23   2:00 or 2:15?

24           **THE COURT:**  That's when we'll end because I want to

25   be able to address these issues as it relates to these

```
 1    witnesses.

 2              MR. CHRISTIN:  Yes, Your Honor.

 3              THE COURT:  And it would be helpful, Mr. Christin, if

 4    you were to provide to the Court and to counsel Thursday,

 5    tomorrow, the exhibits that you're going to ask for me to be

 6    conditionally admitting that way we are all prepared and we're

 7    not getting them on that same day, Friday.

 8              MR. CHRISTIN:  Absolutely.

 9              THE COURT:  Okay.  All right.  Anything else we need

10    to handle?  Ms. Armeni?

11              MS. ARMENI:  Sorry, Your Honor.  This was part of the

12    original request when I was talking.  So we had two jurors.

13    So Number 57 was also the one that --

14              THE COURT:  I was going to get to that.  I wasn't

15    sure if we had any issues about the order of the witnesses.

16              MS. ARMENI:  Okay.  I'm sorry.  I thought --

17              THE COURT:  I want to make sure the order -- because

18    that was brought up about the order of the witnesses, too.

19    I'll come back to Juror Number 57.  But I want to make sure we

20    handle the one topic.

21              Anything else as it relates to the order of the

22    witnesses?  Any information about the Monday testimony?  Okay.

23              Now, Ms. Armeni, Juror Number 57.

24              MS. ARMENI:  Yes, Your Honor.

25              THE COURT:  Okay.  And so, again, I take it you're
```

1    simply reiterating your request that the juror be removed for

2    cause because you believe that you won't be able to -- or we

3    will not be able to accurately determine the juror's thoughts

4    as it relates to Mr. Courson?

5          **MS. ARMENI:**  That's right, Your Honor.  In light of

6    the opening and the exhibits that's been stipulated into

7    regarding his work at Target, yes.

8          **THE COURT:**  Well, why wouldn't that be addressed with

9    me simply bringing -- or back in and saying, assuming that

10   Mr. Courson was someone that you worked with at target, right,

11   is there anything about you working with him or knowing him

12   that would prevent you from being fair and impartial in this

13   jury?

14         **MS. ARMENI:**  And I understand the Court's question.

15   I think the Court touched on what I had said earlier, which is

16   today the answer may be, no, I don't remember anything so, no,

17   it's not going to affect me.  My concern is when she starts

18   hearing -- the more she's here, she may start to have a

19   recollection, and I don't anticipate the Court's going to ask

20   her every day if her recollection has changed.

21         And we also don't know, frankly, what the

22   circumstances were that she left Target.  If she resigned, if

23   she got fired.  Depending on -- it's my understanding that

24   Mr. Courson at times may have input on termination of

25   employees.  So we just don't have all those facts.

1          **THE COURT:**  So are there -- I mean, we could ask her

2     questions.  We could simply ask her, again, what she recalls

3     about him from Target, to let her know that he, in fact, did

4     work there so she may have interacted with him, and ask her

5     whether or not she recalls anything about that interaction and

6     see what she says.

7          I do think it would be helpful to have more specific

8     information now that we know and she knows that, in fact, he

9     worked there.  Because I will tell you, had she disclosed this

10    or been aware of this during -- early on in the voir dire, we

11    could have asked her, and I don't know that she would be able

12    to be excluded for cause simply because she might have

13    interacted with a particular defendant without there being any

14    particular positive or negative recollection with respect to

15    that.

16         And so I want to take a moment to sort of think about

17    and look at some of the case law as it relates to that.  If

18    you have a particular case law you want me to review, I will

19    do so.  But I will bring her back in and ask her some

20    follow-up questions now that we know and she knows that, in

21    fact, Mr. Courson worked at Target.  Okay?

22         **MS. ARMENI:**  Okay.

23         **THE COURT:**  All right.  Thank you.

24         **MR. CHRISTIN:**  Your Honor, if I may just make a

25    statement about this.  I think it's important for the first

1     question to ask where -- which Target she worked at.  I mean,

2     I understand that Mr. Courson worked at a Target in Las Vegas.

3     I think there's more than one.  It is possible that she is

4     mistaken and we're assuming that she actually -- that they

5     worked at the same Target.

6           Now, I also understand that it's maybe likely that

7     they worked at the same Target because she maybe thinks that

8     she recognizes him, but I don't think it's any different from

9     the two individuals yesterday who raised their hand saying

10    that they knew about Jetflicks, they read about it in the

11    news, but that's not going to affect whether they can be fair

12    and impartial.  And I think she's given those same responses.

13          So absent a change in those responses, I don't think

14    she should be struck for cause.

15          **THE COURT:**  Okay.  Well, I think we need to get more

16    information now that we have confirmed that, and I'll ask her

17    tomorrow information about what she recalls.  And we can do

18    that tomorrow either in the morning or during a break.

19          So I'll think about the timing of that as it relates

20    to our schedule depending on where we are.  I may not do it

21    directly in the morning.  I may do it in the afternoon, but

22    I've given very specific instructions which I believe so far

23    as it relates to discussing that with the jurors.  So I'm

24    concerned about that.  It's really about when it's appropriate

25    for us to do it in terms of the timing of our schedule

2:22-cr-00030-RFB-DJA - May 29, 2024

1    tomorrow.  But I will make a decision about her as well as

2    Juror Number 61 tomorrow.

3            Anything else we need to address?  Okay.

4            If nothing else, we will be adjourned until tomorrow

5    morning.  Thank you.  I'm going to sit on the bench for a few

6    minutes.

7        (Proceedings adjourned at 4:11 p.m.)

8                        --o0o--

9               COURT REPORTER'S CERTIFICATE

10

11       I, AMBER M. McCLANE, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   do hereby certify that pursuant to 28 U.S.C. § 753 the

14   foregoing is a true, complete, and correct transcript of the

15   proceedings had in connection with the above-entitled matter.

16

17   DATED:  5/29/2024

18                 /s/ Amber M. McClane_____

19                     AMBER McCLANE, RPR, CRR, CCR #914

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914